IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAYNE SUNSTATE INVESTORS, LLC,<br>a Delaware Limited Liability Company, | )<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | C.A. No. _____ |
| ROY ELIASSON, BRYON WOLF,<br>and ALFRED WOLF, | )<br>)<br>) | |
| Defendants. | ) | |

## <u>NOTICE OF REMOVAL</u>

Defendants Roy Eliasson, Bryon Wolf, and Alfred Wolf (collectively "Defendants"), by and through their undersigned counsel, hereby give notice that this matter has been removed to the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332. The grounds for removal are as follows:

1.    Plaintiff Kayne Sunstate Investors, LLC ("Kayne") commenced the action, entitled *Kayne Sunstate Investors, LLC v. Eliasson,* C.A. No. 08C-02-085 MJB, in the Superior Court of the State of Delaware In and For New Castle County (the "Complaint"). On information and belief, Defendants were served with the Complaint on or about February 8, 2008. All process, pleadings, and orders served upon Defendants are attached hereto as Exhibit A.

2.    The Complaint alleges that Kayne "is a limited liability company duly organized and existing under the laws of Delaware, with its principal place of business in Los Angeles, California." (Complaint ¶ 6). On information and belief, none of Kayne's members is a citizen of the State of Delaware.

3.    The Complaint further alleges that Defendants are all residents of the State of Florida.  (Complaint ¶¶ 7-9).  The Defendants are all citizens of the State of Florida.

4.    Plaintiff claims damages of an amount not less than $24,000,000. (Complaint, Prayer for Relief).

5.    On information and belief, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) which provides that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between – citizens of different States."

6.    In accordance with 28 U.S.C. § 1446(d), Defendants will promptly file notice with the Superior Court of the State of Delaware In and For New Castle County in the form attached hereto as Exhibit B, of this Notice of Removal and serve this notice upon counsel for Kayne.

YOUNG CONAWAY STARGATT & TAYLOR, LLP


John W. Shaw (No. 3312 )
Michele Sherretta Budicak (No. 4651)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
302-571-6689
jshaw@ycst.com
mbudicak@ycst.com

*Attorneys for Defendants Roy Eliasson, Bryon Wolf, and Alfred Wolf*

Dated:  March 7, 2008

2

# EXHIBIT A

## SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS)

COUNTY: <u>N</u>  K  S          CIVIL ACTION NUMBER: _____

CIVIL CASE CODE: <u>CDBT</u>          CIVIL CASE TYPE: <u>Debt/Breach of Contract</u> _____

*(SEE REVERSE SIDE FOR CODE AND TYPE)*

| | |
|---|---|
| CAPTION:<br><br><u>KAYNE SUNSTATE INVESTORS, LLC</u><br><br><u>v.</u><br><br><u>ROY ELIASSON, BYRON WOLF</u> and<br><br><u>ALFRED WOLF</u><br><br>_____<br>_____<br>_____<br>_____<br>_____ | NAME AND STATUS OF PARTY FILING DOCUMENT:<br><br><u>KAYNE SUNSTATE INVESTORS, LLC - Plaintiffs</u><br>DOCUMENT TYPE: (E.G., COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br><u>COMPLAINT</u> _____<br><br>NON-ARBITRATION ____X____          eFile ___X___<br>(CERTIFICATE OF VALUE MAY BE REQUIRED)<br><br>ARBITRATION _____ MEDIATION _____ NEUTRAL ASSESSMENT ____<br><br>DEFENDANT (CIRCLE) ONE     ACCEPT     REJECT<br><br>JURY DEMAND _____ YES ____X____ NO<br><br>TRACK ASSIGNMENT REQUESTED: (CIRCLE ONE)<br><br>EXPEDITED     <u>STANDARD</u>     COMPLEX |
| ATTORNEY NAME(S):<br><u>JOHN C. PHILLIPS, JR.</u> _____<br>ATTORNEY ID(S):<br><u>#110</u> _____<br>FIRM NAME:<br><br><u>1200 NORTH BROOM STREET</u><br>ADDRESS:<br><u>WILMINGTON, DE 19806</u> _____<br><br>TELEPHONE NUMBER:<br>302-655-4200<br>FAX NUMBER:<br>302-655-4210<br>E-MAIL ADDRESS:<br>JCP@PGSLAW.COM | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS<br>_____<br>_____<br>_____<br>EXPLAIN THE RELATIONSHIP(S):_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>OTHER UNUSUAL ISSUES THAT EFFECT CASE MANAGEMENT:<br>_____<br>_____<br>_____<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGES) |

THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND TO HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.

CAM
813-273-4210

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| ROY ELIASSON, BRYON WOLF, and ALFRED WOLF, | ) ) | |
| Defendants, | ) ) ) | |

## PRAECIPE

TO:    Prothonotary

**PLEASE ISSUE** Summons to the agents and/or employees of Parcels, Inc., upon the

granting of Plaintiff's Motion to Appoint Special Process Server, to serve the Complaint upon

Defendant Roy Eliasson, 1947 Peters Place, Clearwater, Florida 33764, by serving the Secretary

of State's Office, Townsend Building, Dover, Delaware 19901, pursuant to 10 Del. C. § 3104.

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

_____
John C. Phillips, Jr. (#110)
Brian E. Farnan (#4089)
David A. Bilson (#4986)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200

Attorneys for Plaintiff

DATE: February 8, 2008

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| ROY ELIASSON, BRYON WOLF, and ALFRED WOLF, | ) ) | |
| Defendants, | ) ) | |

## SUMMONS

THE STATE OF DELAWARE,
TO THE AGENTS AND/OR EMPLOYEES OF PARCELS, INC.:
YOU ARE COMMANDED:

    To summon the above named defendant, Roy Eliasson, so that within 20 days after service hereof upon the defendant, exclusive of the day of service, the defendant shall serve on John C. Phillips, Jr., Esquire, plaintiff's attorney, whose address is 1200 NORTH BROOM STREET, WILMINGTON, DE 19806, an answer to the complaint.

    To serve on defendant a copy hereof and of the complaint.

Dated:

                                               SHARON AGNEW
                                              Prothonotary

                                         _____
                                         Per Deputy

TO THE ABOVE NAMED DEFENDANT:
    In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint and an affidavit of defense, judgment by default will be rendered against you for the relief demanded in the complaint.

                                                SHARON AGNEW
                                            Prothonotary

                                         _____
                                         Per Deputy

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware limited liability company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| ROY ELIASSON, BRYON WOLF, and ALFRED WOLF, | ) ) | |
| Defendants, | ) ) ) | |

### PRAECIPE

TO:    Prothonotary

**PLEASE ISSUE** Summons to the agents and/or employees of Parcels, Inc., upon the

granting of Plaintiff's Motion to Appoint Special Process Server, to serve the Complaint upon

Defendant Bryon Wolf, 630 Pinellas Bayway, Apartment 4102, Tierra Verde, Florida 33715, by

serving the Secretary of State's Office, Townsend Building, Dover, Delaware 19901, pursuant to

10 Del. C. § 3104.

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

John C. Phillips, Jr. (#110)
Brian E. Farnan (#4089)
David A. Bilson (#4986)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200

Attorneys for Plaintiff

DATE: February 8, 2008

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

|  |  |  |
|---|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware limited liability company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| ROY ELIASSON, BRYON WOLF, and ALFRED WOLF, | ) ) | |
| Defendants, | ) ) ) | |

## SUMMONS

THE STATE OF DELAWARE,
TO THE AGENTS AND/OR EMPLOYEES OF PARCELS, INC.:
YOU ARE COMMANDED:

    To summon the above named defendant, Bryon Wolf, so that within 20 days after service hereof upon the defendant, exclusive of the day of service, the defendant shall serve on John C. Phillips, Jr., Esquire, plaintiff's attorney, whose address is 1200 NORTH BROOM STREET, WILMINGTON, DE 19806, an answer to the complaint.

    To serve on defendant a copy hereof and of the complaint.

Dated:

                              SHARON AGNEW
                              Prothonotary

_____
                              Per Deputy

TO THE ABOVE NAMED DEFENDANT:
    In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint and an affidavit of defense, judgment by default will be rendered against you for the relief demanded in the complaint.

                              SHARON AGNEW
                              Prothonotary

_____
                              Per Deputy

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| ROY ELIASSON, BRYON WOLF, and ALFRED WOLF, | ) ) | |
| Defendants, | ) ) ) | |

## PRAECIPE

TO:   Prothonotary

**PLEASE ISSUE** Summons to the agents and/or employees of Parcels, Inc., upon the

granting of Plaintiff's Motion to Appoint Special Process Server, to serve the Complaint upon

Defendant Alfred Wolf, 10760 NW 6th Street, Plantation, Florida 33324, by serving the Secretary

of State's Office, Townsend Building, Dover, Delaware 19901, pursuant to 10 Del. C. § 3104.

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

John C. Phillips, Jr. (#110)
Brian E. Farnan (#4089)
David A. Bilson (#4986)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200

Attorneys for Plaintiff

DATE: February 8, 2008

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| ROY ELIASSON, BRYON WOLF, and ALFRED WOLF, | ) ) | |
| Defendants, | ) ) ) | |

## SUMMONS

THE STATE OF DELAWARE,
TO THE AGENTS AND/OR EMPLOYEES OF PARCELS, INC.:
YOU ARE COMMANDED:

    To summon the above named defendant, Alfred Wolf, so that within 20 days after service hereof upon the defendant, exclusive of the day of service, the defendant shall serve on John C. Phillips, Jr., Esquire, plaintiff's attorney, whose address is 1200 NORTH BROOM STREET, WILMINGTON, DE 19806, an answer to the complaint.
    To serve on defendant a copy hereof and of the complaint.

Dated:

SHARON AGNEW
Prothonotary


_____
Per Deputy

TO THE ABOVE NAMED DEFENDANT:
    In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint and an affidavit of defense, judgment by default will be rendered against you for the relief demanded in the complaint.

SHARON AGNEW
Prothonotary


_____
Per Deputy

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware limited liability company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) C.A. No. _____ |
| ROY ELIASSON, BRYON WOLF, and ALFRED WOLF, | ) ) |
| Defendants, | ) ) |

## COMPLAINT

Plaintiff Kayne Sunstate Investors, LLC, by and through its undersigned counsel, respectfully alleges the following facts and claims:

## NATURE OF THE ACTION

1.　　Plaintiff, Kayne Sunstate Investors, LLC ("Plaintiff"), seeks to remedy the misrepresentations and breaches of contract perpetrated by Defendants Roy Eliasson, Bryon Wolf and Alfred Wolf to induce Plaintiff to enter into an agreement to invest in their telemarketing businesses.

2.　　The Defendants, all experienced in the telemarketing industry, lured the Plaintiff into making investments in their businesses based on promises and representations that, among other things, the Defendants and their telemarketing businesses were not the subject of any investigation by the Federal Trade Commission ("FTC"), and that their businesses were operated in accordance with the Federal Trade Commission Act ("FTCA") and FTC regulations.

3.　　Upon information and belief, at the time the Defendants made these promises and representations, the Defendants and their businesses were under active investigation by the FTC

and, according to allegations made in a complaint filed by the FTC in July 2007 (the "FTC Complaint") with the United States District Court for the Middle District of Florida (the "FTC Suit"), were operating their telemarketing businesses in violation of the FTCA and FTC regulations. A copy of the FTC Complaint is attached as Exhibit "A."

4.    The U.S. District Court entered an injunction in the FTC Suit appointing a receiver to take exclusive control of Defendants' businesses, the assets of those businesses, and to manage the same.

5.    The Defendants' wrongful conduct has caused damages to Plaintiff.

## THE PARTIES

6.    Plaintiff is a limited liability company duly organized and existing under the laws of Delaware, with its principal place of business in Los Angeles, California.

7.    Defendant Roy Eliasson is a resident of the State of Florida and a founder of various telemarketing businesses with their principal places of business in Florida.

8.    Defendant Bryon Wolf is a resident of the State of Florida and a founder of various telemarketing businesses with their principal places of business in Florida.

9.    Defendant Alfred Wolf is a resident of the State of Florida and a founder of various telemarketing businesses with their principal places of business in Florida.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action under 10 Del. C. § 341.

11.    This Court has personal jurisdiction over the Defendants under 10 Del. C. § 3104(c), as all of the Defendants have conducted substantial business in the State of Delaware.

12.    The Defendants further consented to jurisdiction in the State of Delaware pursuant to a choice of law provision contained in Section 9.2 and Section 9.3 of an Interest

Contribution and Preferred Unit Purchase Agreement (the "Purchase Agreement").    Section 9.2

provides, "[t]his Agreement shall be governed by and construed in accordance with the Laws of

the State of Delaware."  Section 9.3 provides, in relevant part:

> Any suit, action or proceeding seeking to enforce any provision of, or based on
> any dispute or matter arising out of or in connection with, this Agreement, the
> Related Documents or the transactions contemplated hereby or thereby, must be
> brought in the courts of the State of Delaware, in New Castle County, or the
> federal courts in the District of Delaware.  Each of the parties (a) consents to the
> exclusive jurisdiction of such courts... in any such suit, action or proceeding, (b)
> irrevocably waives, to the fullest extent permitted by Law, any objection which it
> may now or hereafter have to the laying of venue of any such suit, action or
> proceeding in any such court or that any such suit, action or proceeding which is
> brought in any such court has been brought in an inconvenient forum, (c) will not
> attempt to deny or defeat such personal jurisdiction by motion or other request for
> leave from any such court....

13.    Venue is proper because both the buyer and seller are limited liability companies

formed under the laws of Delaware, and the Defendants consented to venue pursuant to a binding

choice of venue provision in Section 9.3 of the Purchase Agreement (the relevant language of

which is set forth in Paragraph 12 above).

## FACTS

14.    During the fourth quarter of 2006, Plaintiff conducted negotiations (the

"Negotiations") with the Defendants to buy into Defendants' various telemarketing services

companies (the "Telemarketing Companies") based in Florida and doing business throughout the

United States, including Delaware.[1]  The Negotiations with Defendants continued into the first

quarter of 2007.

15.    Throughout the course of the Negotiations, the Defendants consistently and

repeatedly represented to Plaintiff that their Telemarketing Companies: were known for

---

[1]    Certain other companies (the "Operating Subsidiaries") were formed to be owned by a new holding
company, and it was in the new holding company that Plaintiff was to invest.  These Operating Subsidiaries were to
hold the former assets of the Telemarketing Companies and to operate the telemarketing services businesses on an
ongoing basis.

following "the best practices in the industry;" had been inspected by the Office of the Attorney General of the State of Florida, who advised that it "had never seen a telemarketing company run better;" had been monitored by Citibank for years and were about to be "approved" by Citibank into a select group of telemarketing vendors; and, had telemarketing equipment and software sufficient to comply with all FTC rules and regulations.

16.    In addition to the foregoing, the Defendants repeatedly promised and represented to the Plaintiff that their Telemarketing Companies were in compliance with the FTCA and all applicable FTC regulations.

17.    If the allegations in the FTC Suit are correct, all of the foregoing promises, representations and warranties were materially false, intentionally misleading, and known to be such by the Defendants at the time they were made.

18.    Based on the foregoing promises, representations and warranties, on or about March 31, 2007, the Plaintiff made an investment of $20,000,000 in the Telemarketing Companies pursuant to the Purchase Agreement.

19.    The Purchase Agreement contains express promises, representations and warranties made by the Defendants to the Plaintiff. Among the many promises, representations and warranties made by the Defendants to the Plaintiff was that their telemarketing operations, through the Telemarketing Companies and Operating Subsidiaries, were not under investigation by the FTC and were in compliance with the FTCA and all applicable FTC regulations.

20.    Under Section 4.11 of the Purchase Agreement, the Defendants promised, represented and warranted that "there are no Actions . . . pending threatened [sic] against the Sellers, the Company or the Operating Subsidiaries." ("Litigation; Restriction on Business Activities"). "Action" is defined in the Purchase Agreement as "any action, claim, complaint,

petition, investigation, suit or other proceeding, whether administrative, civil or criminal, in Law or in equity, or before any arbitrator or Governmental Authority."

21.     The Purchase Agreement defines "Governmental Authority" broadly as:

[A]ny nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, any governmental authority, agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

22.     Under Section 4.13 of the Purchase Agreement, Defendants promised, represented and warranted that:

(a)     The Sellers and Telequick are and at all times have been, and all of its Products and Properties are, and at all times have been in compliance with, in all respects with, and immediately following the consummation of the transactions contemplated by this Agreement and the Related Documents, the Company and the Operating Subsidiaries will be in compliance in all respects with, and neither the Sellers, the Company nor the Operating Subsidiaries have any liability under any Laws, including without limitation, any applicable franchise, building, zoning, employment, labor relations or other statute, law, ordinance or regulation.

23.     Under Section 4.27 of the Purchase Agreement, Defendants promised, represented and warranted that:

No representation or warranty made by the Sellers, the Company, the Operating Subsidiaries or the Founders in this Agreement, and Schedule hereto, and Related Document, or any document or certificate furnished or to be furnished by or on behalf of the Seller to the Purchaser or its Affiliates, agents and representatives in connection with this Agreement and the Related Documents or the transactions contemplated hereby or thereby contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they are made, not misleading. There is no fact that has not been disclosed in this Agreement or the Related Documents which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

24.    Upon information and belief, prior to March 31, 2007, the FTC was in fact engaged in an active investigation of Defendants, the Telemarketing Companies and the Operating Subsidiaries for compliance with the FTCA and FTC regulations.

25.    Upon information and belief, the Defendants knew or reasonably should have known prior to signing the Purchase Agreement on March 31, 2007 that they, the Telemarketing Companies and the Operating Subsidiaries were under active investigation by the FTC.

26.    On July 23, 2007, the FTC initiated the FTC Suit against Defendants, the Telemarketing Companies, and the Operating Subsidiaries for alleged violations of the FTCA and FTC regulations.

27.    The FTC alleged in the FTC Complaint that, at the time the Defendants entered into the Purchase Agreement, they, the Telemarketing Companies, the Operating Subsidiaries, and their telemarketing operations were in violation of several FTCA provisions and FTC regulations.

28.    As detailed in the FTC Complaint, the FTC asserts that the Telemarketing Companies, the Operating Subsidiaries, the Defendants and their telemarketing operations violated these laws by engaging in unfair or deceptive acts or practices in or affecting commerce, and engaging in deceptive or abusive telemarketing acts or practices.

29.    The FTC Complaint asserts that Defendants, the Telemarketing Companies and Operating Subsidiaries either misrepresented, failed to disclose, or disclosed inadequately several material facts to consumers, including:  failing to disclose the costs of the membership programs being sold; failing to disclose the dates that program trial periods began and ended; failing to disclose the terms and conditions of "Free Gift" inducements; failing to disclose material terms of a "negative option" feature; misrepresenting the terms of their cancellation policy; and failing

to make required oral disclosures regarding the purpose of their calls and nature of their services. Those allegations are inconsistent with the representations made by Defendants to Plaintiff prior to entering the Purchase Agreement.

30.    The Federal District Court in the FTC Suit concluded that the FTC had shown a likelihood of success on the merits on their claims of unlawful activities by the Telemarketing Companies, Operating Subsidiaries and the Defendants, and granted a preliminary injunction against them.

31.    The FTC Suit was filed less than four months after the Defendants signed the Purchase Agreement containing their promises, representations and warranties to the Plaintiff that, among other things, their telemarketing operations, through the Telemarketing Companies and Operating Subsidiaries, were not under investigation by the FTC and were in compliance with the FTCA and FTC regulations.

<u>COUNT I</u>
FRAUDULENT MISREPRESENTATION

32.    Plaintiff realleges and incorporates Paragraphs 1-31 above, as though set forth in full herein.

33    From November 2006 through March 2007, each of the Defendants repeatedly misrepresented or omitted material facts to the Plaintiff regarding how they operated the Telemarketing Companies and the Operating Subsidiaries by repeatedly promising and assuring the Plaintiff that they were not under investigation by the FTC, and that the Defendants operated the Telemarketing Companies and the Operating Subsidiaries lawfully in compliance with the FTCA and FTC regulations.

34.    The Defendants' promises, representations, and warranties that they, the Telemarketing Companies, and the Operating Subsidiaries were not under investigation by the

FTC were false and, if the allegations in the FTC Complaint are true, their promises, representations, and warranties that their operations were completely lawful also were false.

35.    Defendants made these promises, representations, and warranties with the intent of inducing the Plaintiff into entering into the Purchase Agreement.

36.    Defendants knew that these promises, representations, and warranties were false when made, or made them in reckless disregard of the truth, with the intent of defrauding the Plaintiff.

37.    Defendants' misrepresentations and omissions caused the Plaintiff to enter into the Purchase Agreement.  Plaintiff reasonably and justifiably relied on the Defendants' repeated statements and assurances in deciding to enter into the Purchase Agreement.

38    Defendants' misrepresentations and omissions were material in that they induced the Plaintiff into signing the Purchase Agreement, which Plaintiff would not have done had it known the falsity of the Defendants' misrepresentations.

39.    Defendants' misrepresentations and omissions constituted a breach of trust or confidence, and were gross, oppressive, and/or aggravated.

40.    Plaintiff has been damaged by the Defendants' fraudulent misrepresentations in an amount to be proven at trial not less than $24,000,000.

## COUNT II
## NEGLIGENT MISREPRESENTATION

41.    Plaintiff realleges and incorporates Paragraphs 1-31, above, as though set forth in full herein.

42.    From November 2006 through March 2007, each of the Defendants repeatedly misrepresented or omitted material facts to the Plaintiff regarding how they operated the Telemarketing Companies and the Operating Subsidiaries by repeatedly promising and assuring

the Plaintiff that they were not under investigation by the FTC, and that the Defendants operated the Telemarketing Companies and the Operating Subsidiaries lawfully in compliance with the FTCA and FTC regulations.

43.    The Defendants' promises, representations, and warranties that they, the Telemarketing Companies, and the Operating Subsidiaries were not under investigation by the FTC were false and, if the allegations in the FTC Complaint are true, their promises, representations, and warranties that their operations were lawful also were false.

44.    Defendants made these statements with the intent of inducing the Plaintiff into entering into the Purchase Agreement.

45.    Defendants negligently made these statements without a reasonable basis to believe that the facts represented were true.

46.    Defendants' misrepresentations and omissions caused the Plaintiff to enter into the Purchase Agreement.  Plaintiff reasonably and justifiably relied on the Defendants' repeated statements and assurances in deciding to enter into the Purchase Agreement.

47.    Defendants' misrepresentations and omissions were material in that they induced the Plaintiff into signing the Purchase Agreement, which Plaintiff would not have done had it known the falsity of the Defendants' misrepresentations.

48.    Plaintiff has been damaged by the Defendants' negligent misrepresentations in an amount to be proven at trial not less than $24,000,000.

## COUNT III
## BREACH OF CONTRACT

49.    Plaintiff realleges and incorporates Paragraphs 1-31, above, as though set forth in full herein.

50.   The Purchase Agreement is a valid and binding contract, and was entered into by the Defendants on March 31, 2007.

51.   Defendants materially breached the Purchase Agreement by violating the promises, representations and warranties contained in Section 4.11 and Section 4.27 of the Purchase Agreement.   Specifically, Defendants promised, represented and warranted in the Purchase Agreement that they, the Telemarketing Companies, and the Operating Subsidiaries were not under investigation by the FTC, despite the fact that, at the time of the Purchase Agreement's negotiation and execution and prior thereto, the Telemarketing Companies, Operating Subsidiaries and the Defendants were under active investigation by the FTC.

52.   Additionally, the FTC has alleged that, prior to the time the Defendants signed the Purchase Agreement on or about March 31, 2007, the Defendants, the Telemarketing Companies and Operating Subsidiaries were operating their telemarketing services in violation of the FTCA and FTC regulations.   If the FTC's allegations are proven true, the Defendants breached their promises, representations and warranties in Section 4.13 and Section 4.27 of the Purchase Agreement that they were operating the Telemarketing Companies and Operating Subsidiaries in compliance with law. .

53.   The Defendants' breaches of the Purchase Agreement caused and resulted in damages to the Plaintiff.   The Defendants' conduct further caused the Plaintiff to lose its total investment in the businesses.   The Defendants have severely damaged the telemarketing businesses by causing the loss of customers, and impairing goodwill and business reputations.

54.   The Defendants' breaches of the Purchase Agreement have damaged the Plaintiff in an amount to be proven at trial not less than $24,000,000.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment against the Defendants awarding Plaintiff:

A.    Compensatory damages, including lost future profits, in an amount to be proven at trial not less than $24,000,000, plus pre- and post-judgment interest;

B.    Punitive damages;

C.    Reasonable attorney's fees and the costs and disbursements of this action; and

D.    Such other and further relief as the Court deems just and proper.

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

*Brian E. Farnan*

John C. Phillips, Jr. (#110)
Brian E. Farnan (#4089)
David A. Bilson (#4986)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200

Attorneys for Plaintiff

DATE: February 8, 2008

EFiled: Feb 8 2008 4:40PM EST
Transaction ID 18512475
Case No. 08C-02-085 MJB

# EXHIBIT A

JUL 23 '07  11:26AM TPA INSPECTION SVC                                P.2/2

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

8:07CV1279=T 30TGW

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Civ. No. |
| | ) |
| v. | ) |
| | ) |
| FTN PROMOTIONS, INC., a Florida | ) COMPLAINT FOR INJUNCTIVE |
| corporation, dba Suntasia Inc., Suntasia | ) AND OTHER EQUITABLE |
| Marketing, Inc., and Capital Vacations, | ) RELIEF |
| | ) |
| GUARDIAN MARKETING SERVICES, | ) |
| CORP., a Florida corporation, dba Guardian | ) |
| Escrow Service, | ) |
| | ) |
| STRATEGIA MARKETING, LLC, a Florida | ) |
| limited liability company, | ) |
| | ) |
| CO-COMPLIANCE, LLC, a Florida limited | ) |
| liability company, | ) |
| | ) |
| JPW CONSULTANTS, INC., a Florida | ) |
| corporation, dba Freedom Gold, Variety!, | ) |
| Credit Life, and Freedom Ring ULD, | ) |
| | ) |
| TRAVEL AGENTS DIRECT, LLC, a Florida | ) |
| limited liability company, dba Travel Agents | ) |
| Go Direct, Floridaway, Travel Life Go Direct, | ) |
| Florida Direct, and Lucid Long Distance, | ) |
| | ) |
| AGENT'S TRAVEL NETWORK INC., a | ) |
| Florida corporation, dba Florida Passport, | ) |
| | ) |
| BAY PINES TRAVEL, INC., a Florida | ) |
| corporation, | ) |
| | ) |
| SUNTASIA PROPERTIES, INC., a Florida | ) |
| corporation, | ) |
| | ) |

07 JUN 23 AM 9:37

RECEIVED

| | |
|---|---|
| BRYON W. WOLF, | ) |
| | ) |
| ROY A. ELIASSON, | ) |
| | ) |
| ALFRED H. WOLF, | ) |
| | ) |
| DONALD L. BOOTH, | ) |
| | ) |
| JEFFREY P. WOLF, and | ) |
| | ) |
| JOHN LOUIS SMITH II, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its complaint, alleges as follows:

1.    The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to secure preliminary and permanent injunctive relief, rescission of contracts and restitution, disgorgement of ill-gotten gains, and other equitable relief for Defendants' deceptive and unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, as well as pursuant to 15 U.S.C. §§ 45(a), 53(b), 57b, and

6105(b).

3.    Venue in the United States District Court for the Middle District of Florida is proper under 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 53(b).

## THE PARTIES

4.    Plaintiff, the Federal Trade Commission, is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The Commission enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The Commission also enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing acts or practices. The Commission is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief, including restitution for injured consumers, as may be appropriate in each case. 15 U.S.C. §§ 53(b), 57b, 6102(c), and 6105(b).

5.    Defendant FTN Promotions, Inc. ("FTN") is a Florida corporation with its principal place of business located at 8751 Ulmerton Road, Largo, Florida 33771. FTN was incorporated in the State of Florida on February 26, 1996, and it does business under the registered business names "Suntasia Inc.," "Suntasia Marketing, Inc.," and "Capital Vacations." FTN transacts or has transacted business in the Middle District of Florida and throughout the United States.

6.    Defendant Guardian Marketing Services Corp. ("Guardian") is a Florida corporation with its principal place of business located at 8751 Ulmerton Road, Largo,

Florida 33771. Guardian was incorporated in the State of Florida on July 18, 1996, and it does business under its own name and under the registered business name "Guardian Escrow Service." Guardian transacts or has transacted business in the Middle District of Florida and throughout the United States.

7.     Defendant Strategia Marketing, LLC ("Strategia") is a Florida limited liability corporation with its principal place of business located at 8751 Ulmerton Road, Largo, Florida 33771. Strategia was incorporated in the State of Florida on December 6, 2006. Strategia transacts or has transacted business in the Middle District of Florida and throughout the United States.

8.     Defendant Co-Compliance, LLC ("Co-Compliance") is a Florida limited liability corporation with its principal place of business located at 8751 Ulmerton Road, Largo, Florida 33771. Co-Compliance was incorporated in the State of Florida on January 8, 2007. Co-Compliance transacts or has transacted business in the Middle District of Florida and throughout the United States.

9.     Defendant JPW Consultants, Inc. ("JPW") is a Florida corporation with its principal place of business located at 1400 SW 52nd Lane, Plantation, Florida 33317. JPW was incorporated in the State of Florida on April 27, 2004, and it does business under the registered business names "Freedom Gold," "Variety!," "Credit Life," and "Freedom Ring ULD." JPW transacts or has transacted business in the Middle District of Florida and throughout the United States.

10.     Defendant Travel Agents Direct, LLC ("TAD") is a Florida limited liability

4

corporation with its principal place of business located at 11125 Park Boulevard, Suite 104-331, Seminole, Florida 33772. TAD was incorporated in the State of Florida on March 3, 2005, and it does business under the registered business names "Travel Agents Go Direct," "Floridaway," "Travel Life Go Direct," "Florida Direct," and "Lucid Long Distance." TAD transacts or has transacted business in the Middle District of Florida and throughout the United States.

11.    Defendant Agent's Travel Network Inc. ("Agent's Travel") is a Florida corporation with its principal place of business located at 200 2nd Avenue South, Suite 413, St. Petersburg, Florida 33701. Agent's Travel was incorporated in the State of Florida on January 10, 2005, and it does business under the registered business name "Florida Passport." Agent's Travel transacts or has transacted business in the Middle District of Florida and throughout the United States.

12.    Defendant Bay Pines Travel, Inc. ("Bay Pines") is a Florida corporation with its principal place of business located at 9653 Bay Pines Boulevard, St. Petersburg, Florida 33708. Bay Pines was incorporated in the State of Florida on June 11, 1992. Bay Pines transacts or has transacted business in the Middle District of Florida and throughout the United States.

13.    Defendant Suntasia Properties, Inc. ("Suntasia Properties") is a Florida corporation with its principal place of business located at 8751 Ulmerton Road, Largo, Florida 33771. Suntasia Properties was incorporated in the State of Florida on March 23, 2000, and it owns, among other things, the property located at 8751 Ulmerton Road in Largo,

Florida from which Defendants telemarket to consumers located throughout the United States. Suntasia Properties transacts or has transacted business in the Middle District of Florida.

14.    Defendant Bryon W. Wolf is an officer, director, and/or owner of Defendants FTN, Guardian, Strategia, Co-Compliance, Bay Pines, and Suntasia Properties. At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the corporate Defendants, including the acts and practices set forth in this complaint. He resides and transacts, or has transacted, business in the Middle District of Florida.

15.    Defendant Roy A. Eliasson is an officer, director, and/or owner of Defendants FTN, Guardian, Strategia, Co-Compliance, Bay Pines, and Suntasia Properties. At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the corporate Defendants, including the acts and practices set forth in this complaint. He resides and transacts, or has transacted, business in the Middle District of Florida.

16.    Defendant Alfred H. Wolf is an officer, director, and/or owner of Defendants FTN, Strategia, Bay Pines, and Suntasia Properties. At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the corporate Defendants, including the acts and practices set forth in this complaint. He transacts or has transacted business in the Middle District of Florida.

17.    Defendant Donald L. Booth is an officer, director, and/or owner of Defendant

Bay Pines and is the General Counsel of Defendants FTN, Guardian, Strategia, and Co-Compliance. At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the corporate Defendants, including the acts and practices set forth in this complaint. He resides and transacts, or has transacted, business in the Middle District of Florida.

18.    Defendant Jeffrey P. Wolf is an officer, director, and/or owner of Defendant JPW. At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the corporate Defendants, including the acts and practices set forth in this complaint. He transacts or has transacted business in the Middle District of Florida.

19.    Defendant John Louis Smith II is an officer, director, and/or owner of Defendant TAD. At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the corporate Defendants, including the acts and practices set forth in this complaint. He resides and transacts, or has transacted, business in the Middle District of Florida.

20.    Since at least 2003, Defendants have acted as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below. They have shared officers, employees, and office locations, have commingled funds, are commonly controlled, and have engaged in a common scheme.

## COMMERCE

21.    At all times relevant to this complaint, Defendants have maintained a

7

substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

22.    Since at least 2003, Defendants have acted as a common enterprise for the purpose of promoting, marketing, offering to sell, and selling to consumers throughout the United States via telemarketing, memberships in discount buyer's and travel clubs, as well as telecommunications services, under a series of different business and product names, including but not limited to: Capital Vacations, Distinct Advantage, Freedom Gold, Travel Agents Go Direct, Floridaway, Agent's Travel Network, Florida Passport, Variety!, Credit Life, Travel Life Go Direct, Florida Direct, Freedom Ring ULD, and Lucid Long Distance.

23.    Defendants provide all of their products and services to consumers on a free-to-pay conversion basis. This means that consumers receive the product or service free for an initial period but incur an obligation to pay if they do not take affirmative action to cancel before the end of the trial period. Defendants frequently sign up consumers to receive three of their products or services on a free-to-pay conversion basis during a single sales call.

24.    Between them, Defendants have over 700 employees working in furtherance of their deceptive scheme. As described below, they have deceived millions of consumers across the country out of tens of millions of dollars. The acts and practices alleged herein also have generated thousands of consumer complaints to law enforcement agencies and the Better Business Bureau.

8

## The Initial Sales Pitch

25.    Defendants typically begin their sales calls by representing, expressly or by implication, that Defendants are affiliated with the consumer's bank. Defendants' telemarketers either tell consumers directly that Defendants are affiliated with their bank or indicate that they are calling "in regards to your banking account." In some instances, Defendants' telemarketers falsely claim to be calling because the consumer recently made a purchase from one of Defendants' marketing partners or affiliates. In either case, the telemarketers then explain that as a valued or preferred customer, the consumer will receive a series of free gifts in return for agreeing to review a "free trial" of one of Defendants' programs.

26.    The free gifts that Defendants offer to induce consumers to review their programs include "$100 in gas coupons," "$400 in American airlines savings vouchers" (or sometimes simply "$400 in airline savings vouchers"), and "two free nights of hotel accommodations." Defendants typically offer consumers some combination of two of these inducements. Defendants' telemarketers tell consumers that the gifts are theirs to keep even if they ultimately decide to cancel Defendants' program. Consumers often agree to review Defendants' program simply to obtain the gifts. Consumers learn only upon receiving Defendants' gifts that there are significant undisclosed conditions and restrictions on their use, rendering the gifts effectively worthless.

27.    Although Defendants promise consumers "$100 in gas coupons," they initially provide only a $10 gas rebate voucher. The fine print on the voucher indicates that in order

9

to use it, consumers must purchase their own gas and send the receipt and voucher to Defendants, who purportedly will then deposit $10 directly into the consumer's bank account and send the consumer another $10 gas coupon. The voucher states that this process will continue for ten months because the maximum allowable rebate per month is $10. When consumers learn that the "$100 in gas coupons" they were promised actually are rebate vouchers that must be used over a ten-month period, they often do not even attempt to use the vouchers. In many instances, those consumers who do attempt to use the vouchers do not receive a rebate from Defendants.

28.    Consumers promised "$400 in American airlines savings vouchers" receive instead airfare rebate vouchers that are not specific to American Airlines. The vouchers indicate that in order to receive $400 in rebates, consumers must themselves purchase at least $2,000 in airline tickets, as a $100 rebate is available only on a ticket purchase of $500 or $550. The maximum allowable rebate on a single round-trip ticket is $100. In order to receive their rebates, consumers must purchase their own tickets from a travel agency controlled by Defendants and then submit the rebate voucher, along with a boarding pass, within thirty days of traveling. When consumers learn the actual terms and conditions of the rebate vouchers, they often do not even attempt to use them. In many instances, those consumers who do attempt to use the vouchers do not receive a rebate from Defendants.

29.    Defendants sometimes tell consumers who are promised "two free nights of hotel accommodations" that the accommodations are available at any of Defendants' hotels "coast-to-coast." Yet consumers subsequently receive information from Defendants

indicating that they may travel to one of only three destinations: "Las Vegas, Nevada;

Branson, Missouri; or Williamsburg, West Virginia [sic]." They also learn that they must

pay a $50 deposit upon making their reservation, which allegedly is refundable, and that they

must attend a timeshare presentation during their stay or they will be charged the full cost of

the accommodations. Since at least 2006, this two night hotel stay has been provided and

fulfilled by Defendant Bay Pines.

30. Defendants use these "gifts" to induce consumers to accept a free trial

membership in one of their discount buyer's or travel clubs. Defendants' initial offer usually

has a fourteen-day free trial period, and Defendants typically tell consumers, expressly or by

implication, that the trial period will begin to run only after consumers receive a packet of

information about Defendants' program in the mail. In most instances, Defendants focus

their telemarketing pitch on the "free gifts" and tell consumers little or nothing about the

program they are being asked to review.

31. The cost of the first program Defendants pitch to consumers typically is

$19.95 per month with an initial activation fee of $40. In numerous instances, however,

Defendants' telemarketers fail to clearly and conspicuously disclose these costs. The

telemarketers instead emphasize to consumers that they will not be billed anything "today."

32. Even in those instances where the cost of the program is clearly and

conspicuously disclosed, Defendants' telemarketers assure consumers that they will never be

billed if they call to cancel the program before the expiration of the trial period. The

telemarketers represent, expressly or by implication, that canceling the program before the

11

expiration of the free trial period will be easy for consumers to accomplish. Defendants'
telemarketers also represent that even if consumers cancel the program, they are entitled to
keep Defendants' "free gifts," so the consumers "can't lose!"

## Obtaining Consumers' Bank Account Numbers

33.     Defendants then attempt to obtain consumers' bank account numbers by
representing, expressly or by implication, that they already have that information.  Having
already falsely represented that they are affiliated with the consumer's bank or a merchant
from which the consumer recently made a purchase, Defendants now tell consumers that they
are going to pull up their information to confirm that everything is correct.  In many
instances, Defendants' telemarketers have not yet told consumers in a manner they are likely
to notice and understand that there is any charge for Defendants' program.  Consumers
therefore often believe that their bank account number is being verified solely to confirm
their eligibility to receive Defendants' "free gifts."

34.     After asking consumers for the name and location of their bank, Defendants
use that information to obtain the bank's routing number.  They then provide that publicly
available routing number to the consumer and ask the consumer to "verify" that the number is
correct.  Once the consumer has confirmed the routing number, Defendants' telemarketers
ask consumers to "verify" the next set of numbers that appear on their checks, which is the
account number.  Many consumers disclose their bank account numbers, believing that they
are simply verifying information Defendants already have.  Those consumers who are
reluctant to "verify" their account number often are told that Defendants simply are trying to

confirm that the account is still active and that the consumer is not buying or being billed anything today.

35.     At the point in the telemarketing call at which Defendants seek to obtain the consumer's bank account information, Defendants' telemarketers in many instances have not disclosed truthfully, in a clear and conspicuous manner: (1) the fact that the consumer's account will be charged unless the consumer takes affirmative action to avoid the charge; (2) the date the charge will be submitted for payment; and (3) the specific steps the consumer must take to avoid the charge.

36.     In most instances, for example, Defendants' telemarketers do not tell consumers when a charge will be submitted for payment, nor do they disclose the dates on which the free trial period begins and ends.  Although most consumers are told or assume that the trial period will not begin until they receive Defendants' materials in the mail, Defendants actually begin the free trial period on or about the date of the sales call, thus leaving consumers with fewer than the promised number of days to review Defendants' materials.

37.     Although Defendants sometimes tell consumers that they must call a toll-free number to cancel Defendants' program, Defendants in most instances do not provide consumers with that number or any other telephone number during the telemarketing call.  As a result, consumers often have no way of contacting Defendants until they receive Defendants' informational package in the mail.

38.     After convincing consumers to "verify" their bank account numbers,

13

Defendants then record the remainder of the call. During their recorded verifications, Defendants' telemarketers ask consumers to repeat the account number they just "provided" and indicate that the fee for Defendants' program will be billed "to the checking account you just supplied to us." Even in the recorded portion of the call, however, Defendants' telemarketers still do not tell consumers the date on which their accounts will be billed or the telephone number they should use in canceling the program.

### Upsells

39.     After recording a verification relating to the initial program, Defendants then offer consumers two "upsells." "Upselling" refers to the practice of soliciting the purchase of goods or services following an initial transaction during a single telephone call. Defendants' first "upsell" generally consists either of five nights of Florida hotel accommodations or another type of buyer's club membership. Defendants typically offer the first "upsell" for only a seven-day trial period, after which consumers are billed $149 unless they call to cancel. Defendants' second "upsell" consists of a telecommunications package, generally unlimited long-distance with voicemail, that is offered for a free trial period of twenty-one or thirty days, after which consumers are charged a monthly fee of $49.95 unless they call Defendants to cancel.

40.     In numerous instances, in the course of offering these "upsells" to consumers, Defendants' telemarketers introduce the "upsell" as a special bonus, available only to the consumer as a new "VIP member." In many instances, Defendants' telemarketers do not clearly and conspicuously disclose to consumers the identity of the seller or that the purpose

14

of the "upsell" portion of the call is to sell additional goods and services.

41.    In the course of offering these "upsells" to consumers, Defendants' telemarketers use the billing information that consumers provided earlier for the underlying transaction to charge consumers for the "upsells." In doing so, Defendants' telemarketers often do not obtain from consumers the last four digits of the account number to be charged.

42.    In numerous instances, in the course of offering their "upsells" to consumers, Defendants' telemarketers fail to disclose truthfully, in a clear and conspicuous manner: (1) the fact that the consumer's account will be charged unless the consumer takes affirmative action to avoid the charge; (2) the date the charge will be submitted for payment; and (3) the specific steps the consumer must take to avoid the charge.

43.    As in the initial transaction, Defendants do not disclose to consumers when the charges for the "upsells" will be submitted for payment, nor do they disclose the dates on which the free trial period begins and ends. Again, most consumers are told or assume that the free trial period will not begin until they receive informational materials on the "upsells" in the mail, but Defendants also begin the free trial period for the "upsells" on the date of the sales call, thus leaving consumers with fewer than the promised number of days to review the "upsell" materials.

44.    Although Defendants sometimes tell consumers that they must call a toll-free number to cancel the "upsell" programs, Defendants in most instances do not provide consumers with that number or any other telephone number during the telemarketing call. Defendants' telemarketers also do not disclose to consumers that in order to cancel the two

15

"upsells" and the initial program, they must call three different telephone numbers.

45.    In many instances, Defendants' telemarketers do not obtain the consumer's express agreement to review and subsequently to be charged for the "upsells." In some instances, Defendants' telemarketers do not require the consumer to expressly agree to the offer but end with wording such as "so we will rush this out to you as well. O.K." In other instances, consumers do not even recall being presented with the "upsell" offers, perhaps because Defendants' telemarketers read through the "upsell" scripts so quickly that consumers do not understand that they are being asked to make additional purchases and to authorize additional charges.

### Mailings, Charges, Cancellations, and Refunds

46.    In numerous instances, Defendants then mail out informational packages relating to each program the consumer has been signed up to review. Each of the packages contains a "welcome letter" that discloses for the first time the specific dates on which the trial period ends and the consumer's bank account will be charged. The "welcome letter" also finally provides consumers with the telephone number they must call to cancel the program. Consumers often learn upon reviewing Defendants' "welcome letter" that their accounts will be charged in just a few days, meaning that they do not have the promised trial period in which to review Defendants' program.

47.    In numerous instances, consumers do not agree to accept trial memberships in one or more of Defendants' programs and do not recall receiving informational materials containing necessary information about cancellation or the effective dates of the trial

16

memberships. In many instances, consumers first learn of Defendants' trial memberships when Defendants withdraw money from their bank accounts. In some instances, consumers may receive a package from Defendants but do not open it because the package appears to be unsolicited promotional or sales material from an unfamiliar source.

48.    Defendants sometimes charge consumers for one or more of their programs even after consumers have called the appropriate toll-free number and communicated their desire to cancel Defendants' program within the free trial period. When consumers call Defendants to complain of these unauthorized charges, they are told that Defendants have no record of their cancellations.

49.    In other instances, consumers may successfully cancel one of Defendants' programs, but Defendants fail to disclose that they still may be charged for another of Defendants' programs and that they must call another telephone number in order to cancel that program.

50.    In most instances, Defendants refuse to grant refund requests over the telephone, regardless of the reason for the request. They instead require anyone seeking a refund to mail a written request to one of a number of mail drop addresses used for this purpose. Yet even when a consumer makes a written request for a refund, Defendants often fail to issue the requested refund.

51.    Finally, although Defendants promise consumers that they may keep and use the "free gifts" of gas, airline, and accommodation vouchers even if they cancel Defendants' programs, Defendants only allow consumers to use the "gifts" if they maintain their program

17

memberships.

### Defendants Illegally Purchased "Full-Data Leads"

52.    In most instances, Defendants attempt to obtain consumers' bank account information by leading consumers to believe that they already have it. In some instances, however, Defendants already possess consumers' bank account numbers prior to making their telemarketing calls. Defendants obtain this information by purchasing "full data leads" from one or more list brokers. "Full data leads" typically include one or more of the following: (1) consumers' bank account and routing information, or (2) consumers' credit card numbers, security codes, and expiration dates. The "full data leads" purchased by Defendants typically include at least consumers' telephone numbers and unencrypted account information. Defendants use these "full data leads" in telemarketing their products and services to consumers.

### VIOLATIONS OF SECTION 5 OF THE FTC ACT

53.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts or practices in or affecting commerce. Misrepresentations or omissions of material facts constitute deceptive acts or practices prohibited by Section 5(a). An unfair act or practice is one that causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers themselves and that is not outweighed by countervailing benefits either to consumers or competition.

18

## COUNT ONE

### Misrepresentation of Material Facts

54.    In numerous instances, in the course of telemarketing their products and services, Defendants have represented, expressly or by implication, that:

a.    they are calling from, on behalf of, or are otherwise affiliated with the consumer's bank or other third party with whom the consumer has conducted business;

b.    they already have the consumer's bank routing and account numbers;

c.    consumers will have a designated period of time in which to review Defendants' program before incurring any charges;

d.    the free trial period will not begin to run until consumers have received Defendants' informational material in the mail;

e.    they will honor consumers' requests to cancel their participation in Defendants' programs;

f.    consumers will be able to easily cancel their participation in Defendants' programs; and

g.    consumers are entitled to keep and to use the gas coupons, airline savings vouchers, or "two free nights of hotel accommodations" even if they cancel Defendants' program.

55.    In truth and in fact, in numerous instances, Defendants:

a.    are not calling from, nor on behalf of, nor are they otherwise affiliated with the consumer's bank or other third party with whom the consumer has conducted

19

business;·

     b.     do not already have the consumer's bank routing and account numbers;

     c.     do not provide consumers with the designated period of time in which to review Defendants' programs before incurring any charges;

     d.     begin the free trial period on or about the date of the sales call, not on the date consumers receive Defendants' informational materials in the mail;

     e.     do not honor consumers' requests to cancel their participation in Defendants' programs;

     f.     make it difficult for consumers to cancel their participation in Defendants' programs; and

     g.     do not permit consumers who cancel Defendants' program to use the gas coupons, airline savings vouchers, or "two free nights of hotel accommodations."

     56.     Therefore, the representations set forth in Paragraph 54 are false and misleading and constitute deceptive acts and practices in violation of Section 5(a) of the FTC Act.

## COUNT TWO

### Failure to Disclose Material Facts

     57.     In numerous instances, in the course of telemarketing their products and services, Defendants have represented, expressly or by implication, that consumers will have a specified trial period in which to review Defendants' programs without incurring any charges.

58.     In numerous instances, Defendants fail to disclose, or disclose adequately, to consumers the material terms and conditions of the offer, including:

      a.     the fact that the consumer's account will be charged unless the consumer takes affirmative action to avoid the charge;

      b.     that consumers' checking account information will be used to debit their bank accounts to pay for Defendants' programs;

      c.     the cost of Defendants' programs;

      d.     the dates the charges to consumers' checking accounts will be submitted for payment;

      e.     the dates that the trial period begins and ends; and

      f.     the specific steps consumers must take in order to cancel Defendants' programs, including that consumers must cancel each of Defendants' programs by calling a separate telephone number.

59.     In light of the representation set forth in Paragraph 57, the failure of Defendants to disclose, or disclose adequately, this material information is a deceptive act or practice in violation of Section 5(a) of the FTC Act.

## COUNT THREE

### Failure to Disclose Terms and Conditions of "Free Gift" Inducements

60.     In numerous instances, in order to induce consumers to agree to review one of their programs and to provide their bank account number, Defendants have represented, expressly or by implication, that they will provide consumers with two "free gifts," including

21

some combination of the following: "$100 in gas coupons," "$400 in American airlines savings vouchers" or "airline savings vouchers," or "two free nights of hotel accommodations."

61.    In numerous instances, Defendants fail to disclose, or disclose adequately, to consumers material conditions, limitations, and restrictions on the use of these "gifts" that greatly limit their value and usefulness.

62.    In light of the representation set forth in Paragraph 60, the failure of Defendants to disclose, or disclose adequately, this material information is a deceptive act or practice in violation of Section 5(a) of the FTC Act.

## COUNT FOUR

### Unauthorized Billing

63.    In numerous instances, Defendants have caused consumers' bank accounts to be debited without first obtaining consumers' express informed consent.

64.    Defendants' practice of causing consumers' bank accounts to be debited without obtaining consumers' express informed consent causes or is likely to cause substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits either to consumers or competition.

65.    Therefore, Defendants' practice, as described in Paragraph 63, is unfair and violates Section 5(a) of the FTC Act.

22

## THE TELEMARKETING SALES RULE

66.     In the Telemarketing Act, 15 U.S.C. §§ 6101-6108, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices. On August 16, 1995, the Commission promulgated the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, which became effective on December 31, 1995. On January 29, 2003, the FTC amended the TSR by issuing a Statement of Basis and Purpose and the final amended TSR. 68 Fed. Reg. 4580, 4669. Except for specific provisions not relevant to this action, the amended TSR became effective on March 31, 2003.

67.     Defendants are "sellers" or "telemarketers" engaged in "telemarketing" as those terms are defined in the TSR, 16 C.F.R. § 310.2(z), (bb), and (cc).

68.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, that they are affiliated with, or endorsed or sponsored by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

69.     As of March 31, 2003, the TSR requires that sellers and telemarketers who make offers that include a negative option feature to disclose truthfully, in a clear and conspicuous manner, before a consumer pays for the goods or services offered, all material terms and conditions of the negative option feature, including, but not limited to, the following: (1) the fact that the consumer's account will be charged unless the consumer takes affirmative action to avoid the charge; (2) the date(s) the charge(s) will be submitted for payment; and (3) the specific steps the consumer must take to avoid the charge(s). 16 C.F.R. § 310.3(a)(1)(vii).

70.     The TSR's Statement of Basis and Purpose makes clear that free-to-pay conversion offers such as those made by Defendants constitute offers with a "negative option feature" under the TSR. 68 Fed. Reg. at 4594 & 4603. The Statement of Basis and Purpose also indicates that the required disclosures must be made before asking for any credit card, bank account, or other information that will or could be used to obtain payment. *Id.* at 4599.

71.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies. 16 C.F.R. § 310.3(a)(2)(iv).

72.     The TSR requires telemarketers in an outbound telephone call or an upsell to disclose truthfully, promptly, and in a clear and conspicuous manner the following information:

    a.     the identity of the seller;

    b.     that the purpose of the call is to sell goods or services; and

    c.     the nature of the goods or services.

16 C.F.R. § 310.4(d)(1), (2) and (3).

73.     The TSR further prohibits sellers and telemarketers from causing billing information to be submitted for payment without the consumer's express verifiable authorization. When an audio recording of the consumer's express oral authorization is used to satisfy this requirement, that recording must evidence clearly the consumer's authorization of payment for the goods or services that are the subject of the telemarketing transaction and the consumer's receipt of all of the following information, among other information:

24

      a.　　the number of debits, charges, or payments (if more than one);

      b.　　the date(s) the debit(s), charge(s), or payment(s) will be submitted for

payment; and

      c.　　a telephone number for customer inquiry that is answered during

normal business hours.

16 C.F.R. § 310.3(a)(3)(ii).

    74.　　As of March 31, 2003, the TSR also provides that it is an abusive

telemarketing act or practice for a seller or telemarketer to cause "billing information to be

submitted for payment, directly or indirectly, without the express informed consent" of the

consumer. 16 C.F.R. § 310.4(a)(6). In order to establish the consumer's "express informed

consent" in a telemarketing transaction that involves preacquired account information and a

free-to-pay conversion feature, the seller or telemarketer must: "obtain from the customer, at

a minimum, the last four (4) digits of the account number to be charged" and also "obtain

from the customer his or her express agreement to be charged for the goods or services and to

be charged using the account number" for which the last four digits were provided. 16

C.F.R. § 310.4(a)(6)(i)(A) and (B).

    75.　　Finally, as of March 31, 2003, the TSR prohibits any seller or telemarketer

from "[d]isclosing or receiving, for consideration, unencrypted consumer account numbers

for use in telemarketing." 16 C.F.R. § 310.4(a)(5).

    76.　　Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and

Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), violations of the TSR constitute

unfair or deceptive acts or practices, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### COUNT FIVE

### Misrepresenting Affiliation with Consumer's Bank or Other Third Party

77.    In numerous instances, in the course of telemarketing their products and services, Defendants have misrepresented, directly or by implication, that they are calling from, on behalf of, or are otherwise affiliated with the consumer's bank or some other third party with whom the consumer has conducted business.

78.    Defendants' practice as alleged in Paragraph 77 is a deceptive telemarketing practice that violates Section 310.3(a)(2)(vii) of the TSR, 16 C.F.R. § 310.3(a)(2)(vii).

### COUNT SIX

### Failure to Disclose Material Terms of Negative Option Feature

79.    In numerous instances, in the course of telemarketing their products and services, Defendants have failed to disclose truthfully, in a clear and conspicuous manner, before a consumer pays for the goods or services offered, all material terms and conditions of the negative option feature, including, but not limited to, the following:  (1) the fact that the consumer's account will be charged unless the consumer takes affirmative action to avoid the charge; (2) the date(s) the charge(s) will be submitted for payment; and (3) the specific steps the consumer must take to avoid the charge(s).

80.    Defendants' practice as alleged in Paragraph 79 is a deceptive telemarketing

practice that violates Section 310.3(a)(1)(vii) of the TSR, 16 C.F.R. § 310.3(a)(1)(vii).

## COUNT SEVEN

### Misrepresenting Terms of Cancellation Policy

81.    In numerous instances, in the course of telemarketing their products and

services, Defendants have misrepresented, directly or by implication, a material aspect of the

nature or terms of their cancellation policy, including that:

       a.    consumers will have a designated period of time in which to review

and to cancel Defendants' program before incurring any charges;

       b.    the free trial period will not begin to run until consumers have received

Defendants' informational material in the mail;

       c.    they will honor consumers' requests to cancel their participation in .

Defendants' programs;

       d.    consumers will be able to easily cancel their participation in

Defendants' programs; and

       e.    consumers are entitled to keep and to use the gas coupons, airline

savings vouchers, or "two free nights of hotel accommodations" even if they cancel

Defendants' program.

82.    Defendants' practice as alleged in Paragraph 81 is a deceptive telemarketing

practice that violates Section 310.3(a)(2)(iv) of the TSR, 16 C.F.R. § 310.3(a)(2)(iv).

27

## COUNT EIGHT

### Failure to Make Required Oral Disclosures

83.    In numerous instances, in the course of telemarketing their products and services, Defendants have failed to disclose promptly and in a clear and conspicuous manner to the person receiving the call:

        a.      that the purpose of the call is to sell goods or services; and

        b.      the nature of the goods or services.

84.    Defendants' practice as alleged in Paragraph 83 is an abusive telemarketing practice that violates Section 310.4(d)(2) and (3) of the TSR, 16 C.F.R. § 310.4(d)(2) and (3).

## COUNT NINE

### Lack of Express Verifiable Authorization

85.    In numerous instances, in the course of telemarketing their products and services, Defendants have caused billing information to be submitted for payment without the consumer's express verifiable authorization.

86.    Defendants' practice as alleged in Paragraph 85 is a deceptive telemarketing practice that violates Section 310.3(a)(3) of the TSR, 16 C.F.R. § 310.3(a)(3).

## COUNT TEN

### Lack of Express Informed Consent to be Billed

87.    In numerous instances, in the course of telemarketing their products and services, Defendants have caused billing information to be submitted for payment without the express informed consent of the consumer.

88.    Defendants' practice as alleged in Paragraph 87 is an abusive telemarketing practice that violates Section 310.4(a)(6) of the TSR, 16 C.F.R. § 310.4(a)(6).

## COUNT ELEVEN

### Purchase of Unencrypted Consumer Account Numbers

89.    On numerous occasions since March 31, 2003, Defendants have received, for consideration, unencrypted consumer account numbers for use in telemarketing.

90.    Defendants' acts and practices as alleged in Paragraph 89 are abusive telemarketing acts and practices that violate Section 310.4(a)(5) of the TSR, 16 C.F.R. § 310.4(a)(5).

## CONSUMER INJURY

91.    Consumers throughout the United States have suffered and continue to suffer substantial monetary loss as a result of Defendants' unlawful acts and practices. In addition, Defendants have been unjustly enriched as a result of their unlawful practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, enrich themselves unjustly, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

92.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the Commission.

93.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court

finds necessary to redress injury to consumers or other persons resulting from Defendants'
violations of the TSR, including the rescission and reformation of contracts, and the refund of
money.

94.    The Court, in the exercise of its equitable jurisdiction, may award other
ancillary relief to remedy injury caused by Defendants' law violations.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, the Federal Trade Commission, requests that this Court, as
authorized by Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section
6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and pursuant to its own equitable
powers:

1.    Award plaintiff such preliminary injunctive and ancillary relief as may be
necessary to avert the likelihood of consumer injury during the pendency of this action and to
preserve the possibility of effective final relief;

2.    Enter a permanent injunction to prevent future violations of the FTC Act and
TSR as alleged herein;

3.    Award such relief as the Court finds necessary to redress injury to consumers
resulting from Defendants' violations of the FTC Act and the TSR, including, but not limited
to, rescission of contracts, the refund of monies paid, and the disgorgement of ill-gotten
gains; and

4.    Award plaintiff the costs of bringing this action, as well as such other

30

JUL 23  07  12:45PM TFH INSPECTION SVC                                    P.2/2

additional relief as the Court may determine to be just and proper.

Respectfully Submitted,

WILLIAM BLUMENTHAL
General Counsel

DATED: July 23, 2007

_Todd M. Kossow_

TODD M. KOSSOW, Trial Attorney
ROZINA C. BHIMANI
WILLIAM J. HODOR
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]
tkossow@ftc.gov
rbhimani@ftc.gov
whodor@ftc.gov

31

# EXHIBIT B

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware Limited Liability Company, )<br>)<br>) | |
| Plaintiff, ) ) | |
| v. ) ) | C.A. No. 08C-02-085 MJB |
| ROY ELIASSON, BRYON WOLF, and ALFRED WOLF, )<br>)<br>) | |
| Defendants. ) | |

<u>NOTICE OF FILING OF NOTICE OF REMOVAL</u>

PLEASE TAKE NOTICE that defendants Roy Eliasson, Bryon Wolf, and Alfred

Wolf have removed the above-captioned case to the United States District Court for the District

of Delaware.  Service of this notice effects removal.  Pursuant to 28 U.S.C. § 1446(d), upon the

filing of this notice, state court actions shall proceed no further unless and until the case is

remanded.  28 U.S.C. § 1446(d).  A copy of the Notice of Removal is appended hereto.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

John W. Shaw (No. 3312 )
Michele Sherretta Budicak (No. 4651)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
jshaw@ycst.com
mbudicak@ycst.com

*Attorneys for Defendants Roy Eliasson, Bryon Wolf, and Alfred Wolf*

Dated:  March 7, 2008

DB02:6638766.1                                                    000000.0

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, a Delaware Limited Liability Company | ROY ELIASSON, BRYON WOLF, and ALFRED WOLF |

| (b) County of Residence of First Listed Plaintiff: (Except In U.S. Plaintiff Cases) | County Of Residence of First Listed Defendant: (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) Attorneys (Firm Name, Address, And Telephone Number) | Attorneys (If Known) |
|---|---|
| John C. Phillips, Jr., Esq. (No. 110) Phillips Goldman & Spence, P.A. 1200 North Broom Street Wilmington, DE 19806 (302) 655-4200 | John W. Shaw (No. 3312) Michele Sherretta Budiack (No. 4651) Young Conaway Stargatt & Taylor, LLP The Brandywine Building, 17th Floor 1000 West Street Wilmington, DE 19899-0391 (302) 571-6600 |

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ■ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place An X In One Box For Plaintiff And One Box For Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## V. NATURE OF SUIT (Place An X In One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>■ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury – Med Malpractice<br>☐ 365 Personal Injury – Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 U.S.C. 881<br>☐ 630 Liquor Laws<br>☐ 640 R R & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 U.S.C. 158<br>☐ 423 Withdrawal 28 U.S.C. 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates, etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 U.S.C. 3410<br>☐ 891 Agricultural Acts |
| | | | **LABOR** | **SOCIAL SECURITY** | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl Ret Inc Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 U.S.C. 7609 | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence Habeas Corpus<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | | |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ■ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. § 1332

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | ☐ YES ■ NO | DEMAND $ | Check YES only if demanded in complaint JURY DEMAND: ☐ YES ■ NO |
|---|---|---|---|---|

## VIII. RELATED CASE(S) IF ANY (See instructions)

District of Florida    JUDGE: James S. Moody, Jr.    DOCKET NUMBER: 8:07-CV-1279-T-30TGW

| DATE March 7, 2008 | SIGNATURE OF ATTORNEY OF RECORD *Michele S. Budiack (#4651)* |
|---|---|

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

DB02:6640788.1                                                                                    000000.0