IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KAYNE SUNSTATE INVESTORS, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 08-141-SLR |
| | ) | |
| ROY ELIASSON, BRYON WOLF, | ) | |
| and ALFRED WOLF, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX OF EXHIBITS TO
DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO
STAY THIS ACTION IN FAVOR OF THE RELATED ACTION CURRENTLY
<u>PENDING IN FLORIDA OR, ALTERNATIVELY, TO DISMISS</u>**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
John W. Shaw (No. 3362 )
Michele Sherretta Budicak (No. 4651)
James L. Higgins (No. 5021)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
302-571-6600
jshaw@ycst.com

*Attorneys for Defendants Roy Eliasson, Bryon Wolf,
and Alfred Wolf*

Dated:  April 2, 2008

## <u>TABLE OF EXHIBITS</u>

**Exhibit A**   Interest Contribution and Preferred Unit Purchase Agreement, dated March 31, 2007 (the "Purchase Agreement")

**Exhibit B**   Amended and Restated Operating Agreement of Sunstate Holdings, LLC, dated March 31, 2007 (the "LLC Agreement")

**Exhibit C**   Preliminary Injunction Order

i

## **CERTIFICATE OF SERVICE**

I, John W. Shaw, Esquire, hereby certify that on April 2, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> John C. Phillips, Jr., Esquire
> Phillips Goldman & Spence, P.A.
> 1200 North Broom Street
> Wilmington, DE 19806

I further certify that on April 2, 2008, I caused a true and correct copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record.

> YOUNG CONAWAY STARGATT
> & TAYLOR, LLP
>
> John W. Shaw (No. 3362)
> jshaw@ycst.com
> Michele Sherretta Budicak (No. 4651)
> mbudicak@ycst.com
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19899
> (302) 571-6600

# EXHIBIT A

INTEREST CONTRIBUTION AND PREFERRED
UNIT PURCHASE AGREEMENT

BY AND AMONG

FTN PROMOTIONS, INC., A FLORIDA CORPORATION, D/B/A SUNTASIA INC. AND
SUNTASIA MARKETING, INC.,

GUARDIAN MARKETING SERVICES, CORP.,

BAY PINES TRAVEL, INC.,

BRYON WOLF,

ROY ELIASSON,

ALFRED WOLF

SUNSTATE HOLDINGS, LLC,

STRATEGIA MARKETING, LLC,

CO-COMPLIANCE, LLC,

TELEQUICK SYSTEMS, LLC

AND

KAYNE SUNSTATE INVESTORS, LLC

MARCH 31, 2007

# TABLE OF CONTENTS

Page

ARTICLE 1    DEFINITIONS..................................................................2
  1.1    Definitions..................................................................2
  1.2    Interpretation..............................................................9
ARTICLE 2    CONTRIBUTION OF THE INTERESTS TO THE COMPANY.....................10
  2.1    Formation..................................................................10
  2.2    Transfer of Interests to the Company in Exchange for Consideration.......10
  2.3    Assumption of Liabilities..................................................10
  2.4    Contracts; Consents........................................................11
ARTICLE 3    THE CLOSING...............................................................12
  3.1    Closing; Closing Date......................................................12
  3.2    Formation of Company and Transfer of Interests.............................12
  3.3    Purchase and Sale of Preferred Units.......................................12
  3.4    Use of Proceeds............................................................13
ARTICLE 4    REPRESENTATIONS AND WARRANTIES OF THE SELLERS, THE COMPANY, THE OPERATING SUBSIDIARIES AND THE FOUNDERS.............................13
  4.1    Organization; Good Standing; Qualification.................................13
  4.2    Subsidiaries...............................................................14
  4.3    Power and Authority; Capitalization; Indebtedness.........................14
  4.4    Asset and Interest Transfer................................................14
  4.5    Authorization; Execution and Delivery; No Conflicts.......................15
  4.6    Consents...................................................................15
  4.7    Financial Statements.......................................................16
  4.8    Absence of Certain Changes or Events.......................................17
  4.9    Insurance..................................................................18
  4.10   Officers; Officer Benefits.................................................19
  4.11   Litigation; Restriction on Business Activities............................21
  4.12   Material Contracts and Other Agreements....................................22
  4.13   Compliance with Laws; Licenses.............................................23
  4.14   Title to Properties; Liens and Encumbrances...............................23
  4.15   Leased Real Properties; No Owned Real Property............................24
  4.16   Accounts Receivable........................................................24
  4.17   Taxes......................................................................24

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 4.18 | Environmental and Safety Laws | 26 |
| 4.19 | Related Party Transactions | 28 |
| 4.20 | Intellectual Property | 28 |
| 4.21 | Products; Product Warranty and Liability | 29 |
| 4.22 | Liabilities and Indebtedness | 29 |
| 4.23 | Distributors | 30 |
| 4.24 | Customers | 30 |
| 4.25 | Suppliers | 30 |
| 4.26 | Brokers; Certain Expenses | 30 |
| 4.27 | Disclosure | 30 |
| ARTICLE 5 | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 31 |
| 5.1 | Organization and Existence; Authorization; No Conflicts | 31 |
| 5.2 | Investment | 31 |
| 5.3 | Brokers or Finders | 31 |
| ARTICLE 6 | CONDITIONS TO THE CLOSING | 31 |
| 6.1 | Conditions to the Obligations of the Parties | 31 |
| 6.2 | Conditions to the Obligations of the Purchaser | 32 |
| 6.3 | Conditions to the Obligations of the Sellers and the Company | 34 |
| ARTICLE 7 | COVENANTS AND AGREEMENTS | 35 |
| 7.1 | Post-Closing Covenants | 35 |
| 7.2 | Non-solicitation; Covenant Not to Compete; Confidentiality | 36 |
| 7.3 | Tax Matters | 39 |
| ARTICLE 8 | INDEMNIFICATION | 40 |
| 8.1 | Survival of Representations and Warranties | 40 |
| 8.2 | Indemnification by the Sellers, the Company, the Operating Subsidiaries and the Founders | 40 |
| 8.3 | Conditions to and Limitations on Indemnification | 41 |
| 8.4 | Indemnity Threshold | 42 |
| 8.5 | Indemnity Cap | 42 |
| 8.6 | Claims for Indemnity | 42 |
| 8.7 | Defense of Claims by Third Parties | 42 |
| ARTICLE 9 | MISCELLANEOUS | 43 |

TABLE OF CONTENTS
(continued)

| 9.1 | Successors and Assigns | 43 |
| 9.2 | Governing Law | 43 |
| 9.3 | Jurisdiction; Waiver of Jury Trial | 43 |
| 9.4 | Counterparts | 44 |
| 9.5 | Notices | 44 |
| 9.6 | Sellers' Representative | 45 |
| 9.7 | Fees and Expenses | 45 |
| 9.8 | Severability | 45 |
| 9.9 | Entire Agreement | 46 |
| 9.10 | Assurances | 46 |
| 9.11 | Amendments and Waivers | 46 |

*Execution Copy*

## INTEREST CONTRIBUTION AND
## PREFERRED UNIT PURCHASE AGREEMENT

This INTEREST CONTRIBUTION AND PREFERRED UNIT PURCHASE AGREEMENT dated as of March 31, 2007 (this "Agreement"), is entered into by and among (a) FTN Promotions, Inc., a Florida corporation, d/b/a Suntasia Inc. and Suntasia Marketing, Inc. ("FTN"), (b) Guardian Marketing Services, Corp., a Florida corporation ("Guardian"), (c) Bay Pines Travel, Inc., a Florida corporation ("Bay Pines"), (d) Bryon Wolf, an individual ("Wolf"), (e) Roy Eliasson, an individual ("Eliasson" and together with FTN, Guardian, Bay Pines and Wolf, the "Sellers"), (f) Alfred Wolf, an individual (together with Wolf and Eliasson, the "Founders"), (g) Sunstate Holdings, LLC, a Delaware limited liability company (the "Company"), (h) Strategia Marketing, LLC, a Florida limited liability company ("Strategia Marketing LLC"), (i) Co-Compliance, LLC, a Florida limited liability company ("Co-Compliance, LLC"), (j) Telequick Systems, LLC, a Florida limited liability company ("Telequick" and together with Strategia Marketing LLC and Co-Compliance, LLC, the "Operating Subsidiaries"), on the one hand, and Kayne Sunstate Investors LLC, a Delaware limited liability company (the "Purchaser"), on the other hand.

### RECITALS

A.    The Sellers own and operate a business that markets membership products and services (the "Business").

B.    Immediately prior to the Closing Date, the Sellers and the Founders together formed two (2) limited liability companies under the laws of the State of Florida named (i) "Strategia Marketing, LLC", and (ii) "Co-Compliance, LLC", and (A) FTN contributed all of the assets of FTN to Strategia Marketing LLC and Strategia Marketing LLC assumed certain scheduled liabilities of FTN with respect to the Business in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in Strategia Marketing LLC, (B) Guardian contributed all of the assets of Guardian to Co-Compliance, LLC and Co-Compliance, LLC assumed certain scheduled liabilities of Guardian with respect to the Business in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in Co-Compliance, LLC (the contributions of assets in the foregoing clauses (A) and (B) referred to herein as the "Asset Transfer").

C.    As of the Closing Date, the Sellers and the Founders shall have together formed a limited liability company under the laws of the State of Delaware named "Sunstate Holdings, LLC" and the Sellers shall have contributed to the Company One Hundred Percent (100%) of the issued and outstanding membership interests of (i) Strategia Marketing LLC, (ii) Co-Compliance, LLC, and (iii) Telequick, in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in the Company, which membership interests are represented by fifty-six thousand nine hundred twenty-three (56,923) common membership units of the Company (the "Common Units"). The Common Units are also sometimes referred to herein as the "Consideration." In addition, the Company and the Operating Subsidiaries, as applicable, shall have entered into a services agreement with Bay Pines, in form and substance satisfactory to the Purchaser (the "Bay Pines Agreement").

D.    Immediately following the issuance of the Common Units to the Sellers, the Sellers shall cause the Company to issue and sell an additional twenty thousand (20,000) Series A Convertible Redeemable Preferred Units of the Company (the "Preferred Units" and, together with the Common Units, the "Units") to the Purchaser, on the terms and subject to the conditions of this Agreement.

**AGREEMENT**

**NOW, THEREFORE**, for and in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1    Definitions.

As used in this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement, the following definitions will apply:

"Accounts Receivable" shall have the meaning given to such term in Section 4.16.

"Acquired Businesses" shall have the meaning given to such term in Section 4.12.

"Action" shall mean any action, claim, complaint, petition, investigation, suit or other proceeding, whether administrative, civil or criminal, in Law or in equity, or before any arbitrator or Governmental Authority.

"Affiliate" shall mean (a) an "affiliate" as defined under Rule 12b-2 of the Securities Exchange Act of 1934, as amended, (b) a Person who directly or indirectly controls, is controlled by or is under common control with the Person specified and (c) any Person owning directly or indirectly at least Five Percent (5%) of the outstanding equity interests of any other Person. All Related Persons shall be deemed Affiliates of one another.

"Agreement" shall have the meaning given to such term in the preamble.

"Applicable Law or Laws" shall mean all applicable provisions of all (a) constitutions, treaties, statutes, Laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority, (b) Consents of any Governmental Authority and (c) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"Asset Contribution Agreements" shall have the meaning given to such term in Section 2.3(a).

"Asset Transfer" shall have the meaning given to such term in the Recitals.

"Assigned Contracts" shall have the meaning given to such term in Section 2.4(a).

"Assumed Liabilities" shall have the meaning given to such term in Section 2.3(a).

"Audited Financial Statements" shall have the meaning given to such term in Section 6.2(e).

"Bankruptcy" shall mean, with respect to any Person: (a) that a petition has been filed by or against such Person as a "debtor" and the adjudication of such Person as bankrupt under the provisions of the bankruptcy laws of the United States of America has commenced and, in the case of an involuntary bankruptcy, such petition shall not have been dismissed within sixty (60) calendar days from the date of filing; (b) that such Person has made an assignment for the benefit of its creditors generally; (c) that a receiver has been appointed for substantially all of the property and assets of such Person; or (d) the involuntary acceleration of any Indebtedness of the Company or any of its Subsidiaries in excess of Two Hundred Fifty Thousand Dollars ($250,000); provided, however, that any involuntary acceleration of any Indebtedness in excess of Two Hundred Fifty Thousand Dollars ($250,000) may be waived by the Purchaser.

"Bay Pines" shall have the meaning given to such term in the preamble.

"Bay Pines Agreement" shall have the meaning given to such term in the preamble.

"Business" shall have the meaning given to such term in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a day on which banking institutions in the State of Delaware are authorized or obligated by law or executive order to close.

"Business Intellectual Property" shall have the meaning given to such term in Section 4.20(a).

"Caymus Fee" shall mean an amount equal to Six Hundred Thousand Dollars ($600,000) payable to Caymus Partners LLC on the Closing Date.

"Closing" or "Closing Date" shall have the meaning given to such term in Section 3.1(b).

"Closing Fee" shall mean an amount equal to Five Hundred Thousand Dollars ($500,000) payable to the Purchaser within sixty (60) calendar days after the Closing Date.

"COBRA" shall have the meaning given to such term in Section 4.10(h).

"Co-Compliance, LLC" shall have the meaning given to such term in the preamble.

"Code" shall mean the Internal Revenue Code of 1986, together with all rules and regulations promulgated pursuant thereto, as amended from time to time.

"Common Units" shall have the meaning given to such term in the Recitals.

"Company" shall have the meaning given to such term in the preamble.

"Confidential Information" shall mean all proprietary or confidential property, information or knowledge of, about or created by the Sellers, the Company and the Business including without limitation: (a) all records concerning Products or services provided to customers; (b) all information containing pricing policies, the prices charged to customers, the volume or orders of customers and other information concerning transactions with customers; (c) customer lists; (d) financial information, forecasts, budgets, marketing information, research and development, expansion plans, management policies and methods of operation; (e) information concerning salaries or wages paid to, the work records of and other personnel information relative to employees; (f) confidential information of other Persons; (g) technical data specifications, programs, documentation and analyses; (h) all Intellectual Property (whether owned or licensed), including all source code and trade secrets within any such Intellectual Property; and (i) trade secrets.

"Consent" shall mean any consent, approval, authorization, waiver, permit, grant, franchise, license, exemption or order of, any registration, certificate, qualification, declaration or filing with, or any notice to, any Person, including, without limitation, any Governmental Authority.

"Consideration" shall have the meaning given to such term in the Recitals.

"Eliasson" shall have the meaning given to such term in the preamble.

"Employee Plans" shall have the meaning given to such term in Section 4.10(c).

"Employees" shall have the meaning given to such term in Section 4.10(a).

"Employment Agreements" shall have the meaning given to such term in Section 6.2(g)(ii).

"Environmental Liability" shall mean any and all Liabilities, obligations to conduct cleanup, expenses, damages, deficiencies, fines, penalties, sanctions and costs of any kind or nature whatsoever arising out of, relating to or directly or indirectly associated with, the compliance with any Environmental Protection Law.

"Environmental Permit" shall mean any License required by or pursuant to any Environmental Protection Laws.

"Environmental Protection Laws" shall mean all Applicable Laws now or hereafter in effect relating to (i) the protection of the environment (including any environmental laws relating to the protection of human health), (ii) the investigation, cleanup and abatement, removal or remedial action, or any other response to the release of Hazardous Substances to the environment, (iii) any emission of air pollutants or direct or indirect discharge of pollutants or waste, (iv) the generation, treatment, storage, disposal, transportation, processing, handling, use, existence, spill, release, or threatened release, of any Hazardous Substances, and (v) the manufacture, import, distribution or sale of any Hazardous Substances, including, without limitation, (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601 et seq.; (b) the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 et seq.; (c) the Hazardous Materials Transportation Act, 49 U.S.C.

§1801 et seq.; (d) the Clean Water Act, 33 U.S.C. §1251 et seq.; (e) the Clean Air Act, 42 U.S.C. §7401 et seq.; (f) the Toxic Substances Control Act, 15 U.S.C. §2601 et seq.; and (g) corresponding or similar state and local Applicable Laws, all as amended, modified or revised.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall have the meaning given to such term in Section 4.10(i).

"Excluded Liabilities" shall have the meaning given to such term in Section 2.3(b).

"Family Member" shall mean a parent, spouse, any natural or adoptive sibling or any spouse thereof, and any direct lineal descendant (natural or adoptive) of any of the foregoing.

"Financial Statements" shall have the meaning given to such term in Section 4.7(a).

"Formation" shall have the meaning given to such term in Section 2.1(b).

"Founders" shall have the meaning given to such term in the preamble.

"FTN" shall have the meaning given to such term in the preamble.

"GAAP" shall mean United States generally accepted accounting principles as in effect at the time in question.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, any governmental authority, agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

"Guardian" shall have the meaning given to such term in the preamble.

"Hazardous Substance" shall mean any chemical, compound, pollutant, contaminant, material or substance now or hereafter regulated under any Environmental Protection Laws, including, without limitation, any "hazardous substance" or "pollutant or contaminant," as those terms are defined in CERCLA, any "hazardous waste" as such term is defined in RCRA, and any other hazardous or toxic wastes, substances or materials, the presence, existence or threat of which may at any time give rise to any Environmental Liability, including, without limitation, (a) trichloroethylene, tetrachloroethylene, perchloroethylene and other chlorinated solvents, (b) any petroleum products or fractions thereof, (c) asbestos in any form, (d) polychlorinated biphenyls, (e) flammables (f) explosives, (g) urea formaldehyde and (h) radioactive materials and wastes.

"Indebtedness" shall mean all (a) obligations for borrowed money, (b) notes, bonds, debentures, mortgages and similar obligations, (c) capital obligations and leases, (d) guaranties and contingent obligations for the debts or obligations of another Person, (e) obligations to pay

the deferred purchase or acquisition price of property or services (including under conditional sale or other title retention agreements), (f) accounts payable or other liabilities not arising in the Ordinary Course of Business, including accounts payable for equipment purchases, or accounts payable that are more than sixty (60) calendar days past their due dates, (g) obligations in respect of letters of credit, bonds, guaranties, reimbursement agreements and similar instruments, (h) obligations in respect of futures contracts, forward contracts, swaps, options or similar arrangements, (i) off balance sheet financing transactions, (j) all obligations under facilities for the discount or sale of receivables and (k) all obligations that are required to be classified as long term liabilities on a balance sheet under GAAP (in each case whether such obligations are contingent or otherwise).

"Indemnitor" shall have the meaning given to such term in Section 8.2.

"Indemnity Cap" shall have the meaning given to such term in Section 8.4.

"Intellectual Property" shall mean any intellectual or intangible property (whether owned or licensed) including, without limitation, trademarks, trademark registrations and applications, service marks, trade names, corporate names and fictitious names, copyrights, copyright registrations, works of authorship, patents, patent applications, industrial design registrations and applications, integrated circuit topography applications and registrations, design rights, inventions, trade secrets, data, technical information, Confidential Information, designs, plans, specifications, formulas, processes, patterns, compilations, devices, techniques, mask works, methods, shop rights, know-how, show-how, and other business or technical confidential or proprietary information in each case whether or not such rights are patentable, copyrightable, or registrable, software and computer hardware programs and systems, source code, object code, know-how, show-how, processes, formula, specifications and designs, databases, and documentation relating to the foregoing; all domain names and internet addresses, and content with respect to internet websites including such content in its electronic form and other proprietary information owned, controlled, created, under development or used by or on behalf of any Person in whole or in part and whether or not registrable or registered, and any registrations or applications for the foregoing.

"Interest Transfer" shall have the meaning given to such term in Section 2.2.

"IRS" shall have the meaning given to such term in Section 4.10(d).

"Law" shall mean all laws, as written and enforced, of any nation or political subdivision thereof, including, without limitation, all federal, state, provincial, local, or foreign statutes, regulations, ordinances, orders, decrees, or any other laws, common law theories, or reported decisions of any state, provincial, federal or other court or tribunal.

"Leased Real Property" shall have the meaning given to such term in Section 4.15.

"Leases" shall mean all leases, subleases, or other occupancy agreements, licenses, and lease agreements for equipment, machinery, furnishings, vehicles or tools, together with all amendments, supplements and nondisturbance agreements pertaining thereto, under which the Operating Subsidiaries sublease, license, occupy or use any real or personal property.

"Liabilities" shall mean liabilities, obligations or commitments of any nature, whether fixed, absolute, contingent or otherwise and whether liquidated, matured or unmatured, known or unknown and regardless of whether such liability, obligation or commitment is immediately due and payable.

"License" shall mean any license, permit, franchise, authorization, right, privilege, variance, exemption, order or approval issued or granted by any Governmental Authority.

"Lien" shall mean any lien, pledge, mortgage, claim, covenant, restriction, security interest, charge, title defect, transfer restriction, easement, rights of first refusal, preemptive right or other restriction or encumbrance of any kind.

"LLC Agreement" shall have the meaning given to such term in Section 2.1(b).

"Losses" shall have the meaning given to such term in Section 8.2.

"Material Adverse Effect" shall mean a material adverse effect on, or any event, fact, circumstance, condition or change that, individually or in the aggregate, is reasonably likely to have a material adverse effect on (a) the assets, business, operations, condition (financial or otherwise), Property, management, liabilities, obligations, earnings, results of operations or prospects of the Sellers, the Company, the Operating Subsidiaries or the Business, (b) the validity or enforceability of this Agreement and/or any or all of the Related Documents, or (c) the right or ability of the Sellers, the Company, the Operating Subsidiaries or the Founders to consummate the transactions contemplated hereby and/or thereby.

"Material Contracts" shall have the meaning given to such term in Section 4.12.

"Operating Subsidiaries" shall have the meaning given to such term in the preamble.

"Ordinary Course of Business" shall mean in the ordinary course of the Business, as conducted by the Sellers (excluding Wolf and Eliasson) and Telequick prior to the Closing Date, consistent with the Sellers' (excluding Wolf and Eliasson) and Telequick's past custom and practice.

"OSHA Laws" shall mean the Occupational Safety and Health Act, 29 U.S.C. §651 et seq., each state law corresponding thereto and all Applicable Laws, now or hereafter in effect relating thereto.

"Person" shall mean any corporation, partnership, limited liability company, trust, individual, unincorporated organization or a governmental agency or political subdivision thereof, as the context may require.

"Preferred Units" shall have the meaning given to such term in the Recitals.

"Products" shall mean any and all products or services designed, fabricated, manufactured, distributed, performed, provided or sold in connection with the operation of the Business.

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible of the Sellers, the Company and the Operating Subsidiaries.

"Purchase" shall have the meaning given to such term in Section 3.3.

"Purchase Price" shall have the meaning given to such term in Section 3.3.

"Purchaser" shall have the meaning given to such term in the preamble.

"Purchaser Indemnitee" shall have the meaning given to such term in Section 8.2.

"Real Property" shall mean any Leased Real Property and any other real property currently or formerly owned, operated, leased or occupied by the Sellers (or any predecessor), the Company or the Operating Subsidiaries.

"Receivables" shall mean all notes, deposits and accounts receivable in favor of the Sellers (excluding Wolf and Eliasson), the Company or the Operating Subsidiaries and all notes, bonds and other evidence of Indebtedness of and rights to receive payments from any Person in favor of the Sellers (excluding Wolf and Eliasson), the Company or the Operating Subsidiaries.

"Related Documents" shall mean the Asset Contribution Agreements, the Restated LLC Agreement and all other agreements and documents contemplated hereunder or thereunder, and any and all amendments or modifications thereto.

"Related Person" shall mean any Person in which a specified Person owns any material economic interest, and any other Affiliate or Family Member of such specified Person.

"Reserve Amount" shall have the meaning given to such term in Section 3.4.

"Restated LLC Agreement" shall have the meaning given to such term in Section 2.1.

"Restricted Period" shall have the meaning given to such term in Section 7.2(a).

"Schedules" shall have the meaning given to such term in Article 4.

"Securities Act" shall have the meaning given to such term in Section 5.2.

"Sellers" shall have the meaning given to such term in the preamble.

"Sellers' Representative" shall have the meaning given to such term in Section 9.6.

"Services Agreement" shall mean the Services Agreement by and among certain of the Sellers, the Company and the Operating Subsidiaries in substantially the form of **Exhibit D** hereto.

"Strategia Marketing LLC" shall have the meaning given to such term in the preamble.

"Subsidiary" shall mean any corporation, partnership, joint venture, limited liability company, or other entity in which the Company either, directly or indirectly, owns capital stock or is a partner or is in some other manner affiliated through an investment or participation in the equity of such entity, including, without limitation, the Operating Subsidiaries.

"Survival Period" shall have the meaning given to such term in Section 8.1.

"Tax" shall have the meaning given to such term in Section 4.17(j).

"Tax Return" shall mean any return, report, information return, registration form or other document (including any related or supporting information) related to the obligations of any Person filed or required to be filed with any Governmental Authority in connection with the determination of any Tax or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"Telequick" shall have the meaning given to such term in the preamble.

"Territory" shall have the meaning given to such term in Section 7.2(b).

"Third Party Claim" shall have the meaning given to such term in Section 8.6.

"Transferred Assets" shall mean (i) all of the assets of FTN as such were contributed to Strategia Marketing LLC, (ii) all of the assets of Guardian as such were contributed to Co-Compliance, LLC, and (iii) all of the assets of Telequick.

"Transferred Interests" shall have the meaning given to such term in Section 2.2.

"Units" shall have the meaning given to such term in the Recitals.

"Untransferred Contract" shall have the meaning given to such term in Section 2.4(b).

"Wolf" shall have the meaning given to such term in the preamble.

1.2    Interpretation.

(a)    When a reference is made in this Agreement to Articles or Sections, such reference shall be to an Article or a Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not so stated.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.

(b)    The table of contents, titles, captions and headings of the Articles and Sections herein, and the use of a particular gender, are for convenience of reference only and are not intended to be a part of or to affect or restrict the meaning or interpretation of this Agreement.

(c)    The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

## ARTICLE 2
## CONTRIBUTION OF THE INTERESTS TO THE COMPANY

2.1    <u>Formation</u>.  On or before the Closing Date, the Sellers and the Founders shall together (a) form the Company, and (b) enter into a limited liability company operating agreement (the "<u>LLC Agreement</u>") in the form attached hereto as **Exhibit A** (the "<u>Formation</u>"). The Purchaser, the Sellers and the Founders shall take, and shall cause the Company to take, any and all action that can reasonably be taken prior to the Closing to ensure that the Company will be treated for all periods from and after the Closing Date as a partnership for federal and state tax purposes and not as a corporation for federal or state tax purposes.  At the Closing, the Purchaser shall become a party to the Amended and Restated LLC Agreement (the "<u>Restated LLC Agreement</u>") in the form attached hereto as **Exhibit B** and shall become a member of the Company as provided in this Agreement and the Restated LLC Agreement.

2.2    <u>Transfer of Interests to the Company in Exchange for Consideration</u>.

(a)    <u>Interest Transfer</u>.  In exchange for the Consideration, the Sellers shall at the Closing grant, sell, convey, assign, transfer and deliver unto the Company, free and clear of all Liens, all right, title and interest in and to One Hundred Percent (100%) of the issued and outstanding membership interests of the Operating Subsidiaries (the "<u>Transferred Interests</u>" and such transfer of the Transferred Interest, the "<u>Interest Transfer</u>").

(b)    <u>Allocation of Consideration</u>.  The Consideration shall be allocated among the Sellers on the Closing Date as follows:

| Seller: | No. of Common Units |
|---|---|
| FTN Promotions, Inc., d/b/a Suntasia Inc. and Suntasia Marketing, Inc. | 45,538 |
| Guardian Marketing Services, Corp. | 10,247 |
| Bryon Wolf | 569 |
| Roy Eliasson | 569 |
| Total | 56,923 |

2.3    <u>Assumption of Liabilities</u>.

(a)    Prior to the Closing, the Sellers shall have transferred, assigned and set over to the Operating Subsidiaries, and the Operating Subsidiaries shall have assumed and agreed to timely pay, perform and discharge, all of the Assumed Liabilities.  The term "<u>Assumed Liabilities</u>" shall mean the Liabilities of the Sellers expressly set forth on Schedule 2.3(a) of those certain Asset Contribution Agreements, dated March 31, 2007, by and among FTN,

Guardian, Strategia Marketing LLC, and Co-Compliance, LLC (the "<u>Asset Contribution Agreements</u>").

(b)     Other than the Assumed Liabilities, the Company and the Operating Subsidiaries shall not assume, pay, perform, be obligated to pay or perform, or otherwise be responsible for, any other Liability of the Sellers or any other Person (all such Liabilities being referred to as "<u>Excluded Liabilities</u>"). The Excluded Liabilities shall include, but not be limited to, (i) all obligations or liabilities of the Sellers or the Founders relating to Taxes, and (ii) those Liabilities set forth on Schedule 2.3(b) of the Asset Contribution Agreements. The Sellers shall pay, perform or otherwise discharge all of the Excluded Liabilities.

2.4     <u>Contracts; Consents</u>.

(a)     Prior to the Closing, the Sellers shall have granted, sold, transferred, assigned and conveyed to the Operating Subsidiaries all of the Sellers' right, title, and interest in, to, and under the contracts listed on <u>Schedule 2.4</u> of the Asset Contribution Agreements (the "<u>Assigned Contracts</u>"). The Operating Subsidiaries shall accept the foregoing assignment from the Sellers and shall accept and assume the due and punctual performance, discharge and observation of, and, after the Closing Date, shall perform, discharge and observe, all of the Sellers' obligations in, related to, or arising out of the Assigned Contracts to the extent such obligations by the terms of the Assigned Contracts are required to be performed, discharged or observed after the Closing Date, and not prior to such date; <u>provided</u>, <u>however</u>, that the assignment hereunder shall not relieve the Sellers of (i) any obligations with respect to the Excluded Liabilities or (ii) any obligations under the Assigned Contracts which were required to have been performed prior to the Closing Date.

(b)     Without modifying the closing conditions set forth in <u>Section 6.2</u>, to the extent that any of the contracts to be assigned to the Operating Subsidiaries in the Asset Contribution Agreements shall be non-assignable or shall require the Consent of the other party or parties thereto, the Asset Contribution Agreements shall not constitute an assignment thereof, and to the extent that the assignment of any of such contracts shall require the Consent of the other party thereto, the Asset Contribution Agreements shall not constitute an assignment of the same if such Consent has not been given and if an assignment or attempted assignment without such Consent of said other party would constitute a breach thereof or in any way adversely affect the rights, powers, privileges, or liabilities of the Sellers or the Operating Subsidiaries thereunder. Subject to <u>Section 6.2(i)</u>, if any such Consent is not obtained, then after the Closing the Sellers shall cooperate with the Company and the Operating Subsidiaries at the Sellers' and the Founders' sole cost and expense, in any reasonable arrangement requested by the Company and the Operating Subsidiaries designed to provide to the Company and the Operating Subsidiaries on or immediately following the Closing with the benefits under any such Assigned Contract to the extent such benefits are received by the Operating Subsidiaries. After the Closing, each contract which would have been included in the Transferred Assets but for this <u>Section 2.4(b)</u> (an "<u>Untransferred Contract</u>") shall be handled in accordance with the Services Agreement. The Sellers, the Company and the Operating Subsidiaries agree that the Transferred Assets shall include all accounts receivable from any Untransferred Contracts, whether generated before or after the Closing. Effective as of the Closing, the Sellers hereby grant to the Company and the Operating Subsidiaries, as applicable, a security interest in, all of the Sellers' contract

rights under such Untransferred Contracts and all cash and non-cash proceeds thereof, as security for the prompt and timely satisfaction and performance of Seller's obligations under this <u>Section 2.4</u> and the Services Agreement, except that Seller shall not be deemed to have granted a security interest in any Untransferred Contract that by its terms expressly prohibits such actions. The Company and the Operating Subsidiaries, as applicable, shall have, and the Sellers shall deliver to the Company at the Closing, possession of the original executed copy of such Untransferred Contract. Effective as of the Closing, the Sellers hereby appoint the Company as the Sellers' attorney to take such actions, in the Sellers' name and on its behalf, as such attorney determines, in its sole discretion, to be necessary or advisable to cause the Sellers to comply with this <u>Section 2.4</u> or to protect, perfect and continue perfected the security interest granted hereunder including the execution and filing of such financing statements and other instruments and documents as such attorney determines, in its sole discretion, to be necessary or advisable for such purposes. As consents to assignment are received for Untransferred Contracts, such contracts shall become Transferred Assets.

## ARTICLE 3
## THE CLOSING

3.1 <u>Closing; Closing Date</u>. The consummation of the transactions contemplated hereby, including the Formation, the Interest Transfer, the execution of the Restated LLC Agreement and the purchase and sale of the Preferred Units hereunder (the "<u>Closing</u>") shall be held at the offices of the Purchaser, 1800 Avenue of the Stars, Second Floor, Los Angeles, California 90067, at 10:00 a.m. (Pacific Time) on March 31, 2007, or (a) on such later date on which all of the conditions precedent set forth in <u>Article 6</u> shall have been satisfied or waived in writing or (b) at such other time and place as the Sellers, the Founders and the Purchaser may otherwise mutually agree (the date of the Closing is hereinafter referred to as the "<u>Closing Date</u>").

3.2 <u>Formation of Company and Transfer of Interests</u>. At the Closing, the parties shall consummate the Formation and the Sellers shall cause the consummation of the Interest Transfer. The Sellers shall receive, as consideration for the Interest Transfer, the Consideration. The Company will deliver certificates to the Sellers, registered in the name of the Sellers, representing the Common Units, duly endorsed or with such instruments of transfer necessary to transfer to the Sellers all right, title and interest in and to the Common Units.

3.3 <u>Purchase and Sale of Preferred Units</u>. At the Closing, the Company shall sell, assign and transfer to the Purchaser the Preferred Units and the Purchaser shall purchase and acquire such Preferred Units from the Company, free and clear of all Liens, in exchange for a payment to the Company of Twenty Million Dollars ($20,000,000) and, as soon as reasonably practicable, the distribution of senior debt financing in the amount of Five Million Dollars ($5,000,000) (collectively referred to herein as the "<u>Purchase Price</u>"). The Company shall deliver a certificate or certificates to the Purchaser, registered in the name of the Purchaser, representing the Preferred Units, duly endorsed or with such instruments of transfer necessary to transfer to the Purchaser all right, title and interest in and to the Preferred Units, against payment of the Purchase Price by wire transfer of immediately available funds to an account designated by the Company. The purchase by the Purchaser of the Preferred Units may be referred to herein as the "<u>Purchase</u>."

3.4    Use of Proceeds. The Company shall use the Purchase Price to fund liquidity to the Founders through a special distribution to the Sellers on or after the Closing Date; provided, however, that, on the Closing Date, the Sellers shall lend Two Million Dollars ($2,000,000) to the Company on the following terms (the "Sellers Loan"): (a) the Sellers Loan shall be evidenced by a promissory note issued by the Company in form and substance satisfactory to the Purchaser, (b) the Company shall use the proceeds of the Sellers Loan to pay all fees and expenses associated with the transactions contemplated by this Agreement, including, without limitation, the Caymus Fee and the Closing Fee, and (c) the Company shall repay the Sellers Loan upon having at least Four Million Dollars ($4,000,000) in cash (net of (A) any written but uncleared checks of the Company and the Subsidiaries, (B) any accounts payable of the Company and the Subsidiaries that are more than thirty (30) calendar days past due, and (C) any increase in the Indebtedness of the Company and the Operating Subsidiaries following the Closing Date) on its consolidated balance sheet.

3.5    Senior Debt Distribution. It is intended by the Purchaser and the Sellers that, as soon as reasonably practicable, the Company and Operating Subsidiaries shall secure financing, senior in priority to any amounts owed to the Purchaser pursuant to the Preferred Units, of Five Million Dollars ($5,000,000). Upon securing the financing, a special distribution shall be made by the Company to the Sellers in the amount of Five Million Dollars ($5,000,000) to complete the delivery of the Purchase Price under Section 3.3.

**ARTICLE 4**

**REPRESENTATIONS AND WARRANTIES**
**OF THE SELLERS, THE COMPANY, THE OPERATING SUBSIDIARIES AND THE**
**FOUNDERS**

For the purposes of Sections 4.1 through 4.27, the terms "Sellers" shall not include Wolf or Eliasson. Except as set forth on the disclosure schedule concurrently delivered to the Purchaser herewith (the "Schedules"), as of the date of this Agreement and as of the Closing Date, the Sellers, the Company, the Operating Subsidiaries and the Founders hereby jointly and severally represent and warrant to the Purchaser as follows:

4.1    Organization; Good Standing; Qualification. Each of FTN, Guardian, Bay Pines, the Company and the Operating Subsidiaries, are duly organized, validly existing and in good standing under the laws of the state of their formation and have all requisite power and authority and have all Licenses and other governmental authorizations necessary to (a) enter into this Agreement and each of the Related Documents to which they are a party, (b) perform all of their respective obligations hereunder and thereunder and (c) own, operate and lease their respective Property and carry on their respective businesses as now conducted and as proposed to be conducted. Except as provided for on Schedule 4.1, each of the Sellers, the Company and the Operating Subsidiaries is duly qualified or duly licensed to transact business and is in good standing (including in good tax standing) in each jurisdiction set forth on Schedule 4.1, which are all of the jurisdictions in which (a) the nature of the business conducted by the Sellers or Telequick or to be conducted by the Company or the Operating Subsidiaries following the Closing or (b) the ownership or leasing of any Property by the Sellers or Telequick or, following the Closing, by the Company and the Operating Subsidiaries makes such qualification necessary. True and complete copies of the articles or certificates of incorporation or formation, as

applicable and bylaws and operating agreement, as applicable, of the Sellers, the Company and the Operating Subsidiaries have been delivered to the Purchaser. Schedule 4.1 lists the directors, officers and managers of the Sellers, the Company and the Operating Subsidiaries, as applicable.

4.2     Subsidiaries. Except as set forth on Schedule 4.2, the Sellers, the Company and the Operating Subsidiaries do not own, directly or indirectly, and the Transferred Assets shall not include, any stock, partnership interest, membership interest, joint venture interest, ownership interest or other security, investment or interest in any corporation, partnership, limited liability company, joint venture, organization or other entity.

4.3     Power and Authority; Capitalization; Indebtedness.

(a)     The Sellers, the Company and the Operating Subsidiaries have all requisite corporate power and authority to own and operate their respective properties and assets, and to carry on their respective businesses as presently conducted, to execute and deliver this Agreement and the Related Documents to be executed by them and to carry out and perform its obligations under the terms of this Agreement and the Related Documents.

(b)     The capitalization of each of the Sellers, the Company and the Operating Subsidiaries is set forth on Schedule 4.3(b). Immediately prior to the Closing, all equity interests in the Company shall be held by the Sellers, and shall be free and clear of all Liens. Immediately following the Closing, the Purchaser shall have valid and marketable title to the Preferred Units, free and clear of all Liens.

(c)     The Sellers, the Company and the Operating Subsidiaries have no Indebtedness, contingent or otherwise, that any of them have directly or indirectly created, incurred, assumed or guaranteed, or with respect to which any of them have otherwise become directly or indirectly liable, including purchase money financing or capital lease obligations, other than the Indebtedness set forth on Schedule 4.3(c), which includes the name of the creditor, all amounts owing, including principal and interest, and when such Indebtedness is due and payable. None of the Sellers, the Company or the Operating Subsidiaries is in default of any of their respective obligations to such creditors or any such default has been waived in writing.

(d)     The Sellers and Telequick have no, and at the Closing, the Company and the Operating Subsidiaries will have no, accounts payable outstanding that are more than thirty (30) calendar days past their due date.

4.4     Asset and Interest Transfer.

(a)     Sufficiency and Condition of the Assets. The Transferred Assets and the Transferred Interests constitute all of the assets that are (i) owned or leased by the Sellers, the Company, or the Operating Subsidiaries, (ii) necessary for or used in the operation of the Business or (iii) required for the continued operation of the Business following the Closing as currently conducted and as proposed to be conducted. The Transferred Assets constituting tangible personal property, including, without limitation, property, plant and equipment, machinery, tooling, supplies, furniture, fixtures and vehicles, are in good operating condition and repair, ordinary wear and tear excepted, and suitable for the purpose for which they are used and intended.

(b)    <u>Ownership of the Transferred Assets</u>. Except for Telequick, the Company and the Operating Subsidiaries are newly formed entities that shall have no assets, liabilities or operations prior to the consummation of the transactions contemplated under this Agreement or the Related Documents as a result of any action of the Sellers or any Founder. As of the Closing Date, (i) the Company will have good, marketable and indefeasible title to the Transferred Interests free and clear of all Liens, and (ii) the Operating Subsidiaries will have good, marketable and indefeasible title to the Transferred Assets free and clear of all Liens.

4.5    <u>Authorization; Execution and Delivery; No Conflicts</u>.

(a)    The execution, delivery and performance of this Agreement and the Related Documents by the Sellers, the Company, the Operating Subsidiaries and the Founders and the consummation of all transactions contemplated hereby or thereby, including but not limited to the sale of the Preferred Units, have been duly authorized by all required actions, corporate or otherwise, of the Sellers, the Company, the Operating Subsidiaries and the Founders. This Agreement and the Related Documents have been duly executed and delivered by the Sellers, the Company, the Operating Subsidiaries and the Founders. This Agreement and the Related Documents constitute valid and binding obligations of the Sellers, the Company, the Operating Subsidiaries and the Founders enforceable against each of them, as applicable, in accordance with their respective terms, except as enforcement may be limited by principles of public policy, and subject to laws of general application relating to Bankruptcy, insolvency, reorganization, moratorium and the relief of debtors and rules of law and general principles of equity governing specific performance, injunctive relief or other equitable remedies.

(b)    The execution and delivery by the Sellers, the Company, the Operating Subsidiaries and the Founders, as the case may be, of this Agreement and the Related Documents, and the consummation of the transactions contemplated hereby and thereby, including but not limited to the sale of the Preferred Units, the Asset Transfer and the Interest Transfer pursuant to this Agreement and the Related Documents, do not and will not (with or without due notice, lapse of time, or both), except as set forth on <u>Schedule 4.5</u>, (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in the creation of any Lien upon the Transferred Assets, the Transferred Interests, or the Preferred Units pursuant to, (iv) give any third party the right to accelerate any obligation under, or (v) result in a violation of, (A) the charter documents of the Sellers, as applicable, the Company or the Operating Subsidiaries, (B) any Law to which the Sellers, the Company, the Operating Subsidiaries and the Founders, or any of their respective properties, is subject, or (C) any agreement or instrument to which the Sellers, the Company, the Operating Subsidiaries and the Founders (with respect to the Transferred Assets and the Transferred Interests) is a party or any of their respective properties is subject.

4.6    <u>Consents</u>. Except as set forth on <u>Schedule 4.6</u>, no Consent is required to be obtained by the Sellers, the Company, the Operating Subsidiaries or any Founder in connection with the execution, delivery or performance by the Sellers, the Company, the Operating Subsidiaries or any Founder of this Agreement and the Related Documents to which it is a party or the consummation by the Sellers, the Company, the Operating Subsidiaries or any Founder of the transactions contemplated hereby or thereby (including, without limitation, in connection with the sale of the Preferred Units and the consummation of the Asset Transfer and the Interest

Transfer). Specifically, except as set forth on <u>Schedule 4.6</u>, no Consent of any other Person is required to be made or obtained to permit (A) the Company and the Operating Subsidiaries to conduct the lawful operation of the Business following the Closing in substantially the same manner as the Business is currently conducted, or (B) the Sellers to transfer the Transferred Assets to the Operating Subsidiaries and to transfer the Transferred Interests to the Company pursuant to this Agreement and the Related Documents, including, without limitation, the assignment to the Operating Subsidiaries and the assumption by the Operating Subsidiaries of the Assigned Contracts.

    4.7    <u>Financial Statements</u>.

    (a)    Attached hereto as <u>Schedule 4.7</u> are the following financial statements of the Sellers and Telequick: (i) unaudited consolidated balance sheets and income and cash flow statements for the fiscal years ended December 31, 2003, and December 31, 2004; (ii) audited consolidated balance sheet and income and cash flow statements for the fiscal year ended December 31, 2005; (iii) audited consolidated balance sheet and income and cash flow statements for the six (6)-month period ended June 30, 2006; (iv) internally-prepared consolidated balance sheet and income and cash flow statements for the seven (7)-month period ended January 31, 2007, and (v) the related notes thereto (collectively, the "<u>Financial Statements</u>"). The Financial Statements (A) have been prepared from the books and records kept by the Sellers and Telequick, in conformity with GAAP consistently applied with prior periods, and (B) are complete and correct and fairly present the financial condition and results of operations of the Sellers and Telequick, as of the dates and for the periods indicated therein, subject to normal year end adjustments (consistent with prior periods) in the case of the six (6) and seven (7)-month Financial Statements. The books of account, financial data, schedules and other records of the Sellers and Telequick, including any of the foregoing delivered or made available to the Purchaser or its representatives or Affiliates in connection with the transactions contemplated hereby, have been maintained properly and regularly in accordance with sound business practices and in the course of business of the Sellers and Telequick, are accurate and complete in all material respects and there are no material misstatements, mistakes or omissions therein, and there have been no transactions involving the Seller that properly should have been reflected therein in accordance with GAAP that have not been accurately and completely reflected therein. The Financial Statements reflect the conduct of the Business in the Ordinary Course of Business.

    (b)    Except as set forth on <u>Schedule 4.7</u>, the Sellers and Telequick have no Liabilities, obligations or commitments of any nature, including without limitation any liabilities due or to become due to any taxing authority, except (i) Liabilities reflected in, reserved against or disclosed in the footnotes of the Financial Statements or (ii) Liabilities, obligations or commitments incurred since June 30, 2006, in the Ordinary Course of Business (none of which relates to any breach of contract, breach of warranty, tort, infringement or known violation of Law or arose out of any Action or environmental matter). Immediately after the Closing, the Company and the Operating Subsidiaries will have no Liabilities, obligations or commitments of any nature other than the Assumed Liabilities.

4.8    Absence of Certain Changes or Events.

Except as set forth on Schedule 4.8 since December 31, 2005, the Sellers and Telequick have conducted the Business only in the Ordinary Course of Business and there has been no Material Adverse Effect. Without limiting the foregoing, since December 31, 2005, the Sellers, the Company and the Operating Subsidiaries have not:

(a)    entered into any transaction related to the Business other than in the Ordinary Course of Business;

(b)    amended, modified, supplemented, rescinded or terminated (and not renewed) any existing Material Contract and no such Material Contract has expired or terminated (and not been renewed) by its terms;

(c)    sold, transferred, disposed of, or agreed to sell, transfer or dispose of, any Properties, Intellectual Property or rights related to the Business, nor purchased or made any payments with respect to any Property of the Sellers, the Company or the Operating Subsidiaries that are not included in the Transferred Assets;

(d)    acquired any Property related to the Business, except in the Ordinary Course of Business, nor acquired or merged with any other business related to the Business;

(e)    incurred or created, or permitted to be incurred or created, or suffered to exist, any Lien on any of the Transferred Assets;

(f)    experienced any destruction, damage or other loss (whether or not covered by insurance) of any Properties used in or necessary to the conduct of the Business;

(g)    increased the level of benefits under any Employee Plan, the salary or other compensation (including severance) payable or to become payable to any Affiliate of the Sellers, the Company or the Operating Subsidiaries, including any of the Founders or their Affiliates (including Family Members) or any employee who, as of the date hereof, earns at least Fifty Thousand Dollars ($50,000) in compensation per annum or obligated itself to pay any bonus or other additional salary or compensation to any such Person, Affiliate or employee other than in the Ordinary Course of Business and as set forth on Schedule 4.8;

(h)    made any change related to the Business in any pricing, marketing, purchasing, allowance or tax or accounting practice, policy or method or any method of calculating any bad debt, contingency or other reserve for accounting, financial reporting or tax purposes or made any tax election or settled or compromised any income tax Liability with any Governmental Authority;

(i)    waived or amended any material right relating to the conduct of the Business;

(j)    made any capital expenditure (or series of related capital expenditures) that is either in excess of One Hundred Thousand Dollars ($100,000) or that is not in accordance

with any capital expenditure budget of the Sellers, the Company or the Operating Subsidiaries previously furnished to the Purchaser;

      (k)    declared any dividends, or authorized or made any distribution on its capital stock or made any payments to the Founders in excess of distributions necessary to pay taxes, other than salary obligations and benefits in existence as of the date hereof which are set forth on Schedule 4.8;

      (l)    incurred any Indebtedness, other than as set forth on Schedule 4.8;

      (m)    made any loans or advances to any Person or entity, other than travel advances to employees made in the Ordinary Course of Business not in excess of Five Thousand Dollars ($5,000);

      (n)    issued any equity securities or any options, warrants or other rights to purchase its equity securities, nor have the Sellers, the Company or the Operating Subsidiaries approved or adopted any equity option or equity incentive plan;

      (o)    made any alteration or change in the Sellers', the Company's or the Operating Subsidiaries' credit guidelines or policies, charge-off policies or accounting methods;

      (p)    delayed or failed to pay or perform when due any obligation (including accounts payable) of the Sellers, the Company or the Operating Subsidiaries;

      (q)    accelerated the collection of any account receivable or any Indebtedness or other material obligation owed to the Sellers, the Company or the Operating Subsidiaries before it is due or otherwise owed; or

      (r)    taken nor agreed to take any action described in this Section 4.8, and neither the Sellers nor any Founder have taken or agreed to take any such action on behalf of the Company or the Operating Subsidiaries.

    4.9    Insurance. There is in full force and effect one (1) or more policies of insurance issued by insurers of recognized national standing insuring the Properties and business of the Sellers, the Company and the Operating Subsidiaries against such losses and risks and in such amounts as are usual and customary in the Business. Schedule 4.9 identifies the policies of insurance currently maintained by, or on behalf of, the Sellers, the Company and the Operating Subsidiaries, their businesses and Properties, setting forth the name of the insurer, the holder of each such policy, the nature of coverage, the amount of such coverage, the expiration dates thereof, information concerning any claim in excess of Ten Thousand Dollars ($10,000) asserted thereunder (or proposed for assertion thereunder) and other material information. All premiums due under the policies identified on Schedule 4.9 have been paid and neither the Sellers, the Company, the Operating Subsidiaries, nor any party insured under any such policy has been issued or has received any notice of default, cancellation, material modification or termination in respect of any such policy. Neither the Sellers, the Company nor the Operating Subsidiaries are in default with respect to its obligations under any of such outstanding insurance policies. Neither the Sellers, the Company, the Operating Subsidiaries, nor any other insured named on Schedule 4.9 have failed to give any notice or to present any material claim under any such

policy in a due and timely fashion. Such policies are in full force and effect on the date hereof. Neither the Sellers, the Company, the Operating Subsidiaries, nor any such insured has been issued or has received notice that any insurer under any policy referred to on <u>Schedule 4.9</u> is denying liability with respect to a claim thereunder or defending under a reservation of rights clause.

4.10    <u>Officers; Officer Benefits</u>.

(a)    <u>Schedule 4.10(a)</u> sets forth a complete and accurate list of the names and current compensation levels of all officers who are employed by the Sellers and Telequick prior to the Closing (the "<u>Officers</u>"), indicating in each case (i) such Officer's date of hire, (ii) such Officer's current position, (iii) such Officer's salary level, (iv) whether such Officer is employed on an at-will basis or is subject to contractual limitations on the Officer's ability to terminate the employment of such Officer, including severance obligations in the event of certain occurrences, (v) whether such Officer has a written or oral employment agreement providing for employment for any specified period of time or providing for any benefits (other than health, life and disability insurance), profit sharing, equity incentives or other rights, and (vi) whether such Officer is actively at work or is on leave of absence for any reason, including military service, on disability or pursuant to the Family and Medical Leave Act of 1993. The Officers, together with all other Persons employed by the Sellers or Telequick prior to the Closing shall collectively be referred to as the "<u>Employees</u>" and individually as "<u>Employee</u>".

(b)    The Sellers and Telequick have, and after the Asset Transfer and the Interest Transfer, the Company and the Operating Subsidiaries will have, no collective bargaining agreements with any of their respective employees. There is no labor union organizing activity pending or threatened with respect to the Sellers, the Company or the Operating Subsidiaries. The Sellers and Telequick are, and the Company and the Operating Subsidiaries will be, in compliance in all respects with all Applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours, and the Sellers and Telequick have not engaged in any unfair labor practice. Except as disclosed on <u>Schedule 4.10(b)</u>, there is no unfair labor practice, charge, complaint, decision or any other matter against or involving the Sellers, the Company or the Operating Subsidiaries pending or threatened before the National Labor Relations Board or any Governmental Authority. Except as disclosed on <u>Schedule 4.10(b)</u>, there are no charges, investigations, administrative proceedings or formal complaints of discrimination (including discrimination based upon sex, age, marital status, race, national origin, religion, sexual preference, disability or handicap, or veteran status) pending or threatened, before the Equal Employment Opportunity Commission or any other Governmental Authority against the Sellers, the Company or the Operating Subsidiaries. No Employee of the Sellers, the Company or the Operating Subsidiaries, nor any consultant with whom the Sellers, the Company or the Operating Subsidiaries have contracted, is in violation of any term of any employment contract, proprietary information agreement or any other agreement relating to the right of any such individual to be employed by, or to contract with, the Sellers, the Company or the Operating Subsidiaries because of the nature of the Business, and the continued employment by the Company and the Operating Subsidiaries of the Employees, and the performance of the Company's and the Operating Subsidiaries' contracts with its independent contractors, will not result in any such violation. Neither the Sellers, Telequick nor any Founder has received any written notice alleging that any such

violation has occurred or will occur. No current officer or key Employee, or any group of key Employees, intends to terminate his, her or their employment with the Sellers or Telequick or not accept an offer of employment from the Company or the Operating Subsidiaries, nor do the Sellers, Telequick nor any Founder have a present intention to terminate the employment of any current officer, key Employee or group of key Employees. None of the persons performing services for the Sellers or Telequick has been improperly classified as being an independent contractor or leased employee or as being exempt from the payment of wages for overtime.

(c)    Except as disclosed on Schedule 4.10, the Sellers and Telequick do not, and upon the consummation of the Asset Transfer and the Interest Transfer, neither the Company nor the Operating Subsidiaries will, sponsor or maintain, or have any obligation to contribute to or any liability, actual or contingent, with respect to any "employee benefit plan," as defined in Section 3(3) of ERISA, or any other bonus, pension, stock option, stock purchase, stock appreciation right, equity incentive, welfare, profit sharing, retirement, disability, vacation, severance, hospitalization, insurance, incentive, deferred compensation, compensation, fringe benefit or other employee benefit plan, fund, trust, program, agreement or arrangement, whether written or oral (the "Employee Plans").

(d)    The Sellers and Telequick have delivered to the Purchaser a true and complete copy of the following documents, to the extent that they are applicable:  (i) each Employee Plan and any related funding agreements (such as trust agreements or insurance contracts), including all amendments, and, in the case of any unwritten Employee Plan, a written summary thereof; (ii) the current summary plan description and all subsequent summaries of material modifications of each Employee Plan; (iii) the most recent determination letter from the Internal Revenue Service ("IRS") for each Employee Plan that is intended to qualify for favorable income tax treatment under Section 401(a) or 501(c)(9) of the Code, which determination letter reflects all amendments that have been made to the Employee Plan; and (iv) the two (2) most recent Form 5500s (including all applicable schedules and the opinions of the independent accountants) that were filed on behalf of the Employee Plan.

(e)    Each Employee Plan has been maintained and operated in compliance with its terms and the requirements of Applicable Law, including the Code and ERISA.

(f)    Each Employee Plan intended to be qualified under Section 401(a) or Section 501(c)(9) of the Code has received a favorable determination letter from the IRS and nothing has occurred either before or since the date of such favorable determination letter which would adversely affect the qualified status of such Employee Plan.

(g)    All contributions and premium payments required to have been paid under or with respect to any Employee Plan have been timely paid.

(h)    No Employee Plan provides health, life insurance or other welfare benefits to retirees or other terminated employees of the Seller other than continuation coverage required by Section 4980B of the Code or Sections 601-608 of ERISA or similar state law ("COBRA").

(i)    No Employee Plan is or was at any time a multiemployer plan within the meaning of Section 3(37) or 4001(a) of ERISA, and neither the Sellers, Telequick nor any entity

which is or was at any time considered a single employer together with the Sellers or Telequick pursuant to Section 414(b), (c), (m) or (o) of the Code (an "ERISA Affiliate") has ever contributed to or had any obligation to contribute to any multiemployer plan.

(j)    No Employee Plan is subject to Section 302 or Title IV of ERISA or Section 412 of the Code, and neither the Sellers, Telequick nor any ERISA Affiliate has ever maintained, participated in, or had an obligation to contribute to a plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code.

(k)    No event has occurred and no condition exists with respect to any Employee Plan which could subject any Employee Plan, the Sellers, the Company, the Operating Subsidiaries, or any of their respective trustees, fiduciaries, employees, agents or directors directly or indirectly (through an indemnification agreement or otherwise) to any liability for a breach of fiduciary duty, a "prohibited transaction," within the meaning of Section 406 of ERISA or Section 4975 of the Code, or a tax, penalty or fine under Sections 502 or 4071 of ERISA or Subtitle D, Chapter 43 of the Code.

(l)    There are no Actions or audits (other than routine claims for benefits in the Ordinary Course of Business) which are pending threatened or under consideration, with respect to any Employee Plan, and there exist no facts which could give rise to any such Actions.

(m)    No Employee Plan is or has been part of a multiple employer welfare arrangement, as that term is defined in ERISA Section 3(40).

(n)    No Employee Plan or any other arrangement with any Employee provides for any payments or other benefits that (i) become payable or become vested solely as a result of the consummation of the transactions contemplated under this Agreement and the Related Documents or (ii) would result in excess parachute payments (within the meaning of Code Section 280G), either (A) solely as a result of the consummation of such transactions or (B) as a result of the consummation of such transactions and any actions taken by the Company, the Operating Subsidiaries or the Purchaser after the Closing. Furthermore, the consummation of the transactions contemplated by this Agreement and the Related Documents will not require the funding (whether on a formal or informal basis) of the benefits under any Employee Plan (such as contributions to a "rabbi trust").

4.11    Litigation; Restriction on Business Activities.

(a)    Except as set forth on Schedule 4.11, there are no Actions involving the Sellers, the Company or the Operating Subsidiaries pending threatened or threatened against the Sellers, the Company or the Operating Subsidiaries, or any of their properties or rights which could affect (a) the right or ability of the Company to carry on the Business in substantially the same manner as it is conducted as of the date of this Agreement, (b) the right or ability of the Sellers, the Company or the Operating Subsidiaries to transfer the Transferred Interests or the Transferred Assets, or to consummate the sale of the Preferred Units to the Purchaser or otherwise to perform any of the obligations of the Seller or the Company under this Agreement or any of the Related Documents, or (c) the condition, whether financial or otherwise, or assets or properties of the Sellers, the Company or the Operating Subsidiaries, nor as to any matter which could impact the

Transferred Interests or the Transferred Assets, is there any reasonable basis for a claim described in clauses (a), (b) or (c) above. Neither the Sellers, any Founder, the Company, the Operating Subsidiaries nor any Affiliate of the Sellers or any Founder (including the Company and the Operating Subsidiaries) is subject to any judgment, order or decree entered in any lawsuit or proceeding which could affect the Sellers' or Telequick's operations or business practices in connection with the Business, or the ability of the Sellers, the Company or the Operating Subsidiaries to conduct the Business in substantially the same manner as the Business is conducted as of the date of this Agreement and the Related Documents.

(b)     There is no agreement (noncompete or otherwise), commitment, judgment, injunction, order or decree to which the Sellers, the Company or the Operating Subsidiaries is a party or that otherwise could be binding upon the Sellers, the Company, the Operating Subsidiaries or the Business which has or would reasonably have the effect of prohibiting or impairing the operation of the Business. Neither the Sellers, the Company, the Operating Subsidiaries, nor any Founder has entered into any agreement under which the operations of the Business are restricted from selling, servicing or licensing to customers or potential customers or any class of customers, in any geographic area, during any period of time or in any segment of the market.

4.12    Material Contracts and Other Agreements. Schedule 4.12 sets forth the following contracts which are related to or involve the Business (including, without limitation, all contracts of the Sellers, Telequick and any Founder related to the Business), whether written or oral (a) all contracts, agreements and commitments relating to the acquisition, sale or transfer of all or any portion of the business, assets (other than inventory in the Ordinary Course of Business), properties or equity interests of any Person (whether through purchase, merger, consolidation or otherwise) (the "Acquired Businesses"); (b) all agreements containing covenants not to compete on the part of the Sellers or Telequick or otherwise restricting the ability of the Sellers or Telequick in any way to engage in the Business; (c) all notes, mortgages, indentures, letters of credit, guarantees, performance bonds and other obligations and agreements and other instruments for or relating to any lending or Indebtedness entered into by the Sellers or Telequick or pursuant to which any Properties are pledged or mortgaged as collateral; (d) any employment, severance or consulting agreement with any present or former director or officer of the Sellers or Telequick; (e) all contracts, agreements, commitments or other arrangements with any Affiliate of the Sellers or Telequick; (f) all contracts, agreements, commitments or other arrangements for the purchase or sale of goods or services by or from the Sellers or Telequick, each of which requires a payment or payments by or to the Sellers or Telequick, in the aggregate, of more than Ten Thousand Dollars ($10,000) in any given year; (g) all other contracts, agreements or commitments involving aggregate payments of more than Ten Thousand Dollars ($10,000) during the term thereof or with a term of more than one (1) year, including all extensions thereof, at the option of any party other than the Sellers or Telequick; (h) all Licenses and agreements with respect to Business Intellectual Property; and (i) all other contracts, agreements and commitments which are material to the Sellers or Telequick or the operation of the Business, each of the foregoing described under clauses (a) through (i), including each of the same listed on Schedule 4.12, collectively referred to as the "Material Contracts." Except as set forth on Schedule 4.12, with respect to each Material Contract, (i) such Material Contract is valid, binding and enforceable against the Sellers or Telequick and each other party thereto, and is in full force and effect, (ii) the Sellers or Telequick are not and any other party to such

Material Contract is not in material breach thereof or material default thereunder, (iii) there does not exist any event that, with the giving of notice or the lapse of time or both, would constitute a material breach of or a material default by the Sellers or Telequick or any other party to such Material Contract under such Material Contract, and neither the Sellers nor any Affiliate thereof has received or given notice of any such breach, default or event, (iv) true, complete and correct copies of each Material Contract have been delivered or made available to the Purchaser or its representatives, (v) neither the Sellers nor Telequick have waived any material rights under any Material Contract, (vi) no material defense to the validity or enforceability of any Material Contract exists, (vii) neither the Sellers, Telequick nor any Founder has received or given notice of any breach or default in connection with any Material Contract and (viii) neither the Company nor the Operating Subsidiaries has existing Liabilities (contingent or otherwise), including with respect to any indemnification or guarantee obligation, with respect to any Acquired Business.

4.13    Compliance with Laws; Licenses.

(a)    The Sellers and Telequick are and at all times have been, and all of its Products and Properties are, and at all times have been in compliance in all respects with, and immediately following the consummation of the transactions contemplated by this Agreement and the Related Documents, the Company and the Operating Subsidiaries will be in compliance in all respects with, and neither the Sellers, the Company nor the Operating Subsidiaries have any liability under, any Laws, including, without limitation, any applicable franchise, building, zoning, employment, labor relations or other statute, Law, ordinance or regulation. No Consent of any Governmental Authority is required to be obtained and no registration or declaration is required to be filed in connection with the execution and delivery of this Agreement, the Asset Transfer, the Interest Transfer or the sale of the Preferred Units by the Company, except such as has been duly and validly obtained or filed, or with respect to any state or federal securities law filings to be made by the Purchaser or the Company after the Closing.

(b)    The Sellers or Telequick hold or have applied for, and at the Closing the Company or the Operating Subsidiaries will hold or will have applied for, all Licenses necessary to conduct the Business as it is now being conducted and as is proposed to be conducted. A complete and correct list of all such Licenses is set forth on Schedule 4.13, and, excluding those Licenses which have been applied for, each such License is in full force and effect and none of such Licenses will require any Consents or be impaired as a result of the transactions contemplated by this Agreement or the Related Documents. One of the Sellers or Telequick solely possesses, and as of the Closing either the Company or one of the Operating Subsidiaries will solely possess, all such Licenses. Neither the Sellers, Telequick, any Founder, nor any Affiliate thereof has received any notice to the effect that, or has otherwise been advised that, the Sellers or Telequick are not in compliance with, or that it is in violation of, any such License, and the Sellers and Telequick are in compliance in all material respects with the terms of each such License and there are not currently existing any circumstances that are likely to result in a failure of the Sellers, the Company or the Operating Subsidiaries to comply in any material respect with any such License, or result in a material violation by the Sellers, the Company or the Operating Subsidiaries of any such License.

4.14    Title to Properties; Liens and Encumbrances.    As of the Closing, the Company or the Operating Subsidiaries will have good and marketable title to the Transferred Assets and the

Transferred Interests and, with respect to the Property leased by the Company or the Operating Subsidiaries, will hold valid leasehold interests therein, in each case subject to no Lien. There exists no default or other occurrence or condition which could result in termination of any lease under which any Property is leased by the Sellers or Telequick.

4.15    <u>Leased Real Properties; No Owned Real Property</u>.    <u>Schedule 4.15</u> contains a complete and correct list of all real property leases, warehouse leases, subleases, licenses and occupancy agreements pursuant to which any of the Sellers or Telequick is a lessor, lessee, sublessor, sublessee, licensor or licensee of real property, setting forth the address, landlord and tenant for each (the "<u>Leased Real Property</u>"). The Sellers and Telequick have delivered to the Purchaser correct and complete copies of each of the agreements set forth in <u>Schedule 4.15</u>, including all amendments thereto and all nondisturbance agreements in connection therewith. Each lease, sublease, license or other agreement set forth in <u>Schedule 4.15</u> is legal, valid, binding, enforceable and in full force and effect. Except as set forth in <u>Schedule 4.15</u>, no party is in default, violation or breach in any material respect under any such lease, sublease or license and no event has occurred and is continuing thereunder that constitutes or, with notice or the passage of time or both, would constitute a default, violation or breach in any material respect thereunder. The Sellers and Telequick have and the Company and the Operating Subsidiaries will have as of the Closing, good and valid title to the leasehold estate under each lease, sublease, license or other agreement set forth in <u>Schedule 4.15</u>, free and clear of all Liens. All of the improvements situated in whole or in part at any Leased Real Property are in good operating condition, in a state of good maintenance and repair and are adequate and suitable for the purposes for which they are used and intended. The Sellers and Telequick do not own any real property and, other than the interests in the Leased Real Property, the Transferred Assets do not include any interest in any real property.

4.16    <u>Accounts Receivable</u>.    A complete and correct list of all accounts receivable of the Business as of January 31, 2007 ("<u>Accounts Receivable</u>"), is attached hereto as <u>Schedule 4.16</u>. The Accounts Receivable and all accounts receivable since January 31, 2007, represent bona fide sales actually made or services actually performed on or prior to such date in the Ordinary Course of Business. Except as set forth in <u>Schedule 4.16</u>, there is no contest, claim or right of set-off contained in any oral or written agreement with any account debtor relating to the amount or validity of any Account Receivable. The Accounts Receivable and all accounts receivable since December 31, 2006, are valid and collectible at the recorded amounts thereof in the Ordinary Course of Business, subject to the bad debt reserves contained in the Financial Statements. The reserves reflected in the Financial Statements with respect to the Accounts Receivable have been established in the Ordinary Course of Business and in accordance with GAAP.

4.17    <u>Taxes</u>.    Except as set forth on <u>Schedule 4.17</u>:

(a)    All Tax Returns of the Sellers and Telequick relating to the Business that are required by Applicable Law to be filed by the Sellers and Telequick have been duly filed on a timely basis and all amounts set forth thereon have been paid in full. All such Tax Returns are correct and complete in all material respects. All Taxes that are due and payable by the Sellers and Telequick with respect to the operations of the Business have been paid in full or adequate reserves therefor have been established, and all deposits required by Applicable Law to be made

with respect to any such Taxes have been duly made. The Transferred Assets, the Transferred Interest, and the assets of the Company and the Operating Subsidiaries are and will be as of the Closing Date, free and clear of any Liens arising out of any unpaid Taxes and there are no grounds for the assertion or assessment of any Liens against the Transferred Assets, the Transferred Interests or the assets of the Company or the Operating Subsidiaries in respect of any Taxes (other than Liens for Taxes if payment thereof is not yet required, and which are included as a current tax liability on the Financial Statement, if such Taxes accrued before or as of the date thereof). From formation through the Closing Date, the Sellers and Telequick have taken no action to cause the Company or the Operating Subsidiaries not to be treated as a partnership for federal income Tax purposes and the Sellers will take all steps reasonably necessary to cause the Company, and cause the Company to cause the each of Operating Subsidiaries, not to be treated as a corporation for federal income Tax purposes. In the event the transactions contemplated by this Agreement will give rise to the assertion of any additional Taxes against the Transferred Assets, the Transferred Interests, the Company or the Operating Subsidiaries prior to Closing, such additional Taxes shall be the responsibility of the Sellers.

(b)     There is no Action or unresolved claim for assessment or collection pending or threatened by, or present or expected dispute with, any Governmental Authority for assessment or collection of any Taxes of any nature from the Sellers or Telequick relating to the Business and there is no basis for any Governmental Authority to assert that additional Taxes are due with respect to the Company, the Operating Subsidiaries or the Business for any period beginning prior to the Closing Date.

(c)     No powers of attorney or other authorizations are in effect that grant to any Person the authority to represent the Company or the Operating Subsidiaries in connection with any Tax matter or proceeding, or any such powers of attorney or other authorizations shall be revoked as of the Closing Date.

(d)     Neither the Sellers nor Telequick has waived nor has been requested to waive any statute of limitations in respect of Taxes.

(e)     All Tax deficiencies determined as a result of any past-completed audit relating to the Business, the Sellers or Telequick have been satisfied.

(f)     Neither the Sellers nor Telequick is a party to or bound by any closing agreement or offer in compromise with any taxing authority.

(g)     Neither the Sellers nor Telequick has taken any action that is not in accordance with past practice that could defer a liability for Taxes of the Sellers or Telequick related to the Business from any taxable period ending on or before the Closing Date to any taxable period ending after the Closing Date.

(h)     All related party transactions conducted by the Sellers or Telequick, and/or other Affiliates of the Sellers have been on an arms' length basis in accordance with Section 482 of the Code.

(i)     Except as described in the Financial Statements, neither the Company nor the Operating Subsidiaries will be required to include any adjustment in taxable income for any

Tax period (or portion thereof) pursuant to Section 481 or Section 263A of the Code or any comparable provision under state or foreign Tax laws as a result of transactions, events or accounting methods employed prior to the Closing.

(j)    "Tax(es)" shall mean all taxes, charges, fees, levies, imposts, customs duties or other assessments imposed by and required to be paid to any Governmental Authority including any federal, state, municipal, local or foreign taxing authority, including, without limitation, income, excise, real and personal property, sales, transfer, import, export, ad valorem, payroll, use, goods and services, value added, capital, capital gains, alternative, net worth, profits, withholding, employer health and franchise taxes (including any interest, penalties, fines or additions attributable to or imposed on or with respect to any such assessment) and any similar charges in the nature of a tax including, unemployment and employment insurance payments and workers compensation premiums, together with any installments with respect thereto and any estimated payments or estimated taxes and whether disputed or not.

(k)    The Sellers and Telequick have collected all sales, use and value added Taxes required to be collected with respect to the Business, and has remitted or will remit on a timely basis, such amounts to the appropriate Governmental Authorities and has furnished properly completed exemption certificates for all exempt transactions.

(l)    The Sellers and Telequick have properly withheld income and social security or other similar Taxes and paid payroll Taxes with respect to all persons properly characterized as employees with respect to the Business for federal, state or local Tax purposes.

4.18    Environmental and Safety Laws. Except as disclosed on Schedule 4.18:

(a)    Each of the Sellers, Telequick and the Business is, and at all times has been, and the Company and the Operating Subsidiaries will be as of the Closing, in compliance with all, and has or will have, as applicable, no liability under any, Environmental Protection Laws or OSHA Laws.

(b)    The Sellers and Telequick have obtained all Environmental Permits that are required in connection with the conduct of the Business, all of which are sufficient in scope for the conduct of the Business as currently conducted, and are valid, subsisting and in full force and effect. The Sellers and Telequick are in compliance with all terms and conditions of such Environmental Permits, and no Action which could reasonably be expected to result in the revocation or suspension or limitation of any such Environmental Permits is pending or threatened, and the Sellers and Telequick have not engaged in any conduct which could reasonably be expected to cause the revocation or suspension or limitation of any such Environmental Permits. All such Environmental Permits are transferable to the Company or the Operating Subsidiaries and shall have been transferred to the Company or the Operating Subsidiaries as of the Closing.

(c)    There has been no pollution or contamination, whether of soil, groundwater or otherwise, at, upon, above, about or beneath any Real Property.

(d)    There has been no spill, discharge, disposal, leak, emission, injection, storage, escape, dumping, release or threatened release of any kind of any Hazardous Substance on, in, under or about any Real Property.

(e)    Neither the Sellers nor Telequick have received at any time prior to the date hereof any summons, citation, notice, directive, letter or other communication, whether written or oral, from (i) the United States Environmental Protection Agency or any other Governmental Authority or any other Person concerning any request for information or potential liability with respect to any offsite treatment storage or disposal facility or any intentional or unintentional action or omission by the Sellers, Telequick or any other Person with respect to the Business or any Real Property constituting a violation or potential violation of, or potential liability under, any Environmental Protection Laws relating to the Business or any Real Property, including, without limitation, any potential liability or violations or potential violations relating to the disposal, release, threatened release, discharge, spilling, leaking, pumping, pouring, emitting, emptying, dumping or otherwise disposing or arranging for disposal, storage or treatment, of any Hazardous Substance or (ii) any Governmental Authority or any other Person concerning any intentional or unintentional action or omission by the Sellers, Telequick or any other Person with respect to the Business constituting a violation or potential violation of any OSHA Laws, and there exist no facts that would be the basis for finding such a violation.

(f)    There are no events, conditions, circumstances, incidents, actions or plans that may interfere with or prevent continued compliance (i) by the Business and/or any Real Property with any Environmental Protection Laws, give rise to any liability relating to the Business and/or any Real Property, or form the basis for any claim, action, suit or other proceeding under any Environmental Protection Laws relating to the Business and/or any Real Property or (ii) by the Business with any OSHA Laws, give rise to any liability relating to the Business, or form the basis for any claim, action, suit or other proceeding under any OSHA Laws relating to the Business.

(g)    There are no and there have never been, any underground storage tanks located at any Real Property.

(h)    There are no and there have never been, any hazardous waste treatment, storage or disposal units or facilities located on any Real Property.

(i)    All Hazardous Substances now or previously present at any Real Property have been and are handled, packaged, labeled, stored, used and disposed of in compliance with Environmental Protection Laws and OSHA Laws.

(j)    The Sellers and Telequick have delivered to the Purchaser copies of all environmental audits and studies relating to the Real Property and the Business.

(k)    There are no asbestos or asbestos containing materials of any kind on any Real Property, including asbestos building materials, piping, lagging, parts or equipment.

(l)    None of the matters set forth on Schedule 4.18 can reasonably be expected to result in a Material Adverse Effect.

4.19    <u>Related Party Transactions</u>.  Except as set forth on <u>Schedule 4.19</u>, there are no agreements, understandings or proposed transactions between the Sellers, the Company, the Operating Subsidiaries and any Founder or any of their respective employees, directors, Affiliates or any Affiliate thereof.  <u>Schedule 4.19</u> sets forth (a) a correct and complete list and description of all obligations of the Sellers, the Company and the Operating Subsidiaries to any Founder or the Sellers' Affiliates, employees or directors or to any Family Member thereof and of all Indebtedness of such Persons to the Sellers, the Company or the Operating Subsidiaries; and (b) a list of all dividends, distributions, share repurchases, redemptions and tax distributions made by the Sellers or Telequick to any Founder from and after December 31, 2005.  No Founder, nor any Affiliate, employee or director of the Sellers, the Company or the Operating Subsidiaries, or any Family Member of any Founder, Affiliate, employee or director of the Seller, is indebted to the Sellers, the Company or the Operating Subsidiaries or has any direct or indirect ownership interest in any entity with which the Sellers the Company or the Operating Subsidiaries are affiliated or with which the Sellers, the Company or the Operating Subsidiaries have a business relationship, or any entity which competes with the Sellers, the Company or the Operating Subsidiaries.  No Founder, nor any Affiliate, employee or director of the Sellers the Company, the Operating Subsidiaries or any Founder, nor any Family Member of any Founder, Affiliate, employee or director of the Sellers, the Company or the Operating Subsidiaries, is, directly or indirectly, interested in any contract or agreement to which the Sellers the Company or the Operating Subsidiaries are a party (other than such contracts as relate to any such Person's ownership of capital stock or other securities of the Sellers or Telequick).

4.20    <u>Intellectual Property</u>.

(a)    <u>Schedule 4.20</u> sets forth a true, accurate and complete list of the Intellectual Property that is necessary to or used in the Business as now conducted or as presently contemplated to be conducted following the Closing (collectively, the "<u>Business Intellectual Property</u>").  The Sellers or Telequick own or have the right to use, and the Company and the Operating Subsidiaries will own and have the right to use as of the Closing, free and clear of all Liens, all Business Intellectual Property without any conflict with or infringement of the rights of others and the consummation of the transactions contemplated hereby and by the Related Documents will not alter or impair in an adverse manner the Business Intellectual Property.

(b)    Except as set forth on <u>Schedule 4.20</u>, no third party has any ownership right, title, interest, claim in or Lien on any of the Business Intellectual Property.  The Sellers and Telequick have taken steps to preserve and protect its legal rights in, and the secrecy of, the Business Intellectual Property.

(c)    The Sellers and Telequick are not, and the Company and the Operating Subsidiaries will not be as of the Closing, in default under any agreement pursuant to which it is licensing Intellectual Property of a third party or granting licenses to its own Intellectual Property.  The Sellers and Telequick have not received any communications alleging that the Sellers or Telequick have violated in any material respect any other Person's Intellectual Property rights or has engaged in unfair competition against such Person.

(d)    The Sellers or Telequick have written agreements in effect with all of its current and former employees and consultants who have access to the Business Intellectual

Property. None of the Sellers' or Telequick's current or former employees or consultants are in violation of any such agreement and all such agreements fully vest in the Sellers or Telequick (subject to any limitations imposed by Applicable Law) full title and ownership of all inventions and proprietary rights developed or invented by any and all employees and consultants during the period of their employment and/or consultancy and resulting directly or indirectly from their work for the Sellers or Telequick.

(e)     The Sellers and Telequick (i) do not now infringe or misappropriate any third party's Intellectual Property rights, and (ii) do not have any liability for any past infringement or misappropriation. No claim has been made or is threatened with regard to any third party Intellectual Property, including any allegation of Intellectual Property infringement or misappropriation or of any breach or default of an Intellectual Property license or similar agreement.

(f)     Each of the Sellers' and Telequick's patents, patent applications, registered copyrights, copyright applications, trademarks, service marks, trademark and service mark applications, mask work registrations and mask work registration applications are set forth on Schedule 4.20.

4.21    Products; Product Warranty and Liability.

(a)     Each Product designed, manufactured, distributed, performed and provided by the Sellers and Telequick has been designed, manufactured, distributed, performed and provided in conformity with all applicable contractual commitments, all express warranties and all Applicable Laws, and the Sellers and Telequick have (and the Company and the Operating Subsidiaries will have as of the Closing) no Liability or other damages in connection therewith. Schedule 4.21(a) includes copies of the standard terms and conditions of sale for Products of the Business (containing applicable guaranty, warranty, and indemnity provisions). No Product manufactured or fabricated by or on behalf of the Sellers or Telequick in the conduct of the Business is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale set forth in Schedule 4.21(a).

(b)     To the actual knowledge, and the knowledge which could have been acquired after making reasonable investigation under the circumstances, of the Sellers and the Founders, each Product designed, manufactured, distributed, performed, provided and sold by the Sellers and Telequick on behalf of third parties has been designed, manufactured, distributed, performed, provided and sold in conformity with all applicable contractual commitments, all express warranties and all Applicable Laws, and the Sellers and Telequick have (and the Company and the Operating Subsidiaries will have as of the Closing) no Liability or other damages in connection therewith. Schedule 4.21(b) includes copies of the standard terms and conditions of sale for Products of the Business (containing applicable guaranty, warranty, and indemnity provisions).

4.22    Liabilities and Indebtedness. Neither the Sellers nor any Founder have taken any action that would result in the creation, incurrence or assumption of any Indebtedness on the part of the Company or the Operating Subsidiaries, contingent or otherwise, either directly or indirectly, including the guaranty of any Indebtedness of any other Person or entity.

4.23    <u>Distributors</u>.  Except as set forth on <u>Schedule 4.23</u>, no distributor, contractor, broker, dealer, agent or representative, other than the Sellers' and Telequick's current employees, have an oral or written agreement or understanding to sell or otherwise provide Products.

4.24    <u>Customers</u>.  Schedule 4.24 sets forth the names and addresses of the twenty (20) largest (based upon revenues) customers, contractors and other Persons from whom the Sellers and Telequick derived revenues in connection with the Business for the twelve (12) month periods ended December 31, 2006, and 2005, and the amount for which each such customer, contractor or other Person was invoiced during such periods.    Except as set forth in <u>Schedule 4.24</u>, neither the Sellers or Telequick have received any notice, nor do either the Sellers or any Founder have any reason to believe, that any such customer, contractor or other Person set forth in <u>Schedule 4.24</u> has ceased, or will cease, to purchase or use Products, or has substantially reduced, or will substantially reduce, the purchase or use of Products from the Company or the Operating Subsidiaries subsequent to the Closing.  The Sellers and Telequick are current and in full compliance with respect to all of their material obligations to all of their customers, contractors and each other Person from whom they derive revenues.

4.25    <u>Suppliers</u>.  Schedule 4.25 sets forth the name and address of the twenty (20) largest (based upon payments made by the Sellers and Telequick) suppliers, vendors or other providers of services to the Sellers and Telequick for each of the twelve (12) month periods ended December 31, 2006, and 2005.  Except as listed on <u>Schedule 4.25</u>, neither the Sellers nor Telequick have received any notice, nor do either the Sellers or any Founder have any reason to believe, that any such supplier, vendor or other provider of services has ceased, or will cease, to supply products or other goods or services to the Company or the Operating Subsidiaries on or after the Closing Date, or has substantially reduced, or will substantially reduce, the supply of such items or services to the Company or the Operating Subsidiaries after the Closing Date.  The Sellers and Telequick are current and in full compliance with respect to all of their material obligations to their suppliers, vendors and other providers of services.

4.26    <u>Brokers; Certain Expenses</u>.  Except for the Caymus Fee, neither the Sellers, the Company, the Operating Subsidiaries nor the Founders has paid or become obligated to pay any fee or commission to any broker, finder, investment banker or other intermediary in connection with this Agreement or any of the Related Documents.

4.27    <u>Disclosure</u>.  No representation or warranty made by the Sellers, the Company, the Operating Subsidiaries or the Founders in this Agreement, any Schedule hereto, any Related Document, or any document or certificate furnished or to be furnished by or on behalf of the Seller to the Purchaser or its Affiliates, agents and representatives in connection with this Agreement and the Related Documents or the transactions contemplated hereby or thereby contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they are made, not misleading.  There is no fact that has not been disclosed in this Agreement or the Related Documents which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser represents to the Sellers, the Company, the Operating Subsidiaries and the Founders as follows:

5.1     Organization and Existence; Authorization; No Conflicts.

(a)     The Purchaser is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. The Purchaser has all requisite power and authority to execute and deliver this Agreement and the Related Documents to which it is a party, to purchase the Preferred Units hereunder, and to carry out and perform its obligations under the terms of this Agreement and the Related Documents to which it is a party.

(b)     The execution, delivery and performance of this Agreement and the Related Documents by the Purchaser and the consummation of all transactions contemplated hereby or thereby, including but not limited to the purchase of the Preferred Units, have been duly authorized by all required actions of the Purchaser.

(c)     This Agreement and the Related Documents have been duly executed and delivered by the Purchaser. This Agreement and the Related Documents constitute valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with their respective terms, except as enforcement may be limited by principles of public policy, and subject to laws of general application relating to Bankruptcy, insolvency, reorganization, moratorium and the relief of debtors and rules of law and general principles of equity governing specific performance, injunctive relief or other equitable remedies.

5.2     Investment. The Purchaser is acquiring the Preferred Units for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof in violation of Applicable Laws. The Purchaser understands that the Preferred Units to be purchased have not been registered or qualified, as the case may be, under the Securities Act of 1933, as amended (the "Securities Act") or any applicable state securities laws by reason of a specific exemption from the registration or qualification provisions of the Securities Act or any applicable state securities laws.

5.3     Brokers or Finders. The Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken by the Purchaser, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement for which the Sellers, the Company, the Operating Subsidiaries or any Founder will be responsible.

## ARTICLE 6
## CONDITIONS TO THE CLOSING

The obligations of the parties to this Agreement are subject to the following conditions:

6.1     Conditions to the Obligations of the Parties. The obligations of the parties to consummate the transactions contemplated hereby shall be subject to the condition that (a) no injunction or order shall have been issued by any court of competent jurisdiction or any other

Governmental Authority that would restrain or prohibit any of the transactions contemplated by this Agreement or any of the Related Documents or that would impose damages as a result thereof and (b) no Action shall be pending before any court or administrative agency or instrumentality of competent jurisdiction in which any Person seeks such a remedy (if, in the opinion of counsel to any party, there exists a reasonable risk of a materially adverse result in such pending Action).

6.2    Conditions to the Obligations of the Purchaser. The obligations of the Purchaser to purchase the Preferred Units at the Closing as contemplated hereby shall be subject to the fulfillment or satisfaction (or waiver in writing by the Purchaser) at or prior to the Closing of each of the following conditions:

(a)    Representations; Performance by the Seller and the Founders. Each of the representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement and in each Related Document shall be true and correct as of the Closing with the same force and effect as if made on such date, and the Sellers, the Company, the Operating Subsidiaries shall have performed and satisfied their respective obligations required or contemplated by this Agreement and the Related Documents to be performed and satisfied by them prior to the Closing.

(b)    No Material Adverse Effect. Since December 31, 2005, there has been no Material Adverse Effect.

(c)    Asset and Interest Transfers. The Sellers shall have consummated the Asset Transfer and the Interest Transfer, free and clear of all Liens, each in a manner satisfactory to the Purchaser.

(d)    Authorizations. All authorizations of the Sellers, the Company, the Operating Subsidiaries and the Founders in connection with this Agreement and the Related Documents and the transactions contemplated hereby and thereby shall have been taken and shall be reasonably satisfactory in form and substance to the Purchaser.

(e)    Delivery of Audited Financial Statements. The Sellers and Telequick shall have delivered audited balance sheets as of December 31, 2005, and June 30, 2006, and related income and cash flow statements, in form and substance satisfactory to the Purchaser (the "Audited Financial Statements"). The Audited Financial Statements shall have been prepared by Kingery & Crouse, P.A.

(f)    Caymus Fee. The Caymus Fee shall have been paid by wire transfer of immediately available funds to the account designated by Caymus Partners LLC at the Closing.

(g)    Closing Documents. The Sellers shall have delivered, or caused to be delivered, to the Purchaser on the Closing Date the following documents all in form and substance satisfactory to the Purchaser:

(i)    original certificates evidencing the Preferred Units;

(ii)    employment agreements with the Company, duly executed by each of Wolf and Eliasson in form and substance satisfactory to the Purchaser (the "Employment Agreements");

(iii)    a Secretary's Certificate of each Seller, the Company and each Operating Subsidiary, as applicable, duly executed by the Secretary of such party, with incumbency, certifying as to the following matters:    (A) the articles or certificates of incorporation or formation, as applicable, of such party, (B) the bylaws or operating agreement, as applicable, of such party, (C) the authorizing resolutions of the board of directors or managers and the shareholders or members of such party, as applicable, approving the transactions contemplated by this Agreement and (D) the good standing certificates set forth in Section 6.2(g)(iv);

(iv)    certificates dated (A) as of a date that is prior to, and in the same month and year as, the Closing Date, with respect to each of the Company and the Operating Subsidiaries, from the Secretary of State of the State of such entity's organization that such entity is legally existing and in good standing in such State, and (B) as of a date that is prior to, and in the same month and year as, the Closing Date, with respect to FTN, Guardian and Bay Pines, from the Secretary of State of the jurisdiction of organization of such entity, that such entity is legally existing and in good standing in such jurisdiction;

(v)    a certificate of the Sellers, executed by the Chief Executive Officers of the Sellers and Wolf and Eliasson, as applicable, dated the Closing Date, and certifying as to the fulfillment of the conditions specified in Sections 6.2(a), 6.2(b), 6.2(c) and 6.2(d) of this Agreement;

(vi)    the Restated LLC Agreement, duly executed by, as applicable, the Seller, the Founders and the Company;

(vii)    evidence, in a form satisfactory to the Purchaser, that the Company and the Operating Subsidiaries, as applicable, have obtained (A) general liability and property insurance in amounts satisfactory to the Purchaser, and (B) director and officer insurance in an amount of no less than Three Million Dollars ($3,000,000);

(viii)    the Services Agreement, duly executed by each of the Sellers, the Company and the Operating Subsidiaries; and

(ix)    the Bay Pines Agreement, duly executed by each of the Sellers, the Company and the Operating Subsidiaries, as applicable.

(h)    Opinion of Counsel.    The Seller shall have caused to be delivered to the Purchaser an opinion of Macfarlane, Ferguson & McMullen, P.A., dated the Closing Date and addressed to the Purchaser in form and substance satisfactory to the Purchaser.

(i)    Licenses; Governmental and Other Third Party Consents.    The Company, the Operating Subsidiaries or the Purchaser, as applicable, shall have received or applied for all necessary Licenses and Consents, including, without limitation, those identified on Schedule

6.2(i), to the consummation of the transactions contemplated by this Agreement and the Related Documents.

(j)     No Distributions.  Except as set forth on Schedule 6.2(j), since December 31, 2005, there shall have been no distributions or dividends of cash or other property or similar transfers from the Sellers to any of the Founders.

(k)     Employment Arrangements.  All employees set forth on Schedule 6.2(k) shall have accepted employment offers with the Company or the Operating Subsidiaries and, and all current and future employees of the Company or the Operating Subsidiaries shall have entered into noncompetition, proprietary information and invention assignment agreements in form and substance satisfactory to the Purchaser.  The employee benefit plans listed on Schedule 6.2(k) shall have been assigned to or assumed by the Company or the Operating Subsidiaries.

(l)     Registration Rights Agreement.  The Purchaser and the Company shall have executed a registration rights agreement by and between the Company and the Purchaser, in the form of **Exhibit C** attached hereto.

(m)     Cash Balance.  Immediately following the Closing and the payment of all fees, expenses and liquidity pursuant to Section 3.4, the Company shall have a minimum of Two Million and Dollars ($2,000,000) in cash (net of (A) any written but uncleared checks of the Company and the Subsidiaries, (B) any accounts payable of the Company and the Subsidiaries that are more than thirty (30) calendar days past due, and (C) any increase in the Indebtedness of the Company and the Operating Subsidiaries immediately following the Closing Date) on its consolidated balance sheet after giving effect to the Sellers Loan provided for in Section 3.4 and the senior debt referenced in Section 3.5.

6.3     Conditions to the Obligations of the Sellers and the Company.  The obligations of the Sellers and the Company to sell the Preferred Units at the Closing as contemplated hereby shall be subject to the fulfillment or satisfaction (or waiver in writing by the Sellers) at or prior to the Closing of each of the following conditions:

(a)     Representations; Performance of the Purchaser.  Each of the representations and warranties made by the Purchaser in this Agreement shall be true and correct as of the Closing and the Purchaser shall have performed and satisfied in all material respects each of its obligations required or contemplated by this Agreement and in each Related Document to be performed as of the Closing.

(b)     Authorizations.  All authorizations of the Purchaser in connection with this Agreement and the Related Documents and the transactions contemplated hereby and thereby shall have been taken and shall be reasonably satisfactory in form and substance to the Seller.

(c)     Restated LLC Agreement.  The Restated LLC Agreement shall have been executed and delivered by the Purchaser.

(d)     Purchase Price.  The Purchase Price shall have been paid, as provided in Section 3.3.

## ARTICLE 7
## COVENANTS AND AGREEMENTS

7.1    <u>Post-Closing Covenants</u>.

(a)    <u>Cooperation; Securities Filings</u>. Each party shall cooperate with the other parties and use its reasonable best efforts to consummate the transactions contemplated by this Agreement and the Related Documents in accordance with the terms hereof and thereof. The Sellers and the Company shall make all necessary filings under applicable federal and state securities Laws, including, but not limited to, a Form D and any amendments thereto as required by Rule 503 of Regulation D.

(b)    <u>Publicity</u>. At any time on or after the Closing Date, no party (nor any of its Affiliates) shall, directly or indirectly, make any press release or other public announcement with respect to the transactions contemplated hereby or under the Related Documents without the prior written consent of the other parties, unless any such party is required by Applicable Law to make such a press release or announcement.

(c)    <u>Operations of Certain Sellers</u>. The Sellers and the Founders covenant and agree that, at all times after the Closing, (i) the Founders will be the sole record and beneficial owners of FTN, Guardian and Bay Pines, and (ii) FTN and Guardian will engage in no activities or operations other than (A) those incidental to their ownership of interests in the Company, and (B) their obligations under this Agreement and the Services Agreement. The Sellers and the Founders agree that, for as long as (1) FTN and Guardian are the owners of any Common Units, such entities shall not be dissolved or liquidated without the approval of the Purchaser, and (2) the Bay Pines Agreement remain in effect, Bay Pines shall not be dissolved or liquidated without the approval of the Purchaser.

(d)    <u>Payment of Closing Fee</u>. Within sixty (60) calendar days after the Closing Date, the Company shall pay the Closing Fee by wire transfer of immediately available funds to the account designated by the Purchaser.

(e)    <u>Assignment of Untransferred Contracts</u>. Within ninety (90) calendar days after the Closing Date, the Sellers and the Founders shall use their best efforts to take all actions necessary or advisable to, as soon as possible after the Closing, obtain consent to the assignment of, and assign or otherwise transfer the Untransferred Contracts to the Company or one of the Operating Subsidiaries, as applicable.

(f)    <u>Transfer of Bay Pines Assets</u>. Upon the request of the Purchaser, and, in no event, not later than March 31, 2008:

(i)    the Company shall form, and shall own One Hundred Percent (100%) of the outstanding membership interests of, a limited liability company under the laws of the State of Florida named "Bay Pines, LLC" or such other name as the parties hereto shall agree is appropriate ("<u>Bay Pines, LLC</u>"), and Bay Pines shall sell all of its assets to Bay Pines, LLC for an aggregate purchase price of One Dollar ($1);

(ii)    Bay Pines shall change its name to a name sufficiently dissimilar to Bay Pines, LLC in the Purchaser's reasonable judgment;

(iii)    the parties hereto shall (A) amend this Agreement to (1) revise the definition of "Operating Subsidiaries" to include Bay Pines, LLC and (2) make such other changes to this Agreement as are necessary to make Bay Pines, LLC a party hereto, and (B) take all such other actions necessary to ensure that Bay Pines, LLC is subject to the provisions of this Agreement and the Related Documents; and

(iv)    the Bay Pines Agreement shall be terminated.

Notwithstanding the provisions of this Section 7.1(f), the Company may delay such intended actions if the Board of Managers of the Company determines in good faith that the licenses owned by Bay Pines would be cancelled, or otherwise terminated, as a result of such requested actions; provided, however, that the Company may only delay such transactions long enough to ensure that either (A) Bay Pines, LLC has obtained such licenses as are necessary for Bay Pines, LLC to operate as Bay Pines has historically operated, or (B) Bay Pines has successfully transferred its licenses to Bay Pines, LLC without risk of cancellation; provided, further, that the Company may not delay such intended actions beyond March 31, 2008; provided, further, that the Company may make requests from the Purchaser for six (6)-month extensions beyond March 31, 2008, which requests shall not be unreasonably denied.

(g)    Key-Man Life Insurance.  Within thirty (30) days after the Closing Date, the Company shall deliver evidence, in a form satisfactory to the Purchaser, that the Company has obtained "key man" life and disability insurance on the life of Bryon Wolf in the amount of Twenty-Five Million Dollars ($25,000,000), of which (1) Twenty Million Dollars ($20,000,000) shall be collaterally assigned to Kayne as security for the redemption of the Preferred Units pursuant to the terms of the Restated LLC Agreement, and (2) the remainder shall be assigned to the Company; provided, however, in the event (i) the cost of such insurance exceeds Fifty Thousand Dollars ($50,000) and (ii) a majority of the managers of the Company decide, in good faith, to not pay such amount in excess of Fifty Thousand Dollars ($50,000), the Company shall purchase and maintain such insurance in whatever coverage amount can be acquired for Fifty Thousand Dollars ($50,000); provided, further, that the Company may request for an extension of the foregoing thirty (30)-day period from the Purchaser which request shall not be unreasonably denied.

7.2    Non-solicitation; Covenant Not to Compete; Confidentiality.

(a)    From and after the Closing Date, and for a period of five (5) years thereafter (the "Restricted Period"), the Sellers and the Founders shall not, and they shall cause their respective Affiliates not to, directly or indirectly, (i) hire any employee of the Company or the Operating Subsidiaries within twelve (12) months following the termination of his or her employment with the Company or the Operating Subsidiaries unless the Company or the Operating Subsidiaries has terminated such employee's employment, (ii) encourage, solicit, induce or attempt to encourage, solicit or induce any employee to leave his or her employment with the Company or the Operating Subsidiaries, terminate his or her relationship with the Company or the Operating Subsidiaries or to devote less than his or her full-time efforts to the

Business for any reason, (iii) solicit any present or former customers, clients or other persons from whom Sellers and Telequick derived any revenue in the course of conducting the Business prior to the Closing Date for the purpose of competing with the Business, (iv) solicit any present or future customers, clients or other persons from whom the Company or the Operating Subsidiaries derives any revenue, with respect to the Business as conducted by the Company on or after the Closing Date for the purpose of competing with the Business, or (v) persuade or attempt to persuade any present or future customer, client, vendor, service provider, supplier, contractor or any other Person having business dealings with the Company or the Operating Subsidiaries to cease doing business or otherwise transacting with the Company or the Operating Subsidiaries or to reduce the amount of business or such other transactions it conducts or will conduct with the Company or the Operating Subsidiaries or otherwise disrupt, damage, impair or interfere in any manner with the business of the Company or the Operating Subsidiaries.

(b)    From and after the Closing Date, and for the Restricted Period, the Sellers and the Founders jointly and severally agree that they shall not, and they shall cause their respective Affiliates not to, directly or indirectly, own, manage, operate or control, or engage, join or participate in the ownership, management, operation or control of, or furnish any capital or loans to, be employed by or act as a consultant to or be connected in any manner with, any Person or business that is engaged in, or owns, invests in, operates, manages or controls any venture or enterprise which directly or indirectly engages or proposes to engage in a business which is competitive with the Business or with the business in which the Company or the Operating Subsidiaries is then engaged anywhere in the world (the "Territory"). Notwithstanding the foregoing, nothing herein shall prohibit or otherwise restrict the Sellers or any Founder from holding a passive investment in the equity securities of any Person if such equity securities are registered under the Securities Act; provided that such equity investment does not exceed One Percent (1%) of the outstanding equity securities of such Person.

(c)    The Founders acknowledge that in their capacities as the sole shareholders, directly or indirectly, of the Sellers, they have occupied positions of trust and confidence with respect to the Sellers. The Sellers and each Founder jointly and severally agree that they shall not disclose to others or use, and shall prevent each of their Affiliates from disclosing to others or using, directly or indirectly, any Confidential Information regarding the Sellers, the Company, the Operating Subsidiaries, the Business, the prospective businesses of the Company or the Operating Subsidiaries or any of the Products, except as required in the course of any Founder's employment with the Company or the Operating Subsidiaries, at any time after the Closing. The Sellers and each Founder jointly and severally represent and warrant to the Company and the Operating Subsidiaries that, as of the Closing Date it, he or she has surrendered to the Company or the Operating Subsidiaries, as applicable, all documents, work papers, lists, memoranda, records, computer data and other data (including all copies) in its, his or her possession constituting or pertaining in any way to the Confidential Information. The Sellers and the Founders acknowledge and agree that such Confidential Information is specialized, unique in nature and of great value to the Company, the Operating Subsidiaries and the Business and that such information gives the Company, the Operating Subsidiaries and the Business a competitive advantage.

(d)    The necessity of protection against competition from the Sellers and the Founders and the nature and scope of such protection has been carefully considered by the

parties to this Agreement based upon the consultation with and advice from their respective legal counsel. The Sellers and the Founders acknowledge and agree that they will receive direct and substantial benefits from the transactions contemplated by this Agreement and that the Purchaser would not enter into the transactions contemplated by this Agreement without the agreements of Sellers and the Founders contained in this <u>Section 7.2</u>. The parties agree and acknowledge (i) the Purchaser is investing substantial sums to acquire an interest in the Company and the Business, (ii) that the duration, scope and Territory applicable to the covenants contained in this <u>Section 7.2</u> are fair, reasonable and necessary, and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the Company's and the Operating Subsidiaries' and the Purchaser's investment therein and the Company's and the Operating Subsidiaries' business goodwill, (iii) that adequate compensation has been received by the Sellers and the Founders for such obligations and (iv) that these obligations do not prevent the Sellers or the Founders from earning a livelihood and/or conducting any other business. If any provision of this <u>Section 7.2</u> is held to be illegal, invalid or unenforceable under present or future laws, rules or regulations of any governmental entity effective during the period set forth in such sections, the legality, validity and, enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired. If any court determines that any of the covenants contained in this <u>Section 7.2</u>, or any part thereof, are unenforceable because of the duration of such provision or the product, services or area covered thereby or for any other reason, such court shall have the power and the parties intend and desire that such court, and in connection with the purchase and acquisition of the Preferred Units the Purchaser is relying on such court to, exercise such power to reduce the duration or coverage of such provision to the minimum extent necessary to render such provision enforceable, and in its reduced form, such provision shall then be enforceable and shall be enforced. Each party hereto intends to and does hereby confer jurisdiction to enforce the covenants and other provisions contained in this <u>Section 7.2</u>, upon the courts of any jurisdiction within the geographic scope of such covenants or other provisions. If the courts of any one (1) or more of such jurisdictions holds such covenants or other provisions wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of each party that such determination not bar or in any way affect the rights of the Purchaser, the Company or the Operating Subsidiaries to relief in the courts of any other jurisdiction within the geographic scope of such covenants or other provisions, as to breaches of such covenants or other provisions in any such other jurisdiction, such covenants or other provisions as they relate to each jurisdiction and geographic location being, for this purpose, severable into diverse and independent covenants and other provisions.

       (e)      The Sellers and each Founder recognize that any actual or threatened breach of this <u>Section 7.2</u> shall cause irreparable injury to the Company, the Operating Subsidiaries and the Purchaser, inadequately compensable in monetary damages. Accordingly, notwithstanding the provisions of <u>Article 8,</u> in addition to any other legal or equitable remedies that may be available to the Company, the Operating Subsidiaries and the Purchaser, the Sellers and each Founder agree that the Company, the Operating Subsidiaries and the Purchaser shall be able to seek and obtain injunctive relief in the form of a temporary restraining order, preliminary injunction, or permanent injunction. The Company, the Operating Subsidiaries and the Purchaser shall not be required to demonstrate actual injury or damage to obtain injunctive relief from the courts. In addition, in any Action arising out of this <u>Section 7.2</u>, the prevailing party or parties shall be entitled to recover, in addition to any damages caused by a breach of this <u>Section</u>

7.2, all costs and expenses, including but not limited to, reasonable attorneys' fees, expenses, and court costs incurred by such party or parties in connection with such Action.

### 7.3 Tax Matters.

(a)    All transfer, documentary, sales, use, stamp registration and other similar Taxes imposed by any Governmental Authority (including any state, county, local or other taxing authority) as a result of the Transfer or the purchase of the Preferred Units shall be duly and timely paid by the Company. The Company shall duly and timely file all Tax Returns in connection with such Taxes. The Company shall give a copy of each such Tax Return to the Purchaser for its review with sufficient time for the provision of comments prior to filing.

(b)    The Sellers shall prepare or cause to be prepared and file or cause to be filed all Tax Returns with respect to the Business for all periods ending on or before the Closing Date which are filed after the Closing. To the extent permitted by Applicable Law, the Sellers shall include any income, gain, loss, deduction or other Tax items for such periods on their Tax Returns in a manner consistent with the Schedules K-1 furnished by the Company for such periods.

(c)    The Company, the Sellers, the Founders and the Purchaser shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Sellers agree to retain all books and records with respect to Tax matters pertinent to the Sellers and Telequick relating to any Tax period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Company, any extensions thereof) of the respective Tax periods, and to abide by all record retention agreements entered into with any Governmental Authority.

(d)    All Tax sharing agreements or similar agreements with respect to or involving the Sellers, the Company or the Operating Subsidiaries shall be terminated as of the Closing Date and, after the Closing Date, the Sellers, the Company, the Operating Subsidiaries and the Purchaser shall not be bound thereby or have any liability thereunder.

(e)    The Sellers and the Purchaser agree to cause the Company to make an election pursuant to Section 754 of the Code in its initial Tax Return and not to revoke or terminate such election.

(f)    As of the Closing Date, the combined opening Capital Account (as defined in the Restated LLC Agreement) of the Purchaser with respect to the Preferred Units shall be Twenty Million Dollars ($20,000,000). As of the Closing Date, the combined opening Capital Accounts of each Seller with respect to the Common Units shall be Two Million Dollars ($2,000,000).

# ARTICLE 8
## INDEMNIFICATION

8.1    <u>Survival of Representations and Warranties</u>.  The representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement or any Related Document shall survive the Closing and shall continue in effect for a period of eighteen (18) months (the "<u>Survival Period</u>") following the Closing Date, except:

(a)    As to the breach of any such representation or warranty as to which a claim is submitted in writing by a Purchaser Indemnitee within the Survival Period and identified as a claim for indemnification pursuant to this Agreement or any Related Document, in which case such representation and warranty shall survive until the claim is resolved;

(b)    The representations and warranties set forth in <u>Sections 4.8</u> (Absence of Certain Changes or Events), <u>4.11</u> (Litigation; Restriction on Business Activities), <u>4.12</u> (Material Contracts and Other Agreements), <u>4.13</u> (Compliance with Laws; Licenses), <u>4.19</u> (Related Party Transactions), <u>4.21</u> (Products; Product Warranty and Liability), <u>4.22</u> (Liabilities and Indebtedness) and <u>4.27</u> (Disclosure) shall continue in effect for a period of thirty-six (36) months following the Closing Date; and

(c)    The representations and warranties set forth in <u>Sections 4.7</u> (Financial Statements), <u>4.10</u> (Employees; Employee Benefits), <u>4.17</u> (Taxes), <u>4.18</u> (Environmental and Safety Laws) and <u>4.20</u> (Intellectual Property) shall survive the Closing until sixty (60) calendar days following the expiration of all applicable statutes of limitations (and any extension thereof) with respect to such matters; and

(d)    The representations and warranties set forth in <u>Sections 4.1</u> (Organization; Good Standing; Qualification), <u>4.2</u> (Subsidiaries), <u>4.3</u> (Power and Authority; Capitalization; Indebtedness), <u>4.4</u> (Asset and Interest Transfer), <u>4.5</u> (Authorization; Execution and Delivery; No Conflicts), <u>4.14</u> (Title to Properties; Liens and Encumbrances) and shall survive the Closing indefinitely.

Notwithstanding anything to the contrary contained in this Agreement, the obligations of the Sellers, the Company, the Operating Subsidiaries and the Founders to indemnify any Purchaser Indemnitee for Losses arising out of or resulting from any fraud or intentional or willful misrepresentation shall survive indefinitely.  The representations and warranties of the Purchaser shall survive the Closing for a period of eighteen (18) months commencing on the Closing Date.  Notwithstanding the right of the Purchaser to investigate the business, assets and financial condition of the Sellers, the Company and the Operating Subsidiaries, and notwithstanding any knowledge obtained or obtainable by the Purchaser as a result of such investigation, the Purchaser has the right to rely upon, and has relied upon, each of the representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement or pursuant hereto.

8.2    <u>Indemnification by the Sellers, the Company, the Operating Subsidiaries and the Founders</u>.  Subject to the terms and provisions of <u>Section 8.1</u>, the Sellers, the Company, the Operating Subsidiaries and the Founders (each an "<u>Indemnitor</u>") agree, jointly and severally, to

indemnify and hold harmless the Purchaser, and its officers, directors, managers, members, partners, agents, Affiliates (excluding the Company and the Operating Subsidiaries after the Closing) and representatives (each a "Purchaser Indemnitee") from and against, and shall reimburse each Purchaser Indemnitee on demand for, any and all direct or indirect claims, suits, actions, proceedings, liabilities, obligations, judgments, fines, penalties, claims, losses, damages, diminution in value, lost profits, costs and expenses of any kind (including, without limitation, the reasonable fees and disbursements of counsel, accountants and other experts whether incurred in connection with any of the foregoing or in connection with any investigative, administrative or adjudicative proceeding, whether or not such Purchaser Indemnitee shall be designated a party thereto), together with any and all reasonable costs and expenses associated with the investigation of the same and/or the enforcement of the provisions hereof and thereof (collectively, "Losses"), which may be incurred by such Purchaser Indemnitee relating to, based upon, resulting from or arising out of:

(a)    the breach of any representation or warranty made by any of the Sellers, the Company, the Operating Subsidiaries or the Founders in this Agreement or in any Related Document as of the date hereof and as of the Closing Date;

(b)    the breach of any agreement, covenant or obligation of any of the Sellers, the Company, the Operating Subsidiaries or the Founders contained in this Agreement or in any Related Document;

(c)    the Excluded Liabilities;

(d)    any Liability incurred by the Sellers, the Company, the Operating Subsidiaries or the Founders to pay any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement;

(e)    any misrepresentation contained in any certificate or other document furnished by or on behalf of the Sellers, the Company, the Operating Subsidiaries or the Founders pursuant to this Agreement or in any Related Document or in connection with the transactions contemplated hereby or thereby or any other Losses arising out of or resulting from any fraud or intentional or willful misrepresentation;

(f)    the operation of the Business on or prior to the Closing Date, including any suit, action or other proceeding against the Company or the Operating Subsidiaries (not disclosed in the Schedules) brought by or on behalf of (i) any current or former (as of the Closing Date) employee, officer, director, agent, consultant or independent contractor of the Sellers or Telequick with respect to any act or omission by the Sellers or Telequick prior to the Closing or (ii) any Person as a result of a purported breach of contract or tort committed by the Sellers, the Company, the Operating Subsidiaries or the Founders prior to the Closing; or

(g)    the failure of the Sellers, the Company, the Operating Subsidiaries or the Founders to comply with any applicable bulk sales laws.

8.3    Conditions to and Limitations on Indemnification.  No party to this Agreement shall be entitled to indemnification pursuant to this Article 8 for breaches of representations and

warranties made hereunder unless a claim is submitted in writing by a Purchaser Indemnitee within the periods specified in <u>Section 8.1</u> of this Agreement. Notwithstanding anything herein to the contrary, a Purchaser Indemnitee shall not be entitled to make a claim for indemnification under a "diminution in value" theory pursuant to <u>Sections 8.2(a)</u>, <u>(b)</u> or <u>(f)</u> unless the Losses that are the subject of such claim result in (a) an actual loss of any portion of the Original Issue Price (as such term is defined in the Restated LLC Agreement) to the Purchaser, or (b) a material change in the condition (financial or otherwise) or results of operations of the Company, the Operating Subsidiaries or the Business such that the Company, Operating Subsidiaries or Business will not be able to meet its obligations under this Purchase Agreement or the Restated LLC Agreement executed even herewith.

8.4    <u>Indemnity Threshold</u>. A Purchaser Indemnitee shall not be entitled to make any claims for indemnification payment pursuant to <u>Section 8.2(a)</u>, until such time as the total amount of all Losses (including the Losses arising from such breach and all other Losses arising from any other breaches of any representations or warranties made by the Indemnitors in this Agreement) that have been suffered or incurred by any one or more of the Purchaser Indemnitees, or to which any one or more of the Purchaser Indemnitees has or have otherwise become subject, exceeds Four Hundred Thousand Dollars ($400,000). Subject to the Indemnity Cap, if the total amount of such Losses exceeds Four Hundred Thousand Dollars ($400,000), the Purchaser Indemnitees shall be entitled to be indemnified against and compensated and reimbursed for all such Losses.

8.5    <u>Indemnity Cap</u>. Notwithstanding anything in this Agreement to the contrary, the aggregate rights of Purchaser Indemnitees to indemnification payments pursuant to <u>Section 8.2</u> shall be limited to, and shall not exceed the Purchase Price ("<u>Indemnity Cap</u>"); <u>provided however</u>, that the parties agree that the Indemnity Cap in this <u>Section 8.5</u> shall not apply to any claim for Losses arising out of or relating to (a) any Excluded Liabilities, or (b) any fraud or willful or intentional misrepresentation by the Sellers, the Company, the Operating Subsidiaries or the Founders.

8.6    <u>Claims for Indemnity</u>. Whenever a claim for Losses shall arise for which a Purchaser Indemnitee shall be entitled to indemnification hereunder, the Purchaser Indemnitee shall notify the Indemnitor in writing describing the claim and the basis therefor; <u>provided however</u>, that the failure to give notice shall not affect the right of the Purchaser Indemnitee to indemnification hereunder except to the extent (and only to the extent) that the Indemnitor is materially prejudiced by such failure. The right of the Purchaser Indemnitee to indemnification, as set forth in such notice, shall be deemed agreed to by the Indemnitor unless, within thirty (30) calendar days after the mailing of such notice, the Indemnitor shall notify the Purchaser Indemnitee in writing that it disputes the right of the Purchaser Indemnitee to indemnification. If the Purchaser Indemnitee shall be duly notified of such dispute, the parties shall attempt in good faith, for a period of thirty (30) calendar days, to settle and compromise such dispute.

8.7    <u>Defense of Claims by Third Parties</u>. If any Purchaser Indemnitee shall receive notice of any third party claim, suit, arbitration or other legal proceeding giving rise to indemnity under this Agreement (a "<u>Third Party Claim</u>"), the Purchaser Indemnitee shall give the Indemnitor prompt written notice of the same; <u>provided</u>, <u>however</u>, that failure to provide such written notice shall not release the Indemnitor from any of its obligations under this <u>Article 8</u>,

except to the extent (and only to the extent) the Indemnitor is materially prejudiced by such failure. If such Third Party Claim seeks only recovery of a sum of money, the Indemnitor may, but shall not be obligated to, upon prompt written notice furnished to the Purchaser Indemnitee, assume the defense of any such claim, suit, arbitration or other proceeding, with counsel reasonably satisfactory to the Purchaser Indemnitee, if the Indemnitor acknowledges to the Purchaser Indemnitee in writing its obligations to indemnify the Purchaser Indemnitee with respect to all elements of such claim. If the Indemnitor furnishes such written acknowledgment, the Indemnitor will be entitled to assume and control the defense of such claim, suit, arbitration or other or proceeding, and the Purchaser Indemnitee shall be entitled to participate in (but not control) the defense of any such action, with its own counsel and at its own expense. The notice to the Indemnitor shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom. Neither the Indemnitor nor the Purchaser Indemnitee shall settle or compromise any claim by a third party without the prior written consent of the other party (which shall not be unreasonably withheld). If the Indemnitor does not assume the defense of any such claim, suit, arbitration or other proceeding as provided above, (a) the Purchaser Indemnitee may defend against the same, in such manner as it may deem appropriate and at the Indemnitor's cost and expense, including, without limitation, settling such matter; provided that such settlement shall be subject to the Indemnitor's prior written consent (which shall not be unreasonably withheld), and (b) the Indemnitor shall be entitled to participate in (but not control) the defense of such action, with its own counsel and at its own expense. Notwithstanding the foregoing, if a Purchaser Indemnitee determines in good faith that there is a reasonable probability that a Third-Party Claim may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the Purchaser Indemnitee may, by notice to the Indemnitor, assume the exclusive right to defend, compromise, or settle such Third-Party Claim, but the Indemnitor will not be bound by any compromise or settlement effected without its consent (which may not be unreasonably withheld).

## ARTICLE 9
## MISCELLANEOUS

9.1     Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; provided that no such succession, assignment or delegation of obligations by either the Sellers, the Company, the Operating Subsidiaries or any Founder, on the one hand, or Purchaser, on the other hand, may occur without the express written approval of the other party; provided further that Purchaser may (a) assign any or all of its rights and interests hereunder to one (1) or more of its Affiliates and (b) designate one (1) or more of its Affiliates to perform its obligations hereunder. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in Article 8 of this Agreement.

9.2     Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware.

9.3     Jurisdiction; Waiver of Jury Trial.

(a)    Any suit, action or proceeding seeking to enforce any provision of, or based on any dispute or matter arising out of or in connection with, this Agreement, the Related Documents or the transactions contemplated hereby or thereby, must be brought in the courts of the State of Delaware, in New Castle County, or the federal courts in the District of Delaware. Each of the parties (a) consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding, (b) irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum, (c) will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (d) will not bring any action relating to this Agreement, the Related Documents or any of the transactions contemplated hereby or thereby in any other court, and (e) to the fullest extent permitted by Law, voluntarily, knowingly, irrevocably and unconditionally waive any right to have a jury participate in the resolution of any such dispute or matter. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party in accordance with the notice provisions of Section 9.5 below will be deemed effective service of process on such party.

(b)    If the jury waiver set forth in this section is not enforceable, then any dispute, controversy or claim arising out of or relating to this Agreement or any of the transactions contemplated therein shall be settled by final and binding arbitration held in the County of New Castle, State of Delaware in accordance with the then applicable Commercial Arbitration Rules of the American Arbitration Association. Judgment upon any award resulting from arbitration may be entered into and enforced by any state or federal court having jurisdiction thereof.

9.4    Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

9.5    Notices.  Any notices hereunder shall be deemed sufficiently given by one (1) party to another only if in writing and if and when delivered by personal delivery or as of five (5) Business Days after deposit in the United States mail in a sealed envelope, registered or certified, with postage prepaid, twenty-four (24) hours after deposit with an overnight courier if such day is a Business Day (or the next Business Day if it is not), or five (5) hours after confirmation of delivery by facsimile during business hours on a Business Day, addressed as follows (or at such other address or facsimile number for a party as shall be specified by like notice):

If to the Purchaser:                        Kayne Sunstate Investors, LLC
                                            1800 Avenue of the Stars, 2nd Floor
                                            Los Angeles, California  90067
                                            Attn:  Krishnan Ramaswami
                                            Facsimile:  (310) 282-2852

With a copy to (which shall not
constitute notice):

Downey Brand LLP
555 Capitol Mall, 10th Floor
Sacramento, CA 95814
Attn: Jeffrey M. Koewler, Esq.
Facsimile: (916) 444-2100

If to the Sellers, the Company, the
Founders, or the Operating Subsidiaries,
to the Sellers' Representative:

Mr. Bryon Wolf
8751 Ulmerton Road
Largo, Florida 33771
Attn: Chief Executive Officer
Facsimile: _____

With a copy to (which shall not
constitute notice):

Macfarlane, Ferguson & McMullen, P.A.
201 North Franklin Street, Suite 2000
Tampa, Florida 33602
Attn: Charles A. Moore, Esq.
Facsimile: (813) 273-4256

or to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this <u>Section 9.5</u>. Any party may unilaterally change any one (1) or more of the addresses to which a notice to the party or its representative is to be delivered or mailed, by ten (10) calendar days written notice to the other parties hereto given in the manner stated above.

9.6    <u>Sellers' Representative</u>. The Sellers, the Company, the Operating Subsidiaries and the Founders hereby appoint Wolf as the representative (the "<u>Sellers' Representative</u>") for purposes of making and receiving notices. The Purchaser may, for all purposes of this Agreement, assume and treat every notice directed to the Sellers' Representative as if such notice had been directed to each of the Sellers, the Company, the Operating Subsidiaries and the Founders.

9.7    <u>Fees and Expenses</u>. The Company shall bear and pay the Purchaser's costs and expenses, including the costs and expenses of the Purchaser's counsel, accountants and other advisors, relating to the transactions contemplated hereby and in the Related Documents; <u>provided</u>, <u>however</u>, that the Purchaser agrees that its total fees and expenses shall not exceed Two Hundred Fifty Thousand Dollars ($250,000).

9.8    <u>Severability</u>. If one (1) or more provisions of this Agreement is held to be unenforceable under Applicable Law, such provision shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

9.9    <u>Entire Agreement</u>. This Agreement and the Related Documents and the Exhibits and Schedules hereto and thereto constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and thereof and supersede all prior agreements, term sheets, letters, discussions and understandings of the parties in connection therewith.

9.10    <u>Assurances</u>. Each party to this Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate this Agreement, whether before, concurrent with or after the consummation of the transactions contemplated hereby. The Seller and the Founders shall cause the Company and, shall cause the Company to cause the Operating Subsidiaries, to perform all of its obligations hereunder.

9.11    <u>Amendments and Waivers</u>. This Agreement may be amended only in writing with the prior approval of the Sellers, the Founders and the Purchaser. Unless otherwise provided herein, any waiver hereunder may be granted only with the prior written approval of the Sellers, the Founders and the Purchaser.

*[**The Remainder of this Page is Intentionally Left Blank – Signature Pages Follow**]*

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**"PURCHASER"**

KAYNE SUNSTATE INVESTORS, LLC,
a Delaware limited liability company

By: KAYNE ANDERSON PRIVATE INVESTORS II,
L.P., a Delaware limited partnership, Manager

By:_____
   Name: Krishnan Ramaswami
   Title:  Senior Managing Director

| | |
|---|---|
| Address: | 1800 Avenue of the Stars, Second Floor Los Angeles, California 90067 |
| Attention: | Krishnan Ramaswami |
| Telephone: | (310) 282-2802 |
| Facsimile: | (310) 282-2852 |

**"SELLERS"**

FTN PROMOTIONS, INC., a Florida corporation

By:_____
   Name: Bryon Wolf
   Title: President/CEO

| | |
|---|---|
| Address: | 8751 Ulmerton Rd. Largo, FL 33771 |
| Attention: | Donald Booth |
| Telephone: | (727) 471-0292 |
| Facsimile: | (727) 471-0255 |

GUARDIAN MARKETING SERVICES, CORP., a
Florida corporation

By:_____
   Name: Bryon Wolf
   Title: President/CEO

| | |
|---|---|
| Address: | 8751 Ulmerton Rd. Largo, FL 33771 |
| Attention: | Donald Booth |
| Telephone: | (727) 471-0292 |
| Facsimile: | (727) 471-0255 |

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

BAY PINES TRAVEL, INC., a Florida corporation

By: _____

    Name: *Bryon Wolf*

    Title: *CEO*

    Address: _8751 Ulmerton Road_

    _Largo, FL 33771_

    Attention: _Donald Booth_

    Telephone: _(727) 471-0292_

    Facsimile: _(727) 471-0255_

_____

Bryon Wolf

_____

Roy Eliasson

**"COMPANY"**

SUNSTATE HOLDINGS, LLC, a Delaware limited liability company

By: _____

    Name: *Bryon Wolf*

    Title: *CEO*

    Address: _8751 Ulmerton Rd_

    _Largo, FL 23771_

    Attention: _Donald Booth_

    Telephone: _(727) 471-0292_

    Facsimile: _(727) 471-0255_

**"FOUNDERS"**

_____

Bryon Wolf

_____

Roy Eliasson

_____

Alfred Wolf

BAY PINES TRAVEL, INC., a Florida corporation

By:_____
    Name:
    Title:

    Address:    _____
                _____
                _____
    Attention:  _____
    Telephone:  _____
    Facsimile:  _____

_____

Bryon Wolf

_____

Roy Eliasson

**"COMPANY"**

SUNSTATE HOLDINGS, LLC, a Delaware limited liability company

By:_____
    Name:
    Title:

    Address:    _____
                _____
                _____
    Attention:  _____
    Telephone:  _____
    Facsimile:  _____

**"FOUNDERS"**

_____

Bryon Wolf

_____

Roy Eliasson

_____

Alfred Wolf

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

**"OPERATING SUBSIDIARIES"**

STRATEGIA MARKETING, LLC, a Florida limited liability company

By: _____

Name: Bryan Wolf

Title: CEO

Address: 8751 Ulmerton Rd.
Largo, FL 33771

Attention: Donald Booth
Telephone: (727) 471-0292
Facsimile: (727) 471-0255

CO-COMPLIANCE, LLC, a Florida limited liability company

By: _____

Name: Bryan Wolf

Title: CEO

Address: 8751 Ulmerton Rd.
Largo, FL 33771

Attention: Donald Booth
Telephone: (727) 471-0292
Facsimile: (727) 471-0255

TELEQUICK SYSTEMS, LLC, a Florida limited liability company

By: _____

Name: Bryan Wolf

Title: CEO

Address: 8751 Ulmerton Rd.
Largo, FL 33771

Attention: Donald Booth
Telephone: (727) 471-0292
Facsimile: (727) 471-0255

# EXHIBITS OMITTED

# EXHIBIT B

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**SUNSTATE HOLDINGS, LLC**

**(a Delaware limited liability company)**

**March 31, 2007**

# TABLE OF CONTENTS

**Page**

ARTICLE 1       DEFINITIONS ............................................................................. 1

ARTICLE 2       FORMATION AND CONTINUATION OF COMPANY ......................... 10

    2.1      Formation and Continuation.................................................. 10

    2.2      Name; Principal Place of Business ......................................... 10

    2.3      Agent for Service of Process ................................................ 11

    2.4      Agreement ...................................................................... 11

    2.5      Business ......................................................................... 11

    2.6      Term ............................................................................. 11

ARTICLE 3       UNITS ..................................................................................... 11

    3.1      Units ............................................................................. 11

    3.2      Common Units.................................................................. 11

    3.3      Preferred Units................................................................. 12

    3.4      Series A Units.................................................................. 12

    3.5      Certificate of Units ........................................................... 19

ARTICLE 4       MEMBERSHIP ........................................................................ 20

    4.1      Members......................................................................... 20

    4.2      Representations and Warranties ............................................ 20

    4.3      Additional Members .......................................................... 21

    4.4      Restrictions on Transfers of Company Interests ......................... 21

    4.5      Admission of Substitute Members ......................................... 22

    4.6      Rights of Assignees ........................................................... 22

    4.7      Resignation or Withdrawal of a Member.................................. 22

    4.8      Disassociation of a Member................................................. 22

    4.9      Rights of a Disassociated Member ......................................... 22

    4.10     Voting Rights .................................................................. 22

    4.11     No Authority as Agent ....................................................... 23

    4.12     Interest in Property of the Company ....................................... 23

    4.13     Information Rights............................................................. 23

    4.14     Operation of Company Pursuant to Annual Budget ..................... 24

ARTICLE 5       CONTRIBUTIONS TO CAPITAL ............................................... 24

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 5.1 | Capital Contributions | 24 |
| 5.2 | Additional Capital Contributions | 24 |
| 5.3 | Capital Accounts | 24 |
| ARTICLE 6 | MANAGEMENT | 25 |
| 6.1 | Generally | 25 |
| 6.2 | Changes in Board Composition | 25 |
| 6.3 | Managers | 25 |
| 6.4 | Additional Matters | 26 |
| 6.5 | Limitations on Powers of Members | 27 |
| 6.6 | Committees of Managers | 27 |
| 6.7 | Removal of Managers and Term | 27 |
| 6.8 | Officers | 27 |
| 6.9 | Interested Party Transactions | 28 |
| 6.10 | Certain Relationships; Equity Incentive Plans | 28 |
| ARTICLE 7 | DISTRIBUTIONS | 28 |
| 7.1 | Distributions Upon Dissolution | 28 |
| 7.2 | Other Distributions | 28 |
| 7.3 | Restrictions on Distributions | 29 |
| 7.4 | Return of Distributions | 29 |
| 7.5 | No Other Withdrawals | 30 |
| 7.6 | In-Kind Distributions | 30 |
| 7.7 | Withholding on Distributions | 30 |
| ARTICLE 8 | ALLOCATIONS | 30 |
| 8.1 | Allocation of Book Income and Book Loss | 30 |
| 8.2 | Allocations upon Transfer | 32 |
| 8.3 | Partnership Tax Treatment | 32 |
| 8.4 | Tax Allocations | 33 |
| ARTICLE 9 | ACCOUNTING AND RECORDS | 33 |
| 9.1 | Financial and Tax Reporting | 33 |
| 9.2 | Books and Records | 33 |

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 9.3 | Delivery to Members and Inspection | | 34 |
| 9.4 | Reliance on Books and Records | | 34 |
| 9.5 | Tax Matters Partner | | 34 |
| 9.6 | Tax Election | | 34 |
| ARTICLE 10 | LIABILITY, EXCULPATION AND INDEMNIFICATION; INSURANCE; COMPETING ACTIVITIES | | 35 |
| 10.1 | Liability | | 35 |
| 10.2 | Exculpation | | 35 |
| 10.3 | Duties and Liabilities of Covered Persons | | 35 |
| 10.4 | Indemnification | | 35 |
| 10.5 | Expenses | | 35 |
| 10.6 | Insurance | | 36 |
| 10.7 | Competing Activities; Confidential Information | | 36 |
| 10.8 | Survival | | 37 |
| ARTICLE 11 | DISSOLUTION AND TERMINATION | | 37 |
| 11.1 | Termination | | 37 |
| 11.2 | Authority to Wind Up | | 38 |
| 11.3 | Winding Up; Certificate of Dissolution | | 38 |
| 11.4 | Distribution of Property | | 38 |
| 11.5 | Capital Account Deficit | | 38 |
| ARTICLE 12 | CHANGE OF CONTROL TRANSACTIONS | | 38 |
| 12.1 | Change of Control Transaction Distributions | | 38 |
| 12.2 | Distribution of Non-Cash Proceeds | | 39 |
| 12.3 | Distribution of Unused Reserves | | 39 |
| ARTICLE 13 | ADDITIONAL RIGHTS REGARDING THE TRANSFER OF UNITS | | 40 |
| 13.1 | Rights of First Refusal | | 40 |
| 13.2 | Right of Co-Sale | | 41 |
| 13.3 | Permitted Transactions | | 42 |
| 13.4 | Bring-Along Right | | 42 |
| 13.5 | Pre-Emptive Rights | | 44 |

# TABLE OF CONTENTS
(continued)

| 13.6 | Other Transactions | 45 |
| 13.7 | Conversion to Corporation | 45 |
| ARTICLE 14 | MISCELLANEOUS | 45 |
| 14.1 | Amendments | 45 |
| 14.2 | Assignment | 46 |
| 14.3 | Successors and Assigns | 46 |
| 14.4 | Governing Law and Severability | 46 |
| 14.5 | Counterparts; Facsimiles | 46 |
| 14.6 | Notices | 46 |
| 14.7 | Entire Agreement | 47 |
| 14.8 | Interpretation | 47 |
| 14.9 | Jurisdiction; Waiver of Jury Trial | 47 |

# AMENDED AND RESTATED
# OPERATING AGREEMENT
# OF
# SUNSTATE HOLDINGS, LLC

This Amended and Restated Operating Agreement (this "Agreement") of Sunstate Holdings, LLC, a Delaware limited liability company (the "Company"), is entered into as of March 31, 2007, by and among the parties listed on the signature pages hereof (each, a "Member" and collectively, the "Members"), with reference to the following facts:

## RECITALS

A.    Certain of the parties hereto have entered into that certain Interest Contribution and Preferred Unit Purchase Agreement dated as of the date hereof (the "Contribution and Purchase Agreement"), pursuant to which (i) the Seller Members (as defined in Article 1) transferred the Transferred Interests (as defined in the Contribution and Purchase Agreement) to the Company in exchange for fifty-six thousand nine hundred twenty-three (56,923) common units of the Company (the "Common Units"), and (ii) the Company issued and sold twenty thousand (20,000) Series A Convertible Redeemable Preferred Units of the Company (the "Series A Units") to Kayne Suntasia Investors LLC, a Delaware limited liability company ("Kayne"). The number of Common Units held by the Seller Members and the number of Series A Units held by Kayne also shall be set forth on **Exhibit A** to this Agreement, which such exhibit may be amended from time to time as necessary to reflect any changes in the respective ownership of Units by the Members.

B.    The parties hereto, as the holders of Common Units and Series A Units, desire to enter into this Agreement to provide for the management of the business and affairs of the Company, to define certain rights and obligations of the Members and to establish the rights, preferences and privileges of the Common Units and the Series A Units.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the mutual agreements and representations set forth herein, and intending to be legally bound, the parties by this Agreement set forth the agreement for the Company under the laws of the State of Delaware upon the terms and subject to the conditions of this Agreement.

## ARTICLE 1
## DEFINITIONS

The following terms shall have the meanings set forth below for purposes of this Agreement:

"Accounting Period" shall mean the period beginning on January 1 and ending on December 31 of each year, other than 2007, for which the Accounting Period shall begin on the Formation Date and end on December 31, 2007.

"Act" shall mean the Delaware Limited Liability Company Act, as codified in Chapter 18 of Title 6 of the Delaware Code.

"Additional Member" shall mean any Person who has been admitted to all the rights of a Member pursuant to Section 4.3 of this Agreement.

"Additional Preferred Units Issuance" shall have the meaning given to such term in Section 13.5.1.

"Additional Units" shall have the meaning given to such term in Section 3.4.3(e)(iv)(c).

"Affiliate" shall mean, with respect to any specified Person, (a) any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person or (b) any other Person that owns, directly or indirectly, Five Percent (5%) or more of such specified Person's capital stock or other equity interests or any executive officer, director, member or general partner of any such specified Person or other Person or, with respect to any natural person, any person having a relationship with such person by blood, marriage or adoption not more remote than first cousin or any trust for the benefit of the foregoing natural persons. For the purposes of this definition, "control," when used with respect to any specified Person, shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" shall mean this Amended and Restated Operating Agreement, as amended from time to time.

"Annual Budget" shall have the meaning given to such term in Section 4.13.6.

"Articles" shall have the meaning given to such term in Section 14.8.

"Assignee" shall mean a transferee of Units who has not been admitted as a Substitute Member. An Assignee of Units shall have no right to vote on, consent to, approve, or participate in the determination of any matter, or to otherwise participate in the management of the business and affairs of the Company or to become a Member. An Assignee is only entitled to receive distributions and to be allocated the Book Income and Book Loss attributable to the Units transferred to the Assignee.

"Audit Committee" shall have the meaning given to such term in Section 6.6.

"Audited EBITDA" shall mean, for any Accounting Period, the consolidated net income of the Company and its Affiliates, as determined in accordance with GAAP, before income taxes, plus to the extent deducted in the computation thereof, the sum of (i) interest expense, (ii) depreciation expense, and (iii) amortization expense.

"Audited Revenue" shall mean, for any Accounting Period, the consolidated net revenue of the Company and its Affiliates as set forth in the Company's audited financial statements.

"Bankruptcy" shall mean, with respect to any Person: (a) that a petition has been filed by or against such Person as a "debtor" and the adjudication of such Person as bankrupt under the provisions of the bankruptcy laws of the United States of America has commenced and, in the case of an involuntary bankruptcy, such petition shall not have been dismissed within sixty (60) calendar days from the date of filing; (b) that such Person has made an assignment for the benefit of its creditors generally; (c) that a receiver has been appointed for substantially all of the property and assets of such Person; or (d) the involuntary acceleration of any Indebtedness of the Company or any of its subsidiaries in excess of Two Hundred Fifty Thousand Dollars ($250,000); provided, however, that any involuntary acceleration of any Indebtedness in excess of Two Hundred Fifty Thousand Dollars ($250,000) may be waived by a vote of those Members holding a majority of the Series A Units.

"Book Income" or "Book Loss" shall mean for any Accounting Period the amount, computed as of the last day thereof, of the income or loss of the Company determined in accordance with federal income tax principles (but without requiring any items to be stated separately pursuant to Section 703 of the Code), with the following adjustments:

(i)      Any income of the Company that is exempt from federal income tax shall be included in the computation of Book Income;

(ii)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-l(b)(2)(iv)(i) shall be included in the computation of Book Loss;

(iii)    Any adjustment in the Book Value of property in accordance with this Agreement shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Book Income or Book Loss (to the extent such adjustment is not already reflected in the Capital Accounts of the Members);

(iv)     In any situation in which an item of income, gain, loss or deduction is affected by the adjusted basis of property, the Book Value of the property shall be used in lieu of adjusted basis; and

(v)      Any increase or decrease to Capital Accounts as a result of any adjustment to the Book Value of the Company assets pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) shall be included in the computation of Book Income or Book Loss.

"Book Value" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)      The initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset (not reduced by any associated liabilities), as agreed to by the contributing Member and the Managers;

(ii)     The Book Value of the property of the Company shall be adjusted to equal its gross fair market value, as determined by the Managers, as of the following times: (a) the acquisition of an additional Interest (including upon the exercise of options or

warrants, and including the issuance of Common Units pursuant to <u>Section 3.4.3</u> hereof) by any new or existing Member in exchange for more than a de minimis Capital Contribution or the surrender of Preferred Units being converted; (b) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an Interest; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1 (b)(2)(ii)(g). Book Value shall in all cases be adjusted to reflect gross fair market value of assets of the Company as of the closing of a Change of Control Transaction and as of immediately before any distribution pursuant to <u>Article 11</u>; and

       (iii)    The Book Value of any property distributed to a Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Managers.

"<u>Bring-Along Sale</u>" shall have the meaning given to such term in <u>Section 13.4.1(c)</u>.

"<u>Bring-Along Units</u>" shall have the meaning given to such term in <u>Section 13.4.1</u>.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or a day on which banking institutions in the State of Delaware are authorized or obligated by law or executive order to close.

"<u>Buyer</u>" shall have the meaning given to such term in <u>Section 13.4.1(a)</u>.

"<u>Capital Account</u>" shall mean, with respect to each Member, a separate account established and maintained in accordance with the following provisions:

The Capital Account of each Member shall be increased by:

       (i)    the amount of money and the fair market value of any property contributed to the Company (determined by the Managers as of the date of contribution) by such Member pursuant to the provisions of this Agreement (net of any liabilities secured by such property that the Company is considered to assume or hold subject to for purposes of Section 752 of the Code);

       (ii)    such Member's share of Book Income (or items thereof), if any, allocated to its Capital Account pursuant to this Agreement; and

       (iii)    any other amounts required by Treasury Regulation Section 1.704-1(b); <u>provided</u> that the Managers determine that such increase is consistent with the economic arrangement among the Members as expressed in this Agreement.

The Capital Account of each Member shall be decreased by:

       (i)    the amount of money and the fair market value of any property distributed by the Company (determined by the Managers as of the date of distribution) to such Member pursuant to the provisions of this Agreement (net of any liabilities secured by such property that such Member is considered to assume or hold subject to for purposes of Section 752 of the Code);

(ii)    such Member's share of Book Loss (or items thereof) allocated to its Capital Account pursuant to this Agreement; and

(iii)    any other amounts required by Treasury Regulation Section 1.704-1(b); provided, that the Managers determine that such decrease is consistent with the economic arrangement among the Members as expressed in this Agreement.

Upon the admission of an Additional Member to the Company and upon other events when the Book Value of the assets of the Company are adjusted, the Capital Accounts of the Members shall be adjusted to reflect their interests in the then fair market value of the Company's assets. If Units are issued pursuant to the exercise of an option or warrant issued by the Company, the Capital Account of the exercising person shall reflect not only the cash or property contributed by such person, but also any excess of the fair market value of such person's proportionate share of the Company's assets over such contribution (and the Capital Accounts of the other Members shall be adjusted pursuant to the (1st) first sentence of this paragraph).

"Capital Contributions" of a Member shall mean that amount of cash and/or the agreed upon net value of other property actually contributed by such Member to the Company pursuant to this Agreement.

"Certificate" shall mean the Certificate of Formation of the Company originally filed with the Secretary of State of the State of Delaware, as the same may be amended from time to time.

"Change of Control Transaction" shall mean (a) a sale, lease or other transfer of all or substantially all of the assets of the Company, (b) a reorganization, merger or consolidation of the Company with or into any other limited liability company or entity, or an acquisition of the Company effected by an exchange of outstanding securities of the Company, in which transaction the Company's members immediately prior to such transaction own immediately after such transaction less than Fifty Percent (50%) of the equity securities of the surviving limited liability company or entity (or its parent), (c) any sale of voting control or other transaction similar to those described in clause (b) above following which the Company's members immediately prior to such transaction no longer hold effective control of the Company following such transaction, whether through voting power, ownership, ability to elect Managers, or otherwise or (e) liquidation, dissolution, shut down cessation of business, whether voluntary or involuntary or other winding up of the Company.

"Co-Sale Notice" shall have the meaning given to such term in Section 13.2.2.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Commitments" shall have the meaning given to such term in Section 13.4.3.

"Common Holder" shall mean any holder of Common Units.

"Common Units" shall have the meaning given to such term in the Recitals.

"Company" shall have the meaning given to such term in the preamble.

"Compensation Committee" shall have the meaning given to such term in Section 6.6.

"Confidential Information" shall have the meaning given to such term in Section 10.7.2.

"Contribution and Purchase Agreement" shall have the meaning given to such term in the Recitals.

"Conversion Price" shall have the meaning given to such term in Section 3.4.3(e)(iii).

"Convertible Securities" shall mean equity interests, evidences of Indebtedness or other securities that are at any time directly or indirectly convertible into or exchangeable for Units.

"Covered Person" shall mean (i) any Member, any Affiliate of a Member, any officers, directors, trustees, shareholders, members, managers, beneficiaries, partners, employees, representatives or agents of the Company, any Member or their respective Affiliates, or (ii) any Person who is elected to serve as a Manager.

"Disassociated Member" shall mean a Member who has ceased to be a Member as a result of incapacity, death, Bankruptcy or Dissolution or redemption by the Company of all such Member's Units or Transfer of all such Member's Units.

"Dissolution" of a Member which is not a natural person shall mean that such Member has terminated its existence, whether partnership, limited liability company or corporation, wound up its affairs and dissolved; provided, however, that a change in the membership of any Member that is a partnership or limited liability company shall not be deemed or constitute a "Dissolution" hereunder, whether or not the Member is deemed technically dissolved for partnership or limited liability company law purposes, so long as the business of the Member is continued.

"Economic Interest" shall mean the right to share in Book Income and Book Loss of, and receive or accrue dividends or other distributions from, the Company pursuant to this Agreement, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in management of the Company or, except as required by the Act, to receive information concerning the Company.

"Election Date" shall have the meaning given to such term in Section 3.4.3(a).

"Election Notice" shall have the meaning given to such term in Section 3.4.3(b).

"Encumbrances" shall mean any title defects, objections, liens, claims, mortgages, pledges, charges, security interests, encumbrances, leases, options to purchase, rights of first refusal, material restrictions or adverse claims of any nature whatsoever.

"Equity Incentive Plan" shall mean an equity incentive plan or plans to be adopted following the Issue Date upon the approval of the Managers, the Members holding Common Units and the Members holding Preferred Units, which plan or plans shall provide that the Seller

Members may grant, sell or otherwise transfer Common Units held by the Seller Members in an aggregate amount of up to four thousand six hundred fifteen (4,615) Common Units of the Company. The Members hereby agree that **Exhibit A** shall be amended, as necessary, to reflect any grants, sales or transfers of Common Units to employees of the Company.

"Formation Date" shall have the meaning given to such term in Section 2.1.

"Founders" shall mean each of Bryon Wolf, Alfred Wolf and Roy Eliasson.

"GAAP" shall mean United States generally accepted accounting principles as in effect at the time in question.

"Indebtedness" shall mean all (a) obligations for borrowed money, (b) notes, bonds, debentures, mortgages and similar obligations, (c) guaranties and contingent obligations for the debts or obligations of another Person, (d) obligations in respect of letters of credit, bonds, guaranties, reimbursement agreements and similar instruments, (e) obligations in respect of futures contracts, forward contracts, swaps, options or similar arrangements, and (f) off balance sheet financing transactions.

"Interest" shall mean a Member's entire rights in the Company, including the right to share in distributions and allocations hereunder, to vote or participate in management of the Company to the extent set forth herein and to receive information concerning the business and affairs of the Company.

"Issue Date" shall mean the date of this Agreement, regardless of any subsequent amendment or restatement hereof.

"Kayne" shall have the meaning given to such term in the Recitals.

"Leading Members" shall have the meaning given to such term in Section 13.4.1(b).

"Managers" shall mean the persons or entities designated as Managers of the Company as provided in Article 6.

"Members" shall mean the signatories to this Agreement, any Substitute Members and any Additional Members admitted pursuant to this Agreement, but does not include Assignees.

"Net Cash From Operations" shall mean the gross cash proceeds from Company operations (including sales and dispositions of Company assets in the ordinary course of business) less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, the Preferred Dividend Amount, capital improvements, replacements and contingencies, all as determined by the Managers. "Net Cash From Operations" shall not include cash proceeds from any other sources, including, but not limited to, sales and dispositions of Company assets (other than in the ordinary course of business), or any proceeds from the refinance of any debt or obligations of the Company.

"Optional Redemption Date" shall have the meaning given to such term in Section 3.4.3(c).

"Optional Redemption Price" shall have the meaning given to such term in Section 3.4.3(c).

"Original Issue Price" with respect to the Series A Units shall mean One Thousand Dollars ($1,000.00) per Series A Unit, subject to adjustment for splits, reverse splits and other comparable events from time to time affecting the Series A Units after the date hereof.

"Partially Adjusted Capital Account" shall mean, with respect to any Member and any Accounting Period, the aggregate Capital Account of such Member in the Company as of the beginning of such Accounting Period, adjusted as set forth in Article 7 with respect to such Accounting Period but before giving effect to any allocations of Book Income and Book Loss or items of income, gain, loss and deduction of such Accounting Period pursuant to Article 8 of this Agreement.

"Percentage Interest" shall mean, as determined from time to time with respect to each Member, the percentage which is equal to the number of Common Units held by such Member divided by the aggregate number of Common Units then held by all Members and, in the case of Series A Units, into which the Series A Units held by such holders could then be converted.

"Permitted Transfer" shall mean any Transfer of an Interest or an Economic Interest (i) in the case of any Member holding Series A Units (or Common Units issued upon the conversion of Series A Units), to an Affiliate or limited partner of such Member without consideration, (ii) by a Member that is a natural person to any partnership, trust or similar entity for the benefit of any spouse, former spouse, parent, grandparent, sibling, in-law, child or grandchild (including adoptive or step relationships) of the transferring Member so long as such entity is controlled by the transferring Member and so long as the Managers determine that such transfer shall not affect Company's tax status, (iii) upon the death of a natural person pursuant to testament or the laws of descent and distribution, and (iv) in connection with the consummation of the transactions contemplated by the Contribution and Purchase Agreement.

"Person" shall mean a natural person, partnership (whether general or limited and whether domestic or foreign), limited liability company, foreign limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or representative capacity.

"Preferred Dividend Amount" shall mean, as determined on a cumulative basis, a sum equal to Nine Percent (9%) per annum, determined on the basis of a year of three hundred sixty-five (365) days or three hundred sixty-six (366) days, as the case may be, for the actual number of days occurring in the period for which the Preferred Dividend Amount is being determined, multiplied by the Original Issue Price per Series A Unit multiplied by the number of Series A Units held by such Series A Holder from time to time during the period for which the Preferred Dividend Amount is being determined; provided, however, that no amounts distributed pursuant to Sections 7.2.1 or 7.2.3 shall be deemed to reduce the Original Issue Price for purposes of calculating the Preferred Dividend Amount; provided, further, that amounts distributed pursuant to Sections 7.2.2 or 7.2.4 shall be deemed to reduce the Original Issue Price for purposes of calculating the Preferred Dividend Amount.

"Preferred Units" shall mean the preferred units of the Company.

"Proposed Transferee" shall have the meaning given to such term in Section 13.1.1.

"Redemption Date" shall have the meaning given to such term in Section 3.4.6(a).

"Redemption Notice" shall have the meaning given to such term in Section 3.4.6(b).

"Redemption Price" shall have the meaning given to such term in Section 3.4.6(b).

"Remaining Units" shall have the meaning given to such term in Section 13.1.3.

"Right of Co-Sale" shall have the meaning given to such term in Section 13.2.

"Sections" shall have the meaning given to such term in Section 14.8.

"Securities Act" shall have the meaning given to such term in Section 3.5.1.

"Seller Members" shall mean (a) FTN Promotions, Inc., a Florida corporation, d/b/a Suntasia Inc. and Suntasia Marketing, Inc. (b) Guardian Marketing Services, Corp., a Florida corporation, (c) Bryon Wolf, an individual, and (d) Roy Eliasson, an individual.

"Series A Holder" shall mean any holder of Series A Units.

"Series A Units" shall have the meaning given to such term in the Recitals.

"Subsequent Issue Price" shall have the meaning given to such term in Section 3.4.3(e)(iv)(c).

"Substitute Member" shall mean an Assignee who has been admitted to all the rights of a Member pursuant to this Agreement.

"Target Account" shall mean, with respect to any Member for any year or period, an amount equal to the hypothetical distribution such Member would receive if all assets of the Company, including cash, were sold for cash equal to their Book Value (taking into account any adjustments to Book Value for such year or other period), all liabilities allocable to such assets were then due and were satisfied according to their terms and all remaining proceeds from such sale were allocated and distributed pursuant to Article 12.

"Tax Distribution Amount" shall mean the amount of the federal and state income tax liability with respect to the taxable income of the Company allocable to a Member with respect to each Unit (whether a Common Unit or a Series A Unit) for a fiscal year. The calculation of such federal and state income tax liability shall (i) assume that all such holders are taxable as individuals for federal and state income tax purposes, (ii) assume that all such holders are in the highest marginal federal and state income tax bracket applicable to individuals in the State of California (currently Thirty-Six Percent (36%) and Nine Point Three Percent (9.3%), respectively, for a total of Forty-Five Point Three Percent (45.3%)), and (iii) assume the deductibility of California State income taxes for federal income tax purposes but it shall not

take into adjustments to taxable income allocable to any holder resulting under Section 704(c) of the Code and/or resulting from the election by the Company under Section 754 of the Code (and any similar state law provisions of Sections 704(c) and Section 754). In determining the amount of estimated federal and state income tax liability for any fiscal year, if the Company has allocated a taxable loss to its holders for any fiscal year, the amount of such loss shall be carried forward and applied to offset any taxable income allocated to all holders for each succeeding fiscal year or years in which holders are allocated taxable income until such loss is fully absorbed by taxable income allocated to holders, consistent with applicable rules relating to loss carry-forwards under the Code and the provisions of this definition.

"Tax Matters Partner" shall have the meaning given to such term in Section 9.5.

"Transfer" shall have the meaning given to such term in Section 4.4.1.

"Transfer Notice" shall have the meaning given to such term in Section 13.1.1.

"Transferring Member" shall have the meaning given to such term in Section 13.1.

"Treasury Regulations" shall mean regulations issued pursuant to the Code, as amended from time to time.

"Unit Sale Election Period" shall have the meaning given to such term in Section 13.5.2.

"Unit Sale Notice" shall have the meaning given to such term in Section 13.5.2.

"Units" shall mean an Interest in the Company as described in Section 3.1.

"Valuation Firm" shall have the meaning given to such term in Section 3.4.6(b).

"Variance Amounts" shall mean, with respect to any approved cost identified in an Annual Budget for any fiscal year, additional costs related to such approved cost that when aggregated for such fiscal year are in excess of Ten Percent (10%) of such approved cost for such fiscal year, as such costs are approved in connection with the Annual Budget.

## ARTICLE 2
## FORMATION AND CONTINUATION OF COMPANY

2.1     Formation and Continuation.  The Company was formed as a limited liability company pursuant to the provisions of the Act upon the filing of the Certificate with the Office of the Secretary of State of the State of Delaware on March 2, 2007 (the "Formation Date"). The Managers and the Members hereby agree to continue the Company as a limited liability company under the Act, upon the terms and subject to the conditions set forth in this Agreement. The Managers are hereby authorized to file and record any amendments to the Certificate and such other documents as may be required or appropriate under the Act or the laws of any other jurisdiction in which the Company may conduct business or own property.

2.2     Name; Principal Place of Business.  Unless and until amended in accordance with this Agreement and the Act, the name of the Company will be "Sunstate Holdings, LLC." The

principal place of business of the Company shall be 8751 Ulmerton Road, Largo, Florida 33771, or such other place or places as the Managers from time to time determine.

2.3    Agent for Service of Process.    The Company's initial agent for service of process required by the Act is as set forth in the Certificate and may be changed if and as determined by the Managers.

2.4    Agreement.    In consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members executing this Agreement and each Person heretofore serving as a Manager (by virtue of accepting such position) agree to the terms and conditions of this Agreement, as it may be further amended from time to time in accordance with the terms hereof. Except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Treasury Regulations or is expressly prohibited or ineffective under the Act, the Agreement shall govern even when inconsistent with or different from the provisions of the Act or any other law or rule.

2.5    Business.    The purpose of the Company is to engage in any activity in which a limited liability company is permitted to engage in under the Act.

2.6    Term.    The term of the Company commenced upon the filing of the Certificate with the Delaware Secretary of State and its existence shall be perpetual, unless its existence is sooner terminated pursuant to Article 11 of this Agreement.

## ARTICLE 3
## UNITS

3.1    Units.    The Company shall be authorized to issue two (2) classes of Units, designated as "Common Units" and "Preferred Units." Each class of Units may be further subdivided in the Managers' collective discretion into separate series or subclasses of Units, with rights, preferences and privileges as set forth in this Agreement, an amendment to this Agreement or in a separate certificate of designations of the rights, preferences and privileges of such series or subclass of Units duly adopted and approved by the Managers and any Members with applicable approval rights, each of which will be attached as an Exhibit to this Agreement. The total number of Units which the Company is authorized to issue shall be ninety-six thousand nine hundred twenty-three (96,923). Units of the Company may be issued, as authorized by the Managers, only in accordance with the terms of this Agreement. It is not necessary that all authorized Units be issued or outstanding. The total number of authorized Units may not be increased without the approval of the Managers and any Members with applicable approval rights.

3.2    Common Units.    The total number of Common Units authorized for issuance is seventy-six thousand nine hundred twenty-three (76,923). Except as otherwise set forth in this Agreement, the holders of Common Units shall be entitled to distributions as provided in Articles 7, 11 and 12 and shall be entitled to vote on any matters to be put to a vote of the members (other than those matters for which the Series A Units have special or preferential voting or approval rights) and shall have all other rights expressly granted by the Act.

3.3    <u>Preferred Units</u>.  The total number of Preferred Units authorized for issuance is twenty thousand (20,000), all of which shall be designated as "Series A Convertible Redeemable Preferred Units" and the rights, preferences and privileges of which are set forth in <u>Section 3.4</u> below.

3.4    <u>Series A Units</u>.  Except as otherwise set forth in this Agreement, the rights, preferences and privileges associated with the Series A Units are as follows:

3.4.1    <u>Dividends</u>.  In preference to any distribution, other than Tax Distribution Amounts distributed pursuant to <u>Section 7.2.1</u>, to the holders of Common Units, holders of Series A Units are entitled to receive the Preferred Dividend Amount per Series A Unit as provided in this <u>Section 3.4</u> and <u>Sections 7.2</u>, <u>11.4</u> and <u>12.1</u>.

3.4.2    <u>Distribution Rights</u>.  In addition to the right to receive the Preferred Dividend Amount, the holders of Series A Units shall receive the distributions provided for in <u>Articles 7</u>, <u>11</u> and <u>12</u>.

3.4.3    <u>Series A Holders' Optional Conversion and Redemption of Series A Units</u>.

(a)    <u>Issuance of Common Units</u>.  From and after the Issue Date, upon (i) an initial public offering of the Company's securities, or (ii) the election of the Series A Holders, the Company shall issue to such Series A Holders Common Units in accordance with the procedures set forth in <u>Section 3.4.3(b)</u>.  Notwithstanding the issuance of Common Units pursuant to this <u>Section 3.4.3(a)</u>, the Series A Units for which such an election has been made pursuant to this <u>Section 3.4.3(a)</u> shall remain issued and outstanding, but with such Series A Units' rights, preferences and privileges being modified as set forth in <u>Section 3.4.3(d)</u>, until such Series A Units have been redeemed in accordance with <u>Section 3.4.3(c)</u>.  The date on which (A) an initial public offering of the Company's securities occurs, or (B) an election is made pursuant to this <u>Section 3.4.3(a)</u> shall be referred to herein as the "<u>Election Date</u>."

(b)    <u>Procedure</u>.  At least ten (10) Business Days prior to the Election Date, the holders of the Series A Units making an election pursuant to this <u>Section 3.4.3</u> shall provide written notice in accordance with <u>Section 14.6</u> to the Company notifying the Company of the requested issuance of Common Units and specifying the number of Series A Units for which the holder elects to request an issuance of Common Units and setting forth the name or names in which the holder wishes the certificate(s) for Common Units to be issued (the "<u>Election Notice</u>").  On the date specified in the Election Notice for such issuance of Common Units and as provided for in <u>Section 3.4.3(a)</u>, the Company shall issue to such Series A Holders certificates representing that number of fully paid and nonassessable Common Units as determined in accordance with the provisions of <u>Section 3.4.3(e)</u>.  Notwithstanding any provision to the contrary contained in this Agreement, no Member of the Company, other than the holders of Series A Units that have made a request issuance of Common Units pursuant to this <u>Section 3.4.3</u> shall be entitled to receive any portion of the amounts distributed pursuant to <u>Sections 3.4.3(a)</u> and <u>3.4.3(b)</u>.

(c)     Optional Redemption Price.    Following an election made pursuant to Section 3.4.3(a), and upon the occurrence of (i) the fifth (5th) anniversary of the Issue Date, (ii) a Change of Control Transaction, or (iii) an initial public offering of the Company's securities (each an "Optional Redemption Date"), the Company shall repurchase the outstanding Series A Units for which an election has been made under Section 3.4.3(a) by payment (per each Series A Unit for which an such an election has been made) of an amount equal to the Original Issue Price plus any accrued but unpaid Preferred Dividend Amounts less any amounts previously distributed to the holders of the Series A Units pursuant to Section 7.2.4 (the "Optional Redemption Price").

(d)     Effect of Redemption.    Upon an election made pursuant to this Section 3.4.3, with regard to the Series A Units for which such an election has been made, the rights, preferences and privileges set forth in Section 3.4.6 shall no longer apply to such Series A Units.    Prior to the full payment of the Optional Redemption Price contemplated in Section 3.4.3(c), the Series A Units and the Series A Holders, as applicable, shall continue to retain all other rights, preference and privileges set forth in this Agreement.    From and after the full payment of the Optional Redemption Price contemplated in Section 3.4.3(c), all rights of any holder of such Series A Units that the Company has elected to redeem shall cease with respect to such Series A Units and such Series A Holders.    The Series A Units which have not been redeemed pursuant to Section 3.4.3(c) shall remain outstanding and be entitled to all the rights, privileges and preferences provided herein.

(e)     Conversion.    The number of Common Units to be issued pursuant to Section 3.4.3(b) shall be calculated as follows:

(i)     Conversion Calculation.    Upon the Election Date, for the Series A Units for which an election has been made pursuant to Section 3.4.3(a), the Company shall issue that number of fully paid and nonassessable Common Units which results from dividing (i) the Original Issue Price plus any accrued but unpaid Preferred Dividend Amounts as of the Election Date by (ii) the Conversion Price (as defined in Section 3.4.3(e)(iii) below) per Series A Unit in effect at the time of the election; provided, however, that any fractional number of Common Units issuable upon conversion shall be rounded down to the next whole Common Unit.

(ii)     Mechanics of Conversion.    As promptly as practicable after the Election Date, the Company shall issue certificates to each holder of Series A Units (or its nominee(s)) making an election pursuant to Section 3.4.3(a) evidencing the number of Common Units to which such holder is entitled.    Such issuance of Common Units shall be effective immediately prior to the close of business on the Election Date and the person or persons entitled to receive such Common Units shall be treated for all purposes as the record holder of the Common Units at such date and shall, with respect to such Common Units, have only those rights of a holder of Common Units from and after the Election Date.    Upon a conversion of a Preferred Unit into a Common Unit, the certificate for the Preferred Unit shall be cancelled upon the issuance of the certificate for the Common Unit.

(iii)    Conversion Price.  The conversion price of each Series A Unit shall be One Thousand Dollars ($1,000.00), and shall be subject to adjustment from time to time as provided in Section 3.4.3(e)(iv) below (the "Conversion Price").

(iv)    Adjustments to Conversion Price.  The Conversion Price shall be subject to adjustment from time to time as follows:

(A)    Adjustment for Unit Splits, Unit Dividends and Combinations of Common Units.  In the event that the outstanding Common Units shall, after the Issue Date, be further subdivided (split) or combined (reverse split), by reclassification or otherwise, or in the event of any dividend or other distribution payable on the Common Units in Common Units, the Conversion Price in effect immediately prior to such subdivision, combination, reclassification, dividend or other distribution shall, concurrently with the effectiveness of such subdivision, combination, reclassification, dividend or other distribution, be proportionately adjusted.

(B)    Adjustment for Merger or Reorganization, Etc.  In case of a reclassification, reorganization or exchange (other than described in Section 3.4.3(e)(iv)(A) above) or any consolidation or merger of the Company with another corporation or other business entity (other than a merger, acquisition or other reorganization which constitutes a Change of Control Transaction), each Series A Unit shall thereafter be convertible into the number of securities or property to which a holder of the number of Common Units of the Company deliverable upon conversion of such Series A Units would have been entitled upon such reclassification, reorganization, exchange, consolidation or merger; and, in any such case, appropriate adjustment (as determined by the Managers) shall be made in the application of the provisions of this Section 3.4.3(e) with respect to the rights and interests thereafter of the holders of Series A Units, to the end that the provisions set forth herein (including provisions with respect to changes in and other adjustments of the Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Series A Units.

(v)    No Adjustment.  Notwithstanding the provisions of Section 3.4.3(e)(iv) above, there shall be no adjustment to the Conversion Price upon (i) the issuance of Common Units or options to purchase Common Units pursuant to the Equity Incentive Plan or any other employee equity incentive plan or arrangement adopted in accordance with the terms of this Agreement, (ii) the issuance of Units upon the exercise of options granted under any equity incentive plan described in the foregoing clause (i), or (iii) the issuance of Common Units upon conversion of the Series A Units.

(vi)    Conversion Price Adjustment Certificate.  Whenever the Conversion Price is adjusted as provided in Section 3.4.3(e)(iv), the Managers shall promptly file with the Secretary of the Company an officer's certificate setting forth the effective Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment and the calculation thereof, which certificate shall be conclusive evidence of the correctness of such adjustment absent manifest error.  Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Price setting forth the adjusted Conversion Price and the effective date of such adjustment and shall mail such notice of

such adjustment of the Conversion Price to each holder of Series A Units at such holder's last address as shown on the records of the Company. Each holder of Series A Units shall be entitled to review a copy of the officer's certificate filed with the Secretary as described above upon request.

(vii)    <u>Reservation of Units Issuable Upon Conversion</u>.    The Company shall at all times reserve and keep available out of its authorized but unissued Common Units, solely for the purpose of effecting the conversion of the Series A Units, such number of its Common Units as shall from time to time be sufficient to effect a conversion of all outstanding Series A Units. If at any time the number of authorized but unissued Common Units shall not be sufficient to effect the conversion of all then outstanding Series A Units, the Company shall promptly seek such action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued Common Units to such number of units as shall be sufficient for such purpose. In the event of the consolidation or merger of the Company with another Person where the Company is not the surviving entity, effective provisions shall be made in the charter document, the articles or certificate of merger, or other governing document of the surviving entity so that the surviving entity will at all times reserve and keep available a sufficient number of Common Units or other securities or property to provide for the conversion of the Series A Units in accordance with the provisions of this <u>Section 3.4.3(e)(vii)</u>.

3.4.4    <u>Voting and Approval Rights</u>. The Company (or any Subsidiary thereof) and the Managers shall not, without the prior written approval of the holders of at least two-thirds (2/3) of the Series A Units then outstanding:

(a)    except as provided for in <u>Section 3.4.5(a)</u>, authorize, create or issue any class, series or subclass of Units;

(b)    repurchase or redeem any Units or options to acquire Units (other than the redemption of the Series A Preferred Units pursuant to <u>Section 3.4.6</u>);

(c)    authorize or engage in any Change of Control Transaction;

(d)    authorize any sale, transfer, lease, license or encumbrance of any material asset of the Company (or any Subsidiary thereof) or any material portion of the Company's (or any Subsidiary's thereof) assets;

(e)    authorize or permit the Company (or any Subsidiary thereof) to incur or maintain any Indebtedness in excess of an aggregate amount of One Million Dollars ($1,000,000); <u>provided</u>, <u>however</u>, that the Company may borrow up to an additional Five Million Dollars ($5,000,000), and such amount may be (i) senior in priority to any amounts owed to the holders of the Series A Units and (ii) distributed solely to the Seller Members;

(f)    authorize any capital expenditures by the Company (or any Subsidiary thereof) in excess of an aggregate of One Hundred Thousand Dollars ($100,000) per annum;

(g)    change the number of Managers of the Company (or any Subsidiary thereof);

(h)    engage in any reorganization, voluntary bankruptcy proceeding or voluntary winding down, liquidation or dissolution of the Company (or any Subsidiary thereof);

(i)    amend the Certificate or this Agreement (or the governing documents of any Subsidiary of the Company);

(j)    issue, or authorize the issuance of, any authorized but unissued Series A Units or Common Units (other than the issuance of Common Units or Convertible Securities exercisable for Common Units pursuant to the Equity Incentive Plan, which shall be approved by the Managers pursuant to Section 3.4.5) or equity of any Subsidiary of the Company;

(k)    reissue any reacquired Series A Units or Common Units or equity of any Subsidiary of the Company;

(l)    increase the authorized number of Series A Units or Common Units (or equity of any Subsidiary of the Company) or alter in any respect the rights, preferences and privileges of the Series A Units or the Common Units (or equity of any Subsidiary of the Company) (whether by amendment of this Agreement, merger or otherwise);

(m)    authorize any change in the identity or compensation of any member of the Company's (or any Subsidiary thereof) senior management resulting, after giving effect to such change, in such member of senior management receiving annual compensation of over One Hundred Thousand Dollars ($100,000), or enter into or amend any material agreement with any consultant or independent contractor to the Company (or any Subsidiary thereof) pursuant to which such consultant or independent contractor shall provide, or provides, services or shall perform, or performs, functions similar to those traditionally provided or performed by the senior management of a Person engaged in a business substantially similar to that of the Company (or any Subsidiary thereof);

(n)    admit any new Members (other than Permitted Transferees) to the Company or new members to any Subsidiaries of the Company;

(o)    establish any committee of the board of Managers;

(p)    except for the adoption of the Equity Incentive Plan, adopt or subsequently amend any equity incentive plan or arrangement for the benefit of the employees, officers, Managers of and consultants to the Company (or any Subsidiary thereof);

(q)    enter into any material license (as licensor) or non-competition agreement that restricts the right of the Company (or any Subsidiary thereof) to operate its business in any market segment or geographic area;

(r)    engage in any creation, investment in or acquisition of a subsidiary or the taking of any action by which a subsidiary ceases to be wholly owned by the Company (or any Subsidiary thereof);

(s)     approve an Annual Budget for the ensuing year;

(t)     vary from an Annual Budget other than as permitted in <u>Section 4.14</u>; or

(u)     take any action which materially and adversely affects the holders of Series A Units disproportionately versus the holders of other Interests.

3.4.5    <u>Manager Approval Rights</u>.  The Company (and any Subsidiary thereof) shall not:

(a)     without the prior written approval of at least a majority of the Managers, issue Common Units or Convertible Securities exercisable for Common Units pursuant to the Equity Incentive Plan; and

(b)     without the prior unanimous written approval of the Managers, enter into any transaction or agreement between the Company (or any Affiliate thereof), on the one hand, and any Founder or employee of the Company (or any Affiliate thereof), any Affiliate of such Founder or employee, any family member (meaning a parent, spouse, any natural or adoptive sibling or any spouse thereof, and any direct lineal descendant (natural or adoptive) of any of the foregoing) of such Founder or employee, on the other hand; <u>provided, however,</u> that the Company shall not be required to obtain the prior unanimous written approval of the Managers in order to secure the financing and make the distribution to the Seller Members as contemplated in <u>Section 3.4.4(e)</u>.

3.4.6    <u>Redemption of Series A Units</u>.

(a)     <u>Redemption</u>.  (i) From and after March 31, 2012, or (ii) upon a Change of Control Transaction, the Company will, at the request of any holder of Series A Units, repurchase the outstanding Series A Units for which redemption is requested by payment of the Redemption Price (as defined below) on such date.  The "<u>Redemption Date</u>" shall be the date that is ninety (90) calendar days after the Company receives a request for redemption pursuant to the terms of the preceding sentence.

(b)     <u>Redemption Procedure</u>.  At least sixty (60) calendar days prior to the Redemption Date, the Company shall engage an investment banking firm of national reputation (the "<u>Valuation Firm</u>"), approved in writing by the holders of two-thirds (2/3) of the Series A Units then outstanding, to determine the fair market values of (i) the Company on an enterprise basis and (ii) the Series A Units.  If the Company and the holders of Series A Units are unable to mutually agree on any such investment banking firm within ten (10) Business Days after the date upon which the right or obligation to select an investment banking firm arises, each of the holders of Series A Units, on the one hand, and the Company, on the other hand, shall, within three (3) Business Days thereafter, select one (1) investment banking firm, and the two (2) selected firms shall, within three (3) Business Days of their selection, select a third (3rd) investment banking firm which shall make the relevant determination (which determination shall be final and binding) within ten (10) Business Days of the submission of this matter to such third (3rd) firm.  In determining the fair market value per Series A Unit, the Valuation Firm shall not give effect or take into account any "control premium" or "minority discount" but shall value the

Company in its entirety on an enterprise basis. The purchase price payable for any Series A Units purchased by the Company pursuant to this Section 3.4.6 (the "Redemption Price") shall be the greatest of: (i) the amount then payable with respect to each Series A Unit pursuant to Articles 11 and 12 hereof in connection with liquidation of the Company using the valuation of the Company determined by the Valuation Firm pursuant to Section 3.4.6(b); (ii) the fair market value of the Series A Units as determined by the Valuation Firm pursuant to Section 3.4.6(b); and (iii) the Original Issue Price plus any accrued but unpaid Preferred Dividend Amounts, in each case less any amounts previously distributed to the holders of the Series A Units pursuant to Section 7.2.4. The Company shall bear all costs and expenses incurred by it as well as all fees payable and costs and expenses reimbursable to such the Valuation Firm(s) in connection with the determination of the Redemption Price pursuant to this Section 3.4.6, including without limitation any legal fees and expenses incurred by the holders of Series A Units in connection with such determination.

At least ten (10) Business Days prior to the Redemption Date the Company shall provide written notice (the "Redemption Notice") in accordance with Section 14.6 of this Agreement to each holder of record (at the close of business on the Business Day next preceding the day on which notice is given) of Series A Units notifying such holder of the Redemption Price and calling upon such holder to surrender to the Company, in the manner and at the place designated, its certificate or certificates representing the Series A Units to be redeemed. On or after the Redemption Date, each holder of Series A Units to be redeemed shall surrender to the Company the certificate or certificates representing such Series A Units, in the manner and at the place designated in the Redemption Notice, and thereupon the aggregate Redemption Price of such Preferred Units shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof and each surrendered certificate shall be canceled.

(c)     Effect of Redemption. From and after the Redemption Date and the full payment of the Redemption Price, all rights of any holder of such Series A Units electing redemption shall cease with respect to such Series A Units. If the funds of the Company legally available for redemption of Series A Units on any Redemption Date are insufficient to redeem the total number of Series A Units to be redeemed on such date, those funds which are legally available will be used to redeem the maximum possible number of such Series A Units from the holders of Series A Units requesting redemption on a pro-rata basis. The Series A Units not redeemed shall remain outstanding and be entitled to all the rights, privileges and preferences provided herein. At any time thereafter when additional funds of the Company are legally available for the redemption of Series A Units, such funds will immediately be set aside for the redemption of the balance of the Series A Units which the Company has become obligated to redeem on any Redemption Date but which it has not redeemed; provided, however, that the Company shall provide the holders of such Series A Units with at least ten (10) Business Days written notice of such redemption.

(d)     No Payments. Upon receipt of notice of the exercise of redemption rights hereunder, no payment in cash or other assets shall be made to any holder of Common Units unless and until all of the Series A Units have been redeemed in accordance with this Section 3.4.6 that are required to be redeemed and after the Tax Distributions Amounts under Section 7.2.1 have been made.

(e)    Failure to Redeem Full Redemption Price.  In the event that (i) the Redemption Price is calculated to be an amount greater than that specified in Section 12.1.2, and (ii) the Company only is able to redeem an amount equal to or greater than the amount set forth in Section 12.1.2 but less than the Redemption Price, then, following the changes in the composition of the board of Managers contemplated in Section 6.2, the Company may, without the consent of the Members, sell material assets of the Company (or any Affiliate of the Company which is either directly or indirectly wholly-owned by the Company) at fair market value for such assets until the unpaid portion of the Redemption Price has been paid; provided, however, that, notwithstanding the foregoing, the Company may not sell all or substantially all of the assets of the Company, taken as a whole (including the Affiliates of the Company which are either directly or indirectly wholly-owned by the Company) without complying with the provisions of this Agreement.

3.5    Certificate of Units.

3.5.1    Certificate.  Units shall constitute certificated securities governed by Article 8 of the Delaware Uniform Commercial Code and shall be represented by a certificate of membership, the form and content of which shall be in the Managers' sole discretion, subject to the terms of this Section 3.5.  Certificates of membership shall be numbered serially, as they are issued and shall be signed by the officers of the Company designated by the Managers.  Each certificate of membership shall state the name of the Company, the fact that the Company is organized under the laws of the State of Delaware as a limited liability company, the name of the person to whom the certificate is issued, the date of issue, and the number, class and, if applicable, series or subclass of Units represented thereby.  Each certificate of membership shall be otherwise in such form as may be determined by the Managers.  Such certificates shall bear the following restrictive legends, in addition to any other legends required by applicable law or contract:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE OF MEMBERSHIP HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT").  THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR OTHERWISE CONVEYED WITHOUT SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH SALE, TRANSFER, PLEDGE OR OTHER CONVEYANCE UNDER THE SECURITIES ACT.

THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A LIMITED LIABILITY COMPANY AGREEMENT BY AND AMONG THE COMPANY AND THE HOLDERS OF ITS SECURITIES, A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

Notwithstanding such legends, the Company shall not require that an opinion of counsel of the Member holding Series A Units be required before authorizing the Transfer of any Series A Units (or any Common Units issues upon the conversion of any Series A Units) or removal of legends from certificates representing the same (i) for routine sales under Rule 144 of the Securities Act, (ii) after such Units become eligible for resale under Rule 144(k) of the Securities Act or (iii) for distributions by partnerships and limited liability companies affiliated with any Series A Unit holder.

3.5.2    Cancellation of Certificate.  Except as herein provided with respect to lost, stolen, or destroyed certificates, no new certificates of membership shall be issued in lieu of previously issued certificates of membership until former certificates for a like number of Units shall have been surrendered and cancelled.  All certificates of membership surrendered to the Company for Transfer (as defined in Section 4.4.1) or conversion shall be cancelled.

3.5.3    Replacement of Lost, Stolen or Destroyed Certificate.  Any Member claiming that a certificate of membership is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a new certificate.  Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Managers, a new certificate may be issued of the same tenor and representing the same number of Units as was represented by the certificate alleged to be lost, stolen or destroyed.

## ARTICLE 4
## MEMBERSHIP

4.1    Members.  Effective as of the date hereof, the Members of the Company shall be as set forth on the signature pages to this Agreement.

4.2    Representations and Warranties.  Each Member hereby represents and warrants for itself only to the Company and each other Member as follows:

4.2.1    Purchase Entirely for Own Account.  The Member is acquiring its Units for the Member's own account for investment purposes only and, except as contemplated by the Contribution and Purchase Agreement, not with a view to or for the resale, distribution, subdivision or fractionalization thereof in violation of the securities laws and has no contract, understanding, undertaking, agreement or arrangement of any kind with any Person to sell, transfer or pledge to any Person any Interest, nor does such Member have any present plans to enter into any such agreement.

4.2.2    Investment Experience; Accredited Investor.  By reason of such Member's business or financial experience, the Member has the capacity to protect its own interests in connection with the transactions contemplated hereunder, is able to bear the risk of investment in the Company, and at the present time could afford a complete loss of such investment.  The Member is an "accredited investor" as such term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended.

4.2.3    Securities Laws.  The Member acknowledges that the Units have not been registered under the Securities Act or any state securities laws, inasmuch as they are being acquired in a transaction not involving a public offering, and, under such laws, may not be resold

or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

     4.3     <u>Additional Members</u>. One (1) or more Additional Members of the Company may be admitted to the Company as a Member upon the approval of the Managers and the holders of the Series A Units and such Persons shall be admitted as Members of the Company; <u>provided</u> that such Additional Members execute a counterpart signature page to this Agreement agreeing to be bound by the terms of this Agreement and any other agreements or instruments by which a Member is bound as a condition to or by virtue of the Member's ownership of Units.

     4.4     <u>Restrictions on Transfers of Company Interests</u>.

     4.4.1     <u>Transfer of Interest</u>. No Member, Substitute Member or holder of an Economic Interest shall, directly or indirectly, sell, assign, pledge, mortgage or otherwise dispose of, encumber or transfer its Interest or Economic Interest in the Company, whether in whole or in part (collectively, "<u>Transfer</u>") (including, without limitation, in the case of the Seller Members, pursuant to the transfer of any equity interest in the Seller Members), except (a) pursuant to a Permitted Transfer; or (b) in accordance with all applicable provisions of <u>Article 13</u>, if any.

     4.4.2     <u>Requirements for Transfer</u>. Notwithstanding <u>Section 4.4.1</u> and except for a Permitted Transfer, (a) no Person who is a Member as of the Issue Date shall Transfer any Units (or any Economic Interest related thereto) held by such Member for a period of three (3) years following the Issue Date without the prior written consent of the non-Transferring Members, and (b) no Transfer of an Interest or Economic Interest of a Member, Substitute Member or holder of an Economic Interest (including, without limitation, in the case of the Seller Members, pursuant to the transfer of any equity interest in the Seller Members) shall be permitted (regardless of whether the Managers approve such a Transfer) if it would, or would reasonably be likely to:

     (a)     result in violation of the Securities Act, any applicable state law or the applicable securities laws of any other jurisdiction;

     (b)     result in the Transfer of an Interest or an Economic Interest of a Member to a direct or indirect competitor of the Company (<u>provided</u> that this <u>Section 4.4.2(b)</u> shall not apply to a Transfer by a Member of such Member's entire Interest in connection with a Change of Control Transaction);

     (c)     result in a violation of any law, rule, or regulation by the Member, any other Member, any Manager or the Company;

     (d)     cause the Company to be deemed a "publicly traded partnership" as such term is defined in Section 7704(b) of the Code; or

     (e)     cause the termination or dissolution of the Company.

     4.4.3     <u>Transfers of Economic Interest Only</u>. In the event of any Transfer made in accordance with this <u>Section 4.4</u>, the transferee shall receive only the transferor's Economic Interest in the Company, and the transferee shall not be admitted as a Member or have any right

as a result of such Transfer to participate in the affairs of the Company as a Member, unless such transferee is also admitted as a Substitute Member in accordance with <u>Section 4.5</u>.

      4.4.4   <u>Void Transfers</u>.  Any voluntary or involuntary Transfer in violation of this <u>Section 4.4</u> or the requirements of <u>Article 13</u> shall be null and void <u>ab initio</u>, and shall not operate to Transfer any portion of any Interest or Economic Interest in the Company to the purported transferee.

    4.5   <u>Admission of Substitute Members</u>.  An Assignee of Units of the Company shall be admitted as a Substitute Member only upon the approval of the Managers.  If so admitted, the Substitute Member shall have all the rights and powers, and shall be subject to all the restrictions and liabilities of, the Member who assigned such Units to the extent that such rights powers, restrictions and liabilities resulted from such assigning Member's ownership of the assigned Units. The admission of a Substitute Member shall not release any Member who assigned such Units from liabilities or obligations to the Company, the other Members or any other Person that may have arisen prior to the Transfer.

    4.6   <u>Rights of Assignees</u>.  Unless it is a Substitute Member, the Assignee of any Units shall have no right to vote on, consent to, approve or participate in the determination of any matter, or to otherwise participate in the management of the business and affairs of the Company or to become a Member, which rights shall be retained by the Member or Substitute Member who Transferred the applicable Units to the Assignee.  Unless it is a Substitute Member, the Assignee is only entitled to receive distributions (including its return of capital) and to be allocated the Book Income and Book Loss attributable to the Units Transferred to the Assignee.

    4.7   <u>Resignation or Withdrawal of a Member</u>.  Except as specifically provided in this Agreement, no Member shall have the right to resign or withdraw from membership in the Company or withdraw its interest in the capital of the Company; <u>provided, however</u>, that any automatic forfeiture of unvested Units granted pursuant to any option plan or agreement or any restricted Unit plan or agreement duly approved by the Managers and, if required, by the Members, in connection with the termination of a Member's service as an employee of or consultant to the Company shall not be deemed a breach of this <u>Section 4.7</u>.

    4.8   <u>Disassociation of a Member</u>.  The incapacity, death, Bankruptcy or Dissolution of a Member or the redemption by the Company of all of such Member's Units:  (a) will cause such Member to become a Disassociated Member; and (b) will terminate the membership of such Member in the Company.

    4.9   <u>Rights of a Disassociated Member</u>.  In the event any Member becomes a Disassociated Member, the Disassociated Member or its legal representative, successor or assign may request admission to the Company as a Substitute Member pursuant to <u>Section 4.5</u>.  If no request for Substitute Member status is made and granted pursuant to <u>Section 4.5</u>, the Disassociated Member or its legal representative, successor or assign shall thereafter have only those rights of an Assignee under this Agreement.

    4.10   <u>Voting Rights</u>.  Except as expressly required by law or as provided in this Agreement, Members shall have no voting, approval or consent rights.  In matters on which

Members are entitled to vote (other than any matters where certain specified Members have a separate approval right based on the class of Units held by such Members, such as in Section 3.4.4 and Section 6.1), the holders of Common Units and Series A Units shall vote together as a single class, with each Common Unit counting as one (1) vote and each Series A Unit counting as the number of Common Units into which the Series A Unit is then convertible.

4.11    No Authority as Agent. No Member shall have the authority in its capacity as a Member to enter into any transaction on behalf of the Company or to otherwise bind the Company.

4.12    Interest in Property of the Company. Each Member's Interest in the Company shall for all purposes be personal property. No Member shall have any interest in specific Company property. All property of the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any direct ownership in such property.

4.13    Information Rights. So long as any Member holds Series A Units, the Company shall deliver to such Member:

4.13.1    Within thirty (30) calendar days after the end of each month during the Company's fiscal year, unaudited financial statements of the Company consisting of (i) a consolidated statement of income and cash flows of the Company and its subsidiaries (if any) for such monthly period and for the period from the beginning of the fiscal year to the end of such month, and (ii) a consolidated balance sheet of the Company and its subsidiaries as of the end of such monthly period, prepared in accordance with GAAP;

4.13.2    Within forty-five (45) calendar days after the end of each fiscal quarter during the Company's fiscal year, unaudited financial statements of the Company consisting of (i) a consolidated statement of income and cash flows of the Company and its subsidiaries (if any) for such quarterly period and for the period from the beginning of the fiscal year to the end of such quarter, and (ii) a consolidated balance sheet of the Company and its subsidiaries as of the end of such quarterly period, prepared in accordance with GAAP, consistently applied, subject to the absence of footnote disclosures and to normal year-end adjustments;

4.13.3    Within forty-five (45) calendar days after the end of each fiscal year, unaudited financial statements of the Company consisting of (i) a consolidated statement of income and cash flows of the Company and its subsidiaries for such fiscal year, and (ii) a consolidated balance sheet of the Company and its subsidiaries as of the end of such fiscal year, prepared in accordance with GAAP, consistently applied, subject to the absence of footnote disclosures and to normal year-end adjustments;

4.13.4    Within ninety (90) calendar days after the end of each fiscal year, audited financial statements of the Company consisting of (i) a consolidated statement of income and cash flows of the Company and its subsidiaries for such fiscal year, and (ii) a consolidated balance sheet of the Company and its subsidiaries as of the end of such fiscal year, prepared in accordance with GAAP, consistently applied, and accompanied by an independent auditor's report issued by Kingery & Crouse, P.A. or such other independent accounting firm of

recognized national or regional standing as the Audit Committee established pursuant to <u>Section 6.6</u> may select from time to time;

      4.13.5   Within ninety (90) calendar days after the end of each fiscal year, a report setting forth in reasonable detail, for each such fiscal year, (i) all distributions, if any, made pursuant to <u>Section 7.2</u>, (ii) all amounts, if any, paid to the holders of the Series A Units pursuant to <u>Section 3.4.6</u>, (iii) the amount of all accrued but unpaid Preferred Dividend Amounts, and (iv) the Capital Account balance of each Member as of the end of such fiscal year;

      4.13.6   Not later than November 1st of each year, a budget (an "<u>Annual Budget</u>"), for the operation of the Company and its subsidiaries for the ensuing year beginning as of January 1st of such ensuing year, setting forth the anticipated income, operating expenses, taxes, distributions, and capital expenditures for such ensuing year, including a projected balance sheet giving effect to the Annual Budget; and

      4.13.7   All such other information (including, without limitation, management reports and other business forecasting materials) that is material to an understanding of the business and performance of the Company.

    4.14   <u>Operation of Company Pursuant to Annual Budget</u>.  The Managers shall operate the Company in compliance with the approved Annual Budget; <u>provided</u> that, for purposes of determining compliance with such Annual Budget in connection with this Agreement, the Annual Budget shall be deemed to include any amounts permitted as Variance Amounts.

**ARTICLE 5**
**CONTRIBUTIONS TO CAPITAL**

    5.1   <u>Capital Contributions</u>.  Each Member has made a Capital Contribution to the Company and, in exchange for such Capital Contribution, each Member shall have the rights set forth in this Agreement.

    5.2   <u>Additional Capital Contributions</u>.  No Member shall be permitted to make any additional contribution to the capital of the Company without the approval of the Managers. No Member shall be required to make any additional contribution to the capital of the Company.

    5.3   <u>Capital Accounts</u>.

      5.3.1   A separate Capital Account shall be maintained for each Member by the Managers. The Capital Accounts are intended to comply with the requirements of Section 704 of the Code. The Managers shall have the authority to interpret this <u>Section 5.3</u> accordingly, and shall be empowered to make such adjustments to the Members' Capital Accounts to satisfy such requirements.

      5.3.2   Pursuant to the Contribution and Purchase Agreement, Common Units were issued to those holders of Common Units with an opening capital account upon the closing of the transactions contemplated in the Contribution and Purchase Agreement in the amount set forth in **Exhibit A** hereto.

5.3.3    Pursuant to the Contribution and Purchase Agreement, Series A Units were issued to Kayne with the result that Kayne acquired such Series A Units with an opening capital account upon the closing of the transactions contemplated in the Contribution and Purchase Agreement in the amount set forth in **Exhibit A** hereto.

**ARTICLE 6**
**MANAGEMENT**

6.1    Generally.  The business and affairs of the Company shall be managed by a board of Managers (the "Managers") which shall be comprised of five (5) persons who may, but need not, be Members, designated as follows:

6.1.1    The Members holding Series A Units, voting non-cumulatively and as a separate class, shall have the right to elect two (2) Managers.

6.1.2    The Members holding Common Units, voting non-cumulatively as a separate class, shall have the right to elect three (3) Managers, one (1) of whom shall be the Chief Executive Officer of the Company.

It is an express condition precedent to the designation and election of any Manager that such Manager covenant and agree to observe and comply with the obligations and responsibilities of a Manager required by the Act and this Agreement.

6.2    Changes in Board Composition.  Notwithstanding Section 6.1 above, Members holding a majority of the then outstanding Series A Units shall be entitled to remove and re-designate one (1) of the Managers elected pursuant to Section 6.1.2 upon (i) the Bankruptcy of the Company, (ii) the failure of the Company generally to pay its debts as they become due, as determined, in good faith, by the Members holding a majority of the then outstanding Series A Units, (iii) the Company being unable to make a distribution of the Tax Distribution Amount to any holder of Series A Units, (iv) the failure of the Company to redeem any Series A Units pursuant to Section 3.4.6, (v) a material breach by the Company or the Seller Members of any material representation, warranty, covenant or agreement of the Company under this Agreement or the Purchase Agreement, which alleged breach, if the alleged facts are assumed to be true, would result in an indemnifiable Loss as provided for under Article 8 of the Purchase Agreement, or (vi) the ratio of the Company's consolidated EBITDA to the interest on the Company's existing consolidated Indebtedness for any four (4) consecutive fiscal quarters falls below 1.25:1.

6.3    Managers.

6.3.1    Exclusive Management by Managers.  Subject to the provisions of this Agreement and/or the Act relating to actions required to be approved by the Members, the business, property and affairs of the Company shall be managed and all powers of the Company shall be exclusively exercised by or under the direction of the Managers.  The Managers shall act collectively by majority vote in all matters, unless otherwise expressly required by the Act or this Agreement.  The Managers, acting collectively by majority vote, shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Managers under the laws of the State

of Delaware. The Managers shall be deemed to be a "manager" within the meaning of the Act. Without limiting the foregoing, each Manager shall have the ability and the authority to execute contracts and deliver instruments binding upon the Company, but solely to the extent such Manager is authorized and directed by the majority of the Managers to do so. Any determination by the Managers hereunder must be made in good faith.

        6.3.2    <u>Meetings of Managers</u>. Regular meetings of the Managers shall be held at least once during each quarter of the Company's fiscal year. Regular and special meetings of the Managers may be called by one (1) of the Managers elected pursuant to <u>Section 6.1.1</u>. All meetings shall be held upon four (4) Business Days' notice by mail or two (2) Business Days' notice (or upon such shorter notice period if necessary under the circumstances) delivered personally or by telephone, email, telegraph or facsimile. A notice need not specify the purpose of any meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting, which waiver or consent need not specify the purpose of the meeting, or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting. A majority of the Managers present, whether or not a quorum is present, may adjourn any meeting to another time and place. If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment shall be given prior to the time of the adjourned meeting to the Managers who are not present at the time of the adjournment. Meetings of the Managers may be held at any place within or without the State of Delaware which has been designated in the notice of the meeting or at such place as may be approved by the Managers. Managers may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers participating in such meeting can hear one another. Participation in a meeting in such manner constitutes a presence in person at such meeting. A majority of the authorized number of Managers and the presence of at least one (1) of the Managers designated by the holders of Series A Units pursuant to <u>Section 6.1.1</u> constitutes a quorum of the Managers for the transaction of business. Except to the extent that this Agreement expressly requires the approval of all Managers, every act or decision done or made by a majority of the Managers present at a meeting duly held at which a quorum is present is the act of the Managers. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of one (1) or more Managers, if any action taken is approved by at least a majority of the required quorum for such meeting. Any action required or permitted to be taken by the Managers may be taken by the Managers without a meeting, if a majority of the Managers individually or collectively consent in writing to such action, unless the action requires the unanimous vote of the Managers, in which case all Managers must consent in writing. Such action by written consent shall have the same force and effect as a majority vote or unanimous vote, as applicable, of such Managers, and if the written consent is not delivered to all Managers more than forty-eight (48) hours prior to the time of the taking of such action, the action shall not be taken until forty-eight (48) hours have elapsed from the time notice of the approval of the written consent was given to all Managers.

        6.4    <u>Additional Matters</u>. Each non-employee Manager shall be reimbursed by the Company for reasonable travel and other expenses incurred in attending or participating in meetings of the Managers or otherwise fulfilling such Manager's duties as a Manager and each

non-employee Manager shall be eligible to participate in any equity incentive plan or arrangement adopted in accordance with the terms of this Agreement.

6.5    Limitations on Powers of Members.  Pursuant to Section 6.3 and the Certificate, the management of the Company is vested in the Managers.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Certificate and except as expressly required by the Act.  No Member, acting solely in the capacity of a Member, is an agent of the Company.  Nor does any Member, unless expressly authorized in writing to do so by the Managers, have any right, power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

6.6    Committees of Managers.  Subject to Section 3.4.4., the Managers may from time to time establish committees of Managers for specific purposes and delegate the power to take actions and make decisions with respect to specific matters to the Managers comprising any such committee, subject to the requirements of applicable law.  Initially, the Managers shall establish an audit committee (the "Audit Committee") and a compensation committee (the "Compensation Committee").  Any such committee shall be comprised of Managers selected by the majority of the other Managers and the committee members shall be subject to removal upon the vote of the majority of the remaining Managers; provided, however, that any such committee shall at all times have as a member at least one (1) Manager designated by the holders of Series A Units pursuant to Section 6.1.1 and such Manager shall be subject to removal only upon the vote of the Series A Holders.  Regular meetings of the Audit Committee and the Compensation Committee shall be held at least once during the Company's Fiscal Year.  Except as otherwise provided for in this Section 6.6, the notice, quorum and voting provisions of Section 6.3.2 shall also apply to meetings of committees.  In addition to other purposes designated by the Manager and subject to the approval of the Series A Holders, (a) the Audit Committee shall recommend and engage the independent accounting firm and shall periodically review the Company's accounting, reporting and controls, and (b) the Compensation Committee shall review and approve all changes in compensation and approve all bonus, commission and other discretionary compensation payments to employees and consultants of the Company (and any Affiliate thereof); provided, however, the unanimous approval of the members of the Compensation Committee shall be required to the extent that such change in compensation results in such employee or consultant receiving annual compensation in excess of Seventy-Five Thousand Dollars ($75,000).

6.7    Removal of Managers and Term.  Any Manager may be removed and replaced at any time by a majority vote of the Person(s) then entitled to elect a Manager to the position on the board of Managers then held by the Manager to be removed.  Each Manager elected hereunder shall serve as a Manager until such Manager resigns, is removed as provided herein or until such Manager's successor is elected by the Person(s) entitled to elect such successor Manager; provided, however, that the Manager who is also the Chief Executive Officer of the Company shall be deemed to have resigned upon the termination of his or her employment with the Company for any reason.

6.8    Officers.  The Managers may appoint officers at any time.  The officers of the Company shall include a Chief Executive Officer, a Chief Financial Officer and such other officers as may be deemed necessary by the Managers from time to time.  Any individual may

hold any number of offices. The officers shall exercise such powers and perform such duties as shall be determined from time to time by the Managers. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Managers at any time; provided, however, that with regard to any vote to remove Bryon Wolf, Roy Eliasson or Alfred Wolf from their respective offices with the Company without "cause" (as such term is defined in the employment agreements between the Company and Bryon Wolf and Roy Eliasson), the Managers designated by the holders of Series A Units pursuant to Section 6.1.1 shall collectively only be entitled to one (1) vote with regard such vote.

6.9     Interested Party Transactions. In any transaction or event in which a Manager is an interested party such as, for example, a sale of assets to such Manager, or the appointment or removal of, or compensation to, the Manager (either as a Manager or as an officer of the Company), such Manager shall abstain from all such votes and his or her vote shall not be counted among the total votes.

6.10     Certain Relationships; Equity Incentive Plans. Notwithstanding any other provision of this Agreement, (a) any offer or decision to hire or transact business with any relative or family member of any employee of the Company shall be subject to the unanimous approval of the Managers and (b) the Equity Incentive Plan or any other employee equity incentive plan, arrangement and agreement adopted by the Company shall provide that no acceleration of vesting shall occur in the event that a recipient of a grant thereunder is terminated for "cause" (as defined in such plan, arrangement or agreement or under applicable law).

## ARTICLE 7
## DISTRIBUTIONS

7.1     Distributions Upon Dissolution. Articles 11 and 12 shall govern distributions made following the dissolution of the Company.

7.2     Other Distributions. Subject to Section 3.4.4, the timing and amount of all distributions shall be determined by the Managers; provided, however, that the Managers shall cause the distributions contemplated by Section 7.2.1 below to be made, subject only to the limitations set forth in Section 7.3. Subject to Article 11 (which governs distributions made following the dissolution of the Company) and Section 12.1 (which governs distributions following a Change of Control Transaction), all distributions shall be made in the following order:

7.2.1     First. In an amount proportionate to, but not exceeding, the Tax Distribution Amounts, to the holders of all outstanding Series A Units and to the holders of all outstanding Common Units, proportionate with respect to the number of Common Units (a) then held by such holders with and (b) in the case of Series A Units, into which the Series A Units held by such holders could then be converted; provided, however, that any amounts distributed pursuant to this Section 7.2.1 shall in no way reduce amounts owed to Members pursuant to Articles 7, 11 and 12.

7.2.2     Second. In the event the holders of outstanding Series A Units have requested that the Company redeem some or all of their Series A Units pursuant to Sections 3.4.3

or 3.4.6 and the Company has failed pay all amounts owing to the holders of outstanding Series A Units, in an amount equal to any unpaid amounts owed pursuant to Sections 3.4.3 or 3.4.6 to the holders of the Series A Units.

7.2.3    Third.    In an amount up to, but not exceeding, the Net Cash From Operations to the holders of all outstanding Series A Units and to the holders of all outstanding Common Units, proportionate with respect to the number of Common Units (a) then held by such holders and (b) in the case of Series A Units, into which the Series A Units held by such holders could then be converted; provided, however, that any amounts distributed pursuant to this Section 7.2.3 shall in no way reduce the amounts of the Original Issue Price or the Preferred Dividend Amounts owed to Members pursuant to Sections 12.1.2 or 12.1.3.

7.2.4    Notwithstanding the provisions of Section 7.2.3 and in lieu of the distributions contemplated thereby, the Managers may, in their discretion, distribute Net Cash From Operations solely to the holders of the outstanding Series A Units, with the effect that any amounts distributed pursuant to this Section 7.2.4 shall reduce the amount of the Original Issue Price owed pursuant to Sections 3.4.6 and 12.1.2.

7.3    Restrictions on Distributions.    The following restrictions on distributions shall apply:

7.3.1    The Company shall not make any distribution to the Members unless, immediately after giving effect to the distribution, all liabilities to creditors of the Company, other than liabilities as to which recourse of creditors is limited to specified property of the Company, do not exceed the fair market value of the Company property (including intangible assets); provided that the fair value of any property that is subject to a liability as to which recourse of creditors is so limited shall be included in the Company assets only to the extent that the fair value of the property exceeds such liability.

7.3.2    The Company shall not make any distribution to the Members unless, immediately after giving effect to the distribution, the Company shall have sufficient cash available to meet the reasonably anticipated needs of the Company, as such needs are determined in the sole discretion of the Managers.

7.3.3    The Company shall not make any distribution to the Members to the extent such distribution would result in a default under, or a violation of or cause the acceleration of any Indebtedness under, any credit or loan agreement with the Company.

7.4    Return of Distributions.    Members and Assignees who receive distributions made in error or in violation of the Act or this Agreement shall hold such improper distributions in trust for, and promptly return such improper distributions to, the Company.  Except for such improper distributions, no Member or Assignee shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.  The amount of any distribution returned to the Company by a Member or Assignee or paid by a Member or Assignee for the account of the Company or to a creditor of the Company shall be added to the Capital Account(s) from which it was subtracted when it was distributed to the Member or Assignee.

7.5    No Other Withdrawals. Except as provided in this Article 7, Article 11 or Article 12, no withdrawals or distributions shall be required or permitted.

7.6    In-Kind Distributions. If property is distributed in-kind to the Members, the difference between the gross fair market value of such property (as determined by the Managers) and its Book Value shall be considered gain or loss that is recognized by the Company and such gain or loss shall be allocated to the Members in accordance with the provisions of Article 8.

7.7    Withholding on Distributions. All amounts required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or any Member and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to Sections 7.2 and 12.1 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Member with respect to which such amount was withheld.

## ARTICLE 8
## ALLOCATIONS

8.1    Allocation of Book Income and Book Loss. The Book Income or Book Loss for the Company for any Accounting Period shall be allocated for federal income tax purposes, as of the end of such Accounting Period, as follows:

8.1.1    Book Income and Book Loss of the Company shall be allocated among the Members so as to reduce, proportionately, the difference between their respective Target Accounts and Partially Adjusted Capital Accounts as of the end of such Accounting Period. No portion of Book Income or Book Loss for any Accounting Period shall be allocated to a Member, in the case of Book Income, whose Partially Adjusted Capital Account is greater than or equal to its Target Account or, in the case of Book Loss, whose Target Account is greater than or equal to its Partially Adjusted Capital Account for such Accounting Period.

8.1.2    (a) If the Company has Book Income for any Accounting Period (determined prior to giving effect to this Section 8.1.2) and, notwithstanding the application of Section 8.1.1, the balance of any member's Partially Adjusted Capital Account is greater than the balance of its Target Account, then the Member with such excess balance shall be specially allocated items of Company expense or loss (to the extent available) equal to the difference between its Partially Adjusted Capital Account and its Target Account; (b) if the Company has Book Loss for any Accounting Period (determined prior to giving effect to this Section 8.1.2) and, notwithstanding the application of Section 8.1.1, the balance of any Member's Partially Adjusted Capital Account is less than the balance of its Target Account, then the Member with such deficient balance shall be specially allocated items of Company income or gain for such Accounting Period (to the extent available) equal to the difference between its Partially Adjusted

Capital Account and its Target Account; (c) if the Company has neither Book Income nor Book Loss for any Accounting Period (determined prior to giving effect to this Section 8.1.2) and, notwithstanding the application of Section 8.1.1, the balance of any Member's Partially Adjusted Capital Account differs from the balance of its Target Account, then the Member with an excess or deficient balance, as the case may be, shall be specially allocated items of Company expense or loss or income or gain, as the case may be, for such Accounting Period (to the extent available) equal to the difference between its Partially Adjusted Capital Account and its Target Account; and (d) if all Members have a zero capital account and the Company has additional Book Loss to allocate, then the allocation of such Book Loss shall be made in accordance with Treasury Regulations promulgated under Section 704 of the Code and the first subsequent allocation of Book Income shall be made to reverse any allocation of Book Loss under this Section 8.1.2(d).

        8.1.3     Special Allocations.  Notwithstanding anything to the contrary in this Section 8.1:

        (a)     In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Book Income shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Capital Account deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 8.1.3(a) shall be made only if and only to the extent that such Member would have a Capital Account deficit after all other allocations provided for in this Section 8.1 have been tentatively made as if this Section 8.1.3(a) were not in this Agreement.

        (b)     In the event any Member has a deficit Capital Account balance at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Member is obligated to restore and (ii) the amount such Member is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-2(g)(1)(ii) and 1.702-2(i)(5), each such Member shall be specially allocated items of Book Income in the amount of such excess; provided that an allocation pursuant to this Section 8.1.3(b) shall be made if and only to the extent that such Member would have a deficit Capital Account balance in excess of such sum after all other allocations provided for in this Section 8.1 have been tentatively made as if Section 8.1.3(a) and this Section 8.1.3(b) were not in this Agreement.

        (c)     The allocations set forth in Sections 8.1.3(a) and 8.1.3(b) are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently therewith.

        (d)     If, and to the extent that, any Member recognizes (or is deemed to recognize) any income as a result of any transaction between the Company and such Member subject to Section 83 of the Code or any similar provision now or hereafter in effect, any corresponding item of deduction of the Company should be allocated to the other Members who did not recognize such income in order to reflect the Members' economic interests in the Company.

8.1.4    Notwithstanding any other provision of this <u>Section 8.1</u> to the contrary, in the taxable year in which there is a Change of Control Transaction, after the allocations in <u>Section 8.1.3</u>, the Capital Accounts of the Members will, to the extent possible, be adjusted to the amount of the liquidating distributions to be made to them under <u>Article 12</u> by allocations of items of income, gain, deduction, or loss credited to the capital account of a Member whose Capital Account is less than the amount to be distributed to it and debited from the capital account of the Member whose Capital Account is greater than the amount to be distributed to it, as the case may be.

8.1.5    For purposes of <u>Sections 8.1.1</u> and <u>8.1.2</u>, the Capital Account balance of each Member shall be increased by the amount that such Member is deemed obligated to restore to the Company upon liquidation of the Company (or upon liquidation of the Member's Interest) pursuant to Treasury Regulations Sections 1.704-2(g)(1)(ii) and 1.704-2(i)(5).

8.1.6    Upon the exercise of an option to acquire Units that was granted to a Person in connection with the performance of services to the Company, the Company shall treat such Person as receiving compensation income at the time of such exercise equal to the difference between (i) the strike price paid upon such exercise, and (ii) the amount such Person would receive if the Company were to sell its assets for their fair market value (as determined by the board of Managers) and liquidate as provided in this Agreement, all at the time of such exercise.

8.1.7    The allocation provisions contained in this Agreement are intended to produce final Capital Account balances that are at levels which permit liquidating distributions in accordance with positive Capital Account balances to be equal to the Distributions that would occur if such liquidating proceeds were distributed in accordance with <u>Article 12</u>. To the extent that the allocation provisions of this Agreement would not produce such final Capital Account balances, the Members agree that the Managers may take such actions as are necessary to amend such provisions of this Agreement to produce such final Capital Account balance.

8.2    <u>Allocations upon Transfer</u>.  If, during an Accounting Period, a Member transfers all or any portion of its Units to an Assignee, items of Book Income and Book Loss, together with corresponding tax items, that otherwise would have been allocated to such Member with regard to such Accounting Period shall be allocated between that Member and the Assignee in accordance with their respective Units during the Accounting Period using any method permitted by Section 706 of the Code and selected by the Managers.

8.3    <u>Partnership Tax Treatment</u>.  The Members expect and intend that the Company shall be treated as a partnership for all federal and state income tax purposes, and the Members agree that they will not:  (a) take a position on any federal, state, local or other tax return, or otherwise assert a position, inconsistent with such expectation and intent; or (b) elect for the Company to be treated as an association for tax purposes or do any other act or thing which could cause the Company to be treated as other than a partnership for federal income tax purposes.

8.4    Tax Allocations.

8.4.1    Unless otherwise required by Sections 704(b) and (c) of the Code or the Treasury Regulations promulgated thereunder, all items of income, gain, loss or deduction, as determined for federal, state and local tax purposes, shall be allocated among the Members in the same manner as the corresponding items of income, gain, loss or deduction are allocated pursuant to Section 8.1.

8.4.2    In accordance with Section 704(c) of the Code and the applicable Treasury Regulations thereunder, any income, gain, loss or deduction with respect to any property contributed to the capital of the Company, or with respect to any property which has a Book Value different than its adjusted tax basis at the time of the contribution, shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted tax basis of such property and the Book Value of such property. The Managers shall cause the Company to elect any method of allocation permitted by Treasury Regulations Section 1.704-3 with respect to such allocation. Members shall provide the Managers with the adjusted tax basis of any property contributed to the Company to enable such allocation to be made.

8.4.3    Allocations pursuant to this Section 8.4 are made solely for tax purposes and shall not offset, or in any way be taken into account in computing, any Member's Capital Account balance or share of Company distributions. Each Member is aware of the income tax consequences of the allocations made by this Agreement and agrees to be bound by the provisions of this Article 8 in reporting its share of Company income and loss for income tax purposes.

## ARTICLE 9
## ACCOUNTING AND RECORDS

9.1    Financial and Tax Reporting. The Company shall prepare its financial statements in accordance with GAAP, and shall prepare its income tax information returns using such methods of accounting and tax year as the Managers deem necessary or appropriate under the Code and Treasury Regulations.

9.2    Books and Records. The books and records of the Company shall be maintained in a fashion that facilitates income tax reporting and Capital Account maintenance. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office all of the following:

9.2.1    A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with the Capital Contributions, Capital Account and Units of each Member and Assignee;

9.2.2    A current list of the full name and business or residence address of each Manager;

9.2.3    A copy of the Certificate and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate or any amendments thereto have been executed;

9.2.4    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

9.2.5    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

9.2.6    Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

9.2.7    The books and records of the Company as they related to the internal affairs of the Company for at least the current and last four (4) fiscal years.

9.3    Delivery to Members and Inspection.   Upon the request of any Member or Assignee, for purposes solely related to the interest of that Person as a Member or Assignee, the Managers shall make available to the requesting Member or Assignee, during the Company's regular business hours and at the expense of such Member or Assignee, the information required to be maintained pursuant to Section 9.2. Any information so obtained or copied shall be kept and maintained in strict confidence except as required by law.

9.4    Reliance on Books and Records.   Any Member shall be fully protected in relying in good faith upon the records and books of account of the Company and upon such information, opinions, reports or statements presented to the Company by any of its other Members or employees, or by any other Person, as to matters the Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

9.5    Tax Matters Partner.   The Members hereby designate Bryon Wolf as the tax matters partner (the "Tax Matters Partner") pursuant to Section 6231(a)(7) of the Code.

9.6    Tax Election.

9.6.1    The Company shall make an election under Section 754 of the Code and any similar provisions of state law.

9.6.2    The Tax Matters Partner shall have the right to direct the Company to make any other election for federal and state income Tax purposes as it determines appropriate; provided that any election which may adversely affect any Member must be approved of by such Member in writing prior to making such election.

## ARTICLE 10
## LIABILITY, EXCULPATION AND INDEMNIFICATION;
## INSURANCE; COMPETING ACTIVITIES

10.1    Liability.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

10.2    Exculpation.  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.  This Section shall not apply to employee Members in their capacity as officers or employees.

10.3    Duties and Liabilities of Covered Persons.  To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Person for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

10.4    Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of (a) any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company or its subsidiaries and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, or (b) the conduct of the business of the Company or (c) with respect to Kayne, the investment in or ownership of any Common Units or Preferred Units; provided, however, that any indemnity under this Section 10.4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof. Notwithstanding the foregoing, nothing in this Section 10.4 shall in any way invalidate, preempt or otherwise terminate any indemnification obligations of any party contained in the Contribution and Purchase Agreement.

10.5    Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or

proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Article 10.

10.6    Insurance.

10.6.1    The Company shall purchase and at all times maintain insurance, to the extent and in such amounts as the Managers shall deem reasonable, on behalf of Covered Persons and such other Persons as the Managers shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or its subsidiaries or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.    The Managers and the Company may enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 10.5 and containing such other procedures regarding indemnification as are appropriate.

10.6.2    In addition to the foregoing, the Company shall purchase and at all times maintain (a) insurance for general liability and property damage in coverage amounts acceptable to the Managers and the Members holding Series A Units and (b) director's and officer's insurance in an aggregate coverage amount of no less than Three Million Dollars ($3,000,000). In addition, the Company shall purchase and maintain a "key man" life and disability insurance policy on the life of Bryon Wolf in the amount of Twenty-Five Million Dollars ($25,000,000), of which (i) Twenty Million Dollars ($20,000,000) shall be collaterally assigned to Kayne as security for the redemption of the Series A Units pursuant to the terms of this Agreement, and (ii) the remained shall be assigned to the Company; *provided, however,* in the event (A) the cost of such insurance exceeds Fifty Thousand Dollars ($50,000) and (B) a majority of the Managers decide, in good faith, to not pay such amount in excess of Fifty Thousand Dollars ($50,000), the Company shall purchase and maintain such insurance in whatever coverage amount can be acquired for Fifty Thousand Dollars ($50,000).

10.7    Competing Activities; Confidential Information.

10.7.1    Competing Activities.  Except with respect to officers or employees of the Company who are also Members, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity.  The organization of the Company shall be without prejudice to the Members' (other than officers or employees of the Company) respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.  For the avoidance of doubt, Kayne shall not be liable to the Company or to any other Member for any claim arising out of, or based upon, (i) the investment by Kayne in any entity competitive to the Company, or (ii) actions taken by any partner, officer or other representative of Kayne to assist any such

competitive company, whether or not such action was taken as a board member of such competitive company or otherwise, and whether or not such action has a detrimental effect on the Company; provided, however, that Kayne shall be prohibited from using or applying any Confidential Information for any such competitive company. Nothing in this Section 10.7.1 shall be deemed to modify in any manner separate noncompetition agreements executed by certain Members for the benefit of the Company.

10.7.2    Confidential Information.  Each Member acknowledges and agrees that the information, observations, trade secrets and data concerning the business and affairs of the Company obtained by the Members by reason of their membership herein ("Confidential Information") are the property of the Company.  Therefore, each Member agrees that such Member shall not disclose to any unauthorized person or use for such Member's own account any Confidential Information without the prior written consent of the Managers unless and to the extent that the aforementioned matters (a) become generally known to and available for use by the public other than as a result of such Member's acts or omissions to act or (b) must be disclosed under a subpoena or other governmental order (but then, only after the Company is given notice of such subpoena or order and the opportunity to seek a protective order).

10.7.3    Return of Confidential Information.  Any Member or Manager whose Interest is terminated shall at such time deliver to the Company all memoranda, notes, plans, records, reports (including, without limitation, all business plans, financial projections and financial models), computer tapes and discs and software and other documents and data relating to the Confidential Information which such Member has in its, his or her possession or under such Member's control.

10.7.4    No Limitation on Rights to Confidential Information.  Notwithstanding any other provision of this Agreement, nothing herein shall in any way limit the Company's rights with respect to the limitations on disclosure, use and return of Confidential Information as may be set forth in any employment, consulting or similar agreement with any Member or Manager.

10.8    Survival.  Notwithstanding any other provision of this Agreement, the provisions of this Article 10 shall survive termination of this Agreement.

## ARTICLE 11
## DISSOLUTION AND TERMINATION

11.1    Termination.  The Company shall be dissolved, its property disposed of and its affairs wound up upon the first to occur of the following:

(a)    the approval of the Managers and the holders of at least Sixty-Six and Two-Thirds Percent (66 2/3%) of the Series A Units and Common Units then outstanding;

(b)    the entry of a decree of judicial dissolution under the Act;

(c)    the date sixty (60) calendar days after the Company is not treated as a partnership for federal income tax purposes; provided that the Company uses reasonable efforts to restore its partnership tax status in such sixty (60)-day period, except that no

dissolution shall occur pursuant to this clause if treatment of the Company other than as a partnership for federal income tax purposes occurs as a result of a voluntary election by the Company of such other treatment; or

        (d)     any Change of Control Transaction, after the final distribution of any proceeds thereof to the Persons entitled thereto.

    11.2   <u>Authority to Wind Up</u>.  The Managers shall have all necessary power and authority required to marshal the assets of the Company, to pay the Company's creditors, to establish reasonable reserves for contingent liabilities of the Company, to distribute assets and otherwise wind up the business and affairs of the Company.  In particular, the Managers shall have the authority to continue to conduct the business and affairs of the Company insofar as such continued operation remains consistent, in the judgment of the Managers, with the orderly winding up of the Company.

    11.3   <u>Winding Up; Certificate of Dissolution</u>.  The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the Company have been distributed to the Members.  Upon the completion of winding up of the Company, a Certificate of Dissolution shall be filed with the Delaware Secretary of State.

    11.4   <u>Distribution of Property</u>.  Upon dissolution and winding up of the Company, the affairs of the Company shall be wound up and the Company liquidated by the Members.  The assets of the Company shall be applied to pay creditors of the Company in the order of priority provided by law.  Any remaining assets shall be distributed to the Members in accordance with <u>Article 12</u>.

    11.5   <u>Capital Account Deficit</u>.  Any Member with a deficit in its Capital Account shall not be required to contribute such deficit amount to the Company upon the liquidation thereof.

**ARTICLE 12**
**CHANGE OF CONTROL TRANSACTIONS**

    12.1   <u>Change of Control Transaction Distributions</u>.  In the event of a Change of Control Transaction, all proceeds received or deemed received (which shall be the aggregate consideration payable to holders of units of the Company or received by the Company together with all other available assets of the Company in connection with any Change of Control Transaction) by the Company in connection with such Change of Control Transaction (after the full payment of any creditors of the Company and the establishment of reasonable reserves for contingent liabilities of the Company, to the extent required by law or in the Managers' reasonable discretion) shall, promptly after the Company's receipt or deemed receipt thereof, be distributed to the holders of Units in the following order of priority:

    12.1.1   <u>First</u>.  In the event the holders of outstanding Series A Units have requested that the Company redeem some or all of their Series A Units or Common Units pursuant to <u>Sections 3.4.3</u> or <u>3.4.6</u>, and the Company has failed to pay all amounts owing to the

holders of outstanding Series A Units, in an amount equal to any unpaid amounts owed pursuant to Sections 3.4.3 or 3.4.6.

12.1.2    Second.  Among the holders of Series A Units until such holders shall have received an amount equal to the Original Issue Price per each Series A Unit less any amounts previously distributed to the holders of the Series A Units pursuant to Section 7.2.4.

12.1.3    Third.  Among the holders of Series A Units until such holders shall have received an amount equal to any accrued but unpaid Preferred Dividend Amounts as of the date the Company receives the proceeds from the Change of Control Transaction; provided, however, that in the event of a Change of Control Transaction, pursuant to which the then-current holders of Series A Units would have received, pursuant to Sections 12.1.2 and 12.1.4, an amount per each Series A Unit in cash equal to or in excess of the Original Issue Price multiplied by three (3), then upon such Change of Control Transaction, the holders of the Series A Units shall be entitled to no distributions pursuant to this Section 12.1.3, but rather only shall receive in cash the amounts that they are entitled to receive pursuant to Sections 12.1.1, 12.1.2 and 12.1.4.

12.1.4    Fourth.  Ratably among the holders of the Common Units and the Series A Units according to the number of Common Units (a) then held by such holders with respect to the Common Units and (b) in the case of the Series A Units, into which the Series A Units held by such holders are then convertible.

12.2    Distribution of Non-Cash Proceeds.  To the extent that the proceeds from a Change of Control Transaction are in a form other than cash, such non-cash proceeds shall be, in the Managers' discretion, either (a) reduced to cash or some other easily divisible and reasonably liquid asset for subsequent distribution among the holders of Units in the order provided above in Section 12.1 or (b) distributed among the holders of Units in the order provided above in Section 12.1. To the extent that non-cash proceeds from a Change of Control Transaction are not reduced to cash or other liquid asset and are distributed to the holders of the Units, distributions under Section 12.1 shall be made in a manner such that the holders of all Units receive their pro rata share of the cash proceeds from such transaction and each class or type of non-cash proceeds (unless otherwise agreed to by the Members).  The value of such non-cash proceeds shall be equal to the fair market value of the non-cash proceeds at the time of the distribution as determined in good faith by the Managers.

12.3    Distribution of Unused Reserves.  To the extent any proceeds of a Change of Control Transaction are set aside as a reserve against contingent liabilities and are not used to satisfy such liabilities and are subsequently distributed, such unused proceeds shall be distributed to the holders of the Units in the order provided above in Section 12.1, as if such amounts had been distributed immediately following the receipt of the proceeds of the Change of Control Transaction and no such reserves had been established, but taking into account all other distributions made prior to or contemporaneously with such distribution of unused reserves.

## ARTICLE 13
## ADDITIONAL RIGHTS REGARDING THE TRANSFER OF UNITS

13.1     <u>Rights of First Refusal</u>.  Other than in the case of any Permitted Transfer, each time a Member holding Units (the "<u>Transferring Member</u>") proposes to transfer all or any portion of the Units held by such Member (or is required to do so by operation of law or other involuntary means), such Member shall first comply with the following provisions and the provisions of <u>Section 13.2</u> below:

13.1.1     The Transferring Member shall deliver a written notice (the "<u>Transfer Notice</u>") to (i) the other Common Holders, (ii) the Series A Holders, and (iii) the Company stating (A) the Transferring Member's bona fide intention to transfer such Units, (B) the number of Units to be transferred, (C) the purchase price and terms of payment for which the Transferring Member proposes to transfer such Units and (D) the name and address of the proposed transferee (the "<u>Proposed Transferee</u>").

13.1.2     For a period of thirty (30) Business Days after receipt of the Transfer Notice, the Company shall have the right, but not the obligation, to elect to purchase all or any portion of the Units upon the price and terms of payment designated in the Transfer Notice.  If the Transfer Notice provides for the payment of non-cash consideration, the Company may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Managers.  Within thirty (30) Business Days after receipt of the Transfer Notice, the Managers on behalf of the Company, to the extent the Company is electing to purchase Units pursuant to this <u>Section 13.1.2</u>, shall notify the Transferring Member and the non-Transferring Members in writing of the Company's intent to purchase all or any portion of the Units proposed to be so transferred.  The failure of the Company to submit a notice within the applicable period shall constitute an election on the part of the Company not to purchase any of the Units which may be so transferred.

13.1.3     If the Company does not elect to purchase all of the Units proposed to be transferred within the thirty (30)-day period described in <u>Section 13.1.2</u>, the non-Transferring Members shall have the right, but not the obligation, to elect to purchase any remaining portion of such Units (the "<u>Remaining Units</u>") upon the price and terms of payment designated in the Transfer Notice.  If the Transfer Notice provides for the payment of non-cash consideration, the non-Transferring Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Managers.  Within fifteen (15) Business Days following the expiration of the thirty (30)-day period described in <u>Section 13.1.2</u>, each non-Transferring Member electing to purchase the Remaining Units pursuant to this <u>Section 13.1.3</u> shall notify the Managers and the Transferring Member in writing of his, her or its desire to purchase a portion of the Remaining Units.  The failure of any non-Transferring Member to submit a notice within the applicable period shall constitute an election on the part of that non-Transferring Member not to purchase any of the Remaining Units.  The number of Remaining Units that each non-Transferring Member shall be entitled to purchase pursuant to this <u>Section 13.1.3</u> shall be determined based upon the proportion that the Percentage Interest of such non-Transferring Member bears to the aggregate of the Percentage Interests of all of the non-Transferring Members electing to purchase the Remaining Units.  In the event any non-Transferring Member elects to purchase none or less

than all of his, her or its pro rata share of such Remaining Units, then the other non-Transferring Members may elect to purchase more than their pro rata share.

13.1.4    If the Company and the non-Transferring Members elect to purchase or obtain any or all of the Units designated in the Transfer Notice, then (a) the closing of such purchase shall occur no later than sixty (60) Business Days after the date of the Transfer Notice and (b) the Transferring Member, the Company and the non-Transferring Members, as applicable, shall execute such documents and instruments and make such deliveries as may be reasonably required to consummate such purchase.

13.1.5    Subject to Section 13.2 below, if the Company and the non-Transferring Members elect not to purchase or obtain, or default in their obligation to purchase or obtain, the Units which they have elected to purchase, then the Transferring Member may transfer any such Units not so purchased to the Proposed Transferee; provided that such transfer (a) is completed within sixty (60) calendar days after the expiration of the Company's and the non-Transferring Members' right to purchase such Units (as set forth in Sections 13.1.2 and 13.1.3 above), (b) is made on terms not more materially favorable to the Proposed Transferee than as designated in the Transfer Notice, and (c) complies with Sections 4.4 and 13.2; provided, however, that Section 4.4.2(b) shall not apply to a Transfer of the Transferring Member's entire Interest in connection with a Change of Control Transaction. If the Units described in the Transfer Notice are not so transferred, the Transferring Member must give notice in accordance with this Section 13.1 prior to any other or subsequent transfer of such Units.

13.2    Right of Co-Sale. Other than in the case of any Permitted Transfer, and subject to prior compliance with Section 13.1, each Transferring Member shall, prior to consummating any transfer of Units to a Proposed Transferee, offer each Series A Holder the opportunity (the "Right of Co-Sale") to sell or otherwise dispose of their Units pursuant to this Section 13.2.

13.2.1    With respect to any transfer by a Transferring Member to a Proposed Transferee, each Series A Holder shall have the right to require the Proposed Transferee to purchase from such Series A Holder (in lieu of a portion of the Units to be transferred by the Transferring Member) a pro rata portion of the aggregate number of Units to be transferred, based on the aggregate number of Units held by such Series A Holder, as compared with the aggregate number of Units held by the Transferring Member. Any Units transferred by a Series A Holder pursuant to this Section 13.2 shall be paid for at the same price per Unit and upon the same terms and conditions as those in the proposed transfer. Such terms and conditions shall not include the making of any representations and warranties, indemnities or other similar agreements other than representations and warranties with respect to title of the Units being sold and authority to sell such Units and indemnities directly related thereto.

13.2.2    The Right of Co-Sale may be exercised by each Series A Holder by delivery of a written notice to the Transferring Member (the "Co-Sale Notice") within sixty (60) calendar days following such Series A Holder's receipt of the Transfer Notice pursuant to Section 13.1.1. The Co-Sale Notice shall state the number of Units that such Series A Holder proposes to include in the proposed transfer and the number of additional Units, if any, that such Series A Holder wishes to transfer to the Proposed Transferee if the other Members holding Rights of Co-Sale elect not to fully exercise such right. If the Co-Sale Notice is received by the

Transferring Member during the sixty (60)-day period referred to above and the Proposed Transferee does not purchase all of the Units set forth therein on the same terms and conditions as specified in the Notice of Transfer, then the Transferring Member shall not be permitted to sell any Units to the Proposed Transferee in the proposed transfer. If no Co-Sale Notice is received by the Transferring Member during the sixty (60)-day period referred to above, the Transferring Member shall have the right, for a period of thirty (30) calendar days after the expiration of such sixty (60)-day period, to transfer the Units specified in the Transfer Notice substantially on the terms and conditions stated therein (and, if such Units are not so transferred, the Transferring Member must give notice in accordance with Section 13.1 prior to any other or subsequent transfer of such Units). If a Co-Sale Notice is received by the Transferring Member during the sixty (60)-day period referred to above and the Proposed Transferee has agreed to purchase all of the Units proposed to be transferred pursuant to such Co-Sale Notice, the Series A Holder who delivered such Co-Sale Notice shall timely deliver to the Proposed Transferee, against payment of the total purchase price for the securities to be purchased, a certificate or certificates representing the number of Units which the Proposed Transferee has elected to purchase, together with appropriate instruments of transfer, duly endorsed in blank.

13.2.3   No Adverse Effect. The exercise or non-exercise by any party of such party's rights pursuant to Section 13.2 shall not adversely affect the rights of such party to participate in any subsequent Transfer of Transfer Units by any Member.

13.3   Permitted Transactions. Notwithstanding any other provision of this Agreement, the provisions of Section 13.1 and Section 13.2 shall not apply to any Permitted Transfer; provided, however, that in the case of any Permitted Transfer, (a) the transferring party shall inform the Company of such Transfer prior to effecting such Permitted Transfer, and (b) the transferee shall agree in writing to be bound by and comply with the terms and conditions of this Agreement as a condition to the effectiveness of any such Transfer.

13.4   Bring-Along Right.

13.4.1   Sale of Units. In the event that (a) any Person who is not an Affiliate of any Member (a "Buyer") makes a bona fide offer to purchase substantially all of the outstanding Interests or assets of the Company for an aggregate purchase price of at least Eighty Million Dollars ($80,000,000), (b) the holders of a majority of the outstanding Series A Units (the "Leading Members") notify the other Members of their desire to accept such offer and (c) those Members not desiring to accept such offer are unable to match such offer (including by securing all necessary financing) within forty (40) calendar days of receipt of the notice described in clause (b) above, then each Member shall sell, transfer or exchange all of the Bring-Along Units (as defined below) beneficially owned by such Member to the Buyer on the same terms and conditions per class of Unit negotiated by the Leading Members with respect to each class of Unit or, if applicable, shall agree to a sale of all or substantially all of the assets of the Company to the Buyer (any of the foregoing, a "Bring-Along Sale"); provided, however, that the Eighty Million Dollar ($80,000,000) minimum aggregate purchase price requirement set forth in the foregoing clause (a) shall not apply to any Bring-Along Sale initiated by the Leading Members upon the failure of the Company to redeem any Series A Units pursuant to Sections 3.4.3 or 3.4.6. For purposes of this Section 13.4, the term "Bring-Along Units" shall mean all Units representing Interests of the Company including, without limitation, all Units issued or issuable

upon the exercise of any warrant or option or upon the conversion of any Convertible Securities (and, in the case of any warrant or option to acquire Convertible Securities, the Units issuable upon the exercise of such warrant or option and conversion of such Convertible Securities).

13.4.2    Consideration for Sale of Units. Subject to the terms of Article 12 governing the distribution of proceeds from a Change of Control Transaction, each Member shall receive the same form and amount of consideration for each Bring-Along Unit sold in a Bring-Along Sale. In the case of any Bring-Along Unit issuable upon the exercise of a right or option to acquire Units or Convertible Securities, the exercise price required to be paid to exercise such right or option shall be deducted from the consideration to be received in the Bring-Along Sale; provided, however, that if such exercise price is greater than the consideration to be received, the right or option shall be canceled without any payment to the holder.

13.4.3    Further Actions. Each Member hereby agrees to execute such agreements, powers of attorney, voting proxies or other documents and instruments as may be necessary to consummate any proposed Bring-Along Sale. Each Member shall be obligated to make customary and lawful representations and warranties with respect to any proposed Bring-Along Sale, including representations and warranties regarding such Member's authority to transfer the Bring-Along Units subject to the Bring-Along Sale, the absence of conflicts with other agreements that would prevent such transfer and such Member's title to the Bring-Along Units transferred. Each Member will make such representations, warranties and covenants as may be reasonably required by the Buyer, and shall be obligated to indemnify the Buyer with respect to breaches of such representations, warranties and covenants. Each Member further agrees to timely take such other actions as the Leading Members may request to enforce such Member's obligation to sell its Bring-Along Units, and shall execute all documents and take all actions necessary in connection therewith as are otherwise requested by the Leading Members in connection with the approval and consummation of the Bring-Along Sale, including voting such Member's Interest in favor of such Bring-Along Sale and waiving any appraisal or dissenters rights, and causing, to the extent lawfully permissible, the Managers designated by such Member, if any, to approve of or consent to the Bring-Along Sale. Notwithstanding the foregoing, nothing in this Section 13.4.3 shall require a Member to make any representations or warranties or to undertake any covenants, indemnification obligations, or any other obligations (collectively, "Commitments"), to the extent that such Commitments are in any material respect in excess of the Commitments made by the Leading Members in connection with the Bring-Along Sale.

13.4.4    Agreements Not to Compete. In addition to the foregoing, to the extent they are Members as of the closing of any Bring-Along Sale, each of the Founders shall, if requested to do so by a Buyer in connection with any Bring-Along Sale, execute an appropriate non-competition agreement with such Buyer.

13.4.5    Payments; Delivery of Certificates. Each Member shall pay its pro rata portion (based on the total value of the consideration received by such Member compared to the aggregate consideration received by all parties in the transaction) of the costs of any Bring-Along Sale to the extent that such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the Buyer. On or before the closing date of the Bring-Along Sale (other than a sale of assets by the Company), each Member shall deliver the certificate(s)

representing all of the Bring-Along Units owned by it to the Buyer in proper form for transfer in exchange for payment of the purchase price therefor by a wire transfer of immediately available funds to the respective bank accounts designated by such Member or by certified or official bank check or checks or by delivery of any non-monetary consideration therefor.

13.5    Pre-Emptive Rights.

13.5.1    Generally.    Each Member holding Series A Units (or Common Units issued upon conversion of any Series A Unit) shall be entitled to receive notice of, and participate in, at the same price and on the same terms, any sales by the Company of newly issued Units (including any Units having rights and preferences *pari passu* with or junior to the Series A Units or any additional Series A Units (each an "Additional Preferred Units Issuance")) for value from and after the Issue Date so that each such holder may maintain its then current Percentage Interest in the Company; provided, however, that (a) the issuance of Common Units or Convertible Securities exercisable for Common Units pursuant to any equity incentive plan or arrangement adopted by the Company in accordance with the terms of this Agreement, (b) the issuance of Common Units upon the exercise of options granted under any equity incentive plan or arrangement adopted by the Company in accordance with the terms of this Agreement and (c) the issuance of Common Units upon conversion of the Series A Units shall not be deemed to be "sales" within the meaning of this Section 13.5.

13.5.2    Notice of Sales.    If the Company proposes to sell newly issued Units for value from and after the Issue Date, the Company must first provide written notice of such proposed sale (the "Unit Sale Notice") to each Member holding Series A Units. The Unit Sale Notice shall state the class, series or subclass of Units proposed to be sold, the aggregate number of Units proposed to be sold, the purchase price per Unit and any other material terms or conditions of the offering.  Each recipient of a Unit Sale Notice shall be entitled to elect to purchase up to that number of the Units proposed to be sold as shall be required to maintain such recipient's Percentage Interest in the Company plus such recipient's pro rata share of any offered securities subject to the pre-emptive rights granted under this Section 13.5 which are not purchased by other holders of Series A Units by providing written notice to the Company within fifteen (15) Business Days after the date of the Unit Sale Notice (the "Unit Sale Election Period").

13.5.3    Consummation of Sales.    The Company must consummate the sale of Units to those recipients of the Unit Sale Notice who elect to purchase Units within twenty (20) Business Days after the expiration of the Unit Sale Election Period, unless the Company and the recipient mutually agree to a different schedule for closing.  After the Company has sold all of the Units requested by the recipients of the Unit Sale Notice, the Company shall be entitled to sell any Units referenced in the Unit Sale Notice not otherwise purchased by the recipients of the Unit Sale Notice; provided, however, that if the Company does not consummate the sale of all such remaining Units within thirty (30) Business Days after the expiration of the Unit Sale Election Period, the Company must first again comply with the requirements of this Section 13.6 before selling any Units which are unsold (or for which the Company has not received an irrevocable written purchase commitment) at the end of such thirty (30)-day period.

13.5.4    <u>Election to Not Participate</u>. In the event the Company engages in an Additional Preferred Unit Issuance and any Member holding the Series A Units elects not to participate in such Additional Preferred Unit Issuance, the Company shall redeem such Member's Series A Units pursuant to the provisions of <u>Section 3.4.6</u>.

13.6    <u>Other Transactions</u>. In the event of any merger, conversion, or similar transaction to which the Company is a party (other than one in which the holder of each Unit receives interests in a resulting entity with the same economic and other rights relative to the holders of all other Units), all consideration received as a result thereof in respect of Units shall be allocated among the holders of Units in the same manner as distributions would be made pursuant to <u>Article 12</u> as the result of a Change of Control Transaction.

13.7    <u>Conversion to Corporation</u>. Upon the approval of the Managers, the Members holding two-thirds (2/3) of the then outstanding Series A Units and the Members holding two-thirds (2/3) of the then outstanding Common Units, the Company shall be converted (by merger, consolidation, share exchange, transfer of assets or equity or otherwise, as determined by the Managers) into a newly formed corporation so as to convert the Company to a corporation, which shall be a Subchapter C corporation for income tax purposes. Such corporation shall have a certificate of incorporation and bylaws which the Managers determine are customary for corporations comparable to the Company at the time preserving to the greatest extent possible (a) the relative voting rights, liquidation rights, and other rights, preferences and privileges that exist with respect to the Series A Units, the Common Units and any rights with respect to any other classes of Units then outstanding and (b) the liability, exculpation and indemnification provisions set forth in <u>Article 10</u> with respect to Covered Persons. The outstanding equity capitalization of the corporation upon consummation of such conversion shall, to the fullest extent possible, be identical to that of the Company immediately prior to such conversion. Upon any conversion of the Company to a corporation pursuant to this <u>Section 13.7</u>, this Agreement shall terminate except as provided in this <u>Section 13.7</u> and with respect to <u>Article 10</u> (Liability, Exculpation and Indemnification; Competing Activities) and any other section hereof that by its terms survives the termination of this Agreement. The Members hereby consent to the conversion of the Company to corporation pursuant to the terms of this <u>Section 13.7</u> and agree to exchange their Units for stock in the corporation formed in connection with such corporation as provided herein and to take any actions and execute any documents reasonably requested by the Managers in connection with any such conversion.

## ARTICLE 14
## MISCELLANEOUS

14.1    <u>Amendments</u>. Subject to the approval rights of the holders of Series A Units set forth in <u>Section 3.4.4</u>, any amendment to this Agreement shall be adopted and be effective as an amendment hereto if approved by a majority of the Managers; <u>provided, however</u>, that (a) no amendment which has a disproportionate and materially adverse effect on any Member shall be approved without the consent of such Member and (b) no amendment shall be made, and any such purported amendment shall be void and ineffective, to the extent the result thereof would be to cause the Company to be treated as anything other than a partnership for purposes of United States income taxation.

14.2    <u>Assignment</u>.  Except as otherwise provided in <u>Article 4</u>, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto (whether by operation of law or otherwise) without the prior written consent of the other parties hereto; <u>provided, however</u>, that Kayne may (a) assign any or all of its rights and interests hereunder to one (1) or more of its Affiliates and (b) designate one (1) or more of its Affiliates to perform its obligations hereunder; <u>provided, however</u>, that Kayne shall remain liable for any obligations contained in this Agreement that are not fulfilled by its assignee.

14.3    <u>Successors and Assigns</u>.  The provisions of this Agreement shall inure to the benefit of, and shall be binding upon, (a) the Members and their respective successors and permitted assigns and (b) the Company's successors and assigns (including, to the extent applicable, any corporation formed upon the conversion of the Company from a limited liability company to a corporation pursuant to the terms hereof).

14.4    <u>Governing Law and Severability</u>.  This Agreement shall, in all respects, be construed in accordance with and governed by the laws of the State of Delaware as applied to agreements among Delaware residents entered into and to be performed entirely within the State of Delaware.  If any provision of this Agreement becomes or is deemed invalid, illegal or unenforceable in any jurisdiction by reason of the scope, extent or duration of its coverage, then such provision shall be deemed amended to the extent necessary to conform to applicable law so as to be valid and enforceable or, if such provision cannot be so amended without materially altering the intention of the parties, then such provision shall be stricken and the remainder of this Agreement shall continue in full force and effect.  Should there ever occur any conflict between any provision contained in this Agreement and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but the provision of this Agreement affected thereby shall be curtailed and limited only to the extent necessary to bring it into compliance with the law.  All the other terms and provisions of this Agreement shall continue in full force and effect without impairment or limitation.

14.5    <u>Counterparts; Facsimiles</u>.  This Agreement may be executed by facsimile signature in two or more counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one (1) and the same instrument.  Facsimile signatures shall, for all purposes, be treated as originals.

14.6    <u>Notices</u>.  All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered, telecopied or mailed by registered or certified mail as follows:

| | |
|---|---|
| If to the Company: | Sunstate Holdings, LLC<br>8751 Ulmerton Road<br>Largo, Florida 33771<br>Attn: Chief Executive Officer<br>Facsimile: _____ |
| If to any Member: | at the address set forth below such Member's name on the signature pages to this Agreement. |

All notices and communications shall be deemed to have been received unless otherwise set forth herein: (i) in the case of personal delivery, on the date of such delivery; (ii) in the case of telex or facsimile transmission, on the date on which the sender receives confirmation facsimile transmission that such notice was received by the addressee; provided that a copy of such transmission is additionally sent by mail as set forth in clause (iv) below within one (1) Business Day of the facsimile transmission; (iii) in the case of overnight air courier, on the second (2nd) Business Day following the day sent, with receipt confirmed by the courier; and (iv) in the case of mailing by first (1st) class certified or registered mail, postage prepaid, return receipt requested, on the fifth (5th) Business Day following such mailing Any party may unilaterally change any one (1) or more of the addresses to which a notice to the party or its representative is to be delivered or mailed, by ten (10) calendar days' written notice to the other parties hereto given in the manner stated above.

14.7    Entire Agreement.    This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the terms and conditions of the transactions referred to herein and therein and supersede all prior or contemporaneous oral or written agreements and understandings between the parties relating to such subject matter.

14.8    Interpretation.    Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable. All references herein to "Articles" and "Sections" shall refer to corresponding provisions of this Agreement. Whenever the words "including," "includes" or words of similar import appear in this Agreement, they shall be deemed to be followed by the words "without limitation." Words in the singular shall be deemed to include the plural and *vice versa*.

14.9    Jurisdiction; Waiver of Jury Trial.

14.9.1    Any suit, action or proceeding seeking to enforce any provision of, or based on any dispute or matter arising out of or in connection with, this Agreement must be brought in the courts of the State of Delaware, in New Castle County, or the federal courts in the District of Delaware. Each of the parties (a) consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding, (b) irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum, (c) will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (d) will not bring any action relating to this Agreement in any other court, and (e) to the fullest extent permitted by law, voluntarily, knowingly, irrevocably and unconditionally waives any right to have a jury participate in the resolution of any such dispute or matter. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party in accordance with the notice provisions of Section 14.6 above will be deemed effective service of process on such party.

14.9.2   If the jury waiver set forth in this section is not enforceable, then any dispute, controversy or claim arising out of or relating to this Agreement or any of the transactions contemplated therein shall be settled by final and binding arbitration held in the County of New Castle, State of Delaware in accordance with the then applicable Commercial Arbitration Rules of the American Arbitration Association. Judgment upon any award resulting from arbitration may be entered into and enforced by any state or federal court having jurisdiction thereof.

**[*Remainder of Page Intentionally Left Blank -- Signature Pages Follow*]**

[*Signature Page to Amended and Restated Operating Agreement*]

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the date first written above.

KAYNE SUNSTATE INVESTORS, LLC,
a Delaware limited liability company

By: KAYNE ANDERSON PRIVATE INVESTORS
II, L.P., a Delaware limited partnership, Manager

By: _____
    Name: Krishnan Ramaswami
    Title:  Senior Managing Director

Address:    1800 Avenue of the Stars,
                Second Floor
                Los Angeles, California 90067
Attention:  Krishnan Ramaswami
Telephone:  (310) 282-2802
Facsimile:  (310) 282-2852

FTN PROMOTIONS, INC., a Florida corporation

By: _____
    Name: Bryon Wolf
    Title: President/CEO

Address:    8751 Ulmerton Rd.
                Largo, FL 33771

Attention:  Donald Booth
Telephone:  (727) 471-0292
Facsimile:  (727) 471-0255

GUARDIAN MARKETING SERVICES, CORP., a
Florida corporation

By: _____
    Name: Bryon Wolf
    Title: CEO

Address:    8751 Ulmerton Rd.
                Largo, FL 33771

Attention:  Donald Booth
Telephone:  (727) 471-0292
Facsimile:  (727) 471-0255

801031.10

*[Signature Page to Amended and Restated Operating Agreement]*

_____

Bryon Wolf

_____

Roy Eliasson

## Exhibit A

### Schedule of Units

Members Holding Series A Units

| Name | No. of Series A Units | Percentage Interest | Initial Capital Account |
|------|------|------|------|
| Kayne Sunstate Investors, LLC | 20,000 | 26% | $20,000,000 |

Members Holding Common Units

| Name | No. of Common Units | Percentage Interest | Initial Capital Account |
|------|------|------|------|
| FTN Promotions, Inc., d/b/a Suntasia Inc. and Suntasia Marketing, Inc. | 45,538 | 59% | $2,000,000 |
| Guardian Marketing Services, Corp. | 10,247 | 13% | $0.00 |
| Bryon Wolf | 569 | 1% | $0.00 |
| Roy Eliasson | 569 | 1% | $0.00 |
| Total | 56,923 | 74% | $0.00 |

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,  ) | Civ. No. 8:07-cv-1279-T-30TGW |
| ) |  |
| Plaintiff,  ) |  |
| ) |  |
| v.  ) |  |
| ) |  |
| FTN PROMOTIONS, INC., a Florida  ) |  |
| corporation, dba Suntasia Inc., Suntasia  ) |  |
| Marketing, Inc., and Capital Vacations, *et al.*,  ) |  |
| ) |  |
| Defendants.  ) |  |
| ) |  |

## PRELIMINARY INJUNCTION ORDER

In furtherance of this Court's Order (Dkt. #178) entered on January 15, 2008, the Court hereby enters this Preliminary Injunction Order.

The Court, having granted Plaintiff Federal Trade Commission's *Ex Parte* Motion for a Temporary Restraining Order with Asset Freeze and the Appointment of a Receiver; having entered an Order to Show Cause Why a Preliminary Injunction Should Not Issue; and having considered the submissions of the parties, and now being otherwise advised fully of the premises, hereby finds that:

1.    This Court has jurisdiction over the subject matter of this case and there is good cause to believe it will have jurisdiction over the parties;

2.    There is good cause to believe that FTN Promotions, Inc., dba Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services, Corp., dba

Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance, LLC; JPW Consultants, Inc., dba Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC, dba Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct, and Lucid Long Distance; Agent's Travel Network Inc., dba Florida Passport; Bay Pines Travel, Inc.; Suntasia Properties, Inc.; Bryon W. Wolf; Roy A. Eliasson; and John Louis Smith II (herein collectively referred to as "Defendants") have engaged in, and are likely to engage in the future in, acts and practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as well as various provisions of the Telemarketing Sales Rule, 16 C.F.R. Part 310, and that the Commission is therefore likely to prevail on the merits of this action;

3.      There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for Consumers in the form of monetary restitution will occur from the sale, transfer, or other disposition or concealment by Defendants of their Assets or corporate records unless Defendants are immediately restrained and enjoined by Order of this Court;

4.      Weighing the equities and considering Plaintiff's likelihood of ultimate success, a preliminary injunction order with asset freeze and other equitable relief is in the public interest; and

5.      No security is required of any agency of the United States for issuance of a restraining order. Fed. R. Civ. P. 65(c).

2

## DEFINITIONS

For purposes of this Preliminary Injunction ("Order"), the following definitions shall apply:

1.     **"Asset" or "Assets"** means any legal or equitable interest in, right to, or claim to, any real or personal property, including, but not limited to, "goods," "instruments," "equipment," "fixtures," "general intangibles," "inventory," "checks," or "notes," (as these terms are defined in the Uniform Commercial Code), lines of credit, chattels, leaseholds, contracts, mail or other deliveries, shares of stock, lists of Consumer names, accounts, credits, premises, receivables, funds, and all cash, wherever located.

2.     **"Assisting others"** means providing any of the following goods or services to any person or entity engaged in telemarketing, including, but not limited to: (a) providing for or arranging for the provision of mail or telephone lists that contain, incorporate, or utilize consumers' account numbers; (b) preparing or providing, or causing to be prepared or provided, telephone sales scripts or other materials for use in connection with the promotion of products or services to consumers; (c) providing, mailing or shipping, or arranging for the provision, mailing, or shipping, of fulfillment products or services; (d) providing or arranging for the provision of telemarketing services; (e) providing or facilitating the means of obtaining payment from consumers, by providing or facilitating access to the credit card or bank account payment and collection system; (f) performing or providing marketing services of any kind; (g) developing, providing, or arranging for the provision of names of potential customers; (h) providing or arranging for the provision of post office boxes or the

3

services of commercial receiving agencies; (I) preparing, printing, or transmitting invoices; (j) recording or verifying sales solicitations; and (k) performing customer service functions, including, but not limited to, receiving or responding to consumer complaints, obtaining or receiving identifying and financial information from consumers, and communicating with consumers on behalf of the seller or telemarketer.

3.        **"Consumer"** means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

4.        **"Defendant" or "Defendants"** means FTN Promotions, Inc., dba Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services, Corp., dba Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance, LLC; JPW Consultants, Inc., dba Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC, dba Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct, and Lucid Long Distance; Agent's Travel Network Inc., dba Florida Passport; Bay Pines Travel, Inc.; Suntasia Properties, Inc.; Bryon W. Wolf; Roy A. Eliasson; and John Louis Smith II, and by whatever other names each may be known, and any subsidiaries, affiliates, and any fictitious business entities or business names created or used by these entities, or any of them.

5.        **"Document" or "Documents"** means any materials listed in Federal Rule of Civil Procedure 34(a) and includes writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations from which information can be obtained and translated, if necessary, into reasonably usable form through detection

4

devices. A draft or nonidentical copy is a separate Document within the meaning of the term.

6. **"Financial Institution"** means any bank, savings and loan institution, credit union, or any financial depository of any kind, including, but not limited to, any brokerage house, trustee, broker-dealer, escrow agent, title company, commodity trading company, or precious metal dealer.

7. **"Material"** means likely to affect a person's choice of, or conduct regarding, goods or services.

8. **"Person"** means a natural person, an organization or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

9. **"Plaintiff"** means the Federal Trade Commission ("Commission" or "FTC").

10. **"Receivership Defendants"** means FTN Promotions, Inc., dba Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services, Corp., dba Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance, LLC; JPW Consultants, Inc., dba Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC, dba Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct, and Lucid Long Distance; Agent's Travel Network Inc., dba Florida Passport; Bay Pines Travel, Inc.; and Suntasia Properties, Inc.

## I.

### PROHIBITED BUSINESS ACTIVITIES

**IT IS THEREFORE ORDERED** that in connection with the advertising, promoting, offering for sale, or sale of any product or service, Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, are hereby restrained and enjoined from:

A.    Misrepresenting, either orally or in writing, expressly or by implication, that:

1.    Defendants are calling from, on behalf of, or are otherwise affiliated with the Consumer's bank or other third party with whom the Consumer has conducted business;

2.    Defendants already have the Consumer's bank routing and account numbers;

3.    Consumers will have a designated period of time in which to review Defendants' program before incurring any charges;

4.    Defendants' free trial period will not begin to run until Consumers have received Defendants' informational material in the mail;

5.    Defendants will honor Consumers' requests to cancel their

6

participation in Defendants' programs;

6.     Consumers will be able to easily cancel their participation in Defendants' programs; and

7.     Consumers are entitled to keep and to use the gas coupons, airline savings vouchers, or "two free nights of hotel accommodations" even if they cancel Defendants' program.

B.     Failing to disclose, or disclose adequately, Material terms and conditions of any offer of any good or service, including, but not limited to:

1.     The fact that the Consumer's account will be charged unless the Consumer takes affirmative action to avoid the charge;

2.     That Consumers' checking account information will be used to debit their bank accounts to pay for Defendants' programs;

3.     The cost of Defendants' programs;

4.     The dates the charges to Consumers' checking accounts will be submitted for payment;

5.     The dates that a free trial period begins and ends;

6.     the specific steps Consumers must take in order to cancel Defendants' programs, including that Consumers must cancel each of Defendants' programs by calling a separate telephone number; and

7.     Any limitations and restrictions on the use of free gifts that Defendants offer to Consumers as an inducement to convince them to agree to

7

review one of Defendants' programs.

C.    Debiting a Consumer's bank account, or otherwise assessing charges to a Consumer, without first obtaining express informed consent from the Consumer for the charges;

D.    Assisting others who violate any provision of Paragraphs A, B or C of this Section.

E.    Violating, or assisting others in violating, any provision of the Telemarketing Sales Rule, 16 C.F.R. Part 310, including, but not limited to:

    1.    Section 310.3(a)(2)(vii) of the TSR, 16 C.F.R. § 310.3(a)(2)(vii), by misrepresenting, expressly or by implication, that Defendants are calling from, on behalf of, or are otherwise affiliated with the Consumer's bank or some other third party with whom the Consumer has conducted business;

    2.    Section 310.3(a)(1)(vii) of the TSR, 16 C.F.R. § 310.3(a)(1)(vii), by failing to disclose truthfully, in a clear and conspicuous manner, before a Consumer pays for the goods or services offered, all Material terms and conditions of the negative option feature, including, but not limited to, the following: (1) the fact that the Consumer's account will be charged unless the Consumer takes affirmative action to avoid the charge; (2) the date(s) the charge(s) will be submitted for payment; and (3) the specific steps the Consumer must take to avoid the

charge(s);

3.   Section 310.3(a)(2)(iv) of the TSR, 16 C.F.R. § 310.3(a)(2)(iv), by misrepresenting, directly or by implication, a Material aspect of the nature or terms of Defendants' cancellation policy, including that:

   a.   Consumers will have a designated period of time in which to review and to cancel Defendants' programs before incurring any charges;

   b.   The free trial period will not begin until Consumers have received Defendants' informational material in the mail;

   c.   Defendants will honor Consumers' requests to cancel their participation in Defendants' programs;

   d.   Consumers will be able to easily cancel their participation in Defendants' programs; and

   e.   Consumers are entitled to keep and to use the gas coupons, airline savings vouchers, or "two free nights of hotel accommodations" even if they cancel Defendants' program;

4.   Section 310.4(d)(2) and (3) of the TSR, 16 C.F.R. § 310.4(d)(2) and (3), by failing to disclose promptly, and in a clear and conspicuous manner, that the purpose of Defendants' call is to sell goods or

9

services and the nature of the goods or services;

5.    Section 310.3(a)(3) of the TSR, 16 C.F.R. § 310.3(a)(3), by causing a Consumer's billing information to be submitted for payment without the Consumer's express verifiable authorization;

6.    Section 310.4(a)(6) of the TSR, 16 C.F.R. § 310.4(a)(6), by causing a Consumer's billing information to be submitted for payment without the Consumer's express informed consent; and

7.    Section 310.4(a)(5) of the TSR, 16 C.F.R. § 310.4(a)(5), by receiving, for consideration, unencrypted Consumer account numbers for use in telemarketing.

## II.

## MAINTAIN RECORDS AND REPORT NEW BUSINESS ACTIVITY

**IT IS FURTHER ORDERED** that Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, are hereby restrained and enjoined from:

A.    Failing to create and maintain books, records, accounts, bank statements, current accountants' reports, general ledgers, general journals, cash receipt ledgers, cash disbursements ledgers and source Documents, Documents indicating title to real or personal

property, and any other data which, in reasonable detail, accurately, fairly, and completely reflect the incomes, disbursements, transactions, dispositions, and uses of the Defendants' Assets;

B.      Destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any Documents, including electronically-stored materials, that relate in any way to the business practices or business or personal finances of Defendants; to the business practices or finances of entities directly or indirectly under the control of Defendants; or to the business practices or finances of entities directly or indirectly under common control with any other Defendant; and

C.      Creating, operating, or exercising any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing Plaintiff with a written statement disclosing: (1) the name of the business entity; (2) the address and telephone number of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

## III.

## ASSET FREEZE

**IT IS FURTHER ORDERED** that Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active

concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, except as provided herein, as stipulated by the parties, or as directed by further order of the Court, are hereby restrained and enjoined until further order of this Court, from:

A.     Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, or other Assets, or any interest therein, wherever located, including any Assets outside the territorial United States, that are: (1) owned, controlled, or held by, or for the benefit of, in whole or in part, any Defendant; or (2) in the actual or constructive possession of any Defendant, including, but not limited to, any Assets held for or by any Defendant in any account at any bank or savings and loan institution, or any credit card processing agent or agent providing electronic funds transfer services or automated clearing house processing, bank debit processing agent, network transaction processor, customer service agent, commercial mail receiving agency, or mail holding or forwarding company, or any credit union, retirement fund custodian, money market or mutual fund, storage company, trustee, or with any broker-dealer, escrow agent, title company, commodity trading company, precious metal dealer, or other Financial Institution or depository of any kind, either within or outside the United States;

B.     Opening, or causing to be opened, any safe deposit boxes, commercial mail

12

boxes, or storage facilities titled in the name of, or for the use or benefit of, any Defendant, or subject to access by any Defendant, or under the control of any Defendant, without providing Plaintiff prior notice and an opportunity to inspect the contents in order to determine that they contain no Assets covered by this Section;

C.     Incurring charges or cash advances on any credit card issued in the name, singly or jointly, of any Defendant; and

D.     Incurring liens or other encumbrances on real property, personal property or other Assets titled in the name, singly or jointly, of any Defendant.

Notwithstanding the Asset freeze provisions of Sections III.A-D above, and subject to prior written agreement with the Commission, Defendants Bryon W. Wolf, Roy A. Eliasson, and John Louis Smith II may, upon compliance with Section VI (Financial Statements and Accounting), *infra*, pay from their individual personal funds reasonable, usual, ordinary, and necessary living expenses.

The Assets affected by this Section shall include both existing Assets and Assets acquired after the effective date of this Order.

## IV.

## PROHIBITION ON DISCLOSING CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants, their agents, servants, and employees, and those Persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any entity, corporation, subsidiary, division, affiliate, or other device, are hereby restrained and

13

enjoined from:

A.    Selling, renting, leasing, transferring, or otherwise disclosing the name, address, birth date, telephone number, email address, Social Security number, credit card number, bank account number, or other financial or identifying personal information of any Person from whom or about whom any Defendant obtained such information in connection with activities alleged in the FTC's Complaint;

B.    Benefitting from or using the name, address, birth date, telephone number, email address, Social Security number, credit card number, bank account number, or other financial or identifying personal information of any Person from whom or about whom any Defendant obtained such information in connection with activities alleged in the FTC's Complaint.

*Provided, however*, that Defendants may disclose such financial or identifying personal information to a law enforcement agency or as required by any law, regulation, or court order.

## V.

### DUTIES OF THIRD PARTIES

**IT IS FURTHER ORDERED** that each Person, Financial Institution, or other entity maintaining or having custody or control of any Asset of any Defendant, or that at any time since January 1, 2003, has maintained or had custody of any such Asset, and which is provided with a copy of this Order, or otherwise has actual or constructive knowledge of this Order, shall:

14

A.     Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, liquidation or other disposal of any of the Assets or other property held by, under its control, or on behalf of any Defendant in any account maintained in the name of, or for the benefit or use of, any Defendant, in whole or in part, except as directed by further order of this Court, or by written agreement of Plaintiff and the parties claiming an interest in such account or Asset;

B.     Deny Defendants access to any safe deposit boxes, commercial mail boxes or storage facilities that are titled in the name, individually or jointly, of any Defendant, or otherwise subject to access by any Defendant;

C.     Within five (5) business days of the date of notice of this Order, provide to counsel for Plaintiff a certified statement setting forth:

      1.     The identification of each account or Asset titled in the name, individually or jointly, of any Defendant, or to which any Defendant is a signatory, or which is held on behalf of, or for the benefit or use of, any Defendant or subject to any Defendant's control, including all trust accounts on behalf of any Defendant or subject to any Defendant's control;

      2.     The balance of each such account, or a description and appraisal of the value of such Asset, as of the close of business on the day on which notice of this Order is received, and, if the account or other Asset has

been closed or removed, or more than $1,000 withdrawn or transferred from it within the last ninety (90) days, the date of the closure or removal of funds, the total funds removed or transferred, and the name and account number of the Person or entity to whom such account, funds, or other Asset was remitted; and

3. The identification and location of any safe deposit box, commercial mail box, or storage facility that is either titled in the name, individually or jointly, of any Defendant, or is otherwise subject to access or control by any Defendant.

D. Allow representatives of Plaintiff immediate access to inspect and copy, or upon Plaintiff's request, within five (5) days of said request, provide Plaintiff's representatives with copies of, any records or other Documents pertaining to any such account or Asset, including, but not limited to, originals or copies of account applications, corporate resolutions, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

The Assets affected by this Section shall include both existing Assets and Assets acquired after the effective date of this Order.

## VI.

### FINANCIAL STATEMENTS AND ACCOUNTING

**IT IS FURTHER ORDERED** that, if they have not done so already in compliance with the temporary restraining order previously issued in this matter, each Defendant shall serve upon counsel for the Commission, no later than three (3) business days after service of this Order, a completed financial statement accurate as of the date of entry of this Order, in the form provided by Attachments A (for individuals) and B (for businesses) to the *Ex Parte* Temporary Restraining Order With Asset Freeze and the Appointment of Temporary Receiver ("TRO"), signed under penalty of perjury.

The financial statements shall include Assets held outside the territory of the United States, shall be accurate as of the date of the entry of this Order, and shall be verified under oath. Defendants shall attach to these completed financial statements copies of all local, state, provincial, and federal income and property tax returns, with attachments and schedules, as called for by the instructions to the financial statements.

## VII.

### PERMANENT RECEIVER

### A.     APPOINTMENT OF PERMANENT RECEIVER

**IT IS FURTHER ORDERED** that Robb Evans & Associates LLC is appointed Permanent Equity Receiver ("Receiver") for **FTN Promotions, Inc., dba Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services, Corp., dba Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance, LLC; JPW**

17

**Consultants, Inc., dba Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC, dba Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct, and Lucid Long Distance; Agent's Travel Network Inc., dba Florida Passport; Bay Pines Travel, Inc.; Suntasia Properties, Inc.,** and any of their affiliates, subsidiaries, divisions, or telephone sales operations, wherever located, with the full power of an equity receiver. The Receiver shall be the agent of this Court and solely the agent of this Court in acting as Receiver under this Order. The Receiver shall be accountable directly to this Court. The Receiver shall comply with all Local Rules of this Court governing receivers.

**B.    RECEIVERSHIP DUTIES**

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:

1.    Assume full control of the Receivership Defendants by removing, as the Receiver deems necessary or advisable, any director, officer, employee, independent contractor, or agent of the Receivership Defendants, including any Defendant, from control of, management of, or participation in, the affairs of the Receivership Defendants;

2.    Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, the Receivership Defendants, wherever situated. The Receiver shall have full power to divert mail and to sue for, collect, receive, take in possession, hold, and manage all Assets and Documents of the Receivership Defendants and other Persons or entities whose interests are now held by or under the

direction, possession, custody, or control of the Receivership Defendants. Provided, however, that the Receiver shall not attempt to collect any amount from a Consumer or to allow any Receivership Defendant to continue to debit monthly charges from a Consumer's account, if the Receiver believes the Consumer was a victim of the unfair or deceptive acts or practices alleged in the Complaint in this matter;

     3.    Use any means necessary to take possession of and to secure all areas of the business premises of the Receivership Defendants. Such steps may include, but are not limited to, the following as the Receiver deems necessary or advisable: (1) serving this Order; (2) completing a written inventory of all receivership Assets; (3) obtaining pertinent information from all employees and other agents of the Receivership Defendants, including, but not limited to, the name, home address, social security number, job description, method of compensation, and all accrued and unpaid commissions and compensation of each such employee or agent; (4) videotaping all portions of the locations; (5) securing the locations by changing the locks and disconnecting any computer modems or other means of access to the computer or other records maintained at the locations; (6) requiring any persons present on the premises at the time this Order is served to leave the premises, to provide the Receiver with proof of identification, or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises Documents or Assets of the Receivership Defendants; and/or (7) employ the assistance of law enforcement officers as the Receiver deems necessary to implement the provisions of this Order;

     4.    Conserve, hold, and manage all receivership Assets, and perform all acts

necessary or advisable to preserve the value of those Assets, in order to prevent any irreparable loss, damage, or injury to Consumers or to creditors of the Receivership Defendants, including, but not limited to, obtaining an accounting of the Assets and preventing transfer, withdrawal, or misapplication of Assets, and including the authority to liquidate or close out any open securities or commodity futures positions of the Receivership Defendants;

     5.    Enter into contracts and purchase insurance as advisable or necessary;

     6.    Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of Consumers and creditors who have transacted business with the Receivership Defendants;

     7.    Manage and administer the business of the Receivership Defendants until further order of this Court by performing all incidental acts that the Receiver deems to be advisable or necessary, which includes retaining, hiring, or dismissing any employees, independent contractors, or agents;

     8.    Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

     9.    Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order. The Receiver shall apply to the Court for prior approval of any payment of

any debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Defendants, such as rental payments;

10.    Determine and implement the manner in which the Receivership Defendants will comply with, and prevent violations of, this Order and all other applicable laws;

11.    Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

12.    Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Receiver in his role as Receiver, or against the Receivership Defendants that the Receiver deems necessary and advisable to preserve the Assets of the Receivership Defendants or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

13.    Continue and conduct the business of the Receivership Defendants in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; provided, however, that the continuation and conduct of the business shall be conditioned upon the Receiver's good faith determination that the business can be lawfully operated at a profit using the Assets of the receivership estate;

14.    Issue subpoenas to obtain Documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate;

15.    Open one or more bank accounts in the Middle District of Florida as designated depositories for funds of the Receivership Defendants.  The Receiver shall deposit all funds of the Receivership Defendants in such a designated account and shall make all payments and disbursements from the receivership estate from such an account;

16.    Maintain accurate records of all receipts and expenditures that he or she makes as Receiver;

17.    Cooperate with reasonable requests for information or assistance from any state or federal law enforcement agency; and

18.    File reports with the Court on a timely and reasonable basis.

C.    **COOPERATION WITH THE RECEIVER**

**IT IS FURTHER ORDERED** that:

1.    Defendants and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, shall fully cooperate with and assist the Receiver.  This cooperation and assistance shall include, but not be limited to:

a.    Providing any information to the Receiver that the Receiver deems

22

necessary to exercising the authority and discharging the

responsibilities of the Receiver under this Order;

b.    Providing any password required to access any computer,

electronic file, or telephonic data in any medium; or

c.    Advising all Persons who owe money to the Receivership

Defendants that all debts should be paid directly to the Receiver.

2.    Defendants and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, are hereby restrained and enjoined from directly or indirectly:

a.    Transacting any of the business of the Receivership Defendants;

b.    Destroying, secreting, defacing, transferring, or otherwise altering

or disposing of any Documents of the Receivership Defendants,

including, but not limited to, books, records, accounts, writings,

drawings, graphs, charts, photographs, audio and video recordings,

computer records, and other data compilations, electronically-

stored records, or any other records of any kind or nature;

c.    Transferring, receiving, altering, selling, encumbering, pledging,

assigning, liquidating, or otherwise disposing of any Assets owned,

23

controlled, or in the possession or custody of, or in which an

interest is held or claimed by, the Receivership Defendants, or the

Receiver;

d.     Excusing debts owed to the Receivership Defendants;

e.     Failing to notify the Receiver of any Asset, including accounts, of

the Receivership Defendants held in any name other than the name

of the Receivership Defendants, or by any Person or entity other

than the Receivership Defendants, or failing to provide any

assistance or information requested by the Receiver in connection

with obtaining possession, custody, or control of such Assets;

f.     Doing any act or refraining from any act whatsoever to interfere

with the Receiver's taking custody, control, possession, or

managing of the Assets or Documents subject to this receivership;

or to harass or interfere with the Receiver in any way; or to

interfere in any manner with the exclusive jurisdiction of this Court

over the Assets or Documents of the Receivership Defendants; or

to refuse to cooperate with the Receiver or the Receiver's duly

authorized agents in the exercise of their duties or authority under

any Order of this Court; or

g.     Filing, or causing to be filed, any petition on behalf of any of the

Receivership Defendants for relief under the United States Bankruptcy

24

Code, 11 U.S.C. § 101 *et seq.*, without prior permission from this Court.

## D.    DELIVERY OF RECEIVERSHIP PROPERTY

**IT IS FURTHER ORDERED** that:

1.    Immediately upon service of this Order upon them, or within such period as may be permitted by the Receiver, Defendants or any other Person or entity shall transfer or deliver possession, custody, and control of the following to the Receiver:

a.    All Assets of the Receivership Defendants, including Assets subject to repatriation pursuant to Section VIII, *infra*;

b.    All Documents of the Receivership Defendants, including, but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

c.    All Assets belonging to members of the public now held by the Receivership Defendants; and

d.    All keys, codes, and passwords necessary to gain or to secure access to any Assets or Documents of the Receivership Defendants, including, but not limited to, access to their business premises, means of communication, accounts, computer systems, mail boxes, or other property. This includes providing the necessary means to gain access

to at least the following commercial mail boxes:

1.    10500 Ulmerton Road, Suite 726-302
      Largo, FL 33771;

2.    13785 Walsingham Road, Suite 113
      Largo, FL 33774;

3.    10460 Roosevelt Boulevard North, Suite 312
      St. Petersburg, FL 33716;

4.    13799 Park Boulevard, Suite 312
      Seminole, FL 33776;

5.    6822 22nd Avenue North, Suites 432, and PMB 303
      St. Petersburg, FL 33710;

6.    3993 Tyrone Boulevard, Suite 608-182
      St. Petersburg, FL 33709;

7.    11125 Park Boulevard, Suites 104-364, and 331
      Seminole, FL 33772;

8.    2655 Ulmerton Road, Suite 407
      Clearwater, FL 33762;

9.    10500 Ulmerton Road, Suite 726-305
      Largo, FL 33771;

10.   3993 Tyrone Boulevard, Suite 608-149
      St. Petersburg, FL 33709;

11.   200 2nd Avenue South, Suite 413
      St. Petersburg, FL 33701;

12.   6860 Gulfport Boulevard, Suite 148
      South Pasadena, FL 33707; and

13.   4604 49th Street, Suite 64
      St. Petersburg, FL 33709.

2.    In the event any Person or entity fails to deliver or transfer any Asset or

26

otherwise fails to comply with any provision of this Section, the Receiver may file *ex parte* an Affidavit of Non-Compliance regarding the failure.  Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver.  The writs shall authorize and direct the United States Marshal or any sheriff or deputy sheriff of any county, or any other federal or state law enforcement officer, to seize the Asset, Document, or other thing and to deliver it to the Receiver.

**E.      TRANSFER OF FUNDS TO THE RECEIVER**

**IT IS FURTHER ORDERED** that, upon service of a copy of this Order, all banks, savings and loan associations, credit unions, depository institutions, finance companies, commercial lending companies, credit card processing agents or agents providing electronic funds transfer services or automated clearing house processing, brokerage houses, escrow agents, money market or mutual funds, title companies, commodity futures merchants, commodity trading companies, precious metal dealers, trustees, or other Financial Institutions or depositories of any kind, shall cooperate with all reasonable requests of the Receiver relating to implementation of this Order, including transferring funds at his or her direction and producing records related to the Assets of the Receivership Defendants.

**F.      STAY OF ACTIONS**

**IT IS FURTHER ORDERED** that:

1.      Except by leave of this Court, during pendency of the receivership ordered herein, Defendants and all other Persons and entities be and hereby are stayed from taking

any action to establish or enforce any claim, right, or interest for, against, on behalf of, in, or in the name of, the Receivership Defendants, any of their subsidiaries, affiliates, partnerships, Assets, Documents, or the Receiver or the Receiver's duly authorized agents acting in their capacities as such, including, but not limited to, the following actions:

a.   Commencing, prosecuting, continuing, entering, or enforcing any suit or proceeding, except that such actions may be filed to toll any applicable statute of limitations;

b.   Accelerating the due date of any obligation or claimed obligation; filing, perfecting or enforcing any lien; taking or attempting to take possession, custody, or control of any Asset; attempting to foreclose, forfeit, alter, or terminate any interest in any Asset, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise, or setoff of any debt owing to the Receivership Defendants that arose before the date of this Order against any claim against the Receivership Defendants;

c.   Executing, issuing, serving, or causing the execution, issuance or service of, any legal process, including, but not limited to, attachments, garnishments, subpoenas, writs of replevin, writs of execution, or any other form of process whether specified in this Order or not; or

d.   Doing any act or thing whatsoever to interfere with the Receiver

28

taking custody, control, possession, or management of the Assets or Documents subject to this receivership, or to harass or interfere with the Receiver in any way, or to interfere in any manner with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Defendants.

2.      This Order does not stay:

    a.      The commencement or continuation of a criminal action or proceeding;

    b.      The commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or

    c.      The enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

3.      Except as otherwise provided in this Order, all Persons and entities in need of documentation from the Receiver shall in all instances first attempt to secure such information by submitting a formal written request to the Receiver, and, if such request has not been responded to within thirty (30) days of receipt by the Receiver, any such Person or entity may thereafter seek an Order of this Court with regard to the relief requested.

### G.    COMPENSATION OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by or in the possession or control of or which may be received by the Receivership Defendants. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

### H.    RECEIVER'S BOND

**IT IS FURTHER ORDERED** that the Receiver, if it has not already done so, shall file with the Clerk of this Court a bond in the sum of $50,000 with sureties to be approved by the Court, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs.

### I.    ACCESS TO DEFENDANTS' BUSINESS PREMISES

**IT IS FURTHER ORDERED** that Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary,

30

division, or other device, or any of them, and the Receiver, shall allow the Commission's representatives, agents, and assistants, as well as Defendants' representatives, and Defendants themselves, reasonable access to the premises of the Receivership Defendants, or any other premises where the Receivership Defendants conduct business or telephone sales operations. The purpose of this access shall be to inspect and copy any and all books, records, Documents, accounts, and other property owned by or in the possession of the Receivership Defendants or their agents. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access. The Commission may remove materials from the Defendants' business premises to inspect, inventory, and copy such materials. The Commission shall return materials so removed within five (5) business days of completing said inventory and copying.

## VIII.

## REPATRIATION OF ASSETS AND DOCUMENTS
## LOCATED IN FOREIGN COUNTRIES

**IT IS FURTHER ORDERED** that Defendants shall:

A.     Within three (3) business days following service of this Order, take such steps as are necessary to repatriate to the territory of the United States of America all Documents and Assets that are located outside such territory and are held by or for Defendants or are under Defendants' direct or indirect control, jointly, severally, or individually;

B.     Within three (3) business days following service of this Order, provide Plaintiff with a full accounting of all Documents and Assets that are located outside of the territory of the United States of America or that have been transferred to the territory of the

United States pursuant to Subsection A above and are held by or for any Defendant or are under any Defendant's direct or indirect control, jointly, severally, or individually, including the addresses and names of any foreign or domestic Financial Institution or other entity holding the Documents and Assets, along with the account numbers and balances;

C.     Hold and retain all such Documents and Assets and prevent any transfer, disposition, or dissipation whatsoever of any such Documents or Assets; and

D.     Within three (3) business days following service of this Order, provide Plaintiff access to Defendants' records and Documents held by Financial Institutions or other entities outside the territorial United States, by signing and delivering to Plaintiff's counsel the Consent to Release of Financial Records attached to the TRO as Attachment C.

## IX.

## EXPEDITED DISCOVERY

**IT IS FURTHER ORDERED** that pursuant to Federal Rules of Civil Procedure 30(a), 31(a), 34, and 45, and notwithstanding the provisions of Federal Rules of Civil Procedure 26(d) and (f), 30(a)(2)(A)-(C), and 31(a)(2)(A)-(C), Plaintiff is granted leave, at any time after service of this Order to:

A.     Take the deposition of any Person or entity, whether or not a party, for the purpose of discovering the nature, location, status, and extent of the Assets of Defendants, and Defendants' affiliates and subsidiaries; the nature and location of Documents reflecting the business transactions of Defendants, and Defendants' affiliates and subsidiaries; the location of any premises where Defendants, directly or through any third party, conduct

business operations; the Defendants' whereabouts; and/or the applicability of any evidentiary privileges to this action; and

B.     Demand the production of Documents from any Person or entity, whether or not a party, relating to the nature, status, and extent of the Assets of Defendants, and Defendants' affiliates and subsidiaries; the nature and location of Documents reflecting the business transactions of Defendants, and Defendants' affiliates and subsidiaries; the location of any premises where Defendants, directly or through any third party, conduct business operations; the Defendants' whereabouts; and/or the applicability of any evidentiary privileges to this action.

Three (3) days notice shall be deemed sufficient for any such deposition, five (5) days notice shall be deemed sufficient for the production of any such Documents, and twenty-four (24) hours notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only as electronic data. The provisions of this Section shall apply both to parties to this case and to non-parties. The limitations and conditions set forth in Federal Rules of Civil Procedure 30(a)(2)(B) and 31(a)(2)(B) regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Section. Any such depositions taken pursuant to this Section shall not be counted toward any limit on the number of depositions under the Federal Rules of Civil Procedure or the Local Rules of Civil Procedure for the United States District Court for the Middle District of Florida, including those set forth in Federal Rules of Civil Procedure 30(a)(2)(A) and 31(a)(2)(A). Service of discovery upon a party, taken pursuant to this Section, shall be sufficient if made

through the means described in Section XI of this Order.

## X.

## DISTRIBUTION OF ORDER BY DEFENDANTS

**IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this Order to each of their corporations, subsidiaries, affiliates, divisions, directors, officers, agents, partners, successors, assigns, employees, attorneys, agents, representatives, sales entities, sales persons, telemarketers, independent contractors, and any other Persons in active concert of participation with them. Within five (5) calendar days following service of this Order by Plaintiff, each Defendant shall file with this Court and serve on Plaintiff, an affidavit identifying the names, titles, addresses, and telephone numbers of the Persons and entities Defendants have served with a copy of this Order in compliance with this provision.

## XI.

## SERVICE OF THIS ORDER

**IT IS FURTHER ORDERED** that copies of this Order may be distributed by U.S. first class mail, overnight delivery, facsimile, electronic mail, or personally, by agents or employees of Plaintiff, by agents or employees of the Receiver, by any law enforcement agency, or by private process server, upon any Person, Financial Institution, or other entity that may have possession or control of any property, property right, Document, or Asset of any Defendant, or that may be subject to any provision of this Order. Service upon any branch or office of any Financial Institution or entity shall effect service upon the entire Financial Institution or entity.

## XII.

### CONSUMER REPORTING AGENCIES

**IT IS FURTHER ORDERED** that, pursuant to Section 604 of the Fair Credit

Reporting Act, 15 U.S.C. § 1681b, any consumer reporting agency may furnish a consumer

or credit report concerning any Defendant to Plaintiff.

## XIII.

### JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter

for all purposes.

**DONE** and **ORDERED** in Tampa, Florida on February 11, 2008.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

S:\Odd\2007\07-cv-1279.prelim inj order.wpd

35