# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAYNE SUNSTATE INVESTORS, LLC  )
A Delaware Limited Liability Company,  )
)
Plaintiff,  )
)
v.  )    C.A. No. 1:08-CV-00141 (SLR)
)
ROY ELIASSON, BRYON WOLF, and  )
ALFRED WOLF,  )
)
Defendants.  )
)

---

**PLAINTIFF KAYNE SUNSTATE INVESTORS, LLC'S OPENING BRIEF
IN SUPPORT OF ITS MOTION TO REMAND**

---

JOHN C. PHILLIPS, JR. (#110)
BRIAN E. FARNAN (#4089)
DAVID A. BILSON (#4986)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
Attorneys for Plaintiff,
Kayne Sunstate Investors, LLC

Dated:  April 7, 2008

# TABLE OF CONTENTS

**PAGE**

TABLE OF CITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE NATURE & STAGE OF PROCEEDINGS  . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

   1.    KAYNE IS ENTITLED TO A REMAND TO SUPERIOR COURT
       UNDER THE FORUM SELECTION CLAUSE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.   THE FORUM SELECTION CLAUSE IS VALID AND
            ENFORCEABLE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.   THE FORUM SELECTION CLAUSE CONSTITUTES A
            WAIVER OF THE DEFENDANTS' RIGHT TO REMOVE
            THIS ACTION TO FEDERAL COURT UNDER THE
            CIRCUMSTANCES OF THIS CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

i.

# TABLE OF CITATIONS

**PAGE(S)**

Abry Partners V, L.P. v. F & W Acquisitions LLC, 891 A.2d 1032
(Del. Ch. 2006) ................................................................. 7

BBDova, LLC v. Automotive Technologies, Inc.,
358 F.Supp.2d 387 (D. Del. 2005) ........................................ 6-7

Boyer v. Snap-On Tools Corp., 913 F.2d 108 (3d Cir. 1990) ................... 6

Citimortgage, Inc. v. Loan Link Financial Services,
2008 WL 695392 (E.D. Mo. March 12, 2008) ............................ 10, 11

Connecticut Bank of Commerce v. The Republic of Congo,
440 F.Supp.2d 346 (D. Del. 2006) (Robinson, J.) ......................... 9

Continental Grain Export v. Ministry of War-Etka, 603 F. Supp. 724
(S.D.N.Y. 1984) .............................................................. 8

Foster v. Chesapeake Ins. Co., Ltd., 933 F.2d 1207 (3d Cir. 1991) ......... 8, 10

Hodes v. S.N.C. Achille Lauro ed Altri-Gestione, 858 F.2d 905
(3d Cir. 1988) .............................................................. 7-8

iNet Directories, LLC v. Developershed, Inc., 394 F.3d 1081 (8th Cir. 2005) ...... 10

Lauro Lines S.R.L. v. Chasser, 490 U.S. 495 (1989) ......................... 8

Libeua v. Fox, 880 A.2d 1049 (Del. Ch. 2005) .............................. 7

Mobilificio San Giacomo, S.p.A. v. Stoffi, 1998 WL 125534
(D. Del. Jan. 29, 1998) (Robinson, J.) ................................... 7, 8

M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972) ..................... 6, 7

Sanderson, Thompson, Ratledge & Zimny7 v. AWACS, Inc.,
958 F.Supp. 947 (D. Del. 1997) ........................................... 6

Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d 1177 (Del. 1992) ...... 11

Steel Valley Auth. v. Union Switch and Signal Div.,
809 F.2d 1006 (3d Cir. 1987) ............................................. 6

<u>OTHER CITATIONS</u>

28 U.S.C. § 1332 ............................................................... 1

28 U.S.C. § 1441 ............................................................ 1, 8

28 U.S.C. § 1447(c) ........................................................... 1

## STATEMENT OF THE NATURE & STAGE OF PROCEEDINGS

On February 8, 2008, plaintiff Kayne Sunstate Investors, LLC ("Kayne") filed a Complaint against defendants Roy Eliasson, Bryon Wolf, and Alfred Wolf (collectively, the "Defendants") in the Superior Court of the State of Delaware in and for New Castle County. Defendants were served with process on our about February 11, 2008.

On March 7, 2008, Defendants filed a Notice of Removal with this Court pursuant to 28 U.S.C. § 1441 on the basis of diversity of citizenship as defined by 28 U.S.C. § 1332. (D.I. 1).

On April 2, 2008, Defendants filed a Motion to Stay This Action in Favor of the Related Action Currently Pending in Florida or, Alternatively, to Dismiss.

As permitted by 28 U.S.C. § 1447(c), Kayne filed a Motion to Remand this action to Superior Court within thirty (30) days of the filing of Defendants' Notice of Removal. This is Kayne's opening brief in support of that motion.

## SUMMARY OF ARGUMENT

Kayne is entitled to a remand to the Superior Court of Delaware in and for New Castle County pursuant to the Forum Selection Clause because that clause, which is valid and enforceable, constitutes a waiver of the Defendants' right to remove this action to federal court under the circumstances in this case.

## STATEMENT OF FACTS

During the fourth quarter of 2006, Kayne conducted negotiations with the Defendants to buy into Defendants' various telemarketing services companies based in Florida and doing business throughout the United States, including Delaware. Throughout those negotiations, the Defendants consistently and repeatedly made certain representations about, among other things, their telemarketing services companies' superior operations, excellent management, and exceptional reputation in the business and regulatory communities. The Defendants also repeatedly promised and represented to Kayne during those negotiations that their telemarketing services companies were in compliance with the Federal Trade Commission Act and its regulations (collectively, the "FTC Laws").

In reliance on those promises and representations, Kayne entered into an Interest Contribution and Preferred Unit Purchase Agreement (the "Purchase Agreement") with the Defendants, among others, on or about March 31, 2007 pursuant to which Kayne invested $20 million in the Defendants' telemarketing services companies.[1] Kayne's investment was made into a Delaware limited liability company specifically created to serve as a holding company for certain business entities that received the telemarketing service companies' assets and operated their businesses on a day-to-day basis. Defendants Bryon Wolf and Roy Eliasson are officers, board managers, and shareholders/members of that holding company.

In the Purchase Agreement, the Defendants repeatedly represented that their telemarketing services companies were not under investigation by the Federal Trade Commission (the "FTC") and were in compliance with the FTC Laws. The Purchase Agreement also provides that "[t]his Agreement shall be governed by and construed in accordance with the

---

[1]       A copy of the Purchase Agreement is attached as Exhibit A.

Laws of the State of Delaware" (Ex. A at Section 9.2) and contains the following forum selection clause (the "Forum Selection Clause"):

> Any suit, action or proceeding seeking to enforce any provision of, or based on any dispute or matter arising out of or in connection with, this Agreement, the Related Documents or the transactions contemplated hereby or thereby, must be brought in the courts of the State of Delaware, in New Castle County, or the federal courts in the District of Delaware.  Each of the parties (a) consents to the exclusive jurisdiction of such courts... in any such suit, action or proceeding, (b) irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum, (c) will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (d) will not bring any action relating to this Agreement, the Related Documents or any of the transactions contemplated hereby or thereby in any other court....

Ex. A at Section 9.3(a).

Unbeknownst to Kayne, the FTC, in fact, had been conducting an active investigation of Defendants and their telemarketing services companies prior to March 31, 2007 for alleged ongoing violations of the FTC Laws and, on July 23, 2007, initiated an enforcement action against the Defendants and their telemarketing services companies with the United States District Court for the Middle District of Florida.  According to the FTC's complaint, at the time the Defendants negotiated and entered into the Purchase Agreement, they and their telemarketing services companies were in violation of the FTC Laws and engaged in unfair or deceptive acts or practices and deceptive or abusive telemarketing acts or practices.

Upon information and belief that the Defendants knew or reasonably should have known prior to signing the Purchase Agreement that they and their telemarketing services companies were under active investigation by the FTC and may have engaged in ongoing violations of the FTC Laws, Kayne filed a Complaint against the Defendants on February 8, 2008 in the Superior

Court of the State of Delaware in and for New Castle County.  Kayne's Complaint contained counts for fraudulent misrepresentation, negligent misrepresentation, and breach of contract.

On March 7, 2008, the Defendants filed a Notice of Removal in an effort remove Kayne's state court action to this Court and to divest the Superior Court of jurisdiction in clear violation of the Forum Selection Clause.

# ARGUMENT

"On a motion to remand, the removing party, as the party urging the existence of jurisdiction, bears the burden of proving that jurisdiction exists…. In addition, the removal statute is 'strictly construed against removal and all doubts should be resolved in favor of remand.'" Sanderson, Thompson, Ratledge & Zimny v. AWACS, Inc., 958 F. Supp. 947, 952 (D. Del. 1997) (citing Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990) and quoting Steel Valley Auth. v. Union Switch and Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987)). Thus, Defendants bear the burden of proving that they properly removed this action to this Court, and any doubts about the propriety of this Court's exercise of jurisdiction must be resolved in favor of a remand.

I.    Kayne is Entitled to a Remand to Superior Court Under the Forum Selection Clause

    A.    **The Forum Selection Clause is valid and enforceable**

In BBDova, LLC v. Automotive Technologies, Inc., 358 F. Supp.2d 387 (D. Del. 2005) (Robinson, J.), this Court set forth the relevant factors to be considered when assessing the validity and enforceability of a forum selection clause. The Court's analysis in BBDova was grounded upon the United States Supreme Court's opinion in M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972), in which it announced the general rule that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." Id. at 10. "As far as unreasonableness, under Bremen it is incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be *so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court.*" BBDova, 358 F. Supp.2d at 390 (emphasis added). Such a showing can be made only by demonstrating that the contract containing the forum

selection clause resulted from fraud or undue influence, that "enforcement would contravene a

strong public policy of the forum in which suit is brought, whether declared by statute or by

judicial decision," that the resisting party would face "blatant prejudice" in the contractual

forum, or that enforcement would be "severely impractical." BBDova, 358 F. Supp.2d at 390

(quoting Bremen, 407 U.S. at 12, 15, and citing Mobilificio San Giacomo, S.p.A. v. Stoffi, 1998

WL 125534 at *8 (D. Del. Jan. 29, 1998) (Robinson, J.))).

In the instant case, the Defendants, through legal counsel, participated in negotiating the

terms of the Purchase Agreement and repeatedly invoked its terms to support the arguments they

made in their Motion to Stay This Action in Favor of the Related Action Currently Pending in

Florida or, Alternatively, to Dismiss filed with this Court on April 2, 2008.  Furthermore,

enforcement of the Forum Selection Clause in this case would not violate public policy, as

Delaware state courts have long recognized the importance of respecting parties' freedom of

contract while protecting them from fraudulent inducements to contract.  See Abry Partners V,

L.P. v. F & W Acquisition LLC, 891 A.2d 1032, 1035 (Del. Ch. 2006) (finding that Delaware

public policy against fraud in the inducement "is a strong and venerable one"); Libeua v. Fox,

880 A.2d 1049, 1056-7 (Del. Ch. 2005) ("[T]he wealth-creating and peace-inducing effects of

civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-

undertaken mutual obligations.").

There is no reason whatsoever to believe that the Superior Court of Delaware would treat

the Defendants unfairly or with "blatant prejudice" just because Kayne is a Delaware

corporation.[2]  Indeed, certain of the Defendants themselves sought the protection of Delaware's

---

[2]        To find otherwise would impermissibly prohibit a plaintiff from ever lodging suit in its home jurisdiction in
accordance with a valid and enforceable forum selection clause unless that jurisdiction also was home to the
defendants.  Moreover, a finding of "blatant prejudice" is justified only in extreme cases, such as when enforcement
of a forum selection clause would send American litigants to the Islamic revolutionary courts of Tehran.  See Hodes

laws by creating and becoming officers, board managers, and shareholders/members of the limited liability company that received Kayne's investment and acts as a holding company for the telemarketing service companies' business interests.  See Statement of Facts, *supra.* Moreover, litigating in Superior Court would not present the Defendants with any unique financial, logistical, or cultural difficulties that would render enforcement of the Forum Selection Clause "severely impractical."  In addition, the Defendants cannot be heard to complain that litigating in Superior Court would be inconvenient because any such inconvenience would have been easily foreseeable when they entered the Purchase Agreement.  See Mobilificio, 1998 WL 125534 at *8 ("[Any] inconvenience was easily foreseeable at the time of the contract and does not, standing alone, justify rendering the forum selection clauses unenforceable.").  As such, the Defendants cannot escape the Forum Selection Clause by arguing that litigation in Superior Court would be so "gravely difficult and inconvenient" as to deprive them of their day in court.

Because the Forum Selection Clause is presumptively valid and enforceable, and the Defendants cannot show that enforcement of that clause would be so "gravely difficult and inconvenient" as to deprive them of their day in court, this Court should enforce that clause and, as explained more fully below, remand this action to Superior Court.

### B.    The Forum Selection Clause constitutes a waiver of the Defendants' right to remove this action to federal court under the circumstances of this case

By including a forum selection clause in a contract, a party can waive its right under 28 U.S.C. § 1441 to remove from state court to federal court an action arising from or related to that contract.  For example, in Foster v. Chesapeake Ins. Co., Ltd., 933 F.2d 1207 (3d Cir. 1991), the United States District Court for the Eastern District of Pennsylvania held that the defendant

---

v. S.N.C. Achille Lauro ed Altri-Gestione, 858 F.2d 905, 916 (3d Cir. 1988) (abrogated on other grounds by Lauro Lines S.R.L. v. Chasser, 490 U.S. 495 (1989)) (citing Continental Grain Export v. Ministry of War-Etka, 603 F. Supp. 724, 729 (S.D.N.Y. 1984)).

waived its right of removal by agreeing to a forum selection clause that provided: "the [defendant], at the request of the [plaintiff], will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction...." Id. at 1216.  On appeal, the United States Court of Appeals for the Third Circuit noted that such clauses need not clearly and unequivocally waive the right to remove, but that "a court simply should determine contractual waiver of the right to remove using the same benchmarks of construction and, if applicable, interpretation as it employs in resolving all preliminary contractual questions." Id. at 1218.  After applying that principle of construction, the Court of Appeals affirmed the District Court, finding that by consenting to "submit" to "any court" of competent jurisdiction "at the request" of plaintiff and to comply with all requirements necessary to give "such court" jurisdiction, the defendant "agreed to go to, *and stay in*" state court if that was the selected forum.[3]  Id. (emphasis in original).

Under the circumstances of this case, the Forum Selection Clause operates as a waiver of the Defendants' right to remove this case to federal court.  The Forum Selection Clause here provides that:

> Any suit, action or proceeding seeking to enforce any provision of, or based on any dispute or matter arising out of or in connection with, [the Purchase Agreement] the transactions contemplated hereby or thereby, *must be brought in the courts of the State of Delaware, in New Castle County, or the federal courts in the District of Delaware*.  Each of the parties (a) consents to the exclusive jurisdiction of such courts... in any such suit, action or proceeding, (b) *irrevocably waives... any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding in any such court....*

Ex. A at Section 9.3(a) (emphasis added).

---

[3]      In Connecticut Bank of Commerce v. The Republic of Congo, 440 F. Supp.2d 346 (D. Del. 2006) (Robinson, J.), the United States District Court for the District of Delaware applied Foster to find a waiver of the defendant's right to remove based on a forum selection clause that was more sparing than the clause at issue in Foster.  The clause in Connecticut Bank read, in relevant part:  "nothing shall preclude [plaintiff] from bringing any proceeding arising out or in connection with this agreement in the courts of any... competent jurisdiction." Id. at 353.

Unlike the clause at issue in <u>Foster</u>, the Forum Selection Clause expressly limits the forums in which a lawsuit may be brought to the Delaware Superior Court in and for New Castle County and the United States District Court for the District of Delaware, and implicitly allows either party to bring suit in those jurisdictions.  However, also unlike the clause at issue in <u>Foster</u>, the Forum Selection Clause contains a provision under which both Kayne and the Defendants **expressly waived** their right to object to or contest venue in the Delaware Superior Court in and for New Castle County or the United States District Court for the District of Delaware once suit was filed in one of those jurisdictions.  Therefore, if one of the parties to the Purchase Agreement exercises its right under the Forum Selection Clause to bring suit in the Delaware Superior Court in and for New Castle County, the waiver provision prevents other parties to the Purchase Agreement from divesting the Superior Court of jurisdiction by, among other things, removing the suit to federal court.  <u>See</u> <u>iNet Directories, LLC v. Developershed, Inc.</u>, 394 F.3d 1081, 1082 (8th Cir. 2005) (finding that a substantially similar forum selection clause "unambiguously prohibited [defendant] from objecting to venue by removing the case to federal court."); <u>Citimortgage, Inc. v. Loan Link Financial Services</u>, 2008 WL 695392, *2 (E.D. Mo. March 12, 2008) (holding that substantially similar forum selection clause "clearly and unequivocally waived [defendant's] right to remove" once state court forum was chosen by plaintiff).

That construction of the Forum Selection Clause accords with the methodology set forth by the Third Circuit Court of Appeals in <u>Foster</u> that courts should determine whether a forum selection clause waives the right to remove by applying general principles of contract interpretation.  A bedrock principle of contract interpretation under Delaware law is that a contract should be interpreted in such a way as to not render any of its provisions illusory or

meaningless.  Sonitrol Holding Co. v. Marceau Investissements, 607 A.2d 1177, 1183 (Del. 1992).  As explained by the United States District Court for the Eastern District of Missouri when interpreting a forum selection clause substantially similar to the one at issue here, a finding that the Defendants did not waive the right to remove by virtue of the Forum Selection Clause would do just that:

> [T]o interpret [the forum selection clause] not to have waived the right to removal would virtually render the clause meaningless.  If a party could choose either forum, only to have it switched by the other party, then the clause is really pointless.  The purpose of a forum selection clause is to give the parties, as a plaintiff, the benefits and advantages of litigating a dispute in a forum where they believe such favorable attributes exist.  To allow parties to negotiate favorable venues, only to have them taken as soon as they are chosen, undermines the negotiation of the forum selection clause in the first place.

Citimortgage, 2008 WL 695392, at *3.

Once Kayne filed suit in the Delaware Superior Court in and for New Castle County as expressly permitted by the Forum Selection Clause, the waiver provision of that clause was triggered, and the Defendants did not have the right to interfere with the Superior Court's continuing jurisdiction over that suit by removing it to federal court.  To hold otherwise would render the Forum Selection Clause meaningless and effectively re-write the Purchase Agreement to remove a key advantage that the parties expressly bestowed upon the party to first file suit under the Forum Selection Clause.  Thus, this Court should grant Kayne's Motion to Remand and remand this case to the Delaware Superior Court in and for New Castle County.

## CONCLUSION

In light of the foregoing, Kayne respectfully requests that the Court grant its motion and remand this action in its entirety to the Superior Court of Delaware in and for New Castle County.

Respectfully submitted,

 /s/ John C. Phillips, Jr. (#110)
John C. Phillips, Jr. (#110)
Brian E. Farnan (#4089)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
Attorneys for Plaintiff

DATE: April 7, 2008

INTEREST CONTRIBUTION AND PREFERRED
UNIT PURCHASE AGREEMENT

BY AND AMONG

FTN PROMOTIONS, INC., A FLORIDA CORPORATION, D/B/A SUNTASIA INC. AND
SUNTASIA MARKETING, INC.,

GUARDIAN MARKETING SERVICES, CORP.,

BAY PINES TRAVEL, INC.,

BRYON WOLF,

ROY ELIASSON,

ALFRED WOLF

SUNSTATE HOLDINGS, LLC,

STRATEGIA MARKETING, LLC,

CO-COMPLIANCE, LLC,

TELEQUICK SYSTEMS, LLC

AND

KAYNE SUNSTATE INVESTORS, LLC

MARCH 31, 2007

# TABLE OF CONTENTS

**Page**

ARTICLE 1    DEFINITIONS ........................................................................2
    1.1    Definitions ................................................................................2
    1.2    Interpretation ............................................................................9
ARTICLE 2    CONTRIBUTION OF THE INTERESTS TO THE COMPANY ........10
    2.1    Formation ...............................................................................10
    2.2    Transfer of Interests to the Company in Exchange for Consideration ........10
    2.3    Assumption of Liabilities .........................................................10
    2.4    Contracts; Consents .................................................................11
ARTICLE 3    THE CLOSING .....................................................................12
    3.1    Closing; Closing Date ..............................................................12
    3.2    Formation of Company and Transfer of Interests .........................12
    3.3    Purchase and Sale of Preferred Units .........................................12
    3.4    Use of Proceeds .......................................................................13
ARTICLE 4    REPRESENTATIONS AND WARRANTIES OF THE SELLERS, THE COMPANY, THE OPERATING SUBSIDIARIES AND THE FOUNDERS ........13
    4.1    Organization; Good Standing; Qualification .................................13
    4.2    Subsidiaries ............................................................................14
    4.3    Power and Authority; Capitalization; Indebtedness .......................14
    4.4    Asset and Interest Transfer .......................................................14
    4.5    Authorization; Execution and Delivery; No Conflicts ....................15
    4.6    Consents ................................................................................15
    4.7    Financial Statements ................................................................16
    4.8    Absence of Certain Changes or Events ........................................17
    4.9    Insurance ................................................................................18
    4.10    Officers; Officer Benefits .........................................................19
    4.11    Litigation; Restriction on Business Activities ..............................21
    4.12    Material Contracts and Other Agreements ...................................22
    4.13    Compliance with Laws; Licenses ..............................................23
    4.14    Title to Properties; Liens and Encumbrances ...............................23
    4.15    Leased Real Properties; No Owned Real Property .........................24
    4.16    Accounts Receivable ...............................................................24
    4.17    Taxes ....................................................................................24

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 4.18 | Environmental and Safety Laws | 26 |
| 4.19 | Related Party Transactions | 28 |
| 4.20 | Intellectual Property | 28 |
| 4.21 | Products; Product Warranty and Liability | 29 |
| 4.22 | Liabilities and Indebtedness | 29 |
| 4.23 | Distributors | 30 |
| 4.24 | Customers | 30 |
| 4.25 | Suppliers | 30 |
| 4.26 | Brokers; Certain Expenses | 30 |
| 4.27 | Disclosure | 30 |
| ARTICLE 5 | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 31 |
| 5.1 | Organization and Existence; Authorization; No Conflicts | 31 |
| 5.2 | Investment | 31 |
| 5.3 | Brokers or Finders | 31 |
| ARTICLE 6 | CONDITIONS TO THE CLOSING | 31 |
| 6.1 | Conditions to the Obligations of the Parties | 31 |
| 6.2 | Conditions to the Obligations of the Purchaser | 32 |
| 6.3 | Conditions to the Obligations of the Sellers and the Company | 34 |
| ARTICLE 7 | COVENANTS AND AGREEMENTS | 35 |
| 7.1 | Post-Closing Covenants | 35 |
| 7.2 | Non-solicitation; Covenant Not to Compete; Confidentiality | 36 |
| 7.3 | Tax Matters | 39 |
| ARTICLE 8 | INDEMNIFICATION | 40 |
| 8.1 | Survival of Representations and Warranties | 40 |
| 8.2 | Indemnification by the Sellers, the Company, the Operating Subsidiaries and the Founders | 40 |
| 8.3 | Conditions to and Limitations on Indemnification | 41 |
| 8.4 | Indemnity Threshold | 42 |
| 8.5 | Indemnity Cap | 42 |
| 8.6 | Claims for Indemnity | 42 |
| 8.7 | Defense of Claims by Third Parties | 42 |
| ARTICLE 9 | MISCELLANEOUS | 43 |

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| 9.1 | Successors and Assigns | 43 |
| 9.2 | Governing Law | 43 |
| 9.3 | Jurisdiction; Waiver of Jury Trial | 43 |
| 9.4 | Counterparts | 44 |
| 9.5 | Notices | 44 |
| 9.6 | Sellers' Representative | 45 |
| 9.7 | Fees and Expenses | 45 |
| 9.8 | Severability | 45 |
| 9.9 | Entire Agreement | 46 |
| 9.10 | Assurances | 46 |
| 9.11 | Amendments and Waivers | 46 |

*Execution Copy*

## INTEREST CONTRIBUTION AND
## PREFERRED UNIT PURCHASE AGREEMENT

This INTEREST CONTRIBUTION AND PREFERRED UNIT PURCHASE AGREEMENT dated as of March 31, 2007 (this "Agreement"), is entered into by and among (a) FTN Promotions, Inc., a Florida corporation, d/b/a Suntasia Inc. and Suntasia Marketing, Inc. ("FTN"), (b) Guardian Marketing Services, Corp., a Florida corporation ("Guardian"), (c) Bay Pines Travel, Inc., a Florida corporation ("Bay Pines"), (d) Bryon Wolf, an individual ("Wolf"), (e) Roy Eliasson, an individual ("Eliasson" and together with FTN, Guardian, Bay Pines and Wolf, the "Sellers"), (f) Alfred Wolf, an individual (together with Wolf and Eliasson, the "Founders"), (g) Sunstate Holdings, LLC, a Delaware limited liability company (the "Company"), (h) Strategia Marketing, LLC, a Florida limited liability company ("Strategia Marketing LLC"), (i) Co-Compliance, LLC, a Florida limited liability company ("Co-Compliance, LLC"), (j) Telequick Systems, LLC, a Florida limited liability company ("Telequick" and together with Strategia Marketing LLC and Co-Compliance, LLC, the "Operating Subsidiaries"), on the one hand, and Kayne Sunstate Investors LLC, a Delaware limited liability company (the "Purchaser"), on the other hand.

### RECITALS

A.    The Sellers own and operate a business that markets membership products and services (the "Business").

B.    Immediately prior to the Closing Date, the Sellers and the Founders together formed two (2) limited liability companies under the laws of the State of Florida named (i) "Strategia Marketing, LLC", and (ii) "Co-Compliance, LLC", and (A) FTN contributed all of the assets of FTN to Strategia Marketing LLC and Strategia Marketing LLC assumed certain scheduled liabilities of FTN with respect to the Business in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in Strategia Marketing LLC, (B) Guardian contributed all of the assets of Guardian to Co-Compliance, LLC and Co-Compliance, LLC assumed certain scheduled liabilities of Guardian with respect to the Business in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in Co-Compliance, LLC (the contributions of assets in the foregoing clauses (A) and (B) referred to herein as the "Asset Transfer").

C.    As of the Closing Date, the Sellers and the Founders shall have together formed a limited liability company under the laws of the State of Delaware named "Sunstate Holdings, LLC" and the Sellers shall have contributed to the Company One Hundred Percent (100%) of the issued and outstanding membership interests of (i) Strategia Marketing LLC, (ii) Co-Compliance, LLC, and (iii) Telequick, in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in the Company, which membership interests are represented by fifty-six thousand nine hundred twenty-three (56,923) common membership units of the Company (the "Common Units"). The Common Units are also sometimes referred to herein as the "Consideration." In addition, the Company and the Operating Subsidiaries, as applicable, shall have entered into a services agreement with Bay Pines, in form and substance satisfactory to the Purchaser (the "Bay Pines Agreement").

801393.10

D.    Immediately following the issuance of the Common Units to the Sellers, the Sellers shall cause the Company to issue and sell an additional twenty thousand (20,000) Series A Convertible Redeemable Preferred Units of the Company (the "Preferred Units" and, together with the Common Units, the "Units") to the Purchaser, on the terms and subject to the conditions of this Agreement.

AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

ARTICLE 1<br>DEFINITIONS

1.1    Definitions.

As used in this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement, the following definitions will apply:

"Accounts Receivable" shall have the meaning given to such term in Section 4.16.

"Acquired Businesses" shall have the meaning given to such term in Section 4.12.

"Action" shall mean any action, claim, complaint, petition, investigation, suit or other proceeding, whether administrative, civil or criminal, in Law or in equity, or before any arbitrator or Governmental Authority.

"Affiliate" shall mean (a) an "affiliate" as defined under Rule 12b-2 of the Securities Exchange Act of 1934, as amended, (b) a Person who directly or indirectly controls, is controlled by or is under common control with the Person specified and (c) any Person owning directly or indirectly at least Five Percent (5%) of the outstanding equity interests of any other Person.  All Related Persons shall be deemed Affiliates of one another.

"Agreement" shall have the meaning given to such term in the preamble.

"Applicable Law or Laws" shall mean all applicable provisions of all (a) constitutions, treaties, statutes, Laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority, (b) Consents of any Governmental Authority and (c) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"Asset Contribution Agreements" shall have the meaning given to such term in Section 2.3(a).

"Asset Transfer" shall have the meaning given to such term in the Recitals.

"Assigned Contracts" shall have the meaning given to such term in Section 2.4(a).

801393.10

"Assumed Liabilities" shall have the meaning given to such term in Section 2.3(a).

"Audited Financial Statements" shall have the meaning given to such term in Section 6.2(e).

"Bankruptcy" shall mean, with respect to any Person: (a) that a petition has been filed by or against such Person as a "debtor" and the adjudication of such Person as bankrupt under the provisions of the bankruptcy laws of the United States of America has commenced and, in the case of an involuntary bankruptcy, such petition shall not have been dismissed within sixty (60) calendar days from the date of filing; (b) that such Person has made an assignment for the benefit of its creditors generally; (c) that a receiver has been appointed for substantially all of the property and assets of such Person; or (d) the involuntary acceleration of any Indebtedness of the Company or any of its Subsidiaries in excess of Two Hundred Fifty Thousand Dollars ($250,000); provided, however, that any involuntary acceleration of any Indebtedness in excess of Two Hundred Fifty Thousand Dollars ($250,000) may be waived by the Purchaser.

"Bay Pines" shall have the meaning given to such term in the preamble.

"Bay Pines Agreement" shall have the meaning given to such term in the preamble.

"Business" shall have the meaning given to such term in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a day on which banking institutions in the State of Delaware are authorized or obligated by law or executive order to close.

"Business Intellectual Property" shall have the meaning given to such term in Section 4.20(a).

"Caymus Fee" shall mean an amount equal to Six Hundred Thousand Dollars ($600,000) payable to Caymus Partners LLC on the Closing Date.

"Closing" or "Closing Date" shall have the meaning given to such term in Section 3.1(b).

"Closing Fee" shall mean an amount equal to Five Hundred Thousand Dollars ($500,000) payable to the Purchaser within sixty (60) calendar days after the Closing Date.

"COBRA" shall have the meaning given to such term in Section 4.10(h).

"Co-Compliance, LLC" shall have the meaning given to such term in the preamble.

"Code" shall mean the Internal Revenue Code of 1986, together with all rules and regulations promulgated pursuant thereto, as amended from time to time.

"Common Units" shall have the meaning given to such term in the Recitals.

"Company" shall have the meaning given to such term in the preamble.

"Confidential Information" shall mean all proprietary or confidential property, information or knowledge of, about or created by the Sellers, the Company and the Business including without limitation: (a) all records concerning Products or services provided to customers; (b) all information containing pricing policies, the prices charged to customers, the volume or orders of customers and other information concerning transactions with customers; (c) customer lists; (d) financial information, forecasts, budgets, marketing information, research and development, expansion plans, management policies and methods of operation; (e) information concerning salaries or wages paid to, the work records of and other personnel information relative to employees; (f) confidential information of other Persons; (g) technical data specifications, programs, documentation and analyses; (h) all Intellectual Property (whether owned or licensed), including all source code and trade secrets within any such Intellectual Property; and (i) trade secrets.

"Consent" shall mean any consent, approval, authorization, waiver, permit, grant, franchise, license, exemption or order of, any registration, certificate, qualification, declaration or filing with, or any notice to, any Person, including, without limitation, any Governmental Authority.

"Consideration" shall have the meaning given to such term in the Recitals.

"Eliasson" shall have the meaning given to such term in the preamble.

"Employee Plans" shall have the meaning given to such term in Section 4.10(c).

"Employees" shall have the meaning given to such term in Section 4.10(a).

"Employment Agreements" shall have the meaning given to such term in Section 6.2(g)(ii).

"Environmental Liability" shall mean any and all Liabilities, obligations to conduct cleanup, expenses, damages, deficiencies, fines, penalties, sanctions and costs of any kind or nature whatsoever arising out of, relating to or directly or indirectly associated with, the compliance with any Environmental Protection Law.

"Environmental Permit" shall mean any License required by or pursuant to any Environmental Protection Laws.

"Environmental Protection Laws" shall mean all Applicable Laws now or hereafter in effect relating to (i) the protection of the environment (including any environmental laws relating to the protection of human health), (ii) the investigation, cleanup and abatement, removal or remedial action, or any other response to the release of Hazardous Substances to the environment, (iii) any emission of air pollutants or direct or indirect discharge of pollutants or waste, (iv) the generation, treatment, storage, disposal, transportation, processing, handling, use, existence, spill, release, or threatened release, of any Hazardous Substances, and (v) the manufacture, import, distribution or sale of any Hazardous Substances, including, without limitation, (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601 et seq.; (b) the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 et seq.; (c) the Hazardous Materials Transportation Act, 49 U.S.C.

§1801 et seq.; (d) the Clean Water Act, 33 U.S.C. §1251 et seq.; (e) the Clean Air Act, 42 U.S.C. §7401 et seq.; (f) the Toxic Substances Control Act, 15 U.S.C. §2601 et seq.; and (g) corresponding or similar state and local Applicable Laws, all as amended, modified or revised.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall have the meaning given to such term in Section 4.10(i).

"Excluded Liabilities" shall have the meaning given to such term in Section 2.3(b).

"Family Member" shall mean a parent, spouse, any natural or adoptive sibling or any spouse thereof, and any direct lineal descendant (natural or adoptive) of any of the foregoing.

"Financial Statements" shall have the meaning given to such term in Section 4.7(a).

"Formation" shall have the meaning given to such term in Section 2.1(b).

"Founders" shall have the meaning given to such term in the preamble.

"FTN" shall have the meaning given to such term in the preamble.

"GAAP" shall mean United States generally accepted accounting principles as in effect at the time in question.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, any governmental authority, agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

"Guardian" shall have the meaning given to such term in the preamble.

"Hazardous Substance" shall mean any chemical, compound, pollutant, contaminant, material or substance now or hereafter regulated under any Environmental Protection Laws, including, without limitation, any "hazardous substance" or "pollutant or contaminant," as those terms are defined in CERCLA, any "hazardous waste" as such term is defined in RCRA, and any other hazardous or toxic wastes, substances or materials, the presence, existence or threat of which may at any time give rise to any Environmental Liability, including, without limitation, (a) trichloroethylene, tetrachloroethylene, perchloroethylene and other chlorinated solvents, (b) any petroleum products or fractions thereof, (c) asbestos in any form, (d) polychlorinated biphenyls, (e) flammables (f) explosives, (g) urea formaldehyde and (h) radioactive materials and wastes.

"Indebtedness" shall mean all (a) obligations for borrowed money, (b) notes, bonds, debentures, mortgages and similar obligations, (c) capital obligations and leases, (d) guaranties and contingent obligations for the debts or obligations of another Person, (e) obligations to pay

the deferred purchase or acquisition price of property or services (including under conditional sale or other title retention agreements), (f) accounts payable or other liabilities not arising in the Ordinary Course of Business, including accounts payable for equipment purchases, or accounts payable that are more than sixty (60) calendar days past their due dates, (g) obligations in respect of letters of credit, bonds, guaranties, reimbursement agreements and similar instruments, (h) obligations in respect of futures contracts, forward contracts, swaps, options or similar arrangements, (i) off balance sheet financing transactions, (j) all obligations under facilities for the discount or sale of receivables and (k) all obligations that are required to be classified as long term liabilities on a balance sheet under GAAP (in each case whether such obligations are contingent or otherwise).

"Indemnitor" shall have the meaning given to such term in Section 8.2.

"Indemnity Cap" shall have the meaning given to such term in Section 8.4.

"Intellectual Property" shall mean any intellectual or intangible property (whether owned or licensed) including, without limitation, trademarks, trademark registrations and applications, service marks, trade names, corporate names and fictitious names, copyrights, copyright registrations, works of authorship, patents, patent applications, industrial design registrations and applications, integrated circuit topography applications and registrations, design rights, inventions, trade secrets, data, technical information, Confidential Information, designs, plans, specifications, formulas, processes, patterns, compilations, devices, techniques, mask works, methods, shop rights, know-how, show-how, and other business or technical confidential or proprietary information in each case whether or not such rights are patentable, copyrightable, or registrable, software and computer hardware programs and systems, source code, object code, know-how, show-how, processes, formula, specifications and designs, databases, and documentation relating to the foregoing; all domain names and internet addresses, and content with respect to internet websites including such content in its electronic form and other proprietary information owned, controlled, created, under development or used by or on behalf of any Person in whole or in part and whether or not registrable or registered, and any registrations or applications for the foregoing.

"Interest Transfer" shall have the meaning given to such term in Section 2.2.

"IRS" shall have the meaning given to such term in Section 4.10(d).

"Law" shall mean all laws, as written and enforced, of any nation or political subdivision thereof, including, without limitation, all federal, state, provincial, local, or foreign statutes, regulations, ordinances, orders, decrees, or any other laws, common law theories, or reported decisions of any state, provincial, federal or other court or tribunal.

"Leased Real Property" shall have the meaning given to such term in Section 4.15.

"Leases" shall mean all leases, subleases, or other occupancy agreements, licenses, and lease agreements for equipment, machinery, furnishings, vehicles or tools, together with all amendments, supplements and nondisturbance agreements pertaining thereto, under which the Operating Subsidiaries sublease, license, occupy or use any real or personal property.

"Liabilities" shall mean liabilities, obligations or commitments of any nature, whether fixed, absolute, contingent or otherwise and whether liquidated, matured or unmatured, known or unknown and regardless of whether such liability, obligation or commitment is immediately due and payable.

"License" shall mean any license, permit, franchise, authorization, right, privilege, variance, exemption, order or approval issued or granted by any Governmental Authority.

"Lien" shall mean any lien, pledge, mortgage, claim, covenant, restriction, security interest, charge, title defect, transfer restriction, easement, rights of first refusal, preemptive right or other restriction or encumbrance of any kind.

"LLC Agreement" shall have the meaning given to such term in Section 2.1(b).

"Losses" shall have the meaning given to such term in Section 8.2.

"Material Adverse Effect" shall mean a material adverse effect on, or any event, fact, circumstance, condition or change that, individually or in the aggregate, is reasonably likely to have a material adverse effect on (a) the assets, business, operations, condition (financial or otherwise), Property, management, liabilities, obligations, earnings, results of operations or prospects of the Sellers, the Company, the Operating Subsidiaries or the Business, (b) the validity or enforceability of this Agreement and/or any or all of the Related Documents, or (c) the right or ability of the Sellers, the Company, the Operating Subsidiaries or the Founders to consummate the transactions contemplated hereby and/or thereby.

"Material Contracts" shall have the meaning given to such term in Section 4.12.

"Operating Subsidiaries" shall have the meaning given to such term in the preamble.

"Ordinary Course of Business" shall mean in the ordinary course of the Business, as conducted by the Sellers (excluding Wolf and Eliasson) and Telequick prior to the Closing Date, consistent with the Sellers' (excluding Wolf and Eliasson) and Telequick's past custom and practice.

"OSHA Laws" shall mean the Occupational Safety and Health Act, 29 U.S.C. §651 et seq., each state law corresponding thereto and all Applicable Laws, now or hereafter in effect relating thereto.

"Person" shall mean any corporation, partnership, limited liability company, trust, individual, unincorporated organization or a governmental agency or political subdivision thereof, as the context may require.

"Preferred Units" shall have the meaning given to such term in the Recitals.

"Products" shall mean any and all products or services designed, fabricated, manufactured, distributed, performed, provided or sold in connection with the operation of the Business.

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible of the Sellers, the Company and the Operating Subsidiaries.

"Purchase" shall have the meaning given to such term in Section 3.3.

"Purchase Price" shall have the meaning given to such term in Section 3.3.

"Purchaser" shall have the meaning given to such term in the preamble.

"Purchaser Indemnitee" shall have the meaning given to such term in Section 8.2.

"Real Property" shall mean any Leased Real Property and any other real property currently or formerly owned, operated, leased or occupied by the Sellers (or any predecessor), the Company or the Operating Subsidiaries.

"Receivables" shall mean all notes, deposits and accounts receivable in favor of the Sellers (excluding Wolf and Eliasson), the Company or the Operating Subsidiaries and all notes, bonds and other evidence of Indebtedness of and rights to receive payments from any Person in favor of the Sellers (excluding Wolf and Eliasson), the Company or the Operating Subsidiaries.

"Related Documents" shall mean the Asset Contribution Agreements, the Restated LLC Agreement and all other agreements and documents contemplated hereunder or thereunder, and any and all amendments or modifications thereto.

"Related Person" shall mean any Person in which a specified Person owns any material economic interest, and any other Affiliate or Family Member of such specified Person.

"Reserve Amount" shall have the meaning given to such term in Section 3.4.

"Restated LLC Agreement" shall have the meaning given to such term in Section 2.1.

"Restricted Period" shall have the meaning given to such term in Section 7.2(a).

"Schedules" shall have the meaning given to such term in Article 4.

"Securities Act" shall have the meaning given to such term in Section 5.2.

"Sellers" shall have the meaning given to such term in the preamble.

"Sellers' Representative" shall have the meaning given to such term in Section 9.6.

"Services Agreement" shall mean the Services Agreement by and among certain of the Sellers, the Company and the Operating Subsidiaries in substantially the form of **Exhibit D** hereto.

"Strategia Marketing LLC" shall have the meaning given to such term in the preamble.

"Subsidiary" shall mean any corporation, partnership, joint venture, limited liability company, or other entity in which the Company either, directly or indirectly, owns capital stock or is a partner or is in some other manner affiliated through an investment or participation in the equity of such entity, including, without limitation, the Operating Subsidiaries.

"Survival Period" shall have the meaning given to such term in Section 8.1.

"Tax" shall have the meaning given to such term in Section 4.17(j).

"Tax Return" shall mean any return, report, information return, registration form or other document (including any related or supporting information) related to the obligations of any Person filed or required to be filed with any Governmental Authority in connection with the determination of any Tax or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"Telequick" shall have the meaning given to such term in the preamble.

"Territory" shall have the meaning given to such term in Section 7.2(b).

"Third Party Claim" shall have the meaning given to such term in Section 8.6.

"Transferred Assets" shall mean (i) all of the assets of FTN as such were contributed to Strategia Marketing LLC, (ii) all of the assets of Guardian as such were contributed to Co-Compliance, LLC, and (iii) all of the assets of Telequick.

"Transferred Interests" shall have the meaning given to such term in Section 2.2.

"Units" shall have the meaning given to such term in the Recitals.

"Untransferred Contract" shall have the meaning given to such term in Section 2.4(b).

"Wolf" shall have the meaning given to such term in the preamble.

1.2    Interpretation.

(a)    When a reference is made in this Agreement to Articles or Sections, such reference shall be to an Article or a Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not so stated. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.

(b)    The table of contents, titles, captions and headings of the Articles and Sections herein, and the use of a particular gender, are for convenience of reference only and are not intended to be a part of or to affect or restrict the meaning or interpretation of this Agreement.

(c)    The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

## ARTICLE 2
## CONTRIBUTION OF THE INTERESTS TO THE COMPANY

2.1    Formation.  On or before the Closing Date, the Sellers and the Founders shall together (a) form the Company, and (b) enter into a limited liability company operating agreement (the "LLC Agreement") in the form attached hereto as **Exhibit A** (the "Formation"). The Purchaser, the Sellers and the Founders shall take, and shall cause the Company to take, any and all action that can reasonably be taken prior to the Closing to ensure that the Company will be treated for all periods from and after the Closing Date as a partnership for federal and state tax purposes and not as a corporation for federal or state tax purposes.  At the Closing, the Purchaser shall become a party to the Amended and Restated LLC Agreement (the "Restated LLC Agreement") in the form attached hereto as **Exhibit B** and shall become a member of the Company as provided in this Agreement and the Restated LLC Agreement.

2.2    Transfer of Interests to the Company in Exchange for Consideration.

(a)    Interest Transfer.  In exchange for the Consideration, the Sellers shall at the Closing grant, sell, convey, assign, transfer and deliver unto the Company, free and clear of all Liens, all right, title and interest in and to One Hundred Percent (100%) of the issued and outstanding membership interests of the Operating Subsidiaries (the "Transferred Interests" and such transfer of the Transferred Interest, the "Interest Transfer").

(b)    Allocation of Consideration.  The Consideration shall be allocated among the Sellers on the Closing Date as follows:

| Seller: | No. of Common Units |
|---|---|
| FTN Promotions, Inc., d/b/a Suntasia Inc. and Suntasia Marketing, Inc. | 45,538 |
| Guardian Marketing Services, Corp. | 10,247 |
| Bryon Wolf | 569 |
| Roy Eliasson | 569 |
| Total | 56,923 |

2.3    Assumption of Liabilities.

(a)    Prior to the Closing, the Sellers shall have transferred, assigned and set over to the Operating Subsidiaries, and the Operating Subsidiaries shall have assumed and agreed to timely pay, perform and discharge, all of the Assumed Liabilities.  The term "Assumed Liabilities" shall mean the Liabilities of the Sellers expressly set forth on Schedule 2.3(a) of those certain Asset Contribution Agreements, dated March 31, 2007, by and among FTN,

Guardian, Strategia Marketing LLC, and Co-Compliance, LLC (the "Asset Contribution Agreements").

(b)    Other than the Assumed Liabilities, the Company and the Operating Subsidiaries shall not assume, pay, perform, be obligated to pay or perform, or otherwise be responsible for, any other Liability of the Sellers or any other Person (all such Liabilities being referred to as "Excluded Liabilities"). The Excluded Liabilities shall include, but not be limited to, (i) all obligations or liabilities of the Sellers or the Founders relating to Taxes, and (ii) those Liabilities set forth on Schedule 2.3(b) of the Asset Contribution Agreements. The Sellers shall pay, perform or otherwise discharge all of the Excluded Liabilities.

2.4    Contracts; Consents.

(a)    Prior to the Closing, the Sellers shall have granted, sold, transferred, assigned and conveyed to the Operating Subsidiaries all of the Sellers' right, title, and interest in, to, and under the contracts listed on Schedule 2.4 of the Asset Contribution Agreements (the "Assigned Contracts"). The Operating Subsidiaries shall accept the foregoing assignment from the Sellers and shall accept and assume the due and punctual performance, discharge and observation of, and, after the Closing Date, shall perform, discharge and observe, all of the Sellers' obligations in, related to, or arising out of the Assigned Contracts to the extent such obligations by the terms of the Assigned Contracts are required to be performed, discharged or observed after the Closing Date, and not prior to such date; provided, however, that the assignment hereunder shall not relieve the Sellers of (i) any obligations with respect to the Excluded Liabilities or (ii) any obligations under the Assigned Contracts which were required to have been performed prior to the Closing Date.

(b)    Without modifying the closing conditions set forth in Section 6.2, to the extent that any of the contracts to be assigned to the Operating Subsidiaries in the Asset Contribution Agreements shall be non-assignable or shall require the Consent of the other party or parties thereto, the Asset Contribution Agreements shall not constitute an assignment thereof, and to the extent that the assignment of any of such contracts shall require the Consent of the other party thereto, the Asset Contribution Agreements shall not constitute an assignment of the same if such Consent has not been given and if an assignment or attempted assignment without such Consent of said other party would constitute a breach thereof or in any way adversely affect the rights, powers, privileges, or liabilities of the Sellers or the Operating Subsidiaries thereunder. Subject to Section 6.2(i), if any such Consent is not obtained, then after the Closing the Sellers shall cooperate with the Company and the Operating Subsidiaries at the Sellers' and the Founders' sole cost and expense, in any reasonable arrangement requested by the Company and the Operating Subsidiaries designed to provide to the Company and the Operating Subsidiaries on or immediately following the Closing with the benefits under any such Assigned Contract to the extent such benefits are received by the Operating Subsidiaries. After the Closing, each contract which would have been included in the Transferred Assets but for this Section 2.4(b) (an "Untransferred Contract") shall be handled in accordance with the Services Agreement. The Sellers, the Company and the Operating Subsidiaries agree that the Transferred Assets shall include all accounts receivable from any Untransferred Contracts, whether generated before or after the Closing. Effective as of the Closing, the Sellers hereby grant to the Company and the Operating Subsidiaries, as applicable, a security interest in, all of the Sellers' contract

rights under such Untransferred Contracts and all cash and non-cash proceeds thereof, as security for the prompt and timely satisfaction and performance of Seller's obligations under this Section 2.4 and the Services Agreement, except that Seller shall not be deemed to have granted a security interest in any Untransferred Contract that by its terms expressly prohibits such actions. The Company and the Operating Subsidiaries, as applicable, shall have, and the Sellers shall deliver to the Company at the Closing, possession of the original executed copy of such Untransferred Contract. Effective as of the Closing, the Sellers hereby appoint the Company as the Sellers' attorney to take such actions, in the Sellers' name and on its behalf, as such attorney determines, in its sole discretion, to be necessary or advisable to cause the Sellers to comply with this Section 2.4 or to protect, perfect and continue perfected the security interest granted hereunder including the execution and filing of such financing statements and other instruments and documents as such attorney determines, in its sole discretion, to be necessary or advisable for such purposes. As consents to assignment are received for Untransferred Contracts, such contracts shall become Transferred Assets.

### ARTICLE 3
### THE CLOSING

3.1     Closing; Closing Date.  The consummation of the transactions contemplated hereby, including the Formation, the Interest Transfer, the execution of the Restated LLC Agreement and the purchase and sale of the Preferred Units hereunder (the "Closing") shall be held at the offices of the Purchaser, 1800 Avenue of the Stars, Second Floor, Los Angeles, California 90067, at 10:00 a.m. (Pacific Time) on March 31, 2007, or (a) on such later date on which all of the conditions precedent set forth in Article 6 shall have been satisfied or waived in writing or (b) at such other time and place as the Sellers, the Founders and the Purchaser may otherwise mutually agree (the date of the Closing is hereinafter referred to as the "Closing Date").

3.2     Formation of Company and Transfer of Interests.  At the Closing, the parties shall consummate the Formation and the Sellers shall cause the consummation of the Interest Transfer. The Sellers shall receive, as consideration for the Interest Transfer, the Consideration.  The Company will deliver certificates to the Sellers, registered in the name of the Sellers, representing the Common Units, duly endorsed or with such instruments of transfer necessary to transfer to the Sellers all right, title and interest in and to the Common Units.

3.3     Purchase and Sale of Preferred Units.  At the Closing, the Company shall sell, assign and transfer to the Purchaser the Preferred Units and the Purchaser shall purchase and acquire such Preferred Units from the Company, free and clear of all Liens, in exchange for a payment to the Company of Twenty Million Dollars ($20,000,000) and, as soon as reasonably practicable, the distribution of senior debt financing in the amount of Five Million Dollars ($5,000,000) (collectively referred to herein as the "Purchase Price").  The Company shall deliver a certificate or certificates to the Purchaser, registered in the name of the Purchaser, representing the Preferred Units, duly endorsed or with such instruments of transfer necessary to transfer to the Purchaser all right, title and interest in and to the Preferred Units, against payment of the Purchase Price by wire transfer of immediately available funds to an account designated by the Company.  The purchase by the Purchaser of the Preferred Units may be referred to herein as the "Purchase."

3.4    Use of Proceeds. The Company shall use the Purchase Price to fund liquidity to the Founders through a special distribution to the Sellers on or after the Closing Date; provided, however, that, on the Closing Date, the Sellers shall lend Two Million Dollars ($2,000,000) to the Company on the following terms (the "Sellers Loan"): (a) the Sellers Loan shall be evidenced by a promissory note issued by the Company in form and substance satisfactory to the Purchaser, (b) the Company shall use the proceeds of the Sellers Loan to pay all fees and expenses associated with the transactions contemplated by this Agreement, including, without limitation, the Caymus Fee and the Closing Fee, and (c) the Company shall repay the Sellers Loan upon having at least Four Million Dollars ($4,000,000) in cash (net of (A) any written but uncleared checks of the Company and the Subsidiaries, (B) any accounts payable of the Company and the Subsidiaries that are more than thirty (30) calendar days past due, and (C) any increase in the Indebtedness of the Company and the Operating Subsidiaries following the Closing Date) on its consolidated balance sheet.

3.5    Senior Debt Distribution. It is intended by the Purchaser and the Sellers that, as soon as reasonably practicable, the Company and Operating Subsidiaries shall secure financing, senior in priority to any amounts owed to the Purchaser pursuant to the Preferred Units, of Five Million Dollars ($5,000,000). Upon securing the financing, a special distribution shall be made by the Company to the Sellers in the amount of Five Million Dollars ($5,000,000) to complete the delivery of the Purchase Price under Section 3.3.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS, THE COMPANY, THE OPERATING SUBSIDIARIES AND THE FOUNDERS

For the purposes of Sections 4.1 through 4.27, the terms "Sellers" shall not include Wolf or Eliasson. Except as set forth on the disclosure schedule concurrently delivered to the Purchaser herewith (the "Schedules"), as of the date of this Agreement and as of the Closing Date, the Sellers, the Company, the Operating Subsidiaries and the Founders hereby jointly and severally represent and warrant to the Purchaser as follows:

4.1    Organization; Good Standing; Qualification. Each of FTN, Guardian, Bay Pines, the Company and the Operating Subsidiaries, are duly organized, validly existing and in good standing under the laws of the state of their formation and have all requisite power and authority and have all Licenses and other governmental authorizations necessary to (a) enter into this Agreement and each of the Related Documents to which they are a party, (b) perform all of their respective obligations hereunder and thereunder and (c) own, operate and lease their respective Property and carry on their respective businesses as now conducted and as proposed to be conducted. Except as provided for on Schedule 4.1, each of the Sellers, the Company and the Operating Subsidiaries is duly qualified or duly licensed to transact business and is in good standing (including in good tax standing) in each jurisdiction set forth on Schedule 4.1, which are all of the jurisdictions in which (a) the nature of the business conducted by the Sellers or Telequick or to be conducted by the Company or the Operating Subsidiaries following the Closing or (b) the ownership or leasing of any Property by the Sellers or Telequick or, following the Closing, by the Company and the Operating Subsidiaries makes such qualification necessary. True and complete copies of the articles or certificates of incorporation or formation, as

applicable and bylaws and operating agreement, as applicable, of the Sellers, the Company and the Operating Subsidiaries have been delivered to the Purchaser. Schedule 4.1 lists the directors, officers and managers of the Sellers, the Company and the Operating Subsidiaries, as applicable.

4.2     Subsidiaries. Except as set forth on Schedule 4.2, the Sellers, the Company and the Operating Subsidiaries do not own, directly or indirectly, and the Transferred Assets shall not include, any stock, partnership interest, membership interest, joint venture interest, ownership interest or other security, investment or interest in any corporation, partnership, limited liability company, joint venture, organization or other entity.

4.3     Power and Authority; Capitalization; Indebtedness.

(a)     The Sellers, the Company and the Operating Subsidiaries have all requisite corporate power and authority to own and operate their respective properties and assets, and to carry on their respective businesses as presently conducted, to execute and deliver this Agreement and the Related Documents to be executed by them and to carry out and perform its obligations under the terms of this Agreement and the Related Documents.

(b)     The capitalization of each of the Sellers, the Company and the Operating Subsidiaries is set forth on Schedule 4.3(b). Immediately prior to the Closing, all equity interests in the Company shall be held by the Sellers, and shall be free and clear of all Liens. Immediately following the Closing, the Purchaser shall have valid and marketable title to the Preferred Units, free and clear of all Liens.

(c)     The Sellers, the Company and the Operating Subsidiaries have no Indebtedness, contingent or otherwise, that any of them have directly or indirectly created, incurred, assumed or guaranteed, or with respect to which any of them have otherwise become directly or indirectly liable, including purchase money financing or capital lease obligations, other than the Indebtedness set forth on Schedule 4.3(c), which includes the name of the creditor, all amounts owing, including principal and interest, and when such Indebtedness is due and payable. None of the Sellers, the Company or the Operating Subsidiaries is in default of any of their respective obligations to such creditors or any such default has been waived in writing.

(d)     The Sellers and Telequick have no, and at the Closing, the Company and the Operating Subsidiaries will have no, accounts payable outstanding that are more than thirty (30) calendar days past their due date.

4.4     Asset and Interest Transfer.

(a)     Sufficiency and Condition of the Assets. The Transferred Assets and the Transferred Interests constitute all of the assets that are (i) owned or leased by the Sellers, the Company, or the Operating Subsidiaries, (ii) necessary for or used in the operation of the Business or (iii) required for the continued operation of the Business following the Closing as currently conducted and as proposed to be conducted. The Transferred Assets constituting tangible personal property, including, without limitation, property, plant and equipment, machinery, tooling, supplies, furniture, fixtures and vehicles, are in good operating condition and repair, ordinary wear and tear excepted, and suitable for the purpose for which they are used and intended.

(b)    Ownership of the Transferred Assets. Except for Telequick, the Company and the Operating Subsidiaries are newly formed entities that shall have no assets, liabilities or operations prior to the consummation of the transactions contemplated under this Agreement or the Related Documents as a result of any action of the Sellers or any Founder. As of the Closing Date, (i) the Company will have good, marketable and indefeasible title to the Transferred Interests free and clear of all Liens, and (ii) the Operating Subsidiaries will have good, marketable and indefeasible title to the Transferred Assets free and clear of all Liens.

4.5    Authorization; Execution and Delivery; No Conflicts.

(a)    The execution, delivery and performance of this Agreement and the Related Documents by the Sellers, the Company, the Operating Subsidiaries and the Founders and the consummation of all transactions contemplated hereby or thereby, including but not limited to the sale of the Preferred Units, have been duly authorized by all required actions, corporate or otherwise, of the Sellers, the Company, the Operating Subsidiaries and the Founders. This Agreement and the Related Documents have been duly executed and delivered by the Sellers, the Company, the Operating Subsidiaries and the Founders. This Agreement and the Related Documents constitute valid and binding obligations of the Sellers, the Company, the Operating Subsidiaries and the Founders enforceable against each of them, as applicable, in accordance with their respective terms, except as enforcement may be limited by principles of public policy, and subject to laws of general application relating to Bankruptcy, insolvency, reorganization, moratorium and the relief of debtors and rules of law and general principles of equity governing specific performance, injunctive relief or other equitable remedies.

(b)    The execution and delivery by the Sellers, the Company, the Operating Subsidiaries and the Founders, as the case may be, of this Agreement and the Related Documents, and the consummation of the transactions contemplated hereby and thereby, including but not limited to the sale of the Preferred Units, the Asset Transfer and the Interest Transfer pursuant to this Agreement and the Related Documents, do not and will not (with or without due notice, lapse of time, or both), except as set forth on Schedule 4.5, (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in the creation of any Lien upon the Transferred Assets, the Transferred Interests, or the Preferred Units pursuant to, (iv) give any third party the right to accelerate any obligation under, or (v) result in a violation of, (A) the charter documents of the Sellers, as applicable, the Company or the Operating Subsidiaries, (B) any Law to which the Sellers, the Company, the Operating Subsidiaries and the Founders, or any of their respective properties, is subject, or (C) any agreement or instrument to which the Sellers, the Company, the Operating Subsidiaries and the Founders (with respect to the Transferred Assets and the Transferred Interests) is a party or any of their respective properties is subject.

4.6    Consents. Except as set forth on Schedule 4.6, no Consent is required to be obtained by the Sellers, the Company, the Operating Subsidiaries or any Founder in connection with the execution, delivery or performance by the Sellers, the Company, the Operating Subsidiaries or any Founder of this Agreement and the Related Documents to which it is a party or the consummation by the Sellers, the Company, the Operating Subsidiaries or any Founder of the transactions contemplated hereby or thereby (including, without limitation, in connection with the sale of the Preferred Units and the consummation of the Asset Transfer and the Interest

Transfer). Specifically, except as set forth on Schedule 4.6, no Consent of any other Person is required to be made or obtained to permit (A) the Company and the Operating Subsidiaries to conduct the lawful operation of the Business following the Closing in substantially the same manner as the Business is currently conducted, or (B) the Sellers to transfer the Transferred Assets to the Operating Subsidiaries and to transfer the Transferred Interests to the Company pursuant to this Agreement and the Related Documents, including, without limitation, the assignment to the Operating Subsidiaries and the assumption by the Operating Subsidiaries of the Assigned Contracts.

    4.7    <u>Financial Statements.</u>

        (a)    Attached hereto as Schedule 4.7 are the following financial statements of the Sellers and Telequick: (i) unaudited consolidated balance sheets and income and cash flow statements for the fiscal years ended December 31, 2003, and December 31, 2004; (ii) audited consolidated balance sheet and income and cash flow statements for the fiscal year ended December 31, 2005; (iii) audited consolidated balance sheet and income and cash flow statements for the six (6)-month period ended June 30, 2006; (iv) internally-prepared consolidated balance sheet and income and cash flow statements for the seven (7)-month period ended January 31, 2007, and (v) the related notes thereto (collectively, the "Financial Statements"). The Financial Statements (A) have been prepared from the books and records kept by the Sellers and Telequick, in conformity with GAAP consistently applied with prior periods, and (B) are complete and correct and fairly present the financial condition and results of operations of the Sellers and Telequick, as of the dates and for the periods indicated therein, subject to normal year end adjustments (consistent with prior periods) in the case of the six (6) and seven (7)-month Financial Statements. The books of account, financial data, schedules and other records of the Sellers and Telequick, including any of the foregoing delivered or made available to the Purchaser or its representatives or Affiliates in connection with the transactions contemplated hereby, have been maintained properly and regularly in accordance with sound business practices and in the course of business of the Sellers and Telequick, are accurate and complete in all material respects and there are no material misstatements, mistakes or omissions therein, and there have been no transactions involving the Seller that properly should have been reflected therein in accordance with GAAP that have not been accurately and completely reflected therein. The Financial Statements reflect the conduct of the Business in the Ordinary Course of Business.

        (b)    Except as set forth on Schedule 4.7, the Sellers and Telequick have no Liabilities, obligations or commitments of any nature, including without limitation any liabilities due or to become due to any taxing authority, except (i) Liabilities reflected in, reserved against or disclosed in the footnotes of the Financial Statements or (ii) Liabilities, obligations or commitments incurred since June 30, 2006, in the Ordinary Course of Business (none of which relates to any breach of contract, breach of warranty, tort, infringement or known violation of Law or arose out of any Action or environmental matter). Immediately after the Closing, the Company and the Operating Subsidiaries will have no Liabilities, obligations or commitments of any nature other than the Assumed Liabilities.

801393.10

4.8    Absence of Certain Changes or Events.

Except as set forth on Schedule 4.8 since December 31, 2005, the Sellers and Telequick have conducted the Business only in the Ordinary Course of Business and there has been no Material Adverse Effect. Without limiting the foregoing, since December 31, 2005, the Sellers, the Company and the Operating Subsidiaries have not:

(a)    entered into any transaction related to the Business other than in the Ordinary Course of Business;

(b)    amended, modified, supplemented, rescinded or terminated (and not renewed) any existing Material Contract and no such Material Contract has expired or terminated (and not been renewed) by its terms;

(c)    sold, transferred, disposed of, or agreed to sell, transfer or dispose of, any Properties, Intellectual Property or rights related to the Business, nor purchased or made any payments with respect to any Property of the Sellers, the Company or the Operating Subsidiaries that are not included in the Transferred Assets;

(d)    acquired any Property related to the Business, except in the Ordinary Course of Business, nor acquired or merged with any other business related to the Business;

(e)    incurred or created, or permitted to be incurred or created, or suffered to exist, any Lien on any of the Transferred Assets;

(f)    experienced any destruction, damage or other loss (whether or not covered by insurance) of any Properties used in or necessary to the conduct of the Business;

(g)    increased the level of benefits under any Employee Plan, the salary or other compensation (including severance) payable or to become payable to any Affiliate of the Sellers, the Company or the Operating Subsidiaries, including any of the Founders or their Affiliates (including Family Members) or any employee who, as of the date hereof, earns at least Fifty Thousand Dollars ($50,000) in compensation per annum or obligated itself to pay any bonus or other additional salary or compensation to any such Person, Affiliate or employee other than in the Ordinary Course of Business and as set forth on Schedule 4.8;

(h)    made any change related to the Business in any pricing, marketing, purchasing, allowance or tax or accounting practice, policy or method or any method of calculating any bad debt, contingency or other reserve for accounting, financial reporting or tax purposes or made any tax election or settled or compromised any income tax Liability with any Governmental Authority;

(i)    waived or amended any material right relating to the conduct of the Business;

(j)    made any capital expenditure (or series of related capital expenditures) that is either in excess of One Hundred Thousand Dollars ($100,000) or that is not in accordance

with any capital expenditure budget of the Sellers, the Company or the Operating Subsidiaries previously furnished to the Purchaser;

(k)    declared any dividends, or authorized or made any distribution on its capital stock or made any payments to the Founders in excess of distributions necessary to pay taxes, other than salary obligations and benefits in existence as of the date hereof which are set forth on Schedule 4.8;

(l)    incurred any Indebtedness, other than as set forth on Schedule 4.8;

(m)    made any loans or advances to any Person or entity, other than travel advances to employees made in the Ordinary Course of Business not in excess of Five Thousand Dollars ($5,000);

(n)    issued any equity securities or any options, warrants or other rights to purchase its equity securities, nor have the Sellers, the Company or the Operating Subsidiaries approved or adopted any equity option or equity incentive plan;

(o)    made any alteration or change in the Sellers', the Company's or the Operating Subsidiaries' credit guidelines or policies, charge-off policies or accounting methods;

(p)    delayed or failed to pay or perform when due any obligation (including accounts payable) of the Sellers, the Company or the Operating Subsidiaries;

(q)    accelerated the collection of any account receivable or any Indebtedness or other material obligation owed to the Sellers, the Company or the Operating Subsidiaries before it is due or otherwise owed; or

(r)    taken nor agreed to take any action described in this Section 4.8, and neither the Sellers nor any Founder have taken or agreed to take any such action on behalf of the Company or the Operating Subsidiaries.

4.9    Insurance.  There is in full force and effect one (1) or more policies of insurance issued by insurers of recognized national standing insuring the Properties and business of the Sellers, the Company and the Operating Subsidiaries against such losses and risks and in such amounts as are usual and customary in the Business.  Schedule 4.9 identifies the policies of insurance currently maintained by, or on behalf of, the Sellers, the Company and the Operating Subsidiaries, their businesses and Properties, setting forth the name of the insurer, the holder of each such policy, the nature of coverage, the amount of such coverage, the expiration dates thereof, information concerning any claim in excess of Ten Thousand Dollars ($10,000) asserted thereunder (or proposed for assertion thereunder) and other material information.  All premiums due under the policies identified on Schedule 4.9 have been paid and neither the Sellers, the Company, the Operating Subsidiaries, nor any party insured under any such policy has been issued or has received any notice of default, cancellation, material modification or termination in respect of any such policy.  Neither the Sellers, the Company nor the Operating Subsidiaries are in default with respect to its obligations under any of such outstanding insurance policies.  Neither the Sellers, the Company, the Operating Subsidiaries, nor any other insured named on Schedule 4.9 have failed to give any notice or to present any material claim under any such

policy in a due and timely fashion. Such policies are in full force and effect on the date hereof. Neither the Sellers, the Company, the Operating Subsidiaries, nor any such insured has been issued or has received notice that any insurer under any policy referred to on Schedule 4.9 is denying liability with respect to a claim thereunder or defending under a reservation of rights clause.

    4.10   Officers; Officer Benefits.

        (a)   Schedule 4.10(a) sets forth a complete and accurate list of the names and current compensation levels of all officers who are employed by the Sellers and Telequick prior to the Closing (the "Officers"), indicating in each case (i) such Officer's date of hire, (ii) such Officer's current position, (iii) such Officer's salary level, (iv) whether such Officer is employed on an at-will basis or is subject to contractual limitations on the Officer's ability to terminate the employment of such Officer, including severance obligations in the event of certain occurrences, (v) whether such Officer has a written or oral employment agreement providing for employment for any specified period of time or providing for any benefits (other than health, life and disability insurance), profit sharing, equity incentives or other rights, and (vi) whether such Officer is actively at work or is on leave of absence for any reason, including military service, on disability or pursuant to the Family and Medical Leave Act of 1993. The Officers, together with all other Persons employed by the Sellers or Telequick prior to the Closing shall collectively be referred to as the "Employees" and individually as "Employee".

        (b)   The Sellers and Telequick have, and after the Asset Transfer and the Interest Transfer, the Company and the Operating Subsidiaries will have, no collective bargaining agreements with any of their respective employees. There is no labor union organizing activity pending or threatened with respect to the Sellers, the Company or the Operating Subsidiaries. The Sellers and Telequick are, and the Company and the Operating Subsidiaries will be, in compliance in all respects with all Applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours, and the Sellers and Telequick have not engaged in any unfair labor practice. Except as disclosed on Schedule 4.10(b), there is no unfair labor practice, charge, complaint, decision or any other matter against or involving the Sellers, the Company or the Operating Subsidiaries pending or threatened before the National Labor Relations Board or any Governmental Authority. Except as disclosed on Schedule 4.10(b), there are no charges, investigations, administrative proceedings or formal complaints of discrimination (including discrimination based upon sex, age, marital status, race, national origin, religion, sexual preference, disability or handicap, or veteran status) pending threatened, before the Equal Employment Opportunity Commission or any other Governmental Authority against the Sellers, the Company or the Operating Subsidiaries. No Employee of the Sellers, the Company or the Operating Subsidiaries, nor any consultant with whom the Sellers, the Company or the Operating Subsidiaries have contracted, is in violation of any term of any employment contract, proprietary information agreement or any other agreement relating to the right of any such individual to be employed by, or to contract with, the Sellers, the Company or the Operating Subsidiaries because of the nature of the Business, and the continued employment by the Company and the Operating Subsidiaries of the Employees, and the performance of the Company's and the Operating Subsidiaries' contracts with its independent contractors, will not result in any such violation. Neither the Sellers, Telequick nor any Founder has received any written notice alleging that any such

violation has occurred or will occur. No current officer or key Employee, or any group of key Employees, intends to terminate his, her or their employment with the Sellers or Telequick or not accept an offer of employment from the Company or the Operating Subsidiaries, nor do the Sellers, Telequick nor any Founder have a present intention to terminate the employment of any current officer, key Employee or group of key Employees. None of the persons performing services for the Sellers or Telequick has been improperly classified as being an independent contractor or leased employee or as being exempt from the payment of wages for overtime.

(c)     Except as disclosed on <u>Schedule 4.10</u>, the Sellers and Telequick do not, and upon the consummation of the Asset Transfer and the Interest Transfer, neither the Company nor the Operating Subsidiaries will, sponsor or maintain, or have any obligation to contribute to or any liability, actual or contingent, with respect to any "employee benefit plan," as defined in Section 3(3) of ERISA, or any other bonus, pension, stock option, stock purchase, stock appreciation right, equity incentive, welfare, profit sharing, retirement, disability, vacation, severance, hospitalization, insurance, incentive, deferred compensation, compensation, fringe benefit or other employee benefit plan, fund, trust, program, agreement or arrangement, whether written or oral (the "<u>Employee Plans</u>").

(d)     The Sellers and Telequick have delivered to the Purchaser a true and complete copy of the following documents, to the extent that they are applicable: (i) each Employee Plan and any related funding agreements (such as trust agreements or insurance contracts), including all amendments, and, in the case of any unwritten Employee Plan, a written summary thereof; (ii) the current summary plan description and all subsequent summaries of material modifications of each Employee Plan; (iii) the most recent determination letter from the Internal Revenue Service ("<u>IRS</u>") for each Employee Plan that is intended to qualify for favorable income tax treatment under Section 401(a) or 501(c)(9) of the Code, which determination letter reflects all amendments that have been made to the Employee Plan; and (iv) the two (2) most recent Form 5500s (including all applicable schedules and the opinions of the independent accountants) that were filed on behalf of the Employee Plan.

(e)     Each Employee Plan has been maintained and operated in compliance with its terms and the requirements of Applicable Law, including the Code and ERISA.

(f)     Each Employee Plan intended to be qualified under Section 401(a) or Section 501(c)(9) of the Code has received a favorable determination letter from the IRS and nothing has occurred either before or since the date of such favorable determination letter which would adversely affect the qualified status of such Employee Plan.

(g)     All contributions and premium payments required to have been paid under or with respect to any Employee Plan have been timely paid.

(h)     No Employee Plan provides health, life insurance or other welfare benefits to retirees or other terminated employees of the Seller other than continuation coverage required by Section 4980B of the Code or Sections 601-608 of ERISA or similar state law ("<u>COBRA</u>").

(i)     No Employee Plan is or was at any time a multiemployer plan within the meaning of Section 3(37) or 4001(a) of ERISA, and neither the Sellers, Telequick nor any entity

which is or was at any time considered a single employer together with the Sellers or Telequick pursuant to Section 414(b), (c), (m) or (o) of the Code (an "ERISA Affiliate") has ever contributed to or had any obligation to contribute to any multiemployer plan.

(j)    No Employee Plan is subject to Section 302 or Title IV of ERISA or Section 412 of the Code, and neither the Sellers, Telequick nor any ERISA Affiliate has ever maintained, participated in, or had an obligation to contribute to a plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code.

(k)    No event has occurred and no condition exists with respect to any Employee Plan which could subject any Employee Plan, the Sellers, the Company, the Operating Subsidiaries, or any of their respective trustees, fiduciaries, employees, agents or directors directly or indirectly (through an indemnification agreement or otherwise) to any liability for a breach of fiduciary duty, a "prohibited transaction," within the meaning of Section 406 of ERISA or Section 4975 of the Code, or a tax, penalty or fine under Sections 502 or 4071 of ERISA or Subtitle D, Chapter 43 of the Code.

(l)    There are no Actions or audits (other than routine claims for benefits in the Ordinary Course of Business) which are pending threatened or under consideration, with respect to any Employee Plan, and there exist no facts which could give rise to any such Actions.

(m)    No Employee Plan is or has been part of a multiple employer welfare arrangement, as that term is defined in ERISA Section 3(40).

(n)    No Employee Plan or any other arrangement with any Employee provides for any payments or other benefits that (i) become payable or become vested solely as a result of the consummation of the transactions contemplated under this Agreement and the Related Documents or (ii) would result in excess parachute payments (within the meaning of Code Section 280G), either (A) solely as a result of the consummation of such transactions or (B) as a result of the consummation of such transactions and any actions taken by the Company, the Operating Subsidiaries or the Purchaser after the Closing. Furthermore, the consummation of the transactions contemplated by this Agreement and the Related Documents will not require the funding (whether on a formal or informal basis) of the benefits under any Employee Plan (such as contributions to a "rabbi trust").

4.11    Litigation; Restriction on Business Activities.

(a)    Except as set forth on Schedule 4.11, there are no Actions involving the Sellers, the Company or the Operating Subsidiaries pending threatened against the Sellers, the Company or the Operating Subsidiaries, or any of their properties or rights which could affect (a) the right or ability of the Company to carry on the Business in substantially the same manner as it is conducted as of the date of this Agreement, (b) the right or ability of the Sellers, the Company or the Operating Subsidiaries to transfer the Transferred Interests or the Transferred Assets, or to consummate the sale of the Preferred Units to the Purchaser or otherwise to perform any of the obligations of the Seller or the Company under this Agreement or any of the Related Documents, or (c) the condition, whether financial or otherwise, or assets or properties of the Sellers, the Company or the Operating Subsidiaries, nor as to any matter which could impact the

Transferred Interests or the Transferred Assets, is there any reasonable basis for a claim described in clauses (a), (b) or (c) above. Neither the Sellers, any Founder, the Company, the Operating Subsidiaries nor any Affiliate of the Sellers or any Founder (including the Company and the Operating Subsidiaries) is subject to any judgment, order or decree entered in any lawsuit or proceeding which could affect the Sellers' or Telequick's operations or business practices in connection with the Business, or the ability of the Sellers, the Company or the Operating Subsidiaries to conduct the Business in substantially the same manner as the Business is conducted as of the date of this Agreement and the Related Documents.

(b)     There is no agreement (noncompete or otherwise), commitment, judgment, injunction, order or decree to which the Sellers, the Company or the Operating Subsidiaries is a party or that otherwise could be binding upon the Sellers, the Company, the Operating Subsidiaries or the Business which has or would reasonably have the effect of prohibiting or impairing the operation of the Business. Neither the Sellers, the Company, the Operating Subsidiaries, nor any Founder has entered into any agreement under which the operations of the Business are restricted from selling, servicing or licensing to customers or potential customers or any class of customers, in any geographic area, during any period of time or in any segment of the market.

4.12    Material Contracts and Other Agreements.    Schedule 4.12 sets forth the following contracts which are related to or involve the Business (including, without limitation, all contracts of the Sellers, Telequick and any Founder related to the Business), whether written or oral (a) all contracts, agreements and commitments relating to the acquisition, sale or transfer of all or any portion of the business, assets (other than inventory in the Ordinary Course of Business), properties or equity interests of any Person (whether through purchase, merger, consolidation or otherwise) (the "Acquired Businesses"); (b) all agreements containing covenants not to compete on the part of the Sellers or Telequick or otherwise restricting the ability of the Sellers or Telequick in any way to engage in the Business; (c) all notes, mortgages, indentures, letters of credit, guarantees, performance bonds and other obligations and agreements and other instruments for or relating to any lending or Indebtedness entered into by the Sellers or Telequick or pursuant to which any Properties are pledged or mortgaged as collateral; (d) any employment, severance or consulting agreement with any present or former director or officer of the Sellers or Telequick; (e) all contracts, agreements, commitments or other arrangements with any Affiliate of the Sellers or Telequick; (f) all contracts, agreements, commitments or other arrangements for the purchase or sale of goods or services by or from the Sellers or Telequick, each of which requires a payment or payments by or to the Sellers or Telequick, in the aggregate, of more than Ten Thousand Dollars ($10,000) in any given year; (g) all other contracts, agreements or commitments involving aggregate payments of more than Ten Thousand Dollars ($10,000) during the term thereof or with a term of more than one (1) year, including all extensions thereof, at the option of any party other than the Sellers or Telequick; (h) all Licenses and agreements with respect to Business Intellectual Property; and (i) all other contracts, agreements and commitments which are material to the Sellers or Telequick or the operation of the Business, each of the foregoing described under clauses (a) through (i), including each of the same listed on Schedule 4.12, collectively referred to as the "Material Contracts." Except as set forth on Schedule 4.12, with respect to each Material Contract, (i) such Material Contract is valid, binding and enforceable against the Sellers or Telequick and each other party thereto, and is in full force and effect, (ii) the Sellers or Telequick are not and any other party to such

Material Contract is not in material breach thereof or material default thereunder, (iii) there does not exist any event that, with the giving of notice or the lapse of time or both, would constitute a material breach of or a material default by the Sellers or Telequick or any other party to such Material Contract under such Material Contract, and neither the Sellers nor any Affiliate thereof has received or given notice of any such breach, default or event, (iv) true, complete and correct copies of each Material Contract have been delivered or made available to the Purchaser or its representatives, (v) neither the Sellers nor Telequick have waived any material rights under any Material Contract, (vi) no material defense to the validity or enforceability of any Material Contract exists, (vii) neither the Sellers, Telequick nor any Founder has received or given notice of any breach or default in connection with any Material Contract and (viii) neither the Company nor the Operating Subsidiaries has existing Liabilities (contingent or otherwise), including with respect to any indemnification or guarantee obligation, with respect to any Acquired Business.

4.13    Compliance with Laws; Licenses.

(a)    The Sellers and Telequick are and at all times have been, and all of its Products and Properties are, and at all times have been in compliance in all respects with, and immediately following the consummation of the transactions contemplated by this Agreement and the Related Documents, the Company and the Operating Subsidiaries will be in compliance in all respects with, and neither the Sellers, the Company nor the Operating Subsidiaries have any liability under, any Laws, including, without limitation, any applicable franchise, building, zoning, employment, labor relations or other statute, Law, ordinance or regulation. No Consent of any Governmental Authority is required to be obtained and no registration or declaration is required to be filed in connection with the execution and delivery of this Agreement, the Asset Transfer, the Interest Transfer or the sale of the Preferred Units by the Company, except such as has been duly and validly obtained or filed, or with respect to any state or federal securities law filings to be made by the Purchaser or the Company after the Closing.

(b)    The Sellers or Telequick hold or have applied for, and at the Closing the Company or the Operating Subsidiaries will hold or will have applied for, all Licenses necessary to conduct the Business as it is now being conducted and as is proposed to be conducted. A complete and correct list of all such Licenses is set forth on Schedule 4.13, and, excluding those Licenses which have been applied for, each such License is in full force and effect and none of such Licenses will require any Consents or be impaired as a result of the transactions contemplated by this Agreement or the Related Documents. One of the Sellers or Telequick solely possesses, and as of the Closing either the Company or one of the Operating Subsidiaries will solely possess, all such Licenses. Neither the Sellers, Telequick, any Founder, nor any Affiliate thereof has received any notice to the effect that, or has otherwise been advised that, the Sellers or Telequick are not in compliance with, or that it is in violation of, any such License, and the Sellers and Telequick are in compliance in all material respects with the terms of each such License and there are not currently existing any circumstances that are likely to result in a failure of the Sellers, the Company or the Operating Subsidiaries to comply in any material respect with any such License, or result in a material violation by the Sellers, the Company or the Operating Subsidiaries of any such License.

4.14    Title to Properties; Liens and Encumbrances. As of the Closing, the Company or the Operating Subsidiaries will have good and marketable title to the Transferred Assets and the

Transferred Interests and, with respect to the Property leased by the Company or the Operating Subsidiaries, will hold valid leasehold interests therein, in each case subject to no Lien. There exists no default or other occurrence or condition which could result in termination of any lease under which any Property is leased by the Sellers or Telequick.

4.15    Leased Real Properties; No Owned Real Property.    Schedule 4.15 contains a complete and correct list of all real property leases, warehouse leases, subleases, licenses and occupancy agreements pursuant to which any of the Sellers or Telequick is a lessor, lessee, sublessor, sublessee, licensor or licensee of real property, setting forth the address, landlord and tenant for each (the "Leased Real Property"). The Sellers and Telequick have delivered to the Purchaser correct and complete copies of each of the agreements set forth in Schedule 4.15, including all amendments thereto and all nondisturbance agreements in connection therewith. Each lease, sublease, license or other agreement set forth in Schedule 4.15 is legal, valid, binding, enforceable and in full force and effect. Except as set forth in Schedule 4.15, no party is in default, violation or breach in any material respect under any such lease, sublease or license and no event has occurred and is continuing thereunder that constitutes or, with notice or the passage of time or both, would constitute a default, violation or breach in any material respect thereunder. The Sellers and Telequick have and the Company and the Operating Subsidiaries will have as of the Closing, good and valid title to the leasehold estate under each lease, sublease, license or other agreement set forth in Schedule 4.15, free and clear of all Liens. All of the improvements situated in whole or in part at any Leased Real Property are in good operating condition, in a state of good maintenance and repair and are adequate and suitable for the purposes for which they are used and intended. The Sellers and Telequick do not own any real property and, other than the interests in the Leased Real Property, the Transferred Assets do not include any interest in any real property.

4.16    Accounts Receivable.    A complete and correct list of all accounts receivable of the Business as of January 31, 2007 ("Accounts Receivable"), is attached hereto as Schedule 4.16. The Accounts Receivable and all accounts receivable since January 31, 2007, represent bona fide sales actually made or services actually performed on or prior to such date in the Ordinary Course of Business. Except as set forth in Schedule 4.16, there is no contest, claim or right of set-off contained in any oral or written agreement with any account debtor relating to the amount or validity of any Account Receivable. The Accounts Receivable and all accounts receivable since December 31, 2006, are valid and collectible at the recorded amounts thereof in the Ordinary Course of Business, subject to the bad debt reserves contained in the Financial Statements. The reserves reflected in the Financial Statements with respect to the Accounts Receivable have been established in the Ordinary Course of Business and in accordance with GAAP.

4.17    Taxes.    Except as set forth on Schedule 4.17:

(a)    All Tax Returns of the Sellers and Telequick relating to the Business that are required by Applicable Law to be filed by the Sellers and Telequick have been duly filed on a timely basis and all amounts set forth thereon have been paid in full. All such Tax Returns are correct and complete in all material respects. All Taxes that are due and payable by the Sellers and Telequick with respect to the operations of the Business have been paid in full or adequate reserves therefor have been established, and all deposits required by Applicable Law to be made

with respect to any such Taxes have been duly made. The Transferred Assets, the Transferred Interest, and the assets of the Company and the Operating Subsidiaries are and will be as of the Closing Date, free and clear of any Liens arising out of any unpaid Taxes and there are no grounds for the assertion or assessment of any Liens against the Transferred Assets, the Transferred Interests or the assets of the Company or the Operating Subsidiaries in respect of any Taxes (other than Liens for Taxes if payment thereof is not yet required, and which are included as a current tax liability on the Financial Statement, if such Taxes accrued before or as of the date thereof). From formation through the Closing Date, the Sellers and Telequick have taken no action to cause the Company or the Operating Subsidiaries not to be treated as a partnership for federal income Tax purposes and the Sellers will take all steps reasonably necessary to cause the Company, and cause the Company to cause the each of Operating Subsidiaries, not to be treated as a corporation for federal income Tax purposes. In the event the transactions contemplated by this Agreement will give rise to the assertion of any additional Taxes against the Transferred Assets, the Transferred Interests, the Company or the Operating Subsidiaries prior to Closing, such additional Taxes shall be the responsibility of the Sellers.

(b)    There is no Action or unresolved claim for assessment or collection pending or threatened by, or present or expected dispute with, any Governmental Authority for assessment or collection of any Taxes of any nature from the Sellers or Telequick relating to the Business and there is no basis for any Governmental Authority to assert that additional Taxes are due with respect to the Company, the Operating Subsidiaries or the Business for any period beginning prior to the Closing Date.

(c)    No powers of attorney or other authorizations are in effect that grant to any Person the authority to represent the Company or the Operating Subsidiaries in connection with any Tax matter or proceeding, or any such powers of attorney or other authorizations shall be revoked as of the Closing Date.

(d)    Neither the Sellers nor Telequick has waived nor has been requested to waive any statute of limitations in respect of Taxes.

(e)    All Tax deficiencies determined as a result of any past-completed audit relating to the Business, the Sellers or Telequick have been satisfied.

(f)    Neither the Sellers nor Telequick is a party to or bound by any closing agreement or offer in compromise with any taxing authority.

(g)    Neither the Sellers nor Telequick has taken any action that is not in accordance with past practice that could defer a liability for Taxes of the Sellers or Telequick related to the Business from any taxable period ending on or before the Closing Date to any taxable period ending after the Closing Date.

(h)    All related party transactions conducted by the Sellers or Telequick, and/or other Affiliates of the Sellers have been on an arms' length basis in accordance with Section 482 of the Code.

(i)    Except as described in the Financial Statements, neither the Company nor the Operating Subsidiaries will be required to include any adjustment in taxable income for any

801393.10

Tax period (or portion thereof) pursuant to Section 481 or Section 263A of the Code or any comparable provision under state or foreign Tax laws as a result of transactions, events or accounting methods employed prior to the Closing.

(j)     "Tax(es)" shall mean all taxes, charges, fees, levies, imposts, customs duties or other assessments imposed by and required to be paid to any Governmental Authority including any federal, state, municipal, local or foreign taxing authority, including, without limitation, income, excise, real and personal property, sales, transfer, import, export, ad valorem, payroll, use, goods and services, value added, capital, capital gains, alternative, net worth, profits, withholding, employer health and franchise taxes (including any interest, penalties, fines or additions attributable to or imposed on or with respect to any such assessment) and any similar charges in the nature of a tax including, unemployment and employment insurance payments and workers compensation premiums, together with any installments with respect thereto and any estimated payments or estimated taxes and whether disputed or not.

(k)     The Sellers and Telequick have collected all sales, use and value added Taxes required to be collected with respect to the Business, and has remitted or will remit on a timely basis, such amounts to the appropriate Governmental Authorities and has furnished properly completed exemption certificates for all exempt transactions.

(l)     The Sellers and Telequick have properly withheld income and social security or other similar Taxes and paid payroll Taxes with respect to all persons properly characterized as employees with respect to the Business for federal, state or local Tax purposes.

4.18     Environmental and Safety Laws.  Except as disclosed on Schedule 4.18:

(a)     Each of the Sellers, Telequick and the Business is, and at all times has been, and the Company and the Operating Subsidiaries will be as of the Closing, in compliance with all, and has or will have, as applicable, no liability under any, Environmental Protection Laws or OSHA Laws.

(b)     The Sellers and Telequick have obtained all Environmental Permits that are required in connection with the conduct of the Business, all of which are sufficient in scope for the conduct of the Business as currently conducted, and are valid, subsisting and in full force and effect. The Sellers and Telequick are in compliance with all terms and conditions of such Environmental Permits, and no Action which could reasonably be expected to result in the revocation or suspension or limitation of any such Environmental Permits is pending or threatened, and the Sellers and Telequick have not engaged in any conduct which could reasonably be expected to cause the revocation or suspension or limitation of any such Environmental Permits. All such Environmental Permits are transferable to the Company or the Operating Subsidiaries and shall have been transferred to the Company or the Operating Subsidiaries as of the Closing.

(c)     There has been no pollution or contamination, whether of soil, groundwater or otherwise, at, upon, above, about or beneath any Real Property.

(d).    There has been no spill, discharge, disposal, leak, emission, injection, storage, escape, dumping, release or threatened release of any kind of any Hazardous Substance on, in, under or about any Real Property.

(e)    Neither the Sellers nor Telequick have received at any time prior to the date hereof any summons, citation, notice, directive, letter or other communication, whether written or oral, from (i) the United States Environmental Protection Agency or any other Governmental Authority or any other Person concerning any request for information or potential liability with respect to any offsite treatment storage or disposal facility or any intentional or unintentional action or omission by the Sellers, Telequick or any other Person with respect to the Business or any Real Property constituting a violation or potential violation of, or potential liability under, any Environmental Protection Laws relating to the Business or any Real Property, including, without limitation, any potential liability or violations or potential violations relating to the disposal, release, threatened release, discharge, spilling, leaking, pumping, pouring, emitting, emptying, dumping or otherwise disposing or arranging for disposal, storage or treatment, of any Hazardous Substance or (ii) any Governmental Authority or any other Person concerning any intentional or unintentional action or omission by the Sellers, Telequick or any other Person with respect to the Business constituting a violation or potential violation of any OSHA Laws, and there exist no facts that would be the basis for finding such a violation.

(f)    There are no events, conditions, circumstances, incidents, actions or plans that may interfere with or prevent continued compliance (i) by the Business and/or any Real Property with any Environmental Protection Laws, give rise to any liability relating to the Business and/or any Real Property, or form the basis for any claim, action, suit or other proceeding under any Environmental Protection Laws relating to the Business and/or any Real Property or (ii) by the Business with any OSHA Laws, give rise to any liability relating to the Business, or form the basis for any claim, action, suit or other proceeding under any OSHA Laws relating to the Business.

(g)    There are no and there have never been, any underground storage tanks located at any Real Property.

(h)    There are no and there have never been, any hazardous waste treatment, storage or disposal units or facilities located on any Real Property.

(i)    All Hazardous Substances now or previously present at any Real Property have been and are handled, packaged, labeled, stored, used and disposed of in compliance with Environmental Protection Laws and OSHA Laws.

(j)    The Sellers and Telequick have delivered to the Purchaser copies of all environmental audits and studies relating to the Real Property and the Business.

(k)    There are no asbestos or asbestos containing materials of any kind on any Real Property, including asbestos building materials, piping, lagging, parts or equipment.

(l)    None of the matters set forth on Schedule 4.18 can reasonably be expected to result in a Material Adverse Effect.

801393.10

4.19   <u>Related Party Transactions</u>.  Except as set forth on <u>Schedule 4.19</u>, there are no agreements, understandings or proposed transactions between the Sellers, the Company, the Operating Subsidiaries and any Founder or any of their respective employees, directors, Affiliates or any Affiliate thereof.  <u>Schedule 4.19</u> sets forth (a) a correct and complete list or description of all obligations of the Sellers, the Company and the Operating Subsidiaries to any Founder or the Sellers' Affiliates, employees or directors or to any Family Member thereof and of all Indebtedness of such Persons to the Sellers, the Company or the Operating Subsidiaries; and (b) a list of all dividends, distributions, share repurchases, redemptions and tax distributions made by the Sellers or Telequick to any Founder from and after December 31, 2005.  No Founder, nor any Affiliate, employee or director of the Sellers, the Company or the Operating Subsidiaries, or any Family Member of any Founder, Affiliate, employee or director of the Seller, is indebted to the Sellers, the Company or the Operating Subsidiaries or has any direct or indirect ownership interest in any entity with which the Sellers the Company or the Operating Subsidiaries are affiliated or with which the Sellers, the Company or the Operating Subsidiaries have a business relationship, or any entity which competes with the Sellers, the Company or the Operating Subsidiaries.  No Founder, nor any Affiliate, employee or director of the Sellers the Company, the Operating Subsidiaries or any Founder, nor any Family Member of any Founder, Affiliate, employee or director of the Sellers, the Company or the Operating Subsidiaries, is, directly or indirectly, interested in any contract or agreement to which the Sellers the Company or the Operating Subsidiaries are a party (other than such contracts as relate to any such Person's ownership of capital stock or other securities of the Sellers or Telequick).

4.20   <u>Intellectual Property</u>.

(a)   <u>Schedule 4.20</u> sets forth a true, accurate and complete list of the Intellectual Property that is necessary to or used in the Business as now conducted or as presently contemplated to be conducted following the Closing (collectively, the "<u>Business Intellectual Property</u>").  The Sellers or Telequick own or have the right to use, and the Company and the Operating Subsidiaries will own and have the right to use as of the Closing, free and clear of all Liens, all Business Intellectual Property without any conflict with or infringement of the rights of others and the consummation of the transactions contemplated hereby and by the Related Documents will not alter or impair in an adverse manner the Business Intellectual Property.

(b)   Except as set forth on <u>Schedule 4.20</u>, no third party has any ownership right, title, interest, claim in or Lien on any of the Business Intellectual Property.  The Sellers and Telequick have taken steps to preserve and protect its legal rights in, and the secrecy of, the Business Intellectual Property.

(c)   The Sellers and Telequick are not, and the Company and the Operating Subsidiaries will not be as of the Closing, in default under any agreement pursuant to which it is licensing Intellectual Property of a third party or granting licenses to its own Intellectual Property.  The Sellers and Telequick have not received any communications alleging that the Sellers or Telequick have violated in any material respect any other Person's Intellectual Property rights or has engaged in unfair competition against such Person.

(d)   The Sellers or Telequick have written agreements in effect with all of its current and former employees and consultants who have access to the Business Intellectual

Property. None of the Sellers' or Telequick's current or former employees or consultants are in violation of any such agreement and all such agreements fully vest in the Sellers or Telequick (subject to any limitations imposed by Applicable Law) full title and ownership of all inventions and proprietary rights developed or invented by any and all employees and consultants during the period of their employment and/or consultancy and resulting directly or indirectly from their work for the Sellers or Telequick.

(e)     The Sellers and Telequick (i) do not now infringe or misappropriate any third party's Intellectual Property rights, and (ii) do not have any liability for any past infringement or misappropriation. No claim has been made or is threatened with regard to any third party Intellectual Property, including any allegation of Intellectual Property infringement or misappropriation or of any breach or default of an Intellectual Property license or similar agreement.

(f)     Each of the Sellers' and Telequick's patents, patent applications, registered copyrights, copyright applications, trademarks, service marks, trademark and service mark applications, mask work registrations and mask work registration applications are set forth on Schedule 4.20.

4.21    Products; Product Warranty and Liability.

(a)     Each Product designed, manufactured, distributed, performed and provided by the Sellers and Telequick has been designed, manufactured, distributed, performed and provided in conformity with all applicable contractual commitments, all express warranties and all Applicable Laws, and the Sellers and Telequick have (and the Company and the Operating Subsidiaries will have as of the Closing) no Liability or other damages in connection therewith. Schedule 4.21(a) includes copies of the standard terms and conditions of sale for Products of the Business (containing applicable guaranty, warranty, and indemnity provisions). No Product manufactured or fabricated by or on behalf of the Sellers or Telequick in the conduct of the Business is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale set forth in Schedule 4.21(a).

(b)     To the actual knowledge, and the knowledge which could have been acquired after making reasonable investigation under the circumstances, of the Sellers and the Founders, each Product designed, manufactured, distributed, performed, provided and sold by the Sellers and Telequick on behalf of third parties has been designed, manufactured, distributed, performed, provided and sold in conformity with all applicable contractual commitments, all express warranties and all Applicable Laws, and the Sellers and Telequick have (and the Company and the Operating Subsidiaries will have as of the Closing) no Liability or other damages in connection therewith. Schedule 4.21(b) includes copies of the standard terms and conditions of sale for Products of the Business (containing applicable guaranty, warranty, and indemnity provisions).

4.22    Liabilities and Indebtedness. Neither the Sellers nor any Founder have taken any action that would result in the creation, incurrence or assumption of any Indebtedness on the part of the Company or the Operating Subsidiaries, contingent or otherwise, either directly or indirectly, including the guaranty of any Indebtedness of any other Person or entity.

4.23  <u>Distributors</u>.  Except as set forth on <u>Schedule 4.23</u>, no distributor, contractor, broker, dealer, agent or representative, other than the Sellers' and Telequick's current employees, have an oral or written agreement or understanding to sell or otherwise provide Products.

4.24  <u>Customers</u>.  <u>Schedule 4.24</u> sets forth the names and addresses of the twenty (20) largest (based upon revenues) customers, contractors and other Persons from whom the Sellers and Telequick derived revenues in connection with the Business for the twelve (12) month periods ended December 31, 2006, and 2005, and the amount for which each such customer, contractor or other Person was invoiced during such periods.  Except as set forth in <u>Schedule 4.24</u>, neither the Sellers or Telequick have received any notice, nor do either the Sellers or any Founder have any reason to believe, that any such customer, contractor or other Person set forth in <u>Schedule 4.24</u> has ceased, or will cease, to purchase or use Products, or has substantially reduced, or will substantially reduce, the purchase or use of Products from the Company or the Operating Subsidiaries subsequent to the Closing.  The Sellers and Telequick are current and in full compliance with respect to all of their material obligations to all of their customers, contractors and each other Person from whom they derive revenues.

4.25  <u>Suppliers</u>.  <u>Schedule 4.25</u> sets forth the name and address of the twenty (20) largest (based upon payments made by the Sellers and Telequick) suppliers, vendors or other providers of services to the Sellers and Telequick for each of the twelve (12) month periods ended December 31, 2006, and 2005.  Except as listed on <u>Schedule 4.25</u>, neither the Sellers nor Telequick have received any notice, nor do either the Sellers or any Founder have any reason to believe, that any such supplier, vendor or other provider of services has ceased, or will cease, to supply products or other goods or services to the Company or the Operating Subsidiaries on or after the Closing Date, or has substantially reduced, or will substantially reduce, the supply of such items or services to the Company or the Operating Subsidiaries after the Closing Date.  The Sellers and Telequick are current and in full compliance with respect to all of their material obligations to their suppliers, vendors and other providers of services.

4.26  <u>Brokers; Certain Expenses</u>.  Except for the Caymus Fee, neither the Sellers, the Company, the Operating Subsidiaries nor the Founders has paid or become obligated to pay any fee or commission to any broker, finder, investment banker or other intermediary in connection with this Agreement or any of the Related Documents.

4.27  <u>Disclosure</u>.  No representation or warranty made by the Sellers, the Company, the Operating Subsidiaries or the Founders in this Agreement, any Schedule hereto, any Related Document, or any document or certificate furnished or to be furnished by or on behalf of the Seller to the Purchaser or its Affiliates, agents and representatives in connection with this Agreement and the Related Documents or the transactions contemplated hereby or thereby contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they are made, not misleading.  There is no fact that has not been disclosed in this Agreement or the Related Documents which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser represents to the Sellers, the Company, the Operating Subsidiaries and the Founders as follows:

5.1    Organization and Existence; Authorization; No Conflicts.

(a)    The Purchaser is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  The Purchaser has all requisite power and authority to execute and deliver this Agreement and the Related Documents to which it is a party, to purchase the Preferred Units hereunder, and to carry out and perform its obligations under the terms of this Agreement and the Related Documents to which it is a party.

(b)    The execution, delivery and performance of this Agreement and the Related Documents by the Purchaser and the consummation of all transactions contemplated hereby or thereby, including but not limited to the purchase of the Preferred Units, have been duly authorized by all required actions of the Purchaser.

(c)    This Agreement and the Related Documents have been duly executed and delivered by the Purchaser.  This Agreement and the Related Documents constitute valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with their respective terms, except as enforcement may be limited by principles of public policy, and subject to laws of general application relating to Bankruptcy, insolvency, reorganization, moratorium and the relief of debtors and rules of law and general principles of equity governing specific performance, injunctive relief or other equitable remedies.

5.2    Investment.  The Purchaser is acquiring the Preferred Units for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof in violation of Applicable Laws.  The Purchaser understands that the Preferred Units to be purchased have not been registered or qualified, as the case may be, under the Securities Act of 1933, as amended (the "Securities Act") or any applicable state securities laws by reason of a specific exemption from the registration or qualification provisions of the Securities Act or any applicable state securities laws.

5.3    Brokers or Finders.  The Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken by the Purchaser, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement for which the Sellers, the Company, the Operating Subsidiaries or any Founder will be responsible.

## ARTICLE 6
## CONDITIONS TO THE CLOSING

The obligations of the parties to this Agreement are subject to the following conditions:

6.1    Conditions to the Obligations of the Parties.  The obligations of the parties to consummate the transactions contemplated hereby shall be subject to the condition that (a) no injunction or order shall have been issued by any court of competent jurisdiction or any other

Governmental Authority that would restrain or prohibit any of the transactions contemplated by this Agreement or any of the Related Documents or that would impose damages as a result thereof and (b) no Action shall be pending before any court or administrative agency or instrumentality of competent jurisdiction in which any Person seeks such a remedy (if, in the opinion of counsel to any party, there exists a reasonable risk of a materially adverse result in such pending Action).

6.2    Conditions to the Obligations of the Purchaser. The obligations of the Purchaser to purchase the Preferred Units at the Closing as contemplated hereby shall be subject to the fulfillment or satisfaction (or waiver in writing by the Purchaser) at or prior to the Closing of each of the following conditions:

(a)    Representations; Performance by the Seller and the Founders. Each of the representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement and in each Related Document shall be true and correct as of the Closing with the same force and effect as if made on such date, and the Sellers, the Company, the Operating Subsidiaries shall have performed and satisfied their respective obligations required or contemplated by this Agreement and the Related Documents to be performed and satisfied by them prior to the Closing.

(b)    No Material Adverse Effect. Since December 31, 2005, there has been no Material Adverse Effect.

(c)    Asset and Interest Transfers. The Sellers shall have consummated the Asset Transfer and the Interest Transfer, free and clear of all Liens, each in a manner satisfactory to the Purchaser.

(d)    Authorizations. All authorizations of the Sellers, the Company, the Operating Subsidiaries and the Founders in connection with this Agreement and the Related Documents and the transactions contemplated hereby and thereby shall have been taken and shall be reasonably satisfactory in form and substance to the Purchaser.

(e)    Delivery of Audited Financial Statements. The Sellers and Telequick shall have delivered audited balance sheets as of December 31, 2005, and June 30, 2006, and related income and cash flow statements, in form and substance satisfactory to the Purchaser (the "Audited Financial Statements"). The Audited Financial Statements shall have been prepared by Kingery & Crouse, P.A.

(f)    Caymus Fee. The Caymus Fee shall have been paid by wire transfer of immediately available funds to the account designated by Caymus Partners LLC at the Closing.

(g)    Closing Documents. The Sellers shall have delivered, or caused to be delivered, to the Purchaser on the Closing Date the following documents all in form and substance satisfactory to the Purchaser:

(i)    original certificates evidencing the Preferred Units;

(ii)    employment agreements with the Company, duly executed by each of Wolf and Eliasson in form and substance satisfactory to the Purchaser (the "Employment Agreements");

(iii)    a Secretary's Certificate of each Seller, the Company and each Operating Subsidiary, as applicable, duly executed by the Secretary of such party, with incumbency, certifying as to the following matters:  (A) the articles or certificates of incorporation or formation, as applicable, of such party, (B) the bylaws or operating agreement, as applicable, of such party, (C) the authorizing resolutions of the board of directors or managers and the shareholders or members of such party, as applicable, approving the transactions contemplated by this Agreement and (D) the good standing certificates set forth in Section 6.2(g)(iv);

(iv)    certificates dated (A) as of a date that is prior to, and in the same month and year as, the Closing Date, with respect to each of the Company and the Operating Subsidiaries, from the Secretary of State of the State of such entity's organization that such entity is legally existing and in good standing in such State, and (B) as of a date that is prior to, and in the same month and year as, the Closing Date, with respect to FTN, Guardian and Bay Pines, from the Secretary of State of the jurisdiction of organization of such entity, that such entity is legally existing and in good standing in such jurisdiction;

(v)    a certificate of the Sellers, executed by the Chief Executive Officers of the Sellers and Wolf and Eliasson, as applicable, dated the Closing Date, and certifying as to the fulfillment of the conditions specified in Sections 6.2(a), 6.2(b), 6.2(c) and 6.2(d) of this Agreement;

(vi)    the Restated LLC Agreement, duly executed by, as applicable, the Seller, the Founders and the Company;

(vii)    evidence, in a form satisfactory to the Purchaser, that the Company and the Operating Subsidiaries, as applicable, have obtained (A) general liability and property insurance in amounts satisfactory to the Purchaser, and (B) director and officer insurance in an amount of no less than Three Million Dollars ($3,000,000);

(viii)    the Services Agreement, duly executed by each of the Sellers, the Company and the Operating Subsidiaries; and

(ix)    the Bay Pines Agreement, duly executed by each of the Sellers, the Company and the Operating Subsidiaries, as applicable.

(h)    Opinion of Counsel.  The Seller shall have caused to be delivered to the Purchaser an opinion of Macfarlane, Ferguson & McMullen, P.A., dated the Closing Date and addressed to the Purchaser in form and substance satisfactory to the Purchaser.

(i)    Licenses: Governmental and Other Third Party Consents.  The Company, the Operating Subsidiaries or the Purchaser, as applicable, shall have received or applied for all necessary Licenses and Consents, including, without limitation, those identified on Schedule

6.2(i), to the consummation of the transactions contemplated by this Agreement and the Related Documents.

(j) <u>No Distributions</u>. Except as set forth on <u>Schedule 6.2(j)</u>, since December 31, 2005, there shall have been no distributions or dividends of cash or other property or similar transfers from the Sellers to any of the Founders.

(k) <u>Employment Arrangements</u>. All employees set forth on <u>Schedule 6.2(k)</u> shall have accepted employment offers with the Company or the Operating Subsidiaries and, and all current and future employees of the Company or the Operating Subsidiaries shall have entered into noncompetition, proprietary information and invention assignment agreements in form and substance satisfactory to the Purchaser. The employee benefit plans listed on <u>Schedule 6.2(k)</u> shall have been assigned to or assumed by the Company or the Operating Subsidiaries.

(l) <u>Registration Rights Agreement</u>. The Purchaser and the Company shall have executed a registration rights agreement by and between the Company and the Purchaser, in the form of <u>Exhibit C</u> attached hereto.

(m) <u>Cash Balance</u>. Immediately following the Closing and the payment of all fees, expenses and liquidity pursuant to <u>Section 3.4</u>, the Company shall have a minimum of Two Million and Dollars ($2,000,000) in cash (net of (A) any written but uncleared checks of the Company and the Subsidiaries, (B) any accounts payable of the Company and the Subsidiaries that are more than thirty (30) calendar days past due, and (C) any increase in the Indebtedness of the Company and the Operating Subsidiaries immediately following the Closing Date) on its consolidated balance sheet after giving effect to the Sellers Loan provided for in <u>Section 3.4</u> and the senior debt referenced in <u>Section 3.5</u>.

6.3 <u>Conditions to the Obligations of the Sellers and the Company</u>. The obligations of the Sellers and the Company to sell the Preferred Units at the Closing as contemplated hereby shall be subject to the fulfillment or satisfaction (or waiver in writing by the Sellers) at or prior to the Closing of each of the following conditions:

(a) <u>Representations; Performance of the Purchaser</u>. Each of the representations and warranties made by the Purchaser in this Agreement shall be true and correct as of the Closing and the Purchaser shall have performed and satisfied in all material respects each of its obligations required or contemplated by this Agreement and in each Related Document to be performed as of the Closing.

(b) <u>Authorizations</u>. All authorizations of the Purchaser in connection with this Agreement and the Related Documents and the transactions contemplated hereby and thereby shall have been taken and shall be reasonably satisfactory in form and substance to the Seller.

(c) <u>Restated LLC Agreement</u>. The Restated LLC Agreement shall have been executed and delivered by the Purchaser.

(d) <u>Purchase Price</u>. The Purchase Price shall have been paid, as provided in <u>Section 3.3</u>.

801393.10

## ARTICLE 7
## COVENANTS AND AGREEMENTS

7.1    Post-Closing Covenants.

(a)    Cooperation; Securities Filings. Each party shall cooperate with the other parties and use its reasonable best efforts to consummate the transactions contemplated by this Agreement and the Related Documents in accordance with the terms hereof and thereof. The Sellers and the Company shall make all necessary filings under applicable federal and state securities Laws, including, but not limited to, a Form D and any amendments thereto as required by Rule 503 of Regulation D.

(b)    Publicity. At any time on or after the Closing Date, no party (nor any of its Affiliates) shall, directly or indirectly, make any press release or other public announcement with respect to the transactions contemplated hereby or under the Related Documents without the prior written consent of the other parties, unless any such party is required by Applicable Law to make such a press release or announcement.

(c)    Operations of Certain Sellers. The Sellers and the Founders covenant and agree that, at all times after the Closing, (i) the Founders will be the sole record and beneficial owners of FTN, Guardian and Bay Pines, and (ii) FTN and Guardian will engage in no activities or operations other than (A) those incidental to their ownership of interests in the Company, and (B) their obligations under this Agreement and the Services Agreement. The Sellers and the Founders agree that, for as long as (1) FTN and Guardian are the owners of any Common Units, such entities shall not be dissolved or liquidated without the approval of the Purchaser, and (2) the Bay Pines Agreement remain in effect, Bay Pines shall not be dissolved or liquidated without the approval of the Purchaser.

(d)    Payment of Closing Fee. Within sixty (60) calendar days after the Closing Date, the Company shall pay the Closing Fee by wire transfer of immediately available funds to the account designated by the Purchaser.

(e)    Assignment of Untransferred Contracts. Within ninety (90) calendar days after the Closing Date, the Sellers and the Founders shall use their best efforts to take all actions necessary or advisable to, as soon as possible after the Closing, obtain consent to the assignment of, and assign or otherwise transfer the Untransferred Contracts to the Company or one of the Operating Subsidiaries, as applicable.

(f)    Transfer of Bay Pines Assets. Upon the request of the Purchaser, and, in no event, not later than March 31, 2008:

(i)    the Company shall form, and shall own One Hundred Percent (100%) of the outstanding membership interests of, a limited liability company under the laws of the State of Florida named "Bay Pines, LLC" or such other name as the parties hereto shall agree is appropriate ("Bay Pines, LLC"), and Bay Pines shall sell all of its assets to Bay Pines, LLC for an aggregate purchase price of One Dollar ($1);

(ii)      Bay Pines shall change its name to a name sufficiently dissimilar to Bay Pines, LLC in the Purchaser's reasonable judgment;

(iii)      the parties hereto shall (A) amend this Agreement to (1) revise the definition of "Operating Subsidiaries" to include Bay Pines, LLC and (2) make such other changes to this Agreement as are necessary to make Bay Pines, LLC a party hereto, and (B) take all such other actions necessary to ensure that Bay Pines, LLC is subject to the provisions of this Agreement and the Related Documents; and

(iv)      the Bay Pines Agreement shall be terminated.

Notwithstanding the provisions of this Section 7.1(f), the Company may delay such intended actions if the Board of Managers of the Company determines in good faith that the licenses owned by Bay Pines would be cancelled, or otherwise terminated, as a result of such requested actions; provided, however, that the Company may only delay such transactions long enough to ensure that either (A) Bay Pines, LLC has obtained such licenses as are necessary for Bay Pines, LLC to operate as Bay Pines has historically operated, or (B) Bay Pines has successfully transferred its licenses to Bay Pines, LLC without risk of cancellation; provided, further, that the Company may not delay such intended actions beyond March 31, 2008; provided, further, that the Company may make requests from the Purchaser for six (6)-month extensions beyond March 31, 2008, which requests shall not be unreasonably denied.

(g)      Key-Man Life Insurance. Within thirty (30) days after the Closing Date, the Company shall deliver evidence, in a form satisfactory to the Purchaser, that the Company has obtained "key man" life and disability insurance on the life of Bryon Wolf in the amount of Twenty-Five Million Dollars ($25,000,000), of which (1) Twenty Million Dollars ($20,000,000) shall be collaterally assigned to Kayne as security for the redemption of the Preferred Units pursuant to the terms of the Restated LLC Agreement, and (2) the remainder shall be assigned to the Company; provided, however, in the event (i) the cost of such insurance exceeds Fifty Thousand Dollars ($50,000) and (ii) a majority of the managers of the Company decide, in good faith, to not pay such amount in excess of Fifty Thousand Dollars ($50,000), the Company shall purchase and maintain such insurance in whatever coverage amount can be acquired for Fifty Thousand Dollars ($50,000); provided, further, that the Company may request for an extension of the foregoing thirty (30)-day period from the Purchaser which request shall not be unreasonably denied.

7.2      Non-solicitation; Covenant Not to Compete; Confidentiality.

(a)      From and after the Closing Date, and for a period of five (5) years thereafter (the "Restricted Period"), the Sellers and the Founders shall not, and they shall cause their respective Affiliates not to, directly or indirectly, (i) hire any employee of the Company or the Operating Subsidiaries within twelve (12) months following the termination of his or her employment with the Company or the Operating Subsidiaries unless the Company or the Operating Subsidiaries has terminated such employee's employment, (ii) encourage, solicit, induce or attempt to encourage, solicit or induce any employee to leave his or her employment with the Company or the Operating Subsidiaries, terminate his or her relationship with the Company or the Operating Subsidiaries or to devote less than his or her full-time efforts to the

Business for any reason, (iii) solicit any present or former customers, clients or other persons from whom Sellers and Telequick derived any revenue in the course of conducting the Business prior to the Closing Date for the purpose of competing with the Business, (iv) solicit any present or future customers, clients or other persons from whom the Company or the Operating Subsidiaries derives any revenue, with respect to the Business as conducted by the Company on or after the Closing Date for the purpose of competing with the Business, or (v) persuade or attempt to persuade any present or future customer, client, vendor, service provider, supplier, contractor or any other Person having business dealings with the Company or the Operating Subsidiaries to cease doing business or otherwise transacting with the Company or the Operating Subsidiaries or to reduce the amount of business or such other transactions it conducts or will conduct with the Company or the Operating Subsidiaries or otherwise disrupt, damage, impair or interfere in any manner with the business of the Company or the Operating Subsidiaries.

(b)     From and after the Closing Date, and for the Restricted Period, the Sellers and the Founders jointly and severally agree that they shall not, and they shall cause their respective Affiliates not to, directly or indirectly, own, manage, operate or control, or engage, join or participate in the ownership, management, operation or control of, or furnish any capital or loans to, be employed by or act as a consultant to or be connected in any manner with, any Person or business that is engaged in, or owns, invests in, operates, manages or controls any venture or enterprise which directly or indirectly engages or proposes to engage in a business which is competitive with the Business or with the business in which the Company or the Operating Subsidiaries is then engaged anywhere in the world (the "Territory"). Notwithstanding the foregoing, nothing herein shall prohibit or otherwise restrict the Sellers or any Founder from holding a passive investment in the equity securities of any Person if such equity securities are registered under the Securities Act; provided that such equity investment does not exceed One Percent (1%) of the outstanding equity securities of such Person.

(c)     The Founders acknowledge that in their capacities as the sole shareholders, directly or indirectly, of the Sellers, they have occupied positions of trust and confidence with respect to the Sellers. The Sellers and each Founder jointly and severally agree that they shall not disclose to others or use, and shall prevent each of their Affiliates from disclosing to others or using, directly or indirectly, any Confidential Information regarding the Sellers, the Company, the Operating Subsidiaries, the Business, the prospective businesses of the Company or the Operating Subsidiaries or any of the Products, except as required in the course of any Founder's employment with the Company or the Operating Subsidiaries, at any time after the Closing. The Sellers and each Founder jointly and severally represent and warrant to the Company and the Operating Subsidiaries that, as of the Closing Date it, he or she has surrendered to the Company or the Operating Subsidiaries, as applicable, all documents, work papers, lists, memoranda, records, computer data and other data (including all copies) in its, his or her possession constituting or pertaining in any way to the Confidential Information. The Sellers and the Founders acknowledge and agree that such Confidential Information is specialized, unique in nature and of great value to the Company, the Operating Subsidiaries and the Business and that such information gives the Company, the Operating Subsidiaries and the Business a competitive advantage.

(d)     The necessity of protection against competition from the Sellers and the Founders and the nature and scope of such protection has been carefully considered by the

parties to this Agreement based upon the consultation with and advice from their respective legal counsel. The Sellers and the Founders acknowledge and agree that they will receive direct and substantial benefits from the transactions contemplated by this Agreement and that the Purchaser would not enter into the transactions contemplated by this Agreement without the agreements of Sellers and the Founders contained in this Section 7.2. The parties agree and acknowledge (i) the Purchaser is investing substantial sums to acquire an interest in the Company and the Business, (ii) that the duration, scope and Territory applicable to the covenants contained in this Section 7.2 are fair, reasonable and necessary, and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the Company's and the Operating Subsidiaries' and the Purchaser's investment therein and the Company's and the Operating Subsidiaries' business goodwill, (iii) that adequate compensation has been received by the Sellers and the Founders for such obligations and (iv) that these obligations do not prevent the Sellers or the Founders from earning a livelihood and/or conducting any other business. If any provision of this Section 7.2 is held to be illegal, invalid or unenforceable under present or future laws, rules or regulations of any governmental entity effective during the period set forth in such sections, the legality, validity and, enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired. If any court determines that any of the covenants contained in this Section 7.2, or any part thereof, are unenforceable because of the duration of such provision or the product, services or area covered thereby or for any other reason, such court shall have the power and the parties intend and desire that such court, and in connection with the purchase and acquisition of the Preferred Units the Purchaser is relying on such court to, exercise such power to reduce the duration or coverage of such provision to the minimum extent necessary to render such provision enforceable, and in its reduced form, such provision shall then be enforceable and shall be enforced. Each party hereto intends to and does hereby confer jurisdiction to enforce the covenants and other provisions contained in this Section 7.2, upon the courts of any jurisdiction within the geographic scope of such covenants or other provisions. If the courts of any one (1) or more of such jurisdictions holds such covenants or other provisions wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of each party that such determination not bar or in any way affect the rights of the Purchaser, the Company or the Operating Subsidiaries to relief in the courts of any other jurisdiction within the geographic scope of such covenants or other provisions, as to breaches of such covenants or other provisions in any such other jurisdiction, such covenants or other provisions as they relate to each jurisdiction and geographic location being, for this purpose, severable into diverse and independent covenants and other provisions.

(e)     The Sellers and each Founder recognize that any actual or threatened breach of this Section 7.2 shall cause irreparable injury to the Company, the Operating Subsidiaries and the Purchaser, inadequately compensable in monetary damages. Accordingly, notwithstanding the provisions of Article 8, in addition to any other legal or equitable remedies that may be available to the Company, the Operating Subsidiaries and the Purchaser, the Sellers and each Founder agree that the Company, the Operating Subsidiaries and the Purchaser shall be able to seek and obtain injunctive relief in the form of a temporary restraining order, preliminary injunction, or permanent injunction. The Company, the Operating Subsidiaries and the Purchaser shall not be required to demonstrate actual injury or damage to obtain injunctive relief from the courts. In addition, in any Action arising out of this Section 7.2, the prevailing party or parties shall be entitled to recover, in addition to any damages caused by a breach of this Section

<u>7.2,</u> all costs and expenses, including but not limited to, reasonable attorneys' fees, expenses, and court costs incurred by such party or parties in connection with such Action.

7.3    <u>Tax Matters.</u>

(a)    All transfer, documentary, sales, use, stamp registration and other similar Taxes imposed by any Governmental Authority (including any state, county, local or other taxing authority) as a result of the Transfer or the purchase of the Preferred Units shall be duly and timely paid by the Company.  The Company shall duly and timely file all Tax Returns in connection with such Taxes.  The Company shall give a copy of each such Tax Return to the Purchaser for its review with sufficient time for the provision of comments prior to filing.

(b)    The Sellers shall prepare or cause to be prepared and file or cause to be filed all Tax Returns with respect to the Business for all periods ending on or before the Closing Date which are filed after the Closing.  To the extent permitted by Applicable Law, the Sellers shall include any income, gain, loss, deduction or other Tax items for such periods on their Tax Returns in a manner consistent with the Schedules K-1 furnished by the Company for such periods.

(c)    The Company, the Sellers, the Founders and the Purchaser shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Sellers agree to retain all books and records with respect to Tax matters pertinent to the Sellers and Telequick relating to any Tax period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Company, any extensions thereof) of the respective Tax periods, and to abide by all record retention agreements entered into with any Governmental Authority.

(d)    All Tax sharing agreements or similar agreements with respect to or involving the Sellers, the Company or the Operating Subsidiaries shall be terminated as of the Closing Date and, after the Closing Date, the Sellers, the Company, the Operating Subsidiaries and the Purchaser shall not be bound thereby or have any liability thereunder.

(e)    The Sellers and the Purchaser agree to cause the Company to make an election pursuant to Section 754 of the Code in its initial Tax Return and not to revoke or terminate such election.

(f)    As of the Closing Date, the combined opening Capital Account (as defined in the Restated LLC Agreement) of the Purchaser with respect to the Preferred Units shall be Twenty Million Dollars ($20,000,000).  As of the Closing Date, the combined opening Capital Accounts of each Seller with respect to the Common Units shall be Two Million Dollars ($2,000,000).

## ARTICLE 8
## INDEMNIFICATION

8.1    <u>Survival of Representations and Warranties</u>.  The representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement or any Related Document shall survive the Closing and shall continue in effect for a period of eighteen (18) months (the "<u>Survival Period</u>") following the Closing Date, except:

(a)    As to the breach of any such representation or warranty as to which a claim is submitted in writing by a Purchaser Indemnitee within the Survival Period and identified as a claim for indemnification pursuant to this Agreement or any Related Document, in which case such representation and warranty shall survive until the claim is resolved;

(b)    The representations and warranties set forth in <u>Sections 4.8</u> (Absence of Certain Changes or Events), <u>4.11</u> (Litigation; Restriction on Business Activities), <u>4.12</u> (Material Contracts and Other Agreements), <u>4.13</u> (Compliance with Laws; Licenses), <u>4.19</u> (Related Party Transactions), <u>4.21</u> (Products; Product Warranty and Liability), <u>4.22</u> (Liabilities and Indebtedness) and <u>4.27</u> (Disclosure) shall continue in effect for a period of thirty-six (36) months following the Closing Date; and

(c)    The representations and warranties set forth in <u>Sections 4.7</u> (Financial Statements), <u>4.10</u> (Employees; Employee Benefits), <u>4.17</u> (Taxes), <u>4.18</u> (Environmental and Safety Laws) and <u>4.20</u> (Intellectual Property) shall survive the Closing until sixty (60) calendar days following the expiration of all applicable statutes of limitations (and any extension thereof) with respect to such matters; and

(d)    The representations and warranties set forth in <u>Sections 4.1</u> (Organization; Good Standing; Qualification), <u>4.2</u> (Subsidiaries), <u>4.3</u> (Power and Authority; Capitalization; Indebtedness), <u>4.4</u> (Asset and Interest Transfer), <u>4.5</u> (Authorization; Execution and Delivery; No Conflicts), <u>4.14</u> (Title to Properties; Liens and Encumbrances) and shall survive the Closing indefinitely.

Notwithstanding anything to the contrary contained in this Agreement, the obligations of the Sellers, the Company, the Operating Subsidiaries and the Founders to indemnify any Purchaser Indemnitee for Losses arising out of or resulting from any fraud or intentional or willful misrepresentation shall survive indefinitely.  The representations and warranties of the Purchaser shall survive the Closing for a period of eighteen (18) months commencing on the Closing Date.  Notwithstanding the right of the Purchaser to investigate the business, assets and financial condition of the Sellers, the Company and the Operating Subsidiaries, and notwithstanding any knowledge obtained or obtainable by the Purchaser as a result of such investigation, the Purchaser has the right to rely upon, and has relied upon, each of the representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement or pursuant hereto.

8.2    <u>Indemnification by the Sellers, the Company, the Operating Subsidiaries and the Founders</u>.  Subject to the terms and provisions of <u>Section 8.1</u>, the Sellers, the Company, the Operating Subsidiaries and the Founders (each an "<u>Indemnitor</u>") agree, jointly and severally, to

indemnify and hold harmless the Purchaser, and its officers, directors, managers, members, partners, agents, Affiliates (excluding the Company and the Operating Subsidiaries after the Closing) and representatives (each a "Purchaser Indemnitee") from and against, and shall reimburse each Purchaser Indemnitee on demand for, any and all direct or indirect claims, suits, actions, proceedings, liabilities, obligations, judgments, fines, penalties, claims, losses, damages, diminution in value, lost profits, costs and expenses of any kind (including, without limitation, the reasonable fees and disbursements of counsel, accountants and other experts whether incurred in connection with any of the foregoing or in connection with any investigative, administrative or adjudicative proceeding, whether or not such Purchaser Indemnitee shall be designated a party thereto), together with any and all reasonable costs and expenses associated with the investigation of the same and/or the enforcement of the provisions hereof and thereof (collectively, "Losses"), which may be incurred by such Purchaser Indemnitee relating to, based upon, resulting from or arising out of:

(a)    the breach of any representation or warranty made by any of the Sellers, the Company, the Operating Subsidiaries or the Founders in this Agreement or in any Related Document as of the date hereof and as of the Closing Date;

(b)    the breach of any agreement, covenant or obligation of any of the Sellers, the Company, the Operating Subsidiaries or the Founders contained in this Agreement or in any Related Document;

(c)    the Excluded Liabilities;

(d)    any Liability incurred by the Sellers, the Company, the Operating Subsidiaries or the Founders to pay any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement;

(e)    any misrepresentation contained in any certificate or other document furnished by or on behalf of the Sellers, the Company, the Operating Subsidiaries or the Founders pursuant to this Agreement or in any Related Document or in connection with the transactions contemplated hereby or thereby or any other Losses arising out of or resulting from any fraud or intentional or willful misrepresentation;

(f)    the operation of the Business on or prior to the Closing Date, including any suit, action or other proceeding against the Company or the Operating Subsidiaries (not disclosed in the Schedules) brought by or on behalf of (i) any current or former (as of the Closing Date) employee, officer, director, agent, consultant or independent contractor of the Sellers or Telequick with respect to any act or omission by the Sellers or Telequick prior to the Closing or (ii) any Person as a result of a purported breach of contract or tort committed by the Sellers, the Company, the Operating Subsidiaries or the Founders prior to the Closing; or

(g)    the failure of the Sellers, the Company, the Operating Subsidiaries or the Founders to comply with any applicable bulk sales laws.

8.3    Conditions to and Limitations on Indemnification.    No party to this Agreement shall be entitled to indemnification pursuant to this Article 8 for breaches of representations and

warranties made hereunder unless a claim is submitted in writing by a Purchaser Indemnitee within the periods specified in Section 8.1 of this Agreement. Notwithstanding anything herein to the contrary, a Purchaser Indemnitee shall not be entitled to make a claim for indemnification under a "diminution in value" theory pursuant to Sections 8.2(a), (b) or (f) unless the Losses that are the subject of such claim result in (a) an actual loss of any portion of the Original Issue Price (as such term is defined in the Restated LLC Agreement) to the Purchaser, or (b) a material change in the condition (financial or otherwise) or results of operations of the Company, the Operating Subsidiaries or the Business such that the Company, Operating Subsidiaries or Business will not be able to meet its obligations under this Purchase Agreement or the Restated LLC Agreement executed even herewith.

8.4    Indemnity Threshold. A Purchaser Indemnitee shall not be entitled to make any claims for indemnification payment pursuant to Section 8.2(a), until such time as the total amount of all Losses (including the Losses arising from such breach and all other Losses arising from any other breaches of any representations or warranties made by the Indemnitors in this Agreement) that have been suffered or incurred by any one or more of the Purchaser Indemnitees, or to which any one or more of the Purchaser Indemnitees has or have otherwise become subject, exceeds Four Hundred Thousand Dollars ($400,000). Subject to the Indemnity Cap, if the total amount of such Losses exceeds Four Hundred Thousand Dollars ($400,000), the Purchaser Indemnitees shall be entitled to be indemnified against and compensated and reimbursed for all such Losses.

8.5    Indemnity Cap. Notwithstanding anything in this Agreement to the contrary, the aggregate rights of Purchaser Indemnitees to indemnification payments pursuant to Section 8.2 shall be limited to, and shall not exceed the Purchase Price ("Indemnity Cap"); provided however, that the parties agree that the Indemnity Cap in this Section 8.5 shall not apply to any claim for Losses arising out of or relating to (a) any Excluded Liabilities, or (b) any fraud or willful or intentional misrepresentation by the Sellers, the Company, the Operating Subsidiaries or the Founders.

8.6    Claims for Indemnity. Whenever a claim for Losses shall arise for which a Purchaser Indemnitee shall be entitled to indemnification hereunder, the Purchaser Indemnitee shall notify the Indemnitor in writing describing the claim and the basis therefor; provided however, that the failure to give notice shall not affect the right of the Purchaser Indemnitee to indemnification hereunder except to the extent (and only to the extent) that the Indemnitor is materially prejudiced by such failure. The right of the Purchaser Indemnitee to indemnification, as set forth in such notice, shall be deemed agreed to by the Indemnitor unless, within thirty (30) calendar days after the mailing of such notice, the Indemnitor shall notify the Purchaser Indemnitee in writing that it disputes the right of the Purchaser Indemnitee to indemnification. If the Purchaser Indemnitee shall be duly notified of such dispute, the parties shall attempt in good faith, for a period of thirty (30) calendar days, to settle and compromise such dispute.

8.7    Defense of Claims by Third Parties. If any Purchaser Indemnitee shall receive notice of any third party claim, suit, arbitration or other legal proceeding giving rise to indemnity under this Agreement (a "Third Party Claim"), the Purchaser Indemnitee shall give the Indemnitor prompt written notice of the same; provided, however, that failure to provide such written notice shall not release the Indemnitor from any of its obligations under this Article 8,

except to the extent (and only to the extent) the Indemnitor is materially prejudiced by such failure. If such Third Party Claim seeks only recovery of a sum of money, the Indemnitor may, but shall not be obligated to, upon prompt written notice furnished to the Purchaser Indemnitee, assume the defense of any such claim, suit, arbitration or other proceeding, with counsel reasonably satisfactory to the Purchaser Indemnitee, if the Indemnitor acknowledges to the Purchaser Indemnitee in writing its obligations to indemnify the Purchaser Indemnitee with respect to all elements of such claim. If the Indemnitor furnishes such written acknowledgment, the Indemnitor will be entitled to assume and control the defense of such claim, suit, arbitration or other or proceeding, and the Purchaser Indemnitee shall be entitled to participate in (but not control) the defense of any such action, with its own counsel and at its own expense. The notice to the Indemnitor shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.    Neither the Indemnitor nor the Purchaser Indemnitee shall settle or compromise any claim by a third party without the prior written consent of the other party (which shall not be unreasonably withheld). If the Indemnitor does not assume the defense of any such claim, suit, arbitration or other proceeding as provided above, (a) the Purchaser Indemnitee may defend against the same, in such manner as it may deem appropriate and at the Indemnitor's cost and expense, including, without limitation, settling such matter; provided that such settlement shall be subject to the Indemnitor's prior written consent (which shall not be unreasonably withheld), and (b) the Indemnitor shall be entitled to participate in (but not control) the defense of such action, with its own counsel and at its own expense. Notwithstanding the foregoing, if a Purchaser Indemnitee determines in good faith that there is a reasonable probability that a Third-Party Claim may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the Purchaser Indemnitee may, by notice to the Indemnitor, assume the exclusive right to defend, compromise, or settle such Third-Party Claim, but the Indemnitor will not be bound by any compromise or settlement effected without its consent (which may not be unreasonably withheld).

### ARTICLE 9
### MISCELLANEOUS

9.1     Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; provided that no such succession, assignment or delegation of obligations by either the Sellers, the Company, the Operating Subsidiaries or any Founder, on the one hand, or Purchaser, on the other hand, may occur without the express written approval of the other party; provided further that Purchaser may (a) assign any or all of its rights and interests hereunder to one (1) or more of its Affiliates and (b) designate one (1) or more of its Affiliates to perform its obligations hereunder. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in Article 8 of this Agreement.

9.2     Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware.

9.3     Jurisdiction; Waiver of Jury Trial.

801393.10

(a)    Any suit, action or proceeding seeking to enforce any provision of, or based on any dispute or matter arising out of or in connection with, this Agreement, the Related Documents or the transactions contemplated hereby or thereby, must be brought in the courts of the State of Delaware, in New Castle County, or the federal courts in the District of Delaware. Each of the parties (a) consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding, (b) irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum, (c) will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (d) will not bring any action relating to this Agreement, the Related Documents or any of the transactions contemplated hereby or thereby in any other court, and (e) to the fullest extent permitted by Law, voluntarily, knowingly, irrevocably and unconditionally waive any right to have a jury participate in the resolution of any such dispute or matter.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party in accordance with the notice provisions of Section 9.5 below will be deemed effective service of process on such party.

(b)    If the jury waiver set forth in this section is not enforceable, then any dispute, controversy or claim arising out of or relating to this Agreement or any of the transactions contemplated therein shall be settled by final and binding arbitration held in the County of New Castle, State of Delaware in accordance with the then applicable Commercial Arbitration Rules of the American Arbitration Association.  Judgment upon any award resulting from arbitration may be entered into and enforced by any state or federal court having jurisdiction thereof.

9.4    Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

9.5    Notices.  Any notices hereunder shall be deemed sufficiently given by one (1) party to another only if in writing and if and when delivered by personal delivery or as of five (5) Business Days after deposit in the United States mail in a sealed envelope, registered or certified, with postage prepaid, twenty-four (24) hours after deposit with an overnight courier if such day is a Business Day (or the next Business Day if it is not), or five (5) hours after confirmation of delivery by facsimile during business hours on a Business Day, addressed as follows (or at such other address or facsimile number for a party as shall be specified by like notice):

If to the Purchaser:    Kayne Sunstate Investors, LLC
1800 Avenue of the Stars, 2nd Floor
Los Angeles, California  90067
Attn:  Krishnan Ramaswami
Facsimile:  (310) 282-2852

With a copy to (which shall not
constitute notice):

Downey Brand LLP
555 Capitol Mall, 10th Floor
Sacramento, CA 95814
Attn: Jeffrey M. Koewler, Esq.
Facsimile: (916) 444-2100

If to the Sellers, the Company, the
Founders, or the Operating Subsidiaries,
to the Sellers' Representative:

Mr. Bryon Wolf
8751 Ulmerton Road
Largo, Florida 33771
Attn: Chief Executive Officer
Facsimile: _____

With a copy to (which shall not
constitute notice):

Macfarlane, Ferguson & McMullen, P.A.
201 North Franklin Street, Suite 2000
Tampa, Florida 33602
Attn: Charles A. Moore, Esq.
Facsimile: (813) 273-4256

or to such other address as the party addressed shall have previously designated by written notice
to the serving party, given in accordance with this Section 9.5. Any party may unilaterally
change any one (1) or more of the addresses to which a notice to the party or its representative is
to be delivered or mailed, by ten (10) calendar days written notice to the other parties hereto
given in the manner stated above.

9.6    Sellers' Representative. The Sellers, the Company, the Operating Subsidiaries
and the Founders hereby appoint Wolf as the representative (the "Sellers' Representative") for
purposes of making and receiving notices. The Purchaser may, for all purposes of this
Agreement, assume and treat every notice directed to the Sellers' Representative as if such notice
had been directed to each of the Sellers, the Company, the Operating Subsidiaries and the
Founders.

9.7    Fees and Expenses. The Company shall bear and pay the Purchaser's costs and
expenses, including the costs and expenses of the Purchaser's counsel, accountants and other
advisors, relating to the transactions contemplated hereby and in the Related Documents;
provided, however, that the Purchaser agrees that its total fees and expenses shall not exceed
Two Hundred Fifty Thousand Dollars ($250,000).

9.8    Severability. If one (1) or more provisions of this Agreement is held to be
unenforceable under Applicable Law, such provision shall be excluded from this Agreement and
the balance of this Agreement shall be interpreted as if such provision were so excluded and shall
be enforceable in accordance with its terms.

801393.10

9.9    Entire Agreement.  This Agreement and the Related Documents and the Exhibits and Schedules hereto and thereto constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and thereof and supersede all prior agreements, term sheets, letters, discussions and understandings of the parties in connection therewith.

9.10    Assurances.  Each party to this Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate this Agreement, whether before, concurrent with or after the consummation of the transactions contemplated hereby.  The Seller and the Founders shall cause the Company and, shall cause the Company to cause the Operating Subsidiaries, to perform all of its obligations hereunder.

9.11    Amendments and Waivers.  This Agreement may be amended only in writing with the prior approval of the Sellers, the Founders and the Purchaser.  Unless otherwise provided herein, any waiver hereunder may be granted only with the prior written approval of the Sellers, the Founders and the Purchaser.

*[The Remainder of this Page is Intentionally Left Blank — Signature Pages Follow]*

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**"PURCHASER"**

KAYNE SUNSTATE INVESTORS, LLC,
a Delaware limited liability company

By: KAYNE ANDERSON PRIVATE INVESTORS II,
L.P., a Delaware limited partnership, Manager

By: _____
    Name: Krishnan Ramaswami
    Title:  Senior Managing Director

    Address:    1800 Avenue of the Stars,
                Second Floor
                Los Angeles, California  90067
    Attention:   Krishnan Ramaswami
    Telephone:  (310) 282-2802
    Facsimile:   (310) 282-2852

**"SELLERS"**

FTN PROMOTIONS, INC., a Florida corporation

By: _____
Name: Bryon Wolf
Title: President/CEO

    Address:    8751 Ulmerton Rd.
                Largo, FL 33771

    Attention:   Donald Booth
    Telephone:  (727) 471-0292
    Facsimile:   (727) 471-0255

GUARDIAN MARKETING SERVICES, CORP., a
Florida corporation

By: _____
Name: Bryon Wolf
Title: President/CEO

    Address:    8751 Ulmerton Rd.
                Largo, FL 33771

    Attention:   Donald Booth
    Telephone:  (727) 471-0292
    Facsimile:   (727) 471-0255

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

BAY PINES TRAVEL, INC., a Florida corporation

By: _____
Name: *Bryon Wolf*
Title: *CEO*

Address: _8751 Ulmerton Road_
_Largo, FL 33771_

Attention: _Donald Booth_
Telephone: _(727) 471-0292_
Facsimile: _(727) 471-0255_

_____
Bryon Wolf

_____
Roy Eliasson

**"COMPANY"**

SUNSTATE HOLDINGS, LLC, a Delaware limited liability company

By: _____
Name: *Bryon Wolf*
Title: *CEO*

Address: _8751 Ulmerton Rd_
_Largo, FL 23771_

Attention: _Donald Booth_
Telephone: _(727) 471-0292_
Facsimile: _(727) 471-0255_

**"FOUNDERS"**

_____
Bryon Wolf

_____
Roy Eliasson

_____
Alfred Wolf

BAY PINES TRAVEL, INC., a Florida corporation

By:_____
    Name:
    Title:

    Address:   _____
                _____
                _____
    Attention:  _____
    Telephone:  _____
    Facsimile:  _____


_____
Bryon Wolf


_____
Roy Eliasson

"COMPANY"          SUNSTATE HOLDINGS, LLC, a Delaware limited liability company

By:_____
    Name:
    Title:

    Address:   _____
                _____
                _____
    Attention:  _____
    Telephone:  _____
    Facsimile:  _____

"FOUNDERS"

_____
Bryon Wolf


_____
Roy Eliasson

_____
Alfred Wolf

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

"OPERATING
SUBSIDIARIES"

STRATEGIA MARKETING, LLC, a Florida limited
liability company

By: _____
    Name: *Bryon Wolf*
    Title: *CEO*

Address:    *8751 Ulmerton Rd.*
                   *Largo, FL 33771*

Attention:  *Donald Booth*
Telephone:  *(727) 471-0292*
Facsimile:   *(727) 471-0255*

CO-COMPLIANCE, LLC, a Florida limited liability
company

By: _____
    Name: *Bryon Wolf*
    Title: *CEO*

Address:    *8751 Ulmerton Rd.*
                   *Largo, FL 33771*

Attention:  *Donald Booth*
Telephone:  *(727) 471-0292*
Facsimile:   *(727) 471-0255*

TELEQUICK SYSTEMS, LLC, a Florida limited
liability company

By: _____
    Name: *Bryon Wolf*
    Title: *CEO*

Address:    *8751 Ulmerton Rd.*
                   *Largo, FL 33771*

Attention:  *Donald Booth*
Telephone:  *(727) 471-0292*
Facsimile:   *(727) 471-0255*

## CERTIFICATE OF SERVICE

I, David A. Bilson, hereby certify that on April 7, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> John W. Shaw, Esquire
> Michele Sherretta Budicak, Esquire
> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19899

I further certify that on April 7, 2008, I caused a true and correct copy of the foregoing document to be served by hand delivery on the above-listed counsel of record.

/s/ David A. Bilson (# 4986)