## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KAYNE SUNSTATE INVESTORS, LLC )
A Delaware Limited Liability Company, )
                                     )
                 Plaintiff, )
                                       )
           v. )         C.A. No. 1:08-CV-00141 (SLR)
                                         )
ROY ELIASSON, BRYON WOLF, and )
ALFRED WOLF, )
                                       )
                 Defendants. )
                                       )

---

**PLAINTIFF KAYNE SUNSTATE INVESTORS, LLC'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO STAY THIS ACTION IN FAVOR OF THE RELATED ACTION CURRENTLY PENDING IN FLORIDA OR, ALTERNATIVELY, TO DISMISS**

---

JOHN C. PHILLIPS, JR. (#110)
BRIAN E. FARNAN (#4089)
DAVID A. BILSON (#4986)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
Attorneys for Plaintiff,
Kayne Sunstate Investors, LLC

Dated: April 21, 2008

## TABLE OF CONTENTS

TABLE OF CITATIONS..................................................................... -iii-

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS........................... 1

SUMMARY OF ARGUMENT................................................................ 2

STATEMENT OF FACTS.................................................................... 3

ARGUMENT............................................................................... 5

    I.      STANDARD......................................................... .5

    II.    DISMISSAL OR STAY OF THIS CASE IN FAVOR OF THE FTC
          ACTION IS UNNECESSARY AND UNWARRANTED........................... 6

        A. The Plain Language of the Stay Order in the FTC Action Demonstrates
           that This Lawsuit Does Not Violate that Order.............................. 6

        B. Because Any Identity of Issues Between This Lawsuit and the FTC
           Action Is Insubstantial, a Discretionary Stay of This Lawsuit Pending
           the Outcome of the FTC Action is Unwarranted.......................... 9

    III.   THE CLAIMS ASSERTED BY KAYNE ARE RIPE FOR DECISION.......... 13

        A. The Issues Here Are For Fit Adjudication................................. 14

        B. Dismissing This Action Would Cause Hardship To Kayne................ 17

    IV.   KAYNE HAS SATISFIED THE PLEADING STANDARDS OF FEDERAL
          RULE OF CIVIL PROCEDURE 9(b) FOR COUNTS I AND II ..................18

        A. Kayne Has Satisfied the Correct Pleading Standards Under Rule 9(b)........ .18

           1. The purposes of Rule 9(b) have been met ................................18

           2. The Kayne Defendants misconstrue Rule 9(b) standards ...............19

           3. The Kayne Defendants Ignore the Purchase Agreement and FTC
              Complaint ..............................................................22

        B. Kayne Has Sufficiently Plead Falsity to Satisfy Rule 9(B).....................23

V.   THE KAYNE DEFENDANTS HAVE NOT SHOWN THAT THE PURCHASE AGREEMENT CLEARLY AND UNAMBIGUOUSLY BARS KAYNE'S CONTRACT CLAIMS AS A MATTER OF LAW.................................25

   A. The Kayne Defendants' Interpretation of the Indemnification Provisions as an Exclusive Remedy Violates Delaware Contract Law and Is Not the Only Reasonable Construction of the Purchase Agreement...........................25

   B. Kayne's Complaint Adequately Alleges Damages Caused by the Kayne Defendants' Malfeasance........................................................29

CONCLUSION...............................................................................31

## TABLE OF CITATIONS

**Cases**

<u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136 (1967) ...................................... 13

<u>Appriva Shareholder Litig. Company, LLC</u>, 937 A.2d 1275 (Del. 2007) ...........................25

<u>Austost Anstalt Schaan v. Net Value Holdings, Inc.</u>, 2001 WL 908996
    (D. Del. Aug. 10, 2001) ........................................................................... 24

<u>Baker v. MBNA Corp.</u>, 2007 WL 2009673 (D. Del. July 6, 2007).............................. 21

<u>Beach Channel, Inc. v. Shvartzman</u>, 2007 2891119 (E.D.N.Y. Sept. 28, 2007) ......................... 23

<u>Berkes v. San Diego Foreclosure Services, Inc.</u>, 2006 WL 2811278 (Cal. App. Oct. 3, 2006) ..... 8

<u>Betchel Corp. v. Local 215 Laborers' Int'l Union</u>, 544 F.2d 1207 (3d Cir. 1976)...................... 12

<u>Binker v. Pennsylvania</u>, 977 F.2d 738 (3d Cir. 1992) ................................................ 14

<u>Brown v. SAP Am., Inc.</u>, 1999 WL 803888 (D. Del. Sept. 13, 1999)......................................... 20

<u>Carter v. Taylor</u>, 2008 WL 839204 (D. Del. March 29, 2008)........................................ 5

<u>Commissariat a L'Energie Atomique v. Tottori Sanyo Electronic Co., Ltd.</u>, 2004 WL 1554382
    (D. Del. May 13, 2004)............................................................................. 12

<u>Concept Innovation v. CFM Corp.</u>, 2005 WL 670637 (N.D. Ill. Mar. 21, 2005)........................ 23

<u>Cordiant MN, Inc. v. David Cravit & Assocs., Ltd.</u>, 1997 WL 534308
    (N.D. Ill. Aug. 19, 1997).......................................................................... 27

<u>Council Bros., Inc. v. Ray Burner Co.</u>, 473 F.2d 400 (5th Cir. 1973)......................................... 27

<u>Dow Chem. Co. v. Exxon Corp.</u>, 30 F. Supp.2d 673 (D. Del. 1998) ............................... 14, 15, 16

<u>Downey v. Sanders</u>, 1996 WL 190755 (Del. Super. Mar. 22, 1996)............................................ 28

<u>E.I. du Pont de Nemours & Co. v. Monsanto Co. & Asgrow Seed Co. LLC</u>, 2001 WL 652019
    (D. Del. Feb. 14, 2001) ............................................................................ 25

<u>EchoStar Satellite LLC v. Finisar Corp.</u>, 515 F. Supp.2d 447 (D. Del. 2007) ............................... 5

<u>Federal Trade Commission v. 3R Bancorp</u>, 2005 WL 497784 (N.D. Ill. Feb. 23, 2005)............... 8

Federal Trade Commission v. Para-Link Int'l, Inc., 2001 WL 34107045 (M.D. Fla. May 30, 2001) .................................................................................................................. 7, 8

Frederico v. Home Depot, 507 F.3d 188 (3d Cir. 2007) ............................................... 21

Gemtel Corp. v. Community Redevelopment Agency of the City of Los Angeles, 23 F.3d 1542 (9th Cir. 1994) ............................................................................................................ 18

Gertrude L.Q. v. Stephen P.Q., 466 A.2d 1213 (Del. 1983) ........................................ 28

Gold v. Johns-Mansville Sales Corp., 723 F.2d 1068 (3d Cir. 1983) ...................... 5, 10

Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160 (Del. 2002) .......... 26, 27

Griffin Corporate Servs., LLC v. Jacobs, 2005 Del. Ch. LEXIS 120 (Del. Ch. Aug. 11, 2005) ............................................................................................. 30

Haft v. Dart Group Corp., 841 F. Supp. 549 (D. Del. 1993) ................................... 28, 29

Hurley v. Minner, 2006 WL 2789164 (D. Del. September 26, 2006) .......................... 13

In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410 (3d Cir. 1997) .............................. 19, 24

In re Rockefeller Center Props., Inc. Secs. Litig., 311 F.3d 198 (3d Cir. 2002) .............. 19, 21, 22

In re Student Fin. Corp., 2004 WL 609329 (D. Del. Mar. 23, 2004) ........................... 21

In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256 (3d Cir. 2006) ............................. 19, 21

Johnson & Johnson v. Coopervision, Inc., 720 F. Supp. 1116 (D. Del. 1989) .............................. 10

Klein v. Gen. Nutrition Cos., 186 F.3d 338 (3d Cir. 1999) ........................................... 21

Landis v. North American Co., 299 U.S. 248 (1936) .............................................. 5, 10

Levine v. Metal Recovery Tech., Inc., 182 F.R.D. 112 (D. Del. 1998) ........................ 19

MBIA Ins. Corp. v. Royal Indem. Co., 221 F.R.D. 419 (D. Del. 2004) ........................ 21

MDNet, Inc. v. Pharmacia Corp., 2005 WL 1385906 (3d Cir. 2005) ......................... 21

Mendelson v. Delaware River & Bay Authority, 112 F. Supp.2d 386 (D. Del. 2000) ................. 15

Philadelphia Fed'n of Teachers v. Ridge, 150 F.3d 319 (3d Cir. 1998) ....................... 17

Reid v. Thomson Homes at Centreville, Inc., 2007 WL 4248478 (Del. Super.
  Nov. 21, 2007) .................................................................................................... 26

Reyes v. Freebery, 2004 WL 1737683 (D. Del. July 30, 2004) .................................. 12

S. Megga Telecomm. Ltd. v. Lucent Techs., Inc., 1997 WL 86413 (D. Del. Feb. 14, 1997) ...... 20

S.C. Johnson & Sons, Inc. v. DowBrands, Inc., 167 F. Supp.2d 657 (D. Del. 2001).................. 16

Saporito v. Combustion Eng'g, 843 F.2d 666 (3d Cir. 1988)...................................... 20

Seinfeld v. Barrett, 2006 WL 890909 (D. Del. March 31, 2006) ................................. 15

Shamrock Holdings, Inc. v. Arenson, 456 F. Supp.2d 599 (D. Del. 2006) ................................. 30

Smiley v. Daimler Chrysler, 2008 WL 540633 (D. Del. Feb. 21, 2008)....................................... 21

SmithKline Beecham Corp. v. Apotex Corp., 2004 WL 1615307 (E.D. Pa. July 16, 2004)........ 12

Step-Saver Data Systems, Inc. v. Wyse Tech., 912 F.2d 643 (3d Cir. 1990) ............................... 16

Toner v. Allstate Ins. Co., 821 F. Supp. 276 (D. Del. 1993) ....................................... 24

Toys "R" Us-Penn Inc. v. Discovery Zone, Inc., 1996 WL 47980 (E.D.Pa. Feb. 6, 1996) ........25

Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp.2d 42 (D. Del. 2002)................................. 30

Transched Sys. Ltd. v. Versyss Transit Solutions, LLC, 2008 WL 948307 (Del. Super.
  April 2, 2008)......................................................................................................... 28

Tredennick v. Bone, 2007 WL 4244652 (W.D. Pa. Nov. 29, 2007) ............................................ 23

**STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS**

On February 8, 2008, plaintiff Kayne Sunstate Investors, LLC ("Kayne") filed a Complaint against defendants Roy Eliasson, Bryon Wolf, and Alfred Wolf (collectively, the "Kayne Defendants") in the Superior Court of the State of Delaware in and for New Castle County relying on a forum selection clause in the contract between the parties. The Kayne Defendants were served with process on or about February 11, 2008.

On March 7, 2008, the Kayne Defendants filed a Notice of Removal with this Court pursuant to 28 U.S.C. § 1441 on the basis of diversity of citizenship as defined by 28 U.S.C. § 1332.

On April 2, 2008, the Kayne Defendants filed a motion to stay this action in favor of an allegedly related action currently pending in Florida or, alternatively, to dismiss.

Kayne filed a Motion to Remand this action to Superior Court on April 7, 2008, which Kayne believes is a jurisdictional motion.

This is Kayne's answering brief in opposition to the Kayne Defendants' motion.

Shortly after it filed its Motion to Remand, Kayne submitted an emergency request that briefing on the Kayne Defendants' motion be stayed pending decision on the remand motion. Although the Court denied Kayne's emergency request and ordered that briefing proceed, Kayne continues to maintain that, because the Court lacks subject matter jurisdiction over this matter for the reasons cited in the Motion to Remand, the Motion to Remand should be decided before the Court considers the Kayne Defendants' motion and the instant answering brief in opposition thereto.

## SUMMARY OF ARGUMENT

1.      Dismissal or stay of this case in favor of the FTC Action is unnecessary and unwarranted.

2.      The claims asserted by Kayne are ripe for decision.

3.      Kayne has satisfied the pleading standards of Federal Rule of Civil Procedure 9(b) for Counts I and II.

4.      The Kayne Defendants have not shown that the Purchase Agreement clearly and unambiguously bars Kayne's contract claims as a matter of law.

## STATEMENT OF FACTS

In its Complaint, Kayne alleges that, beginning in the fourth quarter of 2006, it conducted negotiations with the Kayne Defendants to buy into their various telemarketing services companies based in Florida and doing business throughout the United States, including Delaware. See Complaint at ¶ 14. Kayne also alleged that, throughout those negotiations, the Kayne Defendants consistently and repeatedly represented that the telemarketing services companies were not the subject of any investigation by the Federal Trade Commission ("FTC"), and that those companies were operated in accordance with the Federal Trade Commission Act and its regulations (collectively, the "FTC Laws"). Id. at ¶¶ 2, 16.

Kayne also alleged that the Kayne Defendants made certain representations about, among other things, their telemarketing service companies' superior operations, excellent management, and exceptional reputation in the business and regulatory communities, including that the companies: (i) were known for following "the best practices in the industry;" (ii) had been inspected by the Office of the Attorney General of the State of Florida, who advised that it "had never seen a telemarketing company run better;" (iii) had been monitored by Citibank for years and were some of the few telemarketing companies "approved" by Citibank; (iv) despite various complaints from consumers, never had an "issue of a consumer being improperly charged;" and (v) had telemarketing equipment and software sufficient to comply with all FTC Laws. Id. at ¶ 15.

Kayne also alleged that, in reliance on those promises and representations, it entered into an Interest Contribution and Preferred Unit Purchase Agreement (the "Purchase Agreement") with the Kayne Defendants, among others, on or about March 31, 2007 pursuant to which Kayne

invested $20 million in the Kayne Defendants' telemarketing services companies.[1]  Id. at ¶ 18.
In the Purchase Agreement, the Kayne Defendants again made repeated representations that their
telemarketing service companies were not under investigation by the FTC and were in
compliance with the FTC Laws.  Id. at ¶¶ 19-23.

Kayne alleged in its Complaint that, unbeknownst to it and contrary to the Kayne
Defendants' representations, the FTC had been conducting an active investigation of the Kayne
Defendants and their telemarketing service companies prior to March 31, 2007 for alleged
ongoing violations of the FTC Laws and, on July 23, 2007, initiated an enforcement action (the
"FTC Action") against the Kayne Defendants and their telemarketing service companies in the
United States District Court for the Middle District of Florida.  Id. at ¶¶ 24-29.  On that same
date, the Court entered a temporary restraining order with asset freeze, a stay of actions against
the defendants in receivership, and the appointment of a temporary receiver, which order was
extended by stipulation.  On February 11, 2008, the Court in the FTC Action entered a
preliminary injunction order (the "Preliminary Injunction Order") that confirmed the
appointment of the receiver (the "Receiver") to take exclusive control of and manage the Kayne
Defendants' telemarketing service companies and their assets, and also imposed a "stay of
actions" (the "Stay Order").  A copy of the Preliminary Injunction Order is attached as Exhibit B.

In its Complaint, Kayne alleged upon information and belief that the Kayne Defendants
knew or reasonably should have known prior to signing the Purchase Agreement that they and
their telemarketing service companies were under active investigation by the FTC and engaged
in ongoing violations of the FTC Laws.  Id. at ¶ 25.  Kayne's Complaint contains counts for
fraudulent misrepresentation, negligent misrepresentation, and breach of contract.

---

[1]        A copy of the Purchase Agreement is attached as Exhibit A.

## ARGUMENT

### I.    STANDARD

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all factual allegations in the complaint as true and take them in the light most favorable to plaintiff. Carter v. Taylor, 2008 WL 839204, *2 (D. Del. March 29, 2008 (Robinson, J.) (citing Erickson v. Pardus, --- U.S. ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); Christopher v. Harbury, 536 U.S. 403, 406 (2002)). A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Carter, 2008 WL 839204, a *2 (quoting Bell Atl. Corp. v. Twombly, --- U.S. ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id.

A party requesting that the Court exercise its discretion to grant a stay must "make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." Landis v. North American Co., 299 U.S. 248, 255 (1936); see also Gold v. Johns-Mansville Sales Corp., 723 F.2d 1068, 1075-1076 (3d Cir. 1983). Furthermore, the Kayne Defendants' attack on the ripeness of this lawsuit constitutes a facial challenge to subject matter jurisdiction under Rule 12(b)(1), thereby requiring the Court to apply the standards relevant to Rule 12(b)(6) and accept all factual allegations in the complaint as true. EchoStar Satellite LLC v. Finisar Corp., 515 F. Supp.2d 447 (D. Del. 2007).

II.   **DISMISSAL OR STAY OF THIS CASE IN FAVOR OF THE FTC ACTION IS UNNECESSARY AND UNWARRANTED.**

A.   **The Plain Language of the Stay Order in the FTC Action Demonstrates that this Lawsuit Does Not Violate that Order.**

The Kayne Defendants have asserted that this action violates the Stay Order in the FTC Action. The plain language of the Stay Order demonstrates that the Kayne Defendants are not protected from suit thereunder and that a stay or dismissal of the instant lawsuit is not warranted. The Court in the FTC Action drafted the Stay Order to provide as follows:

> Except by leave of this Court, during pendency of the receivership ordered herein, Defendants and all other Persons and entities be and hereby are stayed from taking any action to establish or enforce any claim, right, or interest for, against, on behalf of, in, or in the name of, the **Receivership Defendants**, any of their subsidiaries, affiliates, partnerships, Assets, Documents, or the Receiver or the Receiver's duly authorized agents acting in their capacities as such, including, but not limited to, the following actions:
>
> a.   Commencing, prosecuting, continuing, entering, or enforcing any suit or proceeding, except that such actions may be filed to toll any applicable statute of limitations;
>
> c.   Executing, issuing, serving, or causing the execution, issuance or service of, any legal process, including, but not limited to, attachments, garnishments, subpoenas, writs or replevin, writs of execution, or any other form of process whether specified in this Order or not….

Preliminary Injunction Order at pp. 27-28 (emphasis added).

The scope of the Stay Order must be determined in accordance with the definition the Court assigned to the defined term "Receivership Defendants," which are the only entities/ people protected by the Stay Order. As used in the Stay Order (and all other parts of the Preliminary Injunction Order), the term "Receivership Defendants" refers only to the Kayne Defendants' telemarketing service companies, and **not** the Kayne Defendants personally. Id. at 5. Therefore, by its plain and unambiguous terms, the only parties to which the Stay Order applies (other than the Receiver and his agents) are the Receivership Defendants (*i.e.*, the

telemarketing service companies), and their subsidiaries, affiliates, and partnerships, and **not** the Kayne Defendants.

The Kayne Defendants torture the plain language of the Stay Order by arguing that they are "affiliates" of the Receivership Entities and, therefore, are included among the parties protected by the Stay Order. Had the Court in the FTC Action intended to extend such protection to the Kayne Defendants, it would have done so by crafting the Stay Order to prohibit suit against the "Defendants" – an additional defined term which the Court specifically created to include the Kayne Defendants **and** their telemarketing service companies. It is absurd to conclude that, rather than using a defined term that the Court itself tailored to include the Kayne Defendants and their telemarketing service companies, the Court instead used a different, more limited defined term - *i.e.*, the "Receivership Defendants" - in the Stay Order but nonetheless intended to cover the Kayne Defendants, even though they were not within the defined term chosen by the Court. Such a contention ignores the clear differences between the definitions the Court assigned to "Defendants" and "Receivership Defendants," and assumes without justification that the Court was inattentive in drafting the Stay Order. Absent compelling evidence to the contrary, this Court must assume that the Court in the FTC Action intended that the defined terms "Defendants" and "Receivership Defendants" as used in the Stay Order are to be given their plain and ordinary meaning.

Other courts faced with virtually identical stay provisions entered in FTC suits have agreed with Kayne's interpretation. For example, in <u>Federal Trade Commission v. Para-Link Int'l, Inc.</u>, 2001 WL 34107045 (M.D. Fla. May 30, 2001), the United States District Court for the Middle District of Florida (which is the very same court that issued the Preliminary Injunction in the FTC Action) interpreted a stay order almost identical to the Stay Order in the FTC Action as

applying only to the "Receivership Entities," and not to the individual principals of those entities. In Para-Link, a mortgage holder filed a foreclosure action in Florida state court against certain individuals who, along with their businesses, were defendants in an enforcement action filed by the FTC in the federal district court. Id. at *1. In the proceeding before the federal court that issued the stay, both the FTC and the federal district court agreed that the mortgage holder's foreclosure action in state court was not subject to the stay because the stay, by its terms, applied only to the "Receivership Defendants," which was defined to include only the corporate defendants in receivership, and not the individual defendants.[2] Id. at *1-2. See also Berkes v. San Diego Foreclosure Services, Inc., 2006 WL 2811278 (Cal. App. Oct. 3, 2006) (finding that, according to the "plain language" of a nearly identical "stay of actions" provision contained in a preliminary injunction order entered by a federal court in an FTC enforcement action, only the corporate entities in receivership, and not their individual principals, were protected by the stay).

Moreover, the Kayne Defendants' contention that "[p]ermitting this litigation to proceed... puts at risk the very assets that were intended to be preserved by the stay" is incorrect. To the extent any assets available to satisfy a judgment entered against the Kayne Defendants in the instant lawsuit are subject to the receivership in the FTC Action, they are protected by the asset freeze contained in the Preliminary Injunction Order. Kayne, like any other creditor, could

---

[2]    The Kayne Defendants' reliance on Federal Trade Commission v. 3R Bancorp, 2005 WL 497784 (N.D. Ill. Feb. 23, 2005), is misplaced. The Court in 3R Bancorp entered a temporary restraining order with a stay provision that it explicitly held applied to the individual principal of the entities in receivership in his capacity as an "affiliate" of those entities, but the opinion provides no analysis as to how the Court reached that conclusion. The Court later entered a preliminary injunction order with a stay provision similar to the one at issue here, which the receiver and the plaintiff in the concurrent action filed against the individual principal presumed applied to the individual principal. However, the Court tellingly rejected the contention that the concurrent action would not affect the receiver or the receivership entities' estate because the complaint filed in the concurrent action also named as a defendant a "Receivership Entity" expressly protected by the preliminary injunction order's stay provision, as well as several "Does" who might later have been proven to be Receivership Entities expressly protected by that stay provision. Id. at *3, n.1. Because Kayne named no "Receivership Entities" or "Does" as defendants in the Complaint it filed with this Court, 3R Bancorp has no application in the instant matter, and its analysis regarding when relief from a receivership stay should be granted is irrelevant here unless the Kayne Defendants can first show that they are subject to the stay in the FTC Action (which they cannot).

only collect against any such assets in accordance with whatever plan for creditor distribution is implemented by the Receiver and approved by the Court in the FTC Action.

The plain language of the Stay Order in the FTC Action makes clear that the Kayne Defendants are not "affiliates" of the Receivership Defendants and, therefore, are not protected from suit under the Stay Order. Furthermore, there is no reason to extend the scope of the Stay Order beyond its plain language because the asset freeze in the FTC Action preserves any receivership assets that the Kayne Defendants might attempt to use to satisfy a judgment entered in Kayne's favor. Therefore, a stay of the instant lawsuit is neither necessary nor warranted under the Stay Order entered in the FTC Action.

> **B.    Because Any Identity of Issues Between This Lawsuit and the FTC Action Is Insubstantial, a Discretionary Stay of This Lawsuit Pending the Outcome of the FTC Action Is Unwarranted.**

The Kayne Defendants' contention that this action should be stayed because Kayne's claims are dependent on the FTC Action is without merit. Kayne bases its claims, in part, on two categories of alleged misrepresentations made by the Kayne Defendants: (i) that they were not under investigation by FTC at the time the parties negotiated and executed the Purchase Agreement; and (ii) that their telemarketing service companies' operations were lawful. Remarkably, despite requesting an unqualified stay of this action in its entirety on the grounds that Kayne's claims are dependent on the outcome of FTC Action, the Kayne Defendants acknowledge that those portions of Kayne's claims related to the Kayne Defendants' misrepresentations and failures to disclose concerning the FTC investigation (which consist of at least half of Kayne's claims) "are not contingent upon the Florida action . . ." Def. Opening Brief at 11, n 6. Thus, the Court need look no further than the Kayne Defendants' own brief to reject their contention that this action is wholly dependent on the outcome of the FTC Action.

9

Furthermore, the remaining portions of Kayne's claims, which involve the Kayne Defendants' alleged misrepresentations that their telemarketing service companies were operated lawfully, are separate and distinct from any claims asserted by the FTC. The FTC has asserted that the Kayne Defendants, among others, violated the FTC Laws in their dealings with consumers. Kayne is not a consumer. Unlike the FTC Action, Kayne asserts common law tort and breach of contract claims against the Kayne Defendants arising from a business transaction exceeding $20 million. Obviously, the claims of the FTC and Kayne do not mirror one another.

Although certain of Kayne's claims will be bolstered by any violations of the FTC Laws committed by the Defendants, any findings in the FTC Action will not be binding on Kayne in the instant action, as Kayne is neither a party nor in privity with a party to the FTC Action. See Johnson & Johnson v. Coopervision, Inc., 720 F. Supp. 1116, 1123 (D. Del. 1989) (holding claim preclusion (*res judicata*) and issue preclusion (collateral estoppel) may only be asserted against parties, and those in privity with parties, to an earlier action). As such, regardless of the outcome in the FTC Action, the instant case must go forward, as there is no basis for this Court to stay any portion of Kayne's claims.

As Kayne's claims are not dependent on the outcome of the FTC Action, it is unnecessary for this Court to analyze the propriety of staying this lawsuit in favor of the FTC Action. However, to the extent the Court decides to engage in this analysis, the relevant case law demonstrates that the stay requested by the Kayne Defendants is unwarranted. As set forth by the United States Supreme Court in Landis v. North American Co., 299 U.S. 248, 255 (1936): "The suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." Id.; see also Gold v. Johns-Mansville Sales Corp., 723 F.2d 1068, 1075-1076

(3d Cir. 1983). Here, there is a real, not just fair, possibility that the stay would damage Kayne.

If the stay is granted, Kayne will not have progressed toward obtaining judgment on any remaining assets of the Kayne Defendants following conclusion of the FTC Action. Instead, Kayne will have to start from scratch with discovery and proceed through trial, while any remaining assets can be dissipated by the Kayne Defendants. Since the FTC is pursuing consumer claims, not Kayne's claims for breach of contract and misrepresentation, in the FTC Action, the issues presented in the FTC Action have no relation to the negotiations between Kayne and the Kayne Defendants, the proper interpretation and scope of the Purchase Agreement, and whether the Purchase Agreement was breached. Indeed, no efforts will be made to preserve evidence or the testimony of witnesses that might support Kayne's claims regarding the statements made to induce the Purchase Agreement, and no discovery will occur in the FTC Action relating to those facts. As such, Kayne will be forced to sit on the sidelines as evidence that may support its claims is irretrievably lost, either through faded memories or the failure to preserve documents, thereby damaging or destroying its claims.

Because there is, at a minimum, a "fair possibility" that Kayne will be harmed by a stay, the Kayne Defendants must prove a clear case of hardship or inequity to justify the requested stay, which they have not done and cannot do. It clearly is not inequitable for the Kayne Defendants to be expected to defend Kayne's claims alleging they either negligently or fraudulently received $20 million from Kayne. Kayne has over $20 million at risk and should be freely permitted to investigate and advance its claims against the Kayne Defendants, especially in light of the fact that those claims are not being protected or pursued by the FTC, the Receiver or anyone else in the FTC Action.

In support of their position, the Kayne Defendants generically string cite a few cases in which courts have granted a stay, but those cases are inapposite to the case at bar. In each of those cases, other than <u>Reyes v. Freebery</u>,[3] the plaintiff was a party to **both** pending actions and, thus, was not losing the opportunity to pursue its claims. Moreover, each of the cases cited by the Kayne Defendants was stayed based on the specific facts of the case, none of which mirror the facts of this case. For example, in <u>Betchel Corp. v. Local 215 Laborers' Int'l Union</u>, 544 F.2d 1207, 1215 (3d Cir. 1976), the Court affirmed a stay pending the outcome of an arbitration because identical damages were sought in the arbitration, and a resolution of the arbitration in favor of the plaintiff would have barred the second claim. <u>Id.</u> No such circumstances exist here. In <u>Commissariat a L'Energie Atomique v. Tottori Sanyo Electronic Co., Ltd.</u>, 2004 WL 1554382, *3 (D. Del. May 13, 2004), the Court stayed other pending patent cases in favor of the case before it that involved the same patent because of the common judicial practice to stay all patent litigation involving entities further down the supply chain until resolution of the claim between the owner of the patent and the manufacturer. Again, no such circumstances exist here. In <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 2004 WL 1615307 (E.D. Pa. July 16, 2004), the Court stayed a patent case during the appeal of a decision declaring the patents at issue invalid. Once again, no such circumstances exist here.

In sum, the Court should reject the Kayne Defendants' request for a stay because they admit that Kayne's claims are, in significant part, completely unrelated to the FTC Action. In addition, a stay is unwarranted because Kayne's claims are materially different from the claims asserted in the FTC Action, Kayne will suffer harm if a stay is granted since no one will protect

---

[3]     <u>Reyes v. Freebery</u>, 2004 WL 1737683 (D. Del. July 30, 2004), is wholly inapposite to the case at bar, as it involved staying a civil case pending the outcome of a criminal case, which requires consideration of an entirely different standard and implicates 5th Amendment concerns not at issue here.

and pursue its interests during a stay, and the Kayne Defendants have failed to prove a clear case of hardship or inequity if a stay is not granted.

## III.    THE CLAIMS ASSERTED BY KAYNE ARE RIPE FOR DECISION.

The ripeness doctrine, drawn from Article III of the Constitution and prudential policy, prevents a court from issuing advisory opinions or otherwise prematurely adjudicating an issue. Hurley v. Minner, 2006 WL 2789164, *3 (D. Del. September 26, 2006). The Supreme Court explained the policies underlying the ripeness doctrine in Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967): "[i]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements...." Despite the Kayne Defendants' assertions to the contrary, Kayne's claims are clearly ripe, as the facts and events on which those claims are based have already occurred and, thus, the issues presented by those claims can be presently decided with finality. Simply put, Kayne's Complaint is neither premature nor contingent, and its claims will either stand or fall on their own, thereby making the requested dismissal entirely improper and unwarranted.

A claim should only be dismissed on ripeness grounds "when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous." Hurely, 2006 WL 2789164, *2 (quoting Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408-09 (3d Cir. 1991)). The Court in Abbott set forth a two-pronged standard by which to evaluate a claim's ripeness: (i) "the fitness of the issues for judicial decision;" and (ii) "the hardship to the parties of withholding court consideration." Abbott Laboratories, 387 U.S. at 149. Each element is discussed separately below.

**A.      The Issues Here Are Fit for Adjudication.**

Issues are fit for adjudication if there is a present case or controversy between the parties. Dow Chem. Co. v. Exxon Corp., 30 F. Supp.2d 673, 690 (D. Del. 1998) (Robinson, J.). Thus, courts will not decide a case where the claim involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." Binker v. Pennsylvania, 977 F.2d 738, 753 (3d Cir. 1992) (quoting 13A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532 at 112 (1984)). Contrary to the Kayne Defendants' assertions, Kayne's claims in this lawsuit are not contingent upon the outcome of the FTC Action and, therefore, are currently fit for adjudication.

Kayne alleges in its Complaint that the Kayne Defendants wrongfully failed to disclose that their telemarketing service companies were under FTC investigation at the time the parties negotiated and executed the Purchase Agreement. In their Opening Brief, the Kayne Defendants admit, as they must, that those allegations are not contingent on the outcome of the FTC Action. See Def. Opening Brief at 11, n.6. However, the Kayne Defendants fail to take their analysis a step further because of the inescapable conclusion that Kayne's claims arising from those allegations are presently fit for adjudication by this Court and only this Court. Therefore, the Kayne Defendants' assertion that dismissal of this action is proper because **none** of Kayne's claims is ripe for decision is patently false and unsupportable.

Additionally, Kayne's claims that the telemarketing service companies were operated in violation of applicable laws at the time the parties negotiated and executed the Purchase Agreement also are not contingent or premature. In fact, these claims do not depend on any future acts of third parties or findings by any finder of fact. Rather, the success of Kayne's claims depends on the Kayne Defendants' past conduct and whether their conduct violated the

Purchase Agreement. The factual record for Kayne's claims already exists and is ready to be fully explored and developed through discovery. As noted by this Court in <u>Mendelson v. Delaware River & Bay Authority</u>, 112 F. Supp.2d 386, 396 (D. Del. 2000), "[n]ormally, when 'the essential facts establishing a right to relief . . . have already occurred, the case is justiciable.'" <u>Id.</u> (citing <u>Riehl v. Travelers Ins. Co.</u>, 772 F.2d 19, 22 (3d Cir. 1985)). Here, the facts establishing a right to relief have occurred and, thus, the claim is justiciable. <u>See Seinfeld v. Barrett</u>, 2006 WL 890909, *3 (D. Del. March 31, 2006) (holding that there was "no additional requirement that a defendant do anything beyond making the false statement" to find a claim ripe).

Moreover, neither the existence of the FTC Action nor Kayne's citing of the allegations made by the FTC in the FTC Action make Kayne's claims contingent. Regardless of the outcome of the FTC Action, Kayne possesses its own unique claims against the Kayne Defendants for misrepresentation and violations of the Purchase Agreement which will not be addressed by the Court in the FTC Action. Therefore, it is immaterial whether there are allegations common to both the Kayne Complaint and FTC Complaint.[4]

Indeed, this Court found claims to be ripe in a virtually identical context in <u>Dow Chemical Company v. Exxon Corp.</u>, 30 F. Supp.2d 673 (D. Del. 1998). In <u>Dow</u>, the plaintiff brought a RICO claim against the defendant based on submissions by the defendant to the Patent and Trademark Office ("PTO"). <u>Id.</u> at 677. The defendant moved to dismiss plaintiff's claims on ripeness grounds contending that plaintiff's claims would be significantly affected by

---

[4]    The Kayne Defendants fail to explain how their continuing efforts to settle the FTC Action without an admission of fault would affect the ripeness analysis. Moreover, whether any assets of the Kayne Defendants available to satisfy a judgment entered in the instant lawsuit are subject to the asset freeze contained in the Preliminary Injunction Order is an issue to be determined by the Court in the FTC Action **after** such judgment has been obtained. That determination would not affect the ripeness of the threshold issue of whether Kayne is entitled to such a judgment.

proceedings pending before the PTO, in which the defendant's conduct was at issue. Id. at 690. This Court rejected the defendant's ripeness challenge holding that, "[t]he court recognizes that the issues before the PTO involve issues of fact that underlie [plaintiff's] contentions before this court; nevertheless, the PTO's findings would not be *res judicata* in this case." Id. at 691. The Court further noted that the case was not one in which "the existence of a case or controversy was dependent on the resolution of a pending judicial or administrative proceedings." Id. Similarly, although the FTC Action may involve certain issues of fact underlying Kayne's claims, a determination of those claims will not be binding on Kayne. As such, regardless of the outcome in the FTC Action, Kayne possesses independent claims that will go forward, and, like the plaintiff in Dow, Kayne's claims are in no way contingent on the FTC Action.

The Kayne Defendants' reliance on S.C. Johnson & Sons, Inc. v. DowBrands, Inc., 167 F. Supp.2d 657 (D. Del. 2001), in support of their ripeness argument is unavailing. Indeed, unlike Kayne or the plaintiff in Dow, the plaintiff in that case expressly alleged in its complaint that the defendant would be liable to it only if the plaintiff was found liable to another party in an unrelated pending case and, thus, S.C. Johnson, again unlike Dow or the case at bar, is an example of a case in which the existence of a case or controversy was dependent on the resolution of a pending judicial proceeding . Id. at 667. The Court in S.C. Johnson relied on the decision of the United States Court of Appeals for the Third Circuit in Step-Saver Data Systems, Inc. v. Wyse Tech., 912 F.2d 643 (3d Cir. 1990), where the plaintiff sought a declaratory judgment that the defendants were responsible for any liability that might be imposed upon the plaintiff in certain unrelated suits. In both cases, the plaintiffs asked that the defendants be made to pay only if the plaintiffs were found liable to third parties in other actions. Nowhere in its Complaint does Kayne condition the Kayne Defendants' liability or Kayne's right to recover

damages in the instant action on the FTC's success in the FTC Action. Kayne instead alleges that the Kayne Defendants are liable to it for present injuries caused by their misrepresentations about the lawfulness of the telemarketing service companies' operations, which Kayne intends to prove on its own in the instant action.[5]

Because the Kayne Defendants, the Purchase Agreement, and the circumstances surrounding the negotiation of the Purchase Agreement are not at issue and will not be at issue in the FTC Action and Kayne does not allege in its Complaint that the Kayne Defendants would be liable to it only if they are found liable in the FTC Action, Kayne's claims are not contingent upon the outcome of the FTC Action, and the instant case presents an active case or controversy ripe for decision by this Court.

### B.     Dismissing This Action Would Cause Hardship to Kayne.

Under the hardship inquiry, a court looks to "whether the challenged action creates a 'direct and immediate' dilemma for the parties, such that the lack of pre-enforcement review will put the plaintiffs to costly choices." Philadelphia Fed'n of Teachers v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998). There is no doubt that a "direct and immediate" dilemma exists between the parties, and that Kayne alleges the existence of an actual, present harm in its Complaint. Unlike the declaratory judgment cases in which the ripeness doctrine evolved, Kayne alleged in its Complaint that it has **already suffered** concrete injuries at the hands of the Kayne Defendants. (Compl. ¶¶ 5, 40, 48, 53, and 54).

---

[5]     The Kayne Defendants' argument that this case will not be ripe for decision until March 2012 – when Kayne allegedly was to first see a return on its investment – is preposterous. The conduct of the Kayne Defendants has caused such severe harm to the telemarketing service companies (e.g., loss of customers, impairment of goodwill, loss of business reputation – see Complaint at ¶ 53) as to prevent the Kayne Defendants from ever living up to their obligations to Kayne under the Purchase Agreement. See infra. at V.A. and B. The Kayne Defendants' extremely restrictive interpretation of the ripeness doctrine would encourage unscrupulous parties and conmen to lure victims into long-term investment contracts so the victims could not seek legal redress until after the wrongdoers had ample time to plunder the investment and render themselves judgment-proof.

Taking those allegations as true (as this Court must for purposes of the Kayne Defendants' motion), the Court here is not called upon to consider any prospective injuries or the likelihood of their occurrence in the future, but instead is faced with damages that already accrued in the past and continue to accrue. For purpose of ripeness analysis, no further hardship analysis is needed. See, e.g., Gemtel Corp. v. Community Redevelopment Agency of the City of Los Angeles, 23 F.3d 1542, 1545 (9th Cir. 1994) ("But damages, if any, have already accrued. It is hard to see how a claim for damages could be unripe.").

However, to the extent it is relevant to this Court's consideration of the ripeness issue, Kayne will face grave and costly consequences as described in section II.B above if the Court elects to dismiss this action on ripeness grounds. Forcing Kayne to wait to bring its action until after the conclusion of the FTC Action poses risk of serious financial hardship to Kayne and threatens it continued viability.

As set forth above, Kayne's claims are currently ripe for adjudication and, therefore, the Court should deny the Kayne Defendants' request that this case be dismissed as unripe.

## IV.  KAYNE HAS SATISFIED THE PLEADING STANDARDS OF FEDERAL RULE OF CIVIL PROCEDURE 9(B) FOR COUNTS I AND II.

The Kayne Defendants have moved to dismiss Counts I and Count II of the Complaint for purportedly not satisfying the pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). As shown below, Kayne's pleadings satisfy the standards of Rule 9(b).

### A.    Kayne Has Satisfied the Correct Pleading Standards Under Rule 9(b).

#### 1.    The purposes of Rule 9(b) have been met.

The Kayne Defendants' recital of the purposes of Rule 9(b) highlights why dismissal would be inappropriate in this case. See Def. Opening Brief at 16-17. As the Kayne Defendants acknowledge, the purpose of Rule 9(b) is to "give defendants notice of the claims, provide an

increased measure of protection for their reputations, and reduce the number of frivolous suits brought solely to extract settlements." In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir. 2006). Here, the Kayne Defendants have been publicly investigated and sued for fraud by the United States government, and a federal district court has issued findings that the Kayne Defendants are likely culpable on the substantive claims. Additionally, Kayne has provided detailed pleadings of the alleged fraud, and incorporated clear and extensive documentation of the Kayne Defendants' fraudulent representations, including the Purchase Agreement and the FTC Complaint. The notion that the Kayne Defendants somehow lack notice of the claims against them is preposterous.

2.  The Kayne Defendants misconstrue Rule 9(b) standards.

The Kayne Defendants misconstrue the pleading standards under Rule 9(b). Rule 9(b) does **not** require the "exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated . . . the alleged fraud and reasonably believes that a wrong has occurred." Levine v. Metal Recovery Tech., Inc., 182 F.R.D. 112, 116 (D. Del. 1998) (quoting In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec. Litig., 848 F. Supp. 527, 555 (D. Del. 1994)). As the United States Court of Appeals for the Third Circuit has explained, Rule 9(b) does **not** require that "every material detail of the fraud such as date, location, and time" be pled, and plaintiffs can satisfy Rule 9(b) through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." In re Rockefeller Center Props., Inc. Secs. Litig., 311 F.3d 198, 216 (3d Cir. 2002). Plaintiffs must only accompany their legal theory "with factual allegations that make their theoretically viable claim plausible." In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).

The Kayne Defendants erroneously assert that Kayne must plead with particularity "which defendant made each of the allegedly false statements" and must "allege with particularity who <u>heard</u> the allegedly false statements" to satisfy Rule 9(b).  <u>See</u> Def. Opening Brief at 17-19 (emphasis in original).  However, contrary to the Kayne Defendants' suggestions, Rule 9(b) does not specifically require, in all instances, that a complaint identify every "author" and "listener" for each fraudulent statement in every case.  As this Court recognizes, the "Plaintiff is *not* required to identify the specific author and recipient of each alleged misrepresentation."  <u>Brown v. SAP Am., Inc.</u>, No. C.A. 98-507-SLR, 1999 WL 803888, at *14 (D. Del. Sept. 13, 1999) (Robinson, J.) (denying motion to dismiss under Rule 9(b)) (emphasis added).

The Kayne Defendants craft their "rule" by mischaracterizing dicta from unpublished or factually inapposite cases.  For example, they rely heavily on <u>Saporito v. Combustion Eng'g</u>, 843 F.2d 666 (3d Cir. 1988).  However, the Delaware District Court has already rejected a virtually identical misreading of <u>Saporito</u> made by another defendant:

> [Defendant] cites <u>Saporito v. Combustion Eng'g, Inc.</u> for the proposition that plaintiffs are required by Rule 9(b) to plead the author and recipient of the alleged misrepresentations . . . In <u>Saporito</u>, however, the Third Circuit did not explicitly hold that a plaintiff must identify the author and recipient of the misrepresentations in order to satisfy the 'particularity' requirement of Rule 9(b). Instead, the Third Circuit held that the pleadings simply did not provide a sufficient level of notice of the precise misconduct charged.

<u>S. Megga Telecomm. Ltd. v. Lucent Techs., Inc.</u>, 1997 WL 86413, at *7 (D. Del. Feb. 14, 1997) (Robinson, J.).

In the Kayne Defendants' other inapposite citations, the pleadings suffered from numerous deficiencies and the cases either: (i) involved large companies with many potential

speakers[6] or (ii) the opinions were addressing pleading problems inherent to specific claims,[7] including large-scale class actions[8] and federal securities actions.[9] The Kayne Defendants also draw on dicta from a nonprecedential unpublished case which the Third Circuit prohibits citing. See MDNet, Inc. v. Pharmacia Corp., 2005 WL 1385906, at *3 (3d Cir. 2005) ("NOT PRECEDENTIAL").

By contrast, Kayne has brought state common law claims against three individual defendants who tightly controlled and managed their alter ego companies. Moreover, Kayne specifically alleges that "*each* of the Defendants" made a limited number of specific misrepresentations concerning their corporate entities. See Complaint at ¶¶ 33, 43 (emphasis added). In such circumstances, Rule 9(b) standards are clearly satisfied. See, e.g., MBIA Ins. Corp. v. Royal Indem. Co., 221 F.R.D. 419, 423 (D. Del. 2004) (denying motion to dismiss under Rule 9(b) where complaints alleged fraudulent scheme perpetrated by corporate principal and small group of related corporate entities).

The Kayne Defendants' third contention that Kayne has the burden of alleging "with particularity when the allegedly false statements were made" down to the date is simply wrong See Def. Opening Brief at 20. The Kayne Defendants do **not** cite any Third Circuit precedent for such a rule. In fact, the United States Court of Appeals for the Third Circuit has **rejected** such a rule, explaining that Rule 9(b) does not require pleading "every material detail of the fraud such

---

[6]     See In re Student Fin. Corp., 2004 WL 609329 (D. Del. Mar. 23, 2004) (national student lending company involved in market securitizations).

[7]     See Smiley v. Daimler Chrysler, 2008 WL 540633, at *4 (D. Del. Feb. 21, 2008) (defamation claim against international automobile company).

[8]     Frederico v. Home Depot, 507 F.3d 188 (3d Cir. 2007) (putative class action against nationwide corporation); Baker v. MBNA Corp., 2007 WL 2009673, at *5 (D. Del. July 6, 2007) (federal securities class action against nationwide finance corporation).

[9]     See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir. 2006) (federal securities law claims); Klein v. Gen. Nutrition Cos., 186 F.3d 338 (3d Cir. 1999) (federal securities law claims).

as *date*, location, *and time* . . . ." In re Rockefeller Center Props., Inc. Secs. Litig., 311 F.3d at

216 (emphasis added).  The Kayne Defendants' supposed "rule" does not exist under Third

Circuit law.

3.    The Kayne Defendants Ignore the Purchase Agreement and FTC
      Complaint.

Significantly, Kayne has specifically alleged the content of the false statements at issue,

the authors, and the listeners of such statements by referencing the statements made in the

Purchase Agreement.  While the Kayne Defendants avoid mentioning both the Purchase

Agreement and the FTC Complaint, both are clearly incorporated into the pleadings by

reference.  The Purchase Agreement, along with the averments of oral misrepresentations,

provide ample detail of the content of the Kayne Defendants' misrepresentations and of their

specific identities.  Kayne may rely on these as "alternative means of injecting precision and

some measure of substantiation into their allegations of fraud." In re Rockefeller Center Props.,

Inc. Secs. Litig., 311 F.3d at 216 (emphasis added).

The Purchase Agreement provides detail sufficient to satisfy Rule 9(b).  As the

Complaint specifically alleges, on March 31, 2007 (Complaint at ¶¶ 18-19), each of the Kayne

Defendants -- Mr. Roy Eliasson, Mr. Bryon Wolf, and Mr. Alfred Wolf -- (Complaint at ¶¶ 7-9,

33, 42) made specific representations in the Purchase Agreement to Kayne, including that "they

were not under investigation by the FTC, and that the [Kayne] Defendants operated the

Telemarketing Companies and the Operating Subsidiaries lawfully in compliance with the FTCA

and FTC Regulations."  Complaint at ¶¶ 33, 42.  Furthermore, the Complaint specifically

identifies these misrepresentations in the Purchase Agreement under Section 4.11, Section 4.13

and Section 4.27.  Complaint ¶¶ 20-23.  Finally, Kayne further incorporated the FTC Complaint

to show how the misrepresentations were false.

The oral and written misrepresentations set forth in Complaint, the Purchase Agreement and the FTC Complaint all clearly satisfy Rule 9(b)'s requirements.  See Beach Channel, Inc. v. Shvartzman, 2007 2891119, at *8 (E.D.N.Y. Sept. 28, 2007) (stating pleading concerning oral and written fraudulent statements "*in the contract* that was prepared" by the defendant were not "insufficiently particularized for purposes of Rule 9(b)") (emphasis added); see also Concept Innovation v. CFM Corp., 2005 WL 670637, at *4 (N.D. Ill. Mar. 21, 2005) (denying motion to dismiss under Rule 9(b) where the pleadings alleged "either explicitly or implicitly" the speakers, times and misrepresentations "during negotiations and *as part of the agreement itself*") (emphasis added).

**B.      Kayne Has Sufficiently Plead Falsity to Satisfy Rule 9(b).**

The Kayne Defendants also make a cursory argument that Kayne has somehow failed to plead falsity.  While the Kayne Defendants focus on a handful of allegations using the phrase "on information and belief," they ignore the many averments clearly alleging falsity.  For example, Kayne's Complaint unequivocally states that the Kayne Defendants' representations "that they, the Telemarketing Companies, and the Operating Subsidiaries were not under investigation by the FTC *were false* . . . ."  Complaint at ¶¶ 34, 43 (emphasis added).

Furthermore, the Court of Appeals for the Third Circuit has never issued a published decision holding that Rule 9(b) flatly prohibits the use "on information and belief."  In fact, district courts in the Third Circuit have eschewed such a flat prohibition under Rule 9(b) and have permitted such alternative pleading.  See Tredennick v. Bone, 2007 WL 4244652, at *5 (W.D. Pa. Nov. 29, 2007) (holding that "where a plaintiff's allegations of fraud are based on information and belief," that the "supporting facts on which this belief is founded must be set forth in the complaint").  Here, additional supporting facts are reflected in the Complaint and in

the FTC Complaint, which is incorporated into the Complaint.

In the cases cited by the Kayne Defendants, the courts recognized "an exception to the prohibition against 'information and belief' pleading for situations in which the factual information is peculiarly within the knowledge or control of the defendant." Toner v. Allstate Ins. Co., 821 F. Supp. 276, 285 (D. Del. 1993). By the terms of the Purchase Agreement, the Kayne Defendants acknowledged that Kayne was not and could not be in the same position as the Kayne Defendants to know of the telemarketing service companies' compliance practices, or precisely when the Kayne Defendants were under investigation by the FTC. See Purchase Agreement § 8.1(d) ("Notwithstanding the right of the Purchaser to investigate the business, assets, and financial condition of the Sellers, the Company and the Operating Subsidiaries, and notwithstanding any knowledge obtained or obtainable by the Purchaser as a result of such investigation, the Purchaser has the right to rely upon, and has relied upon, each of the representations and warranties made by the Sellers, the Companies, the Operating Subsidiaries and the Founders in this Agreement or pursuant hereto.").

Independent of what happens in the FTC Action, Kayne is entitled in this action to prove that the Kayne Defendants misrepresented their compliance with the FTC Laws and misrepresented that the FTC was not investigating the Kayne Defendants and their entities before March 31, 2007.[10]

---

[10]    Even if the Complaint is deemed deficient under Rule 9(b), the Court should grant Kayne leave to amend to correct such deficiencies. As then-Judge Alito explained: "Ordinarily, complaints dismissed under Rule 9(b) are dismissed *with leave to amend*." In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (reversing denial of leave to amend) (emphasis added); see also Austost Anstalt Schaan v. Net Value Holdings, Inc., 2001 WL 908996, at *4 (D. Del. Aug. 10, 2001) (Robinson, J.) ("Thus, in the event of a Rule 9(b) dismissal, it is customary for claimants to obtain a second opportunity to correct any deficiencies in their complaint.").

## V. THE KAYNE DEFENDANTS HAVE NOT SHOWN THAT THE PURCHASE AGREEMENT CLEARLY AND UNAMBIGUOUSLY BARS KAYNE'S CONTRACT CLAIMS AS A MATTER OF LAW.

The Kayne Defendants move to dismiss with prejudice Kayne's claim in Count III for breach of contract, contending that the Purchase Agreement's indemnification provisions in Section 8 somehow bar that claim as a matter of law. The Kayne Defendants also argue that Kayne has not pled damages sufficiently. As shown below, the Kayne Defendants' motion to dismiss Count III should be denied.

### A. The Kayne Defendants' Interpretation of the Indemnification Provisions as an Exclusive Remedy Violates Delaware Contract Law and Is Not the Only Reasonable Construction of the Purchase Agreement.

In reviewing Kayne's contract claim, "the court should read the complaint generously, accept all of the allegations contained therein as true, and construe them in a light most favorable to the plaintiff." E.I. du Pont de Nemours & Co. v. Monsanto Co. & Asgrow Seed Co. LLC, 2001 WL 652019, at *1 (D. Del. Feb. 14, 2001) (Robinson, J.) (denying motion to dismiss contract claims); see also Toys "R" Us-Penn Inc. v. Discovery Zone, Inc., 1996 WL 47980, at *6 (E.D. Pa. Feb. 6, 1996) ("Accepting as true all factual allegations and viewing all reasonable inferences therefrom in the light most favorable to the plaintiff . . . the interpretation advanced by [plaintiff], while not free from all doubt, is plausible within the four corners of the contract. Accordingly, I will deny the motion to dismiss . . . .").[11]

Here, the *gravamen* of the Kayne Defendants' argument is that the Purchase Agreement must be interpreted to limit Kayne to the exclusive remedy of indemnification under Section 8 for any breach of contract claim involving breaches of representations or warranties. However,

---

[11]    The Supreme Court of Delaware has made clear that under Delaware contract law, "[d]ismissal is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law." Appriva Shareholder Litig. Company, *LLC*, 937 A.2d 1275 (Del. 2007) (reversing motion to dismiss where defendants' interpretation was *not* the only reasonable construction of a merger agreement).

without a clause expressly limiting Kayne's remedies to indemnification under Section 8.3,

Kayne's common law claim for breach of contract in Count III survives.

Delaware courts have rejected arguments similar to that proffered by the Kayne

Defendants.  As a Delaware court recently explained:

> In regards to exclusive remedy clauses, our courts have refused to construe a
> contract as taking away a common law remedy unless that result is imperatively
> required.  For example, the Supreme Court has held that, *even if a contract
> specifies a remedy for breach of that contract, a contractual remedy cannot be
> read as exclusive of all other remedies if it lacks the requisite expression of
> exclusivity.*

Reid v. Thomson Homes at Centreville, Inc., 2007 WL 4248478, at *5 (Del. Super. Nov. 21,

2007) (emphasis added).  Like the Kayne Defendants, the defendants in *Reid* similarly insisted

that all of the plaintiffs' contract claims were covered by a specific provision establishing a one-

year warranty in the contract.  The Superior Court of Delaware rejected that position, holding

"the Defendants' argument that the express warranty provided in this case *is necessarily the

exclusive remedy is not supported by case law.*"  Reid, 2007 WL 4248478, at *6 (emphasis

added).

Likewise, in Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 176

(Del. 2002), the Supreme Court of Delaware rejected an argument on contract interpretation

similar to that advanced by the Kayne Defendants in this case.  In Gotham Partners, the

defendants argued that because a partnership agreement contained specific contractual terms on

fiduciary duties, that the parties must have intended the plaintiff's contract claims and remedies

be limited to these contractual terms.  Id. at 175.  Like the Purchase Agreement in this case, the

partnership agreement in Gotham Partners provided a specific contract remedy, but did not

expressly state that it was to be the exclusive remedy for all contract claims.  Id. at 175.  The

Supreme Court explained that "even if a contract specifies a remedy for breach of that contract, a

'*contractual remedy cannot be read as exclusive of all other remedies [if] it lacks the requisite expression of exclusivity.*'" Id. at 176 (quoting Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc., 336 A.2d 211, 214 (Del. 1975)).  Delaware's rule of contract construction mandates that the Court reject the Kayne Defendants' reading of Section 8.3.[12]

The Kayne Defendants rely principally on Section 8.3 in support of their argument.  See Def. Opening Brief at 23.  This provision reads as follows:

> Notwithstanding anything here to the contrary, a Purchase Indemnitee shall not be entitled *to make a claim for indemnification* under a 'diminution in value' theory pursuant to Section 8.2(a), (b) or (f) unless the Losses that are the subject of such claim result in (a) an actual loss of any portion of the Original Issue Price (as such term is defined in the Restated LLC Agreement) to the Purchaser, or (b) a material change in the condition (financial or otherwise) or results of operations of the Company, the Operating Subsidiaries or Business will not be able to meet its obligations under this Purchase Agreement or the Restated LLC Agreement executed even herewith.

Purchase Agreement at § 8.3 (emphasis added).  The Kayne Defendants also obliquely reference Section 8.2, which states: "Sellers agree, jointly and severally, to indemnify and hold harmless the Purchaser . . . from and against . . . .  Losses . . . which may be incurred . . . relating to, based upon, resulting from or arising out of the breach of any representation or warranty . . . ."  Based on these two clauses, the Kayne Defendants contends that Kayne is somehow limited to indemnification under Section 8.3 as its exclusive remedy for Kayne's breach of contract claim.

Section 8.3 does **not** state anywhere that it is the sole or exclusive remedy for all claims for breach of contract or breaches of representations and warranties for diminution of value damages.  The Kayne Defendants are sophisticated parties.  Had they intended to make indemnification the sole remedy for such contract claims, they could have drafted such language

---

[12]    Federal courts have rejected virtually identical arguments as those advanced by the Kayne Defendants as well.  See Council Bros., Inc. v. Ray Burner Co., 473 F.2d 400, 406 (5th Cir. 1973) ("We would point out that the warranty here at issue nowhere, clearly or otherwise, specifies that the remedy or remedies provided thereby are to be exclusive of any other remedy . . . ."); Cordiant MN, Inc. v. David Cravit & Assocs., Ltd., 1997 WL 534308, at *8 (N.D. Ill. Aug. 19, 1997) (same).

into the Purchase Agreement.  Compare Transched Sys. Ltd. v. Versyss Transit Solutions, LLC, 2008 WL 948307, at *2 (Del. Super. April 2, 2008) ("The foregoing indemnification provisions shall constitute the *sole and exclusive remedy for monetary damages* in respect of any breach of or default under this Agreement by any Party . . . .") (emphasis added).

The plain language of Section 8.3 expressly limits its reach to claims for indemnification. The title of Article 8 is "**INDEMNIFICATION**."  Section 8.3 itself expressly states that it is limited to "a *claim for indemnification* . . . ."  Section 8.2 likewise falls under Article VIII, and states that its provisions are for: "Conditions to and Limitations ***on Indemnification***."  (underline in original; bold emphasis added).  By their own terms, these provisions were expressly written so as to only apply to a "claim for indemnification."

To accept the Kayne Defendants' position, the Court would have to effectively rewrite the contract, including the separate Sellers' representations and warranties provisions under Article 4.  The Supreme Court of Delaware has long followed "the well-established principle that in construing a contract a court cannot in effect rewrite it or supply omitted provisions." Gertrude L.Q. v. Stephen P.Q., 466 A.2d 1213, 1217 (Del. 1983) (citing Conner v. Phoenix Steel Corp., 249 A.2d 866, 868 (Del. 1969) ("[A] court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions.") (emphasis added)); Downey v. Sanders, 1996 WL 190755, at *3 (Del. Super. Mar. 22, 1996) ("[T]he text of Paragraph 18 simply does not support this position.  In order to accept it, therefore, the Court would have to rewrite the plain language of an otherwise valid contractual provision . . . . *Since this is not the Court's function,* [defendant's] position must be rejected.") (emphasis added).  As the United States District Court for the District of Delaware has recognized: "Courts should *not rewrite the plain language of an otherwise valid contractual provision, even to supply perceived omissions.*"

Haft v. Dart Group Corp., 841 F. Supp. 549, 564 (D. Del. 1993). This principle of Delaware law is grounds alone to deny the Kayne Defendants' motion to dismiss Kayne's breach of contract claim.

### B.   Kayne's Complaint Adequately Alleges Damages Caused by the Kayne Defendants' Malfeasance.

Even if the Kayne Defendants could limit Kayne to the indemnification remedy of Section 8.3 (which Delaware law and the Purchase Agreement do not permit), Kayne has alleged damages sufficient to state a claim. Count III of Kayne's Complaint is for breach of contract and breach of the Article 4 representations and warranties, not a claim for indemnification under Article 5. Nevertheless, Kayne's pleadings have more than alleged facts that satisfy the requirements of Section 8.3 for pleading loss.

Kayne specifically alleged that the Court in the FTC Action has granted a preliminary injunction against the Kayne Defendants and the telemarketing service companies, among others, based on the Kayne Defendants' actions. See Compl. ¶ 30. Kayne's allegations that the Kayne Defendants' telemarketing service companies were enjoined, their assets frozen, and a Receiver appointed to operate them each constitutes an averment not only of adverse impact on the businesses, but of change of control and loss of the moneys Kayne paid as part of the Original Issue Price, as those funds are now being used to pay the Receiver, its counsel, and the entities' counsel in defending the FTC Action.

Additionally, Kayne specifically alleged that the "Defendants' conduct further caused the Plaintiff to lose its total investment in the business." Complaint at ¶ 53. Kayne alleged that the "Defendants have severely damaged the telemarketing businesses by causing the loss of customers, and impairing goodwill and business reputations." Id. Kayne also alleged that Defendants' breaches have caused $24,000,000 in damages. Id. at ¶ 54. Such allegations present

facts sufficient to show actual loss and damages at the pleading stage. See Shamrock Holdings,

Inc. v. Arenson, 456 F. Supp.2d 599, 610 (D. Del. 2006) (Robinson, J.) (denying motion to

dismiss claim based on financial transactions on grounds that the pleadings adequately stated

damages); Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp.2d 42, 67 (D. Del. 2002)

(denying motion to dismiss claim on grounds that the pleadings for diminution in value of share

value were sufficient).[13]

  Kayne has alleged that the Kayne Defendants "have severely damaged the telemarketing

businesses by causing the loss of customers, and impairing goodwill and business reputations."

Complaint at ¶ 53. When Kayne's pleadings are read as a whole, they clearly allege facts

showing the Kayne Defendants and their companies have not or "will not be able to meet [their]

obligations." Thus, Kayne has alleged damages arising from the Kayne Defendants' conduct

sufficient to state a claim.

---

[13]  The Kayne Defendants selectively quote from cases which are readily distinguishable. For example, in Griffin Corporate Servs., LLC v. Jacobs, 2005 Del. Ch. LEXIS 120 (Del. Ch. Aug. 11, 2005), a case not decided under the federal rules, the plaintiffs alleged a much more speculative claim for interference with existing and prospective business relationships, in which the plaintiffs failed to allege **any** breach of contract, and alleged only **four** vague words on damages. See Griffin, 2005 Del. Ch. LEXIS 120 at **16-17.

## **CONCLUSION**

For the foregoing reasons, Kayne respectfully requests that this Court deny the Kayne Defendants' Motion in its entirety.

Respectfully submitted,

JOHN C. PHILLIPS, JR. (#110)
BRIAN E. FARNAN (#4089)
DAVID A. BILSON (#4986)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
Attorneys for Plaintiff,
Dated:  April 21, 2008                    Kayne Sunstate Investors, LLC

# EXHIBIT A
# (PART 1 OF 2)

INTEREST CONTRIBUTION AND PREFERRED
UNIT PURCHASE AGREEMENT

BY AND AMONG

FTN PROMOTIONS, INC., A FLORIDA CORPORATION, D/B/A SUNTASIA INC. AND
SUNTASIA MARKETING, INC.,

GUARDIAN MARKETING SERVICES, CORP.,

BAY PINES TRAVEL, INC.,

BRYON WOLF,

ROY ELIASSON,

ALFRED WOLF

SUNSTATE HOLDINGS, LLC,

STRATEGIA MARKETING, LLC,

CO-COMPLIANCE, LLC,

TELEQUICK SYSTEMS, LLC

AND

KAYNE SUNSTATE INVESTORS, LLC

MARCH 31, 2007

801393.10

# TABLE OF CONTENTS

Page

ARTICLE 1    DEFINITIONS.................................................................2
  1.1    Definitions................................................................2
  1.2    Interpretation............................................................9
ARTICLE 2    CONTRIBUTION OF THE INTERESTS TO THE COMPANY.......................10
  2.1    Formation................................................................10
  2.2    Transfer of Interests to the Company in Exchange for Consideration........10
  2.3    Assumption of Liabilities................................................10
  2.4    Contracts; Consents......................................................11
ARTICLE 3    THE CLOSING..............................................................12
  3.1    Closing; Closing Date....................................................12
  3.2    Formation of Company and Transfer of Interests...........................12
  3.3    Purchase and Sale of Preferred Units.....................................12
  3.4    Use of Proceeds..........................................................13
ARTICLE 4    REPRESENTATIONS AND WARRANTIES OF THE SELLERS, THE COMPANY, THE OPERATING SUBSIDIARIES AND THE FOUNDERS ........................................13
  4.1    Organization; Good Standing; Qualification...............................13
  4.2    Subsidiaries.............................................................14
  4.3    Power and Authority; Capitalization; Indebtedness........................14
  4.4    Asset and Interest Transfer..............................................14
  4.5    Authorization; Execution and Delivery; No Conflicts......................15
  4.6    Consents.................................................................15
  4.7    Financial Statements.....................................................16
  4.8    Absence of Certain Changes or Events.....................................17
  4.9    Insurance................................................................18
  4.10   Officers; Officer Benefits...............................................19
  4.11   Litigation; Restriction on Business Activities...........................21
  4.12   Material Contracts and Other Agreements..................................22
  4.13   Compliance with Laws; Licenses...........................................23
  4.14   Title to Properties; Liens and Encumbrances..............................23
  4.15   Leased Real Properties; No Owned Real Property...........................24
  4.16   Accounts Receivable......................................................24
  4.17   Taxes....................................................................24

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 4.18 | Environmental and Safety Laws | 26 |
| 4.19 | Related Party Transactions | 28 |
| 4.20 | Intellectual Property | 28 |
| 4.21 | Products; Product Warranty and Liability | 29 |
| 4.22 | Liabilities and Indebtedness | 29 |
| 4.23 | Distributors | 30 |
| 4.24 | Customers | 30 |
| 4.25 | Suppliers | 30 |
| 4.26 | Brokers; Certain Expenses | 30 |
| 4.27 | Disclosure | 30 |
| ARTICLE 5 | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 31 |
| 5.1 | Organization and Existence; Authorization; No Conflicts | 31 |
| 5.2 | Investment | 31 |
| 5.3 | Brokers or Finders | 31 |
| ARTICLE 6 | CONDITIONS TO THE CLOSING | 31 |
| 6.1 | Conditions to the Obligations of the Parties | 31 |
| 6.2 | Conditions to the Obligations of the Purchaser | 32 |
| 6.3 | Conditions to the Obligations of the Sellers and the Company | 34 |
| ARTICLE 7 | COVENANTS AND AGREEMENTS | 35 |
| 7.1 | Post-Closing Covenants | 35 |
| 7.2 | Non-solicitation; Covenant Not to Compete; Confidentiality | 36 |
| 7.3 | Tax Matters | 39 |
| ARTICLE 8 | INDEMNIFICATION | 40 |
| 8.1 | Survival of Representations and Warranties | 40 |
| 8.2 | Indemnification by the Sellers, the Company, the Operating Subsidiaries and the Founders | 40 |
| 8.3 | Conditions to and Limitations on Indemnification | 41 |
| 8.4 | Indemnity Threshold | 42 |
| 8.5 | Indemnity Cap | 42 |
| 8.6 | Claims for Indemnity | 42 |
| 8.7 | Defense of Claims by Third Parties | 42 |
| ARTICLE 9 | MISCELLANEOUS | 43 |

## TABLE OF CONTENTS
(continued)

Page

9.1   Successors and Assigns ..................................................................... 43

9.2   Governing Law .................................................................................. 43

9.3   Jurisdiction; Waiver of Jury Trial ................................................... 43

9.4   Counterparts ..................................................................................... 44

9.5   Notices ............................................................................................... 44

9.6   Sellers' Representative ..................................................................... 45

9.7   Fees and Expenses ............................................................................ 45

9.8   Severability ....................................................................................... 45

9.9   Entire Agreement ............................................................................. 46

9.10  Assurances ........................................................................................ 46

9.11  Amendments and Waivers .............................................................. 46

## INTEREST CONTRIBUTION AND
## PREFERRED UNIT PURCHASE AGREEMENT

This INTEREST CONTRIBUTION AND PREFERRED UNIT PURCHASE AGREEMENT dated as of March 31, 2007 (this "Agreement"), is entered into by and among (a) FTN Promotions, Inc., a Florida corporation, d/b/a Suntasia Inc. and Suntasia Marketing, Inc. ("FTN"), (b) Guardian Marketing Services, Corp., a Florida corporation ("Guardian"), (c) Bay Pines Travel, Inc., a Florida corporation ("Bay Pines"), (d) Bryon Wolf, an individual ("Wolf"), (e) Roy Eliasson, an individual ("Eliasson" and together with FTN, Guardian, Bay Pines and Wolf, the "Sellers"), (f) Alfred Wolf, an individual (together with Wolf and Eliasson, the "Founders"), (g) Sunstate Holdings, LLC, a Delaware limited liability company (the "Company"), (h) Strategia Marketing, LLC, a Florida limited liability company ("Strategia Marketing LLC"), (i) Co-Compliance, LLC, a Florida limited liability company ("Co-Compliance, LLC"), (j) Telequick Systems, LLC, a Florida limited liability company ("Telequick" and together with Strategia Marketing LLC and Co-Compliance, LLC, the "Operating Subsidiaries"), on the one hand, and Kayne Sunstate Investors LLC, a Delaware limited liability company (the "Purchaser"), on the other hand.

### RECITALS

A.    The Sellers own and operate a business that markets membership products and services (the "Business").

B.    Immediately prior to the Closing Date, the Sellers and the Founders together formed two (2) limited liability companies under the laws of the State of Florida named (i) "Strategia Marketing, LLC", and (ii) "Co-Compliance, LLC", and (A) FTN contributed all of the assets of FTN to Strategia Marketing LLC and Strategia Marketing LLC assumed certain scheduled liabilities of FTN with respect to the Business in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in Strategia Marketing LLC, (B) Guardian contributed all of the assets of Guardian to Co-Compliance, LLC and Co-Compliance, LLC assumed certain scheduled liabilities of Guardian with respect to the Business in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in Co-Compliance, LLC (the contributions of assets in the foregoing clauses (A) and (B) referred to herein as the "Asset Transfer").

C.    As of the Closing Date, the Sellers and the Founders shall have together formed a limited liability company under the laws of the State of Delaware named "Sunstate Holdings, LLC" and the Sellers shall have contributed to the Company One Hundred Percent (100%) of the issued and outstanding membership interests of (i) Strategia Marketing LLC, (ii) Co-Compliance, LLC, and (iii) Telequick, in exchange for One Hundred Percent (100%) of the issued and outstanding membership interests in the Company, which membership interests are represented by fifty-six thousand nine hundred twenty-three (56,923) common membership units of the Company (the "Common Units"). The Common Units are also sometimes referred to herein as the "Consideration." In addition, the Company and the Operating Subsidiaries, as applicable, shall have entered into a services agreement with Bay Pines, in form and substance satisfactory to the Purchaser (the "Bay Pines Agreement").

D.    Immediately following the issuance of the Common Units to the Sellers, the Sellers shall cause the Company to issue and sell an additional twenty thousand (20,000) Series A Convertible Redeemable Preferred Units of the Company (the "Preferred Units" and, together with the Common Units, the "Units") to the Purchaser, on the terms and subject to the conditions of this Agreement.

## AGREEMENT

**NOW, THEREFORE**, for and in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Definitions.

As used in this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement, the following definitions will apply:

"Accounts Receivable" shall have the meaning given to such term in Section 4.16.

"Acquired Businesses" shall have the meaning given to such term in Section 4.12.

"Action" shall mean any action, claim, complaint, petition, investigation, suit or other proceeding, whether administrative, civil or criminal, in Law or in equity, or before any arbitrator or Governmental Authority.

"Affiliate" shall mean (a) an "affiliate" as defined under Rule 12b-2 of the Securities Exchange Act of 1934, as amended, (b) a Person who directly or indirectly controls, is controlled by or is under common control with the Person specified and (c) any Person owning directly or indirectly at least Five Percent (5%) of the outstanding equity interests of any other Person.  All Related Persons shall be deemed Affiliates of one another.

"Agreement" shall have the meaning given to such term in the preamble.

"Applicable Law or Laws" shall mean all applicable provisions of all (a) constitutions, treaties, statutes, Laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority, (b) Consents of any Governmental Authority and (c) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"Asset Contribution Agreements" shall have the meaning given to such term in Section 2.3(a).

"Asset Transfer" shall have the meaning given to such term in the Recitals.

"Assigned Contracts" shall have the meaning given to such term in Section 2.4(a).

"Assumed Liabilities" shall have the meaning given to such term in Section 2.3(a).

"Audited Financial Statements" shall have the meaning given to such term in Section 6.2(e).

"Bankruptcy" shall mean, with respect to any Person: (a) that a petition has been filed by or against such Person as a "debtor" and the adjudication of such Person as bankrupt under the provisions of the bankruptcy laws of the United States of America has commenced and, in the case of an involuntary bankruptcy, such petition shall not have been dismissed within sixty (60) calendar days from the date of filing; (b) that such Person has made an assignment for the benefit of its creditors generally; (c) that a receiver has been appointed for substantially all of the property and assets of such Person; or (d) the involuntary acceleration of any Indebtedness of the Company or any of its Subsidiaries in excess of Two Hundred Fifty Thousand Dollars ($250,000); provided, however, that any involuntary acceleration of any Indebtedness in excess of Two Hundred Fifty Thousand Dollars ($250,000) may be waived by the Purchaser.

"Bay Pines" shall have the meaning given to such term in the preamble.

"Bay Pines Agreement" shall have the meaning given to such term in the preamble.

"Business" shall have the meaning given to such term in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a day on which banking institutions in the State of Delaware are authorized or obligated by law or executive order to close.

"Business Intellectual Property" shall have the meaning given to such term in Section 4.20(a).

"Caymus Fee" shall mean an amount equal to Six Hundred Thousand Dollars ($600,000) payable to Caymus Partners LLC on the Closing Date.

"Closing" or "Closing Date" shall have the meaning given to such term in Section 3.1(b).

"Closing Fee" shall mean an amount equal to Five Hundred Thousand Dollars ($500,000) payable to the Purchaser within sixty (60) calendar days after the Closing Date.

"COBRA" shall have the meaning given to such term in Section 4.10(h).

"Co-Compliance, LLC" shall have the meaning given to such term in the preamble.

"Code" shall mean the Internal Revenue Code of 1986, together with all rules and regulations promulgated pursuant thereto, as amended from time to time.

"Common Units" shall have the meaning given to such term in the Recitals.

"Company" shall have the meaning given to such term in the preamble.

"Confidential Information" shall mean all proprietary or confidential property, information or knowledge of, about or created by the Sellers, the Company and the Business including without limitation: (a) all records concerning Products or services provided to customers; (b) all information containing pricing policies, the prices charged to customers, the volume or orders of customers and other information concerning transactions with customers; (c) customer lists; (d) financial information, forecasts, budgets, marketing information, research and development, expansion plans, management policies and methods of operation; (e) information concerning salaries or wages paid to, the work records of and other personnel information relative to employees; (f) confidential information of other Persons; (g) technical data specifications, programs, documentation and analyses; (h) all Intellectual Property (whether owned or licensed), including all source code and trade secrets within any such Intellectual Property; and (i) trade secrets.

"Consent" shall mean any consent, approval, authorization, waiver, permit, grant, franchise, license, exemption or order of, any registration, certificate, qualification, declaration or filing with, or any notice to, any Person, including, without limitation, any Governmental Authority.

"Consideration" shall have the meaning given to such term in the Recitals.

"Eliasson" shall have the meaning given to such term in the preamble.

"Employee Plans" shall have the meaning given to such term in Section 4.10(c).

"Employees" shall have the meaning given to such term in Section 4.10(a).

"Employment Agreements" shall have the meaning given to such term in Section 6.2(g)(ii).

"Environmental Liability" shall mean any and all Liabilities, obligations to conduct cleanup, expenses, damages, deficiencies, fines, penalties, sanctions and costs of any kind or nature whatsoever arising out of, relating to or directly or indirectly associated with, the compliance with any Environmental Protection Law.

"Environmental Permit" shall mean any License required by or pursuant to any Environmental Protection Laws.

"Environmental Protection Laws" shall mean all Applicable Laws now or hereafter in effect relating to (i) the protection of the environment (including any environmental laws relating to the protection of human health), (ii) the investigation, cleanup and abatement, removal or remedial action, or any other response to the release of Hazardous Substances to the environment, (iii) any emission of air pollutants or direct or indirect discharge of pollutants or waste, (iv) the generation, treatment, storage, disposal, transportation, processing, handling, use, existence, spill, release, or threatened release, of any Hazardous Substances, and (v) the manufacture, import, distribution or sale of any Hazardous Substances, including, without limitation, (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601 et seq.; (b) the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 et seq.; (c) the Hazardous Materials Transportation Act, 49 U.S.C.

§1801 et seq.; (d) the Clean Water Act, 33 U.S.C. §1251 et seq.; (e) the Clean Air Act, 42 U.S.C. §7401 et seq.; (f) the Toxic Substances Control Act, 15 U.S.C. §2601 et seq.; and (g) corresponding or similar state and local Applicable Laws, all as amended, modified or revised.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall have the meaning given to such term in Section 4.10(i).

"Excluded Liabilities" shall have the meaning given to such term in Section 2.3(b).

"Family Member" shall mean a parent, spouse, any natural or adoptive sibling or any spouse thereof, and any direct lineal descendant (natural or adoptive) of any of the foregoing.

"Financial Statements" shall have the meaning given to such term in Section 4.7(a).

"Formation" shall have the meaning given to such term in Section 2.1(b).

"Founders" shall have the meaning given to such term in the preamble.

"FTN" shall have the meaning given to such term in the preamble.

"GAAP" shall mean United States generally accepted accounting principles as in effect at the time in question.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, any governmental authority, agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

"Guardian" shall have the meaning given to such term in the preamble.

"Hazardous Substance" shall mean any chemical, compound, pollutant, contaminant, material or substance now or hereafter regulated under any Environmental Protection Laws, including, without limitation, any "hazardous substance" or "pollutant or contaminant," as those terms are defined in CERCLA, any "hazardous waste" as such term is defined in RCRA, and any other hazardous or toxic wastes, substances or materials, the presence, existence or threat of which may at any time give rise to any Environmental Liability, including, without limitation, (a) trichloroethylene, tetrachloroethylene, perchloroethylene and other chlorinated solvents, (b) any petroleum products or fractions thereof, (c) asbestos in any form, (d) polychlorinated biphenyls, (e) flammables (f) explosives, (g) urea formaldehyde and (h) radioactive materials and wastes.

"Indebtedness" shall mean all (a) obligations for borrowed money, (b) notes, bonds, debentures, mortgages and similar obligations, (c) capital obligations and leases, (d) guaranties and contingent obligations for the debts or obligations of another Person, (e) obligations to pay

the deferred purchase or acquisition price of property or services (including under conditional sale or other title retention agreements), (f) accounts payable or other liabilities not arising in the Ordinary Course of Business, including accounts payable for equipment purchases, or accounts payable that are more than sixty (60) calendar days past their due dates, (g) obligations in respect of letters of credit, bonds, guaranties, reimbursement agreements and similar instruments, (h) obligations in respect of futures contracts, forward contracts, swaps, options or similar arrangements, (i) off balance sheet financing transactions, (j) all obligations under facilities for the discount or sale of receivables and (k) all obligations that are required to be classified as long term liabilities on a balance sheet under GAAP (in each case whether such obligations are contingent or otherwise).

"Indemnitor" shall have the meaning given to such term in Section 8.2.

"Indemnity Cap" shall have the meaning given to such term in Section 8.4.

"Intellectual Property" shall mean any intellectual or intangible property (whether owned or licensed) including, without limitation, trademarks, trademark registrations and applications, service marks, trade names, corporate names and fictitious names, copyrights, copyright registrations, works of authorship, patents, patent applications, industrial design registrations and applications, integrated circuit topography applications and registrations, design rights, inventions, trade secrets, data, technical information, Confidential Information, designs, plans, specifications, formulas, processes, patterns, compilations, devices, techniques, mask works, methods, shop rights, know-how, show-how, and other business or technical confidential or proprietary information in each case whether or not such rights are patentable, copyrightable, or registrable, software and computer hardware programs and systems, source code, object code, know-how, show-how, processes, formula, specifications and designs, databases, and documentation relating to the foregoing; all domain names and internet addresses, and content with respect to internet websites including such content in its electronic form and other proprietary information owned, controlled, created, under development or used by or on behalf of any Person in whole or in part and whether or not registrable or registered, and any registrations or applications for the foregoing.

"Interest Transfer" shall have the meaning given to such term in Section 2.2.

"IRS" shall have the meaning given to such term in Section 4.10(d).

"Law" shall mean all laws, as written and enforced, of any nation or political subdivision thereof, including, without limitation, all federal, state, provincial, local, or foreign statutes, regulations, ordinances, orders, decrees, or any other laws, common law theories, or reported decisions of any state, provincial, federal or other court or tribunal.

"Leased Real Property" shall have the meaning given to such term in Section 4.15.

"Leases" shall mean all leases, subleases, or other occupancy agreements, licenses, and lease agreements for equipment, machinery, furnishings, vehicles or tools, together with all amendments, supplements and nondisturbance agreements pertaining thereto, under which the Operating Subsidiaries sublease, license, occupy or use any real or personal property.

"<u>Liabilities</u>" shall mean liabilities, obligations or commitments of any nature, whether fixed, absolute, contingent or otherwise and whether liquidated, matured or unmatured, known or unknown and regardless of whether such liability, obligation or commitment is immediately due and payable.

"<u>License</u>" shall mean any license, permit, franchise, authorization, right, privilege, variance, exemption, order or approval issued or granted by any Governmental Authority.

"<u>Lien</u>" shall mean any lien, pledge, mortgage, claim, covenant, restriction, security interest, charge, title defect, transfer restriction, easement, rights of first refusal, preemptive right or other restriction or encumbrance of any kind.

"<u>LLC Agreement</u>" shall have the meaning given to such term in <u>Section 2.1(b)</u>.

"<u>Losses</u>" shall have the meaning given to such term in <u>Section 8.2</u>.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on, or any event, fact, circumstance, condition or change that, individually or in the aggregate, is reasonably likely to have a material adverse effect on (a) the assets, business, operations, condition (financial or otherwise), Property, management, liabilities, obligations, earnings, results of operations or prospects of the Sellers, the Company, the Operating Subsidiaries or the Business, (b) the validity or enforceability of this Agreement and/or any or all of the Related Documents, or (c) the right or ability of the Sellers, the Company, the Operating Subsidiaries or the Founders to consummate the transactions contemplated hereby and/or thereby.

"<u>Material Contracts</u>" shall have the meaning given to such term in <u>Section 4.12</u>.

"<u>Operating Subsidiaries</u>" shall have the meaning given to such term in the preamble.

"<u>Ordinary Course of Business</u>" shall mean in the ordinary course of the Business, as conducted by the Sellers (excluding Wolf and Eliasson) and Telequick prior to the Closing Date, consistent with the Sellers' (excluding Wolf and Eliasson) and Telequick's past custom and practice.

"<u>OSHA Laws</u>" shall mean the Occupational Safety and Health Act, 29 U.S.C. §651 et seq., each state law corresponding thereto and all Applicable Laws, now or hereafter in effect relating thereto.

"<u>Person</u>" shall mean any corporation, partnership, limited liability company, trust, individual, unincorporated organization or a governmental agency or political subdivision thereof, as the context may require.

"<u>Preferred Units</u>" shall have the meaning given to such term in the Recitals.

"<u>Products</u>" shall mean any and all products or services designed, fabricated, manufactured, distributed, performed, provided or sold in connection with the operation of the Business.

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible of the Sellers, the Company and the Operating Subsidiaries.

"Purchase" shall have the meaning given to such term in Section 3.3.

"Purchase Price" shall have the meaning given to such term in Section 3.3.

"Purchaser" shall have the meaning given to such term in the preamble.

"Purchaser Indemnitee" shall have the meaning given to such term in Section 8.2.

"Real Property" shall mean any Leased Real Property and any other real property currently or formerly owned, operated, leased or occupied by the Sellers (or any predecessor), the Company or the Operating Subsidiaries.

"Receivables" shall mean all notes, deposits and accounts receivable in favor of the Sellers (excluding Wolf and Eliasson), the Company or the Operating Subsidiaries and all notes, bonds and other evidence of Indebtedness of and rights to receive payments from any Person in favor of the Sellers (excluding Wolf and Eliasson), the Company or the Operating Subsidiaries.

"Related Documents" shall mean the Asset Contribution Agreements, the Restated LLC Agreement and all other agreements and documents contemplated hereunder or thereunder, and any and all amendments or modifications thereto.

"Related Person" shall mean any Person in which a specified Person owns any material economic interest, and any other Affiliate or Family Member of such specified Person.

"Reserve Amount" shall have the meaning given to such term in Section 3.4.

"Restated LLC Agreement" shall have the meaning given to such term in Section 2.1.

"Restricted Period" shall have the meaning given to such term in Section 7.2(a).

"Schedules" shall have the meaning given to such term in Article 4.

"Securities Act" shall have the meaning given to such term in Section 5.2.

"Sellers" shall have the meaning given to such term in the preamble.

"Sellers' Representative" shall have the meaning given to such term in Section 9.6.

"Services Agreement" shall mean the Services Agreement by and among certain of the Sellers, the Company and the Operating Subsidiaries in substantially the form of **Exhibit D** hereto.

"Strategia Marketing LLC" shall have the meaning given to such term in the preamble.

"Subsidiary" shall mean any corporation, partnership, joint venture, limited liability company, or other entity in which the Company either, directly or indirectly, owns capital stock or is a partner or is in some other manner affiliated through an investment or participation in the equity of such entity, including, without limitation, the Operating Subsidiaries.

"Survival Period" shall have the meaning given to such term in Section 8.1.

"Tax" shall have the meaning given to such term in Section 4.17(j).

"Tax Return" shall mean any return, report, information return, registration form or other document (including any related or supporting information) related to the obligations of any Person filed or required to be filed with any Governmental Authority in connection with the determination of any Tax or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"Telequick" shall have the meaning given to such term in the preamble.

"Territory" shall have the meaning given to such term in Section 7.2(b).

"Third Party Claim" shall have the meaning given to such term in Section 8.6.

"Transferred Assets" shall mean (i) all of the assets of FTN as such were contributed to Strategia Marketing LLC, (ii) all of the assets of Guardian as such were contributed to Co-Compliance, LLC, and (iii) all of the assets of Telequick.

"Transferred Interests" shall have the meaning given to such term in Section 2.2.

"Units" shall have the meaning given to such term in the Recitals.

"Untransferred Contract" shall have the meaning given to such term in Section 2.4(b).

"Wolf" shall have the meaning given to such term in the preamble.

1.2    Interpretation.

(a)    When a reference is made in this Agreement to Articles or Sections, such reference shall be to an Article or a Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not so stated. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.

(b)    The table of contents, titles, captions and headings of the Articles and Sections herein, and the use of a particular gender, are for convenience of reference only and are not intended to be a part of or to affect or restrict the meaning or interpretation of this Agreement.

801393.10

(c)   The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

## ARTICLE 2
## CONTRIBUTION OF THE INTERESTS TO THE COMPANY

2.1   Formation.  On or before the Closing Date, the Sellers and the Founders shall together (a) form the Company, and (b) enter into a limited liability company operating agreement (the "LLC Agreement") in the form attached hereto as **Exhibit A** (the "Formation"). The Purchaser, the Sellers and the Founders shall take, and shall cause the Company to take, any and all action that can reasonably be taken prior to the Closing to ensure that the Company will be treated for all periods from and after the Closing Date as a partnership for federal and state tax purposes and not as a corporation for federal or state tax purposes.  At the Closing, the Purchaser shall become a party to the Amended and Restated LLC Agreement (the "Restated LLC Agreement") in the form attached hereto as **Exhibit B** and shall become a member of the Company as provided in this Agreement and the Restated LLC Agreement.

2.2   Transfer of Interests to the Company in Exchange for Consideration.

(a)   Interest Transfer.  In exchange for the Consideration, the Sellers shall at the Closing grant, sell, convey, assign, transfer and deliver unto the Company, free and clear of all Liens, all right, title and interest in and to One Hundred Percent (100%) of the issued and outstanding membership interests of the Operating Subsidiaries (the "Transferred Interests" and such transfer of the Transferred Interest, the "Interest Transfer").

(b)   Allocation of Consideration.  The Consideration shall be allocated among the Sellers on the Closing Date as follows:

| Seller: | No. of Common Units |
|---|---|
| FTN Promotions, Inc., d/b/a Suntasia Inc. and Suntasia Marketing, Inc. | 45,538 |
| Guardian Marketing Services, Corp. | 10,247 |
| Bryon Wolf | 569 |
| Roy Eliasson | 569 |
| Total | 56,923 |

2.3   Assumption of Liabilities.

(a)   Prior to the Closing, the Sellers shall have transferred, assigned and set over to the Operating Subsidiaries, and the Operating Subsidiaries shall have assumed and agreed to timely pay, perform and discharge, all of the Assumed Liabilities.  The term "Assumed Liabilities" shall mean the Liabilities of the Sellers expressly set forth on Schedule 2.3(a) of those certain Asset Contribution Agreements, dated March 31, 2007, by and among FTN,

Guardian, Strategia Marketing LLC, and Co-Compliance, LLC (the "Asset Contribution Agreements").

(b)     Other than the Assumed Liabilities, the Company and the Operating Subsidiaries shall not assume, pay, perform, be obligated to pay or perform, or otherwise be responsible for, any other Liability of the Sellers or any other Person (all such Liabilities being referred to as "Excluded Liabilities"). The Excluded Liabilities shall include, but not be limited to, (i) all obligations or liabilities of the Sellers or the Founders relating to Taxes, and (ii) those Liabilities set forth on Schedule 2.3(b) of the Asset Contribution Agreements. The Sellers shall pay, perform or otherwise discharge all of the Excluded Liabilities.

2.4     Contracts; Consents.

(a)     Prior to the Closing, the Sellers shall have granted, sold, transferred, assigned and conveyed to the Operating Subsidiaries all of the Sellers' right, title, and interest in, to, and under the contracts listed on Schedule 2.4 of the Asset Contribution Agreements (the "Assigned Contracts"). The Operating Subsidiaries shall accept the foregoing assignment from the Sellers and shall accept and assume the due and punctual performance, discharge and observation of, and, after the Closing Date, shall perform, discharge and observe, all of the Sellers' obligations in, related to, or arising out of the Assigned Contracts to the extent such obligations by the terms of the Assigned Contracts are required to be performed, discharged or observed after the Closing Date, and not prior to such date; provided, however, that the assignment hereunder shall not relieve the Sellers of (i) any obligations with respect to the Excluded Liabilities or (ii) any obligations under the Assigned Contracts which were required to have been performed prior to the Closing Date.

(b)     Without modifying the closing conditions set forth in Section 6.2, to the extent that any of the contracts to be assigned to the Operating Subsidiaries in the Asset Contribution Agreements shall be non-assignable or shall require the Consent of the other party or parties thereto, the Asset Contribution Agreements shall not constitute an assignment thereof, and to the extent that the assignment of any of such contracts shall require the Consent of the other party thereto, the Asset Contribution Agreements shall not constitute an assignment of the same if such Consent has not been given and if an assignment or attempted assignment without such Consent of said other party would constitute a breach thereof or in any way adversely affect the rights, powers, privileges, or liabilities of the Sellers or the Operating Subsidiaries thereunder. Subject to Section 6.2(i), if any such Consent is not obtained, then after the Closing the Sellers shall cooperate with the Company and the Operating Subsidiaries at the Sellers' and the Founders' sole cost and expense, in any reasonable arrangement requested by the Company and the Operating Subsidiaries designed to provide to the Company and the Operating Subsidiaries on or immediately following the Closing with the benefits under any such Assigned Contract to the extent such benefits are received by the Operating Subsidiaries. After the Closing, each contract which would have been included in the Transferred Assets but for this Section 2.4(b) (an "Untransferred Contract") shall be handled in accordance with the Services Agreement. The Sellers, the Company and the Operating Subsidiaries agree that the Transferred Assets shall include all accounts receivable from any Untransferred Contracts, whether generated before or after the Closing. Effective as of the Closing, the Sellers hereby grant to the Company and the Operating Subsidiaries, as applicable, a security interest in, all of the Sellers' contract

rights under such Untransferred Contracts and all cash and non-cash proceeds thereof, as security for the prompt and timely satisfaction and performance of Seller's obligations under this <u>Section 2.4</u> and the Services Agreement, except that Seller shall not be deemed to have granted a security interest in any Untransferred Contract that by its terms expressly prohibits such actions. The Company and the Operating Subsidiaries, as applicable, shall have, and the Sellers shall deliver to the Company at the Closing, possession of the original executed copy of such Untransferred Contract. Effective as of the Closing, the Sellers hereby appoint the Company as the Sellers' attorney to take such actions, in the Sellers' name and on its behalf, as such attorney determines, in its sole discretion, to be necessary or advisable to cause the Sellers to comply with this <u>Section 2.4</u> or to protect, perfect and continue perfected the security interest granted hereunder including the execution and filing of such financing statements and other instruments and documents as such attorney determines, in its sole discretion, to be necessary or advisable for such purposes. As consents to assignment are received for Untransferred Contracts, such contracts shall become Transferred Assets.

**ARTICLE 3**
**THE CLOSING**

3.1    <u>Closing; Closing Date</u>.  The consummation of the transactions contemplated hereby, including the Formation, the Interest Transfer, the execution of the Restated LLC Agreement and the purchase and sale of the Preferred Units hereunder (the "<u>Closing</u>") shall be held at the offices of the Purchaser, 1800 Avenue of the Stars, Second Floor, Los Angeles, California 90067, at 10:00 a.m. (Pacific Time) on March 31, 2007, or (a) on such later date on which all of the conditions precedent set forth in <u>Article 6</u> shall have been satisfied or waived in writing or (b) at such other time and place as the Sellers, the Founders and the Purchaser may otherwise mutually agree (the date of the Closing is hereinafter referred to as the "<u>Closing Date</u>").

3.2    <u>Formation of Company and Transfer of Interests</u>.  At the Closing, the parties shall consummate the Formation and the Sellers shall cause the consummation of the Interest Transfer. The Sellers shall receive, as consideration for the Interest Transfer, the Consideration.  The Company will deliver certificates to the Sellers, registered in the name of the Sellers, representing the Common Units, duly endorsed or with such instruments of transfer necessary to transfer to the Sellers all right, title and interest in and to the Common Units.

3.3    <u>Purchase and Sale of Preferred Units</u>.  At the Closing, the Company shall sell, assign and transfer to the Purchaser the Preferred Units and the Purchaser shall purchase and acquire such Preferred Units from the Company, free and clear of all Liens, in exchange for a payment to the Company of Twenty Million Dollars ($20,000,000) and, as soon as reasonably practicable, the distribution of senior debt financing in the amount of Five Million Dollars ($5,000,000) (collectively referred to herein as the "<u>Purchase Price</u>").  The Company shall deliver a certificate or certificates to the Purchaser, registered in the name of the Purchaser, representing the Preferred Units, duly endorsed or with such instruments of transfer necessary to transfer to the Purchaser all right, title and interest in and to the Preferred Units, against payment of the Purchase Price by wire transfer of immediately available funds to an account designated by the Company.  The purchase by the Purchaser of the Preferred Units may be referred to herein as the "<u>Purchase</u>."

3.4    Use of Proceeds. The Company shall use the Purchase Price to fund liquidity to the Founders through a special distribution to the Sellers on or after the Closing Date; provided, however, that, on the Closing Date, the Sellers shall lend Two Million Dollars ($2,000,000) to the Company on the following terms (the "Sellers Loan"):  (a) the Sellers Loan shall be evidenced by a promissory note issued by the Company in form and substance satisfactory to the Purchaser, (b) the Company shall use the proceeds of the Sellers Loan to pay all fees and expenses associated with the transactions contemplated by this Agreement, including, without limitation, the Caymus Fee and the Closing Fee, and (c) the Company shall repay the Sellers Loan upon having at least Four Million Dollars ($4,000,000) in cash (net of (A) any written but uncleared checks of the Company and the Subsidiaries, (B) any accounts payable of the Company and the Subsidiaries that are more than thirty (30) calendar days past due, and (C) any increase in the Indebtedness of the Company and the Operating Subsidiaries following the Closing Date) on its consolidated balance sheet.

3.5    Senior Debt Distribution. It is intended by the Purchaser and the Sellers that, as soon as reasonably practicable, the Company and Operating Subsidiaries shall secure financing, senior in priority to any amounts owed to the Purchaser pursuant to the Preferred Units, of Five Million Dollars ($5,000,000).  Upon securing the financing, a special distribution shall be made by the Company to the Sellers in the amount of Five Million Dollars ($5,000,000) to complete the delivery of the Purchase Price under Section 3.3.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS, THE COMPANY, THE OPERATING SUBSIDIARIES AND THE
## FOUNDERS

For the purposes of Sections 4.1 through 4.27, the terms "Sellers" shall not include Wolf or Eliasson.  Except as set forth on the disclosure schedule concurrently delivered to the Purchaser herewith (the "Schedules"), as of the date of this Agreement and as of the Closing Date, the Sellers, the Company, the Operating Subsidiaries and the Founders hereby jointly and severally represent and warrant to the Purchaser as follows:

4.1    Organization; Good Standing; Qualification. Each of FTN, Guardian, Bay Pines, the Company and the Operating Subsidiaries, are duly organized, validly existing and in good standing under the laws of the state of their formation and have all requisite power and authority and have all Licenses and other governmental authorizations necessary to (a) enter into this Agreement and each of the Related Documents to which they are a party, (b) perform all of their respective obligations hereunder and thereunder and (c) own, operate and lease their respective Property and carry on their respective businesses as now conducted and as proposed to be conducted.  Except as provided for on Schedule 4.1, each of the Sellers, the Company and the Operating Subsidiaries is duly qualified or duly licensed to transact business and is in good standing (including in good tax standing) in each jurisdiction set forth on Schedule 4.1, which are all of the jurisdictions in which (a) the nature of the business conducted by the Sellers or Telequick or to be conducted by the Company or the Operating Subsidiaries following the Closing or (b) the ownership or leasing of any Property by the Sellers or Telequick or, following the Closing, by the Company and the Operating Subsidiaries makes such qualification necessary.  True and complete copies of the articles or certificates of incorporation or formation, as

801393.10

applicable and bylaws and operating agreement, as applicable, of the Sellers, the Company and the Operating Subsidiaries have been delivered to the Purchaser. Schedule 4.1 lists the directors, officers and managers of the Sellers, the Company and the Operating Subsidiaries, as applicable.

4.2    Subsidiaries. Except as set forth on Schedule 4.2, the Sellers, the Company and the Operating Subsidiaries do not own, directly or indirectly, and the Transferred Assets shall not include, any stock, partnership interest, membership interest, joint venture interest, ownership interest or other security, investment or interest in any corporation, partnership, limited liability company, joint venture, organization or other entity.

4.3    Power and Authority; Capitalization; Indebtedness.

(a)    The Sellers, the Company and the Operating Subsidiaries have all requisite corporate power and authority to own and operate their respective properties and assets, and to carry on their respective businesses as presently conducted, to execute and deliver this Agreement and the Related Documents to be executed by them and to carry out and perform its obligations under the terms of this Agreement and the Related Documents.

(b)    The capitalization of each of the Sellers, the Company and the Operating Subsidiaries is set forth on Schedule 4.3(b). Immediately prior to the Closing, all equity interests in the Company shall be held by the Sellers, and shall be free and clear of all Liens. Immediately following the Closing, the Purchaser shall have valid and marketable title to the Preferred Units, free and clear of all Liens.

(c)    The Sellers, the Company and the Operating Subsidiaries have no Indebtedness, contingent or otherwise, that any of them have directly or indirectly created, incurred, assumed or guaranteed, or with respect to which any of them have otherwise become directly or indirectly liable, including purchase money financing or capital lease obligations, other than the Indebtedness set forth on Schedule 4.3(c), which includes the name of the creditor, all amounts owing, including principal and interest, and when such Indebtedness is due and payable. None of the Sellers, the Company or the Operating Subsidiaries is in default of any of their respective obligations to such creditors or any such default has been waived in writing.

(d)    The Sellers and Telequick have no, and at the Closing, the Company and the Operating Subsidiaries will have no, accounts payable outstanding that are more than thirty (30) calendar days past their due date.

4.4    Asset and Interest Transfer.

(a)    Sufficiency and Condition of the Assets. The Transferred Assets and the Transferred Interests constitute all of the assets that are (i) owned or leased by the Sellers, the Company, or the Operating Subsidiaries, (ii) necessary for or used in the operation of the Business or (iii) required for the continued operation of the Business following the Closing as currently conducted and as proposed to be conducted. The Transferred Assets constituting tangible personal property, including, without limitation, property, plant and equipment, machinery, tooling, supplies, furniture, fixtures and vehicles, are in good operating condition and repair, ordinary wear and tear excepted, and suitable for the purpose for which they are used and intended.

(b)    Ownership of the Transferred Assets. Except for Telequick, the Company and the Operating Subsidiaries are newly formed entities that shall have no assets, liabilities or operations prior to the consummation of the transactions contemplated under this Agreement or the Related Documents as a result of any action of the Sellers or any Founder. As of the Closing Date, (i) the Company will have good, marketable and indefeasible title to the Transferred Interests free and clear of all Liens, and (ii) the Operating Subsidiaries will have good, marketable and indefeasible title to the Transferred Assets free and clear of all Liens.

4.5    Authorization; Execution and Delivery; No Conflicts.

(a)    The execution, delivery and performance of this Agreement and the Related Documents by the Sellers, the Company, the Operating Subsidiaries and the Founders and the consummation of all transactions contemplated hereby or thereby, including but not limited to the sale of the Preferred Units, have been duly authorized by all required actions, corporate or otherwise, of the Sellers, the Company, the Operating Subsidiaries and the Founders. This Agreement and the Related Documents have been duly executed and delivered by the Sellers, the Company, the Operating Subsidiaries and the Founders. This Agreement and the Related Documents constitute valid and binding obligations of the Sellers, the Company, the Operating Subsidiaries and the Founders enforceable against each of them, as applicable, in accordance with their respective terms, except as enforcement may be limited by principles of public policy, and subject to laws of general application relating to Bankruptcy, insolvency, reorganization, moratorium and the relief of debtors and rules of law and general principles of equity governing specific performance, injunctive relief or other equitable remedies.

(b)    The execution and delivery by the Sellers, the Company, the Operating Subsidiaries and the Founders, as the case may be, of this Agreement and the Related Documents, and the consummation of the transactions contemplated hereby and thereby, including but not limited to the sale of the Preferred Units, the Asset Transfer and the Interest Transfer pursuant to this Agreement and the Related Documents, do not and will not (with or without due notice, lapse of time, or both), except as set forth on Schedule 4.5, (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in the creation of any Lien upon the Transferred Assets, the Transferred Interests, or the Preferred Units pursuant to, (iv) give any third party the right to accelerate any obligation under, or (v) result in a violation of, (A) the charter documents of the Sellers, as applicable, the Company or the Operating Subsidiaries, (B) any Law to which the Sellers, the Company, the Operating Subsidiaries and the Founders, or any of their respective properties, is subject, or (C) any agreement or instrument to which the Sellers, the Company, the Operating Subsidiaries and the Founders (with respect to the Transferred Assets and the Transferred Interests) is a party or any of their respective properties is subject.

4.6    Consents. Except as set forth on Schedule 4.6, no Consent is required to be obtained by the Sellers, the Company, the Operating Subsidiaries or any Founder in connection with the execution, delivery or performance by the Sellers, the Company, the Operating Subsidiaries or any Founder of this Agreement and the Related Documents to which it is a party or the consummation by the Sellers, the Company, the Operating Subsidiaries or any Founder of the transactions contemplated hereby or thereby (including, without limitation, in connection with the sale of the Preferred Units and the consummation of the Asset Transfer and the Interest

Transfer). Specifically, except as set forth on Schedule 4.6, no Consent of any other Person is required to be made or obtained to permit (A) the Company and the Operating Subsidiaries to conduct the lawful operation of the Business following the Closing in substantially the same manner as the Business is currently conducted, or (B) the Sellers to transfer the Transferred Assets to the Operating Subsidiaries and to transfer the Transferred Interests to the Company pursuant to this Agreement and the Related Documents, including, without limitation, the assignment to the Operating Subsidiaries and the assumption by the Operating Subsidiaries of the Assigned Contracts.

4.7     Financial Statements.

(a)     Attached hereto as Schedule 4.7 are the following financial statements of the Sellers and Telequick: (i) unaudited consolidated balance sheets and income and cash flow statements for the fiscal years ended December 31, 2003, and December 31, 2004; (ii) audited consolidated balance sheet and income and cash flow statements for the fiscal year ended December 31, 2005; (iii) audited consolidated balance sheet and income and cash flow statements for the six (6)-month period ended June 30, 2006; (iv) internally-prepared consolidated balance sheet and income and cash flow statements for the seven (7)-month period ended January 31, 2007, and (v) the related notes thereto (collectively, the "Financial Statements"). The Financial Statements (A) have been prepared from the books and records kept by the Sellers and Telequick, in conformity with GAAP consistently applied with prior periods, and (B) are complete and correct and fairly present the financial condition and results of operations of the Sellers and Telequick, as of the dates and for the periods indicated therein, subject to normal year end adjustments (consistent with prior periods) in the case of the six (6) and seven (7)-month Financial Statements. The books of account, financial data, schedules and other records of the Sellers and Telequick, including any of the foregoing delivered or made available to the Purchaser or its representatives or Affiliates in connection with the transactions contemplated hereby, have been maintained properly and regularly in accordance with sound business practices and in the course of business of the Sellers and Telequick, are accurate and complete in all material respects and there are no material misstatements, mistakes or omissions therein, and there have been no transactions involving the Seller that properly should have been reflected therein in accordance with GAAP that have not been accurately and completely reflected therein. The Financial Statements reflect the conduct of the Business in the Ordinary Course of Business.

(b)     Except as set forth on Schedule 4.7, the Sellers and Telequick have no Liabilities, obligations or commitments of any nature, including without limitation any liabilities due or to become due to any taxing authority, except (i) Liabilities reflected in, reserved against or disclosed in the footnotes of the Financial Statements or (ii) Liabilities, obligations or commitments incurred since June 30, 2006, in the Ordinary Course of Business (none of which relates to any breach of contract, breach of warranty, tort, infringement or known violation of Law or arose out of any Action or environmental matter). Immediately after the Closing, the Company and the Operating Subsidiaries will have no Liabilities, obligations or commitments of any nature other than the Assumed Liabilities.

4.8    <u>Absence of Certain Changes or Events</u>.

Except as set forth on <u>Schedule 4.8</u> since December 31, 2005, the Sellers and Telequick have conducted the Business only in the Ordinary Course of Business and there has been no Material Adverse Effect. Without limiting the foregoing, since December 31, 2005, the Sellers, the Company and the Operating Subsidiaries have not:

(a)    entered into any transaction related to the Business other than in the Ordinary Course of Business;

(b)    amended, modified, supplemented, rescinded or terminated (and not renewed) any existing Material Contract and no such Material Contract has expired or terminated (and not been renewed) by its terms;

(c)    sold, transferred, disposed of, or agreed to sell, transfer or dispose of, any Properties, Intellectual Property or rights related to the Business, nor purchased or made any payments with respect to any Property of the Sellers, the Company or the Operating Subsidiaries that are not included in the Transferred Assets;

(d)    acquired any Property related to the Business, except in the Ordinary Course of Business, nor acquired or merged with any other business related to the Business;

(e)    incurred or created, or permitted to be incurred or created, or suffered to exist, any Lien on any of the Transferred Assets;

(f)    experienced any destruction, damage or other loss (whether or not covered by insurance) of any Properties used in or necessary to the conduct of the Business;

(g)    increased the level of benefits under any Employee Plan, the salary or other compensation (including severance) payable or to become payable to any Affiliate of the Sellers, the Company or the Operating Subsidiaries, including any of the Founders or their Affiliates (including Family Members) or any employee who, as of the date hereof, earns at least Fifty Thousand Dollars ($50,000) in compensation per annum or obligated itself to pay any bonus or other additional salary or compensation to any such Person, Affiliate or employee other than in the Ordinary Course of Business and as set forth on <u>Schedule 4.8</u>;

(h)    made any change related to the Business in any pricing, marketing, purchasing, allowance or tax or accounting practice, policy or method or any method of calculating any bad debt, contingency or other reserve for accounting, financial reporting or tax purposes or made any tax election or settled or compromised any income tax Liability with any Governmental Authority;

(i)    waived or amended any material right relating to the conduct of the Business;

(j)    made any capital expenditure (or series of related capital expenditures) that is either in excess of One Hundred Thousand Dollars ($100,000) or that is not in accordance

with any capital expenditure budget of the Sellers, the Company or the Operating Subsidiaries previously furnished to the Purchaser;

(k)    declared any dividends, or authorized or made any distribution on its capital stock or made any payments to the Founders in excess of distributions necessary to pay taxes, other than salary obligations and benefits in existence as of the date hereof which are set forth on Schedule 4.8;

(l)    incurred any Indebtedness, other than as set forth on Schedule 4.8;

(m)    made any loans or advances to any Person or entity, other than travel advances to employees made in the Ordinary Course of Business not in excess of Five Thousand Dollars ($5,000);

(n)    issued any equity securities or any options, warrants or other rights to purchase its equity securities, nor have the Sellers, the Company or the Operating Subsidiaries approved or adopted any equity option or equity incentive plan;

(o)    made any alteration or change in the Sellers', the Company's or the Operating Subsidiaries' credit guidelines or policies, charge-off policies or accounting methods;

(p)    delayed or failed to pay or perform when due any obligation (including accounts payable) of the Sellers, the Company or the Operating Subsidiaries;

(q)    accelerated the collection of any account receivable or any Indebtedness or other material obligation owed to the Sellers, the Company or the Operating Subsidiaries before it is due or otherwise owed; or

(r)    taken nor agreed to take any action described in this Section 4.8, and neither the Sellers nor any Founder have taken or agreed to take any such action on behalf of the Company or the Operating Subsidiaries.

4.9    Insurance.  There is in full force and effect one (1) or more policies of insurance issued by insurers of recognized national standing insuring the Properties and business of the Sellers, the Company and the Operating Subsidiaries against such losses and risks and in such amounts as are usual and customary in the Business.  Schedule 4.9 identifies the policies of insurance currently maintained by, or on behalf of, the Sellers, the Company and the Operating Subsidiaries, their businesses and Properties, setting forth the name of the insurer, the holder of each such policy, the nature of coverage, the amount of such coverage, the expiration dates thereof, information concerning any claim in excess of Ten Thousand Dollars ($10,000) asserted thereunder (or proposed for assertion thereunder) and other material information.  All premiums due under the policies identified on Schedule 4.9 have been paid and neither the Sellers, the Company, the Operating Subsidiaries, nor any party insured under any such policy has been issued or has received any notice of default, cancellation, material modification or termination in respect of any such policy.  Neither the Sellers, the Company nor the Operating Subsidiaries are in default with respect to its obligations under any of such outstanding insurance policies. Neither the Sellers, the Company, the Operating Subsidiaries, nor any other insured named on Schedule 4.9 have failed to give any notice or to present any material claim under any such

policy in a due and timely fashion. Such policies are in full force and effect on the date hereof. Neither the Sellers, the Company, the Operating Subsidiaries, nor any such insured has been issued or has received notice that any insurer under any policy referred to on Schedule 4.9 is denying liability with respect to a claim thereunder or defending under a reservation of rights clause.

4.10    Officers; Officer Benefits.

(a)    Schedule 4.10(a) sets forth a complete and accurate list of the names and current compensation levels of all officers who are employed by the Sellers and Telequick prior to the Closing (the "Officers"), indicating in each case (i) such Officer's date of hire, (ii) such Officer's current position, (iii) such Officer's salary level, (iv) whether such Officer is employed on an at-will basis or is subject to contractual limitations on the Officer's ability to terminate the employment of such Officer, including severance obligations in the event of certain occurrences, (v) whether such Officer has a written or oral employment agreement providing for employment for any specified period of time or providing for any benefits (other than health, life and disability insurance), profit sharing, equity incentives or other rights, and (vi) whether such Officer is actively at work or is on leave of absence for any reason, including military service, on disability or pursuant to the Family and Medical Leave Act of 1993. The Officers, together with all other Persons employed by the Sellers or Telequick prior to the Closing shall collectively be referred to as the "Employees" and individually as "Employee".

(b)    The Sellers and Telequick have, and after the Asset Transfer and the Interest Transfer, the Company and the Operating Subsidiaries will have, no collective bargaining agreements with any of their respective employees. There is no labor union organizing activity pending or threatened with respect to the Sellers, the Company or the Operating Subsidiaries. The Sellers and Telequick are, and the Company and the Operating Subsidiaries will be, in compliance in all respects with all Applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours, and the Sellers and Telequick have not engaged in any unfair labor practice. Except as disclosed on Schedule 4.10(b), there is no unfair labor practice, charge, complaint, decision or any other matter against or involving the Sellers, the Company or the Operating Subsidiaries pending or threatened before the National Labor Relations Board or any Governmental Authority. Except as disclosed on Schedule 4.10(b), there are no charges, investigations, administrative proceedings or formal complaints of discrimination (including discrimination based upon sex, age, marital status, race, national origin, religion, sexual preference, disability or handicap, or veteran status) pending threatened, before the Equal Employment Opportunity Commission or any other Governmental Authority against the Sellers, the Company or the Operating Subsidiaries. No Employee of the Sellers, the Company or the Operating Subsidiaries, nor any consultant with whom the Sellers, the Company or the Operating Subsidiaries have contracted, is in violation of any term of any employment contract, proprietary information agreement or any other agreement relating to the right of any such individual to be employed by, or to contract with, the Sellers, the Company or the Operating Subsidiaries because of the nature of the Business, and the continued employment by the Company and the Operating Subsidiaries of the Employees, and the performance of the Company's and the Operating Subsidiaries' contracts with its independent contractors, will not result in any such violation. Neither the Sellers, Telequick nor any Founder has received any written notice alleging that any such

violation has occurred or will occur. No current officer or key Employee, or any group of key Employees, intends to terminate his, her or their employment with the Sellers or Telequick or not accept an offer of employment from the Company or the Operating Subsidiaries, nor do the Sellers, Telequick nor any Founder have a present intention to terminate the employment of any current officer, key Employee or group of key Employees. None of the persons performing services for the Sellers or Telequick has been improperly classified as being an independent contractor or leased employee or as being exempt from the payment of wages for overtime.

(c)    Except as disclosed on Schedule 4.10, the Sellers and Telequick do not, and upon the consummation of the Asset Transfer and the Interest Transfer, neither the Company nor the Operating Subsidiaries will, sponsor or maintain, or have any obligation to contribute to or any liability, actual or contingent, with respect to any "employee benefit plan," as defined in Section 3(3) of ERISA, or any other bonus, pension, stock option, stock purchase, stock appreciation right, equity incentive, welfare, profit sharing, retirement, disability, vacation, severance, hospitalization, insurance, incentive, deferred compensation, compensation, fringe benefit or other employee benefit plan, fund, trust, program, agreement or arrangement, whether written or oral (the "Employee Plans").

(d)    The Sellers and Telequick have delivered to the Purchaser a true and complete copy of the following documents, to the extent that they are applicable:  (i) each Employee Plan and any related funding agreements (such as trust agreements or insurance contracts), including all amendments, and, in the case of any unwritten Employee Plan, a written summary thereof; (ii) the current summary plan description and all subsequent summaries of material modifications of each Employee Plan; (iii) the most recent determination letter from the Internal Revenue Service ("IRS") for each Employee Plan that is intended to qualify for favorable income tax treatment under Section 401(a) or 501(c)(9) of the Code, which determination letter reflects all amendments that have been made to the Employee Plan; and (iv) the two (2) most recent Form 5500s (including all applicable schedules and the opinions of the independent accountants) that were filed on behalf of the Employee Plan.

(e)    Each Employee Plan has been maintained and operated in compliance with its terms and the requirements of Applicable Law, including the Code and ERISA.

(f)    Each Employee Plan intended to be qualified under Section 401(a) or Section 501(c)(9) of the Code has received a favorable determination letter from the IRS and nothing has occurred either before or since the date of such favorable determination letter which would adversely affect the qualified status of such Employee Plan.

(g)    All contributions and premium payments required to have been paid under or with respect to any Employee Plan have been timely paid.

(h)    No Employee Plan provides health, life insurance or other welfare benefits to retirees or other terminated employees of the Seller other than continuation coverage required by Section 4980B of the Code or Sections 601-608 of ERISA or similar state law ("COBRA").

(i)    No Employee Plan is or was at any time a multiemployer plan within the meaning of Section 3(37) or 4001(a) of ERISA, and neither the Sellers, Telequick nor any entity

which is or was at any time considered a single employer together with the Sellers or Telequick pursuant to Section 414(b), (c), (m) or (o) of the Code (an "ERISA Affiliate") has ever contributed to or had any obligation to contribute to any multiemployer plan.

(j)      No Employee Plan is subject to Section 302 or Title IV of ERISA or Section 412 of the Code, and neither the Sellers, Telequick nor any ERISA Affiliate has ever maintained, participated in, or had an obligation to contribute to a plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code.

(k)      No event has occurred and no condition exists with respect to any Employee Plan which could subject any Employee Plan, the Sellers, the Company, the Operating Subsidiaries, or any of their respective trustees, fiduciaries, employees, agents or directors directly or indirectly (through an indemnification agreement or otherwise) to any liability for a breach of fiduciary duty, a "prohibited transaction," within the meaning of Section 406 of ERISA or Section 4975 of the Code, or a tax, penalty or fine under Sections 502 or 4071 of ERISA or Subtitle D, Chapter 43 of the Code.

(l)      There are no Actions or audits (other than routine claims for benefits in the Ordinary Course of Business) which are pending threatened or under consideration, with respect to any Employee Plan, and there exist no facts which could give rise to any such Actions.

(m)      No Employee Plan is or has been part of a multiple employer welfare arrangement, as that term is defined in ERISA Section 3(40).

(n)      No Employee Plan or any other arrangement with any Employee provides for any payments or other benefits that (i) become payable or become vested solely as a result of the consummation of the transactions contemplated under this Agreement and the Related Documents or (ii) would result in excess parachute payments (within the meaning of Code Section 280G), either (A) solely as a result of the consummation of such transactions or (B) as a result of the consummation of such transactions and any actions taken by the Company, the Operating Subsidiaries or the Purchaser after the Closing. Furthermore, the consummation of the transactions contemplated by this Agreement and the Related Documents will not require the funding (whether on a formal or informal basis) of the benefits under any Employee Plan (such as contributions to a "rabbi trust").

4.11    Litigation; Restriction on Business Activities.

(a)      Except as set forth on Schedule 4.11, there are no Actions involving the Sellers, the Company or the Operating Subsidiaries pending threatened against the Sellers, the Company or the Operating Subsidiaries, or any of their properties or rights which could affect (a) the right or ability of the Company to carry on the Business in substantially the same manner as it is conducted as of the date of this Agreement, (b) the right or ability of the Sellers, the Company or the Operating Subsidiaries to transfer the Transferred Interests or the Transferred Assets, or to consummate the sale of the Preferred Units to the Purchaser or otherwise to perform any of the obligations of the Seller or the Company under this Agreement or any of the Related Documents, or (c) the condition, whether financial or otherwise, or assets or properties of the Sellers, the Company or the Operating Subsidiaries, nor as to any matter which could impact the

Transferred Interests or the Transferred Assets, is there any reasonable basis for a claim described in clauses (a), (b) or (c) above. Neither the Sellers, any Founder, the Company, the Operating Subsidiaries nor any Affiliate of the Sellers or any Founder (including the Company and the Operating Subsidiaries) is subject to any judgment, order or decree entered in any lawsuit or proceeding which could affect the Sellers' or Telequick's operations or business practices in connection with the Business, or the ability of the Sellers, the Company or the Operating Subsidiaries to conduct the Business in substantially the same manner as the Business is conducted as of the date of this Agreement and the Related Documents.

(b)    There is no agreement (noncompete or otherwise), commitment, judgment, injunction, order or decree to which the Sellers, the Company or the Operating Subsidiaries is a party or that otherwise could be binding upon the Sellers, the Company, the Operating Subsidiaries or the Business which has or would reasonably have the effect of prohibiting or impairing the operation of the Business. Neither the Sellers, the Company, the Operating Subsidiaries, nor any Founder has entered into any agreement under which the operations of the Business are restricted from selling, servicing or licensing to customers or potential customers or any class of customers, in any geographic area, during any period of time or in any segment of the market.

4.12    Material Contracts and Other Agreements. Schedule 4.12 sets forth the following contracts which are related to or involve the Business (including, without limitation, all contracts of the Sellers, Telequick and any Founder related to the Business), whether written or oral (a) all contracts, agreements and commitments relating to the acquisition, sale or transfer of all or any portion of the business, assets (other than inventory in the Ordinary Course of Business), properties or equity interests of any Person (whether through purchase, merger, consolidation or otherwise) (the "Acquired Businesses"); (b) all agreements containing covenants not to compete on the part of the Sellers or Telequick or otherwise restricting the ability of the Sellers or Telequick in any way to engage in the Business; (c) all notes, mortgages, indentures, letters of credit, guarantees, performance bonds and other obligations and agreements and other instruments for or relating to any lending or Indebtedness entered into by the Sellers or Telequick or pursuant to which any Properties are pledged or mortgaged as collateral; (d) any employment, severance or consulting agreement with any present or former director or officer of the Sellers or Telequick; (e) all contracts, agreements, commitments or other arrangements with any Affiliate of the Sellers or Telequick; (f) all contracts, agreements, commitments or other arrangements for the purchase or sale of goods or services by or from the Sellers or Telequick, each of which requires a payment or payments by or to the Sellers or Telequick, in the aggregate, of more than Ten Thousand Dollars ($10,000) in any given year; (g) all other contracts, agreements or commitments involving aggregate payments of more than Ten Thousand Dollars ($10,000) during the term thereof or with a term of more than one (1) year, including all extensions thereof, at the option of any party other than the Sellers or Telequick; (h) all Licenses and agreements with respect to Business Intellectual Property; and (i) all other contracts, agreements and commitments which are material to the Sellers or Telequick or the operation of the Business, each of the foregoing described under clauses (a) through (i), including each of the same listed on Schedule 4.12, collectively referred to as the "Material Contracts." Except as set forth on Schedule 4.12, with respect to each Material Contract, (i) such Material Contract is valid, binding and enforceable against the Sellers or Telequick and each other party thereto, and is in full force and effect, (ii) the Sellers or Telequick are not and any other party to such

Material Contract is not in material breach thereof or material default thereunder, (iii) there does not exist any event that, with the giving of notice or the lapse of time or both, would constitute a material breach of or a material default by the Sellers or Telequick or any other party to such Material Contract under such Material Contract, and neither the Sellers nor any Affiliate thereof has received or given notice of any such breach, default or event, (iv) true, complete and correct copies of each Material Contract have been delivered or made available to the Purchaser or its representatives, (v) neither the Sellers nor Telequick have waived any material rights under any Material Contract, (vi) no material defense to the validity or enforceability of any Material Contract exists, (vii) neither the Sellers, Telequick nor any Founder has received or given notice of any breach or default in connection with any Material Contract and (viii) neither the Company nor the Operating Subsidiaries has existing Liabilities (contingent or otherwise), including with respect to any indemnification or guarantee obligation, with respect to any Acquired Business.

    4.13   <u>Compliance with Laws; Licenses</u>.

    (a)   The Sellers and Telequick are and at all times have been, and all of its Products and Properties are, and at all times have been in compliance in all respects with, and immediately following the consummation of the transactions contemplated by this Agreement and the Related Documents, the Company and the Operating Subsidiaries will be in compliance in all respects with, and neither the Sellers, the Company nor the Operating Subsidiaries have any liability under, any Laws, including, without limitation, any applicable franchise, building, zoning, employment, labor relations or other statute, Law, ordinance or regulation. No Consent of any Governmental Authority is required to be obtained and no registration or declaration is required to be filed in connection with the execution and delivery of this Agreement, the Asset Transfer, the Interest Transfer or the sale of the Preferred Units by the Company, except such as has been duly and validly obtained or filed, or with respect to any state or federal securities law filings to be made by the Purchaser or the Company after the Closing.

    (b)   The Sellers or Telequick hold or have applied for, and at the Closing the Company or the Operating Subsidiaries will hold or will have applied for, all Licenses necessary to conduct the Business as it is now being conducted and as is proposed to be conducted. A complete and correct list of all such Licenses is set forth on <u>Schedule 4.13</u>, and, excluding those Licenses which have been applied for, each such License is in full force and effect and none of such Licenses will require any Consents or be impaired as a result of the transactions contemplated by this Agreement or the Related Documents. One of the Sellers or Telequick solely possesses, and as of the Closing either the Company or one of the Operating Subsidiaries will solely possess, all such Licenses. Neither the Sellers, Telequick, any Founder, nor any Affiliate thereof has received any notice to the effect that, or has otherwise been advised that, the Sellers or Telequick are not in compliance with, or that it is in violation of, any such License, and the Sellers and Telequick are in compliance in all material respects with the terms of each such License and there are not currently existing any circumstances that are likely to result in a failure of the Sellers, the Company or the Operating Subsidiaries to comply in any material respect with any such License, or result in a material violation by the Sellers, the Company or the Operating Subsidiaries of any such License.

    4.14   <u>Title to Properties; Liens and Encumbrances</u>. As of the Closing, the Company or the Operating Subsidiaries will have good and marketable title to the Transferred Assets and the

Transferred Interests and, with respect to the Property leased by the Company or the Operating Subsidiaries, will hold valid leasehold interests therein, in each case subject to no Lien. There exists no default or other occurrence or condition which could result in termination of any lease under which any Property is leased by the Sellers or Telequick.

4.15    Leased Real Properties; No Owned Real Property.  Schedule 4.15 contains a complete and correct list of all real property leases, warehouse leases, subleases, licenses and occupancy agreements pursuant to which any of the Sellers or Telequick is a lessor, lessee, sublessor, sublessee, licensor or licensee of real property, setting forth the address, landlord and tenant for each (the "Leased Real Property").  The Sellers and Telequick have delivered to the Purchaser correct and complete copies of each of the agreements set forth in Schedule 4.15, including all amendments thereto and all nondisturbance agreements in connection therewith. Each lease, sublease, license or other agreement set forth in Schedule 4.15 is legal, valid, binding, enforceable and in full force and effect.  Except as set forth in Schedule 4.15, no party is in default, violation or breach in any material respect under any such lease, sublease or license and no event has occurred and is continuing thereunder that constitutes or, with notice or the passage of time or both, would constitute a default, violation or breach in any material respect thereunder.  The Sellers and Telequick have and the Company and the Operating Subsidiaries will have as of the Closing, good and valid title to the leasehold estate under each lease, sublease, license or other agreement set forth in Schedule 4.15, free and clear of all Liens.  All of the improvements situated in whole or in part at any Leased Real Property are in good operating condition, in a state of good maintenance and repair and are adequate and suitable for the purposes for which they are used and intended.  The Sellers and Telequick do not own any real property and, other than the interests in the Leased Real Property, the Transferred Assets do not include any interest in any real property.

4.16    Accounts Receivable.  A complete and correct list of all accounts receivable of the Business as of January 31, 2007 ("Accounts Receivable"), is attached hereto as Schedule 4.16.  The Accounts Receivable and all accounts receivable since January 31, 2007, represent bona fide sales actually made or services actually performed on or prior to such date in the Ordinary Course of Business.  Except as set forth in Schedule 4.16, there is no contest, claim or right of set-off contained in any oral or written agreement with any account debtor relating to the amount or validity of any Account Receivable.  The Accounts Receivable and all accounts receivable since December 31, 2006, are valid and collectible at the recorded amounts thereof in the Ordinary Course of Business, subject to the bad debt reserves contained in the Financial Statements.  The reserves reflected in the Financial Statements with respect to the Accounts Receivable have been established in the Ordinary Course of Business and in accordance with GAAP.

4.17    Taxes.  Except as set forth on Schedule 4.17:

(a)    All Tax Returns of the Sellers and Telequick relating to the Business that are required by Applicable Law to be filed by the Sellers and Telequick have been duly filed on a timely basis and all amounts set forth thereon have been paid in full.  All such Tax Returns are correct and complete in all material respects.  All Taxes that are due and payable by the Sellers and Telequick with respect to the operations of the Business have been paid in full or adequate reserves therefor have been established, and all deposits required by Applicable Law to be made

with respect to any such Taxes have been duly made. The Transferred Assets, the Transferred Interest, and the assets of the Company and the Operating Subsidiaries are and will be as of the Closing Date, free and clear of any Liens arising out of any unpaid Taxes and there are no grounds for the assertion or assessment of any Liens against the Transferred Assets, the Transferred Interests or the assets of the Company or the Operating Subsidiaries in respect of any Taxes (other than Liens for Taxes if payment thereof is not yet required, and which are included as a current tax liability on the Financial Statement, if such Taxes accrued before or as of the date thereof). From formation through the Closing Date, the Sellers and Telequick have taken no action to cause the Company or the Operating Subsidiaries not to be treated as a partnership for federal income Tax purposes and the Sellers will take all steps reasonably necessary to cause the Company, and cause the Company to cause the each of Operating Subsidiaries, not to be treated as a corporation for federal income Tax purposes. In the event the transactions contemplated by this Agreement will give rise to the assertion of any additional Taxes against the Transferred Assets, the Transferred Interests, the Company or the Operating Subsidiaries prior to Closing, such additional Taxes shall be the responsibility of the Sellers.

(b)     There is no Action or unresolved claim for assessment or collection pending or threatened by, or present or expected dispute with, any Governmental Authority for assessment or collection of any Taxes of any nature from the Sellers or Telequick relating to the Business and there is no basis for any Governmental Authority to assert that additional Taxes are due with respect to the Company, the Operating Subsidiaries or the Business for any period beginning prior to the Closing Date.

(c)     No powers of attorney or other authorizations are in effect that grant to any Person the authority to represent the Company or the Operating Subsidiaries in connection with any Tax matter or proceeding, or any such powers of attorney or other authorizations shall be revoked as of the Closing Date.

(d)     Neither the Sellers nor Telequick has waived nor has been requested to waive any statute of limitations in respect of Taxes.

(e)     All Tax deficiencies determined as a result of any past-completed audit relating to the Business, the Sellers or Telequick have been satisfied.

(f)     Neither the Sellers nor Telequick is a party to or bound by any closing agreement or offer in compromise with any taxing authority.

(g)     Neither the Sellers nor Telequick has taken any action that is not in accordance with past practice that could defer a liability for Taxes of the Sellers or Telequick related to the Business from any taxable period ending on or before the Closing Date to any taxable period ending after the Closing Date.

(h)     All related party transactions conducted by the Sellers or Telequick, and/or other Affiliates of the Sellers have been on an arms' length basis in accordance with Section 482 of the Code.

(i)     Except as described in the Financial Statements, neither the Company nor the Operating Subsidiaries will be required to include any adjustment in taxable income for any

# EXHIBIT A
# (PART 2 OF 2)

Tax period (or portion thereof) pursuant to Section 481 or Section 263A of the Code or any comparable provision under state or foreign Tax laws as a result of transactions, events or accounting methods employed prior to the Closing.

(j) "Tax(es)" shall mean all taxes, charges, fees, levies, imposts, customs duties or other assessments imposed by and required to be paid to any Governmental Authority including any federal, state, municipal, local or foreign taxing authority, including, without limitation, income, excise, real and personal property, sales, transfer, import, export, ad valorem, payroll, use, goods and services, value added, capital, capital gains, alternative, net worth, profits, withholding, employer health and franchise taxes (including any interest, penalties, fines or additions attributable to or imposed on or with respect to any such assessment) and any similar charges in the nature of a tax including, unemployment and employment insurance payments and workers compensation premiums, together with any installments with respect thereto and any estimated payments or estimated taxes and whether disputed or not.

(k) The Sellers and Telequick have collected all sales, use and value added Taxes required to be collected with respect to the Business, and has remitted or will remit on a timely basis, such amounts to the appropriate Governmental Authorities and has furnished properly completed exemption certificates for all exempt transactions.

(l) The Sellers and Telequick have properly withheld income and social security or other similar Taxes and paid payroll Taxes with respect to all persons properly characterized as employees with respect to the Business for federal, state or local Tax purposes.

4.18    Environmental and Safety Laws. Except as disclosed on Schedule 4.18:

(a) Each of the Sellers, Telequick and the Business is, and at all times has been, and the Company and the Operating Subsidiaries will be as of the Closing, in compliance with all, and has or will have, as applicable, no liability under any, Environmental Protection Laws or OSHA Laws.

(b) The Sellers and Telequick have obtained all Environmental Permits that are required in connection with the conduct of the Business, all of which are sufficient in scope for the conduct of the Business as currently conducted, and are valid, subsisting and in full force and effect. The Sellers and Telequick are in compliance with all terms and conditions of such Environmental Permits, and no Action which could reasonably be expected to result in the revocation or suspension or limitation of any such Environmental Permits is pending or threatened, and the Sellers and Telequick have not engaged in any conduct which could reasonably be expected to cause the revocation or suspension or limitation of any such Environmental Permits. All such Environmental Permits are transferable to the Company or the Operating Subsidiaries and shall have been transferred to the Company or the Operating Subsidiaries as of the Closing.

(c) There has been no pollution or contamination, whether of soil, groundwater or otherwise, at, upon, above, about or beneath any Real Property.

(d)    There has been no spill, discharge, disposal, leak, emission, injection, storage, escape, dumping, release or threatened release of any kind of any Hazardous Substance on, in, under or about any Real Property.

(e)    Neither the Sellers nor Telequick have received at any time prior to the date hereof any summons, citation, notice, directive, letter or other communication, whether written or oral, from (i) the United States Environmental Protection Agency or any other Governmental Authority or any other Person concerning any request for information or potential liability with respect to any offsite treatment storage or disposal facility or any intentional or unintentional action or omission by the Sellers, Telequick or any other Person with respect to the Business or any Real Property constituting a violation or potential violation of, or potential liability under, any Environmental Protection Laws relating to the Business or any Real Property, including, without limitation, any potential liability or violations or potential violations relating to the disposal, release, threatened release, discharge, spilling, leaking, pumping, pouring, emitting, emptying, dumping or otherwise disposing or arranging for disposal, storage or treatment, of any Hazardous Substance or (ii) any Governmental Authority or any other Person concerning any intentional or unintentional action or omission by the Sellers, Telequick or any other Person with respect to the Business constituting a violation or potential violation of any OSHA Laws, and there exist no facts that would be the basis for finding such a violation.

(f)    There are no events, conditions, circumstances, incidents, actions or plans that may interfere with or prevent continued compliance (i) by the Business and/or any Real Property with any Environmental Protection Laws, give rise to any liability relating to the Business and/or any Real Property, or form the basis for any claim, action, suit or other proceeding under any Environmental Protection Laws relating to the Business and/or any Real Property or (ii) by the Business with any OSHA Laws, give rise to any liability relating to the Business, or form the basis for any claim, action, suit or other proceeding under any OSHA Laws relating to the Business.

(g)    There are no and there have never been, any underground storage tanks located at any Real Property.

(h)    There are no and there have never been, any hazardous waste treatment, storage or disposal units or facilities located on any Real Property.

(i)    All Hazardous Substances now or previously present at any Real Property have been and are handled, packaged, labeled, stored, used and disposed of in compliance with Environmental Protection Laws and OSHA Laws.

(j)    The Sellers and Telequick have delivered to the Purchaser copies of all environmental audits and studies relating to the Real Property and the Business.

(k)    There are no asbestos or asbestos containing materials of any kind on any Real Property, including asbestos building materials, piping, lagging, parts or equipment.

(l)    None of the matters set forth on Schedule 4.18 can reasonably be expected to result in a Material Adverse Effect.

4.19    Related Party Transactions.  Except as set forth on Schedule 4.19, there are no agreements, understandings or proposed transactions between the Sellers, the Company, the Operating Subsidiaries and any Founder or any of their respective employees, directors, Affiliates or any Affiliate thereof.  Schedule 4.19 sets forth (a) a correct and complete list or description of all obligations of the Sellers, the Company and the Operating Subsidiaries to any Founder or the Sellers' Affiliates, employees or directors or to any Family Member thereof and of all Indebtedness of such Persons to the Sellers, the Company or the Operating Subsidiaries; and (b) a list of all dividends, distributions, share repurchases, redemptions and tax distributions made by the Sellers or Telequick to any Founder from and after December 31, 2005.  No Founder, nor any Affiliate, employee or director of the Sellers, the Company or the Operating Subsidiaries, or any Family Member of any Founder, Affiliate, employee or director of the Seller, is indebted to the Sellers, the Company or the Operating Subsidiaries or has any direct or indirect ownership interest in any entity with which the Sellers the Company or the Operating Subsidiaries are affiliated or with which the Sellers, the Company or the Operating Subsidiaries have a business relationship, or any entity which competes with the Sellers, the Company or the Operating Subsidiaries.  No Founder, nor any Affiliate, employee or director of the Sellers the Company, the Operating Subsidiaries or any Founder, nor any Family Member of any Founder, Affiliate, employee or director of the Sellers, the Company or the Operating Subsidiaries, is, directly or indirectly, interested in any contract or agreement to which the Sellers the Company or the Operating Subsidiaries are a party (other than such contracts as relate to any such Person's ownership of capital stock or other securities of the Sellers or Telequick).

4.20    Intellectual Property.

(a)    Schedule 4.20 sets forth a true, accurate and complete list of the Intellectual Property that is necessary to or used in the Business as now conducted or as presently contemplated to be conducted following the Closing (collectively, the "Business Intellectual Property").  The Sellers or Telequick own or have the right to use, and the Company and the Operating Subsidiaries will own and have the right to use as of the Closing, free and clear of all Liens, all Business Intellectual Property without any conflict with or infringement of the rights of others and the consummation of the transactions contemplated hereby and by the Related Documents will not alter or impair in an adverse manner the Business Intellectual Property.

(b)    Except as set forth on Schedule 4.20, no third party has any ownership right, title, interest, claim in or Lien on any of the Business Intellectual Property.  The Sellers and Telequick have taken steps to preserve and protect its legal rights in, and the secrecy of, the Business Intellectual Property.

(c)    The Sellers and Telequick are not, and the Company and the Operating Subsidiaries will not be as of the Closing, in default under any agreement pursuant to which it is licensing Intellectual Property of a third party or granting licenses to its own Intellectual Property.  The Sellers and Telequick have not received any communications alleging that the Sellers or Telequick have violated in any material respect any other Person's Intellectual Property rights or has engaged in unfair competition against such Person.

(d)    The Sellers or Telequick have written agreements in effect with all of its current and former employees and consultants who have access to the Business Intellectual

Property. None of the Sellers' or Telequick's current or former employees or consultants are in violation of any such agreement and all such agreements fully vest in the Sellers or Telequick (subject to any limitations imposed by Applicable Law) full title and ownership of all inventions and proprietary rights developed or invented by any and all employees and consultants during the period of their employment and/or consultancy and resulting directly or indirectly from their work for the Sellers or Telequick.

(e)    The Sellers and Telequick (i) do not now infringe or misappropriate any third party's Intellectual Property rights, and (ii) do not have any liability for any past infringement or misappropriation. No claim has been made or is threatened with regard to any third party Intellectual Property, including any allegation of Intellectual Property infringement or misappropriation or of any breach or default of an Intellectual Property license or similar agreement.

(f)    Each of the Sellers' and Telequick's patents, patent applications, registered copyrights, copyright applications, trademarks, service marks, trademark and service mark applications, mask work registrations and mask work registration applications are set forth on Schedule 4.20.

4.21    Products; Product Warranty and Liability.

(a)    Each Product designed, manufactured, distributed, performed and provided by the Sellers and Telequick has been designed, manufactured, distributed, performed and provided in conformity with all applicable contractual commitments, all express warranties and all Applicable Laws, and the Sellers and Telequick have (and the Company and the Operating Subsidiaries will have as of the Closing) no Liability or other damages in connection therewith. Schedule 4.21(a) includes copies of the standard terms and conditions of sale for Products of the Business (containing applicable guaranty, warranty, and indemnity provisions). No Product manufactured or fabricated by or on behalf of the Sellers or Telequick in the conduct of the Business is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale set forth in Schedule 4.21(a).

(b)    To the actual knowledge, and the knowledge which could have been acquired after making reasonable investigation under the circumstances, of the Sellers and the Founders, each Product designed, manufactured, distributed, performed, provided and sold by the Sellers and Telequick on behalf of third parties has been designed, manufactured, distributed, performed, provided and sold in conformity with all applicable contractual commitments, all express warranties and all Applicable Laws, and the Sellers and Telequick have (and the Company and the Operating Subsidiaries will have as of the Closing) no Liability or other damages in connection therewith. Schedule 4.21(b) includes copies of the standard terms and conditions of sale for Products of the Business (containing applicable guaranty, warranty, and indemnity provisions).

4.22    Liabilities and Indebtedness. Neither the Sellers nor any Founder have taken any action that would result in the creation, incurrence or assumption of any Indebtedness on the part of the Company or the Operating Subsidiaries, contingent or otherwise, either directly or indirectly, including the guaranty of any Indebtedness of any other Person or entity.

4.23  Distributors.  Except as set forth on Schedule 4.23, no distributor, contractor, broker, dealer, agent or representative, other than the Sellers' and Telequick's current employees, have an oral or written agreement or understanding to sell or otherwise provide Products.

4.24  Customers.  Schedule 4.24 sets forth the names and addresses of the twenty (20) largest (based upon revenues) customers, contractors and other Persons from whom the Sellers and Telequick derived revenues in connection with the Business for the twelve (12) month periods ended December 31, 2006, and 2005, and the amount for which each such customer, contractor or other Person was invoiced during such periods.  Except as set forth in Schedule 4.24, neither the Sellers or Telequick have received any notice, nor do either the Sellers or any Founder have any reason to believe, that any such customer, contractor or other Person set forth in Schedule 4.24 has ceased, or will cease, to purchase or use Products, or has substantially reduced, or will substantially reduce, the purchase or use of Products from the Company or the Operating Subsidiaries subsequent to the Closing.  The Sellers and Telequick are current and in full compliance with respect to all of their material obligations to all of their customers, contractors and each other Person from whom they derive revenues.

4.25  Suppliers.  Schedule 4.25 sets forth the name and address of the twenty (20) largest (based upon payments made by the Sellers and Telequick) suppliers, vendors or other providers of services to the Sellers and Telequick for each of the twelve (12) month periods ended December 31, 2006, and 2005.  Except as listed on Schedule 4.25, neither the Sellers nor Telequick have received any notice, nor do either the Sellers or any Founder have any reason to believe, that any such supplier, vendor or other provider of services has ceased, or will cease, to supply products or other goods or services to the Company or the Operating Subsidiaries on or after the Closing Date, or has substantially reduced, or will substantially reduce, the supply of such items or services to the Company or the Operating Subsidiaries after the Closing Date.  The Sellers and Telequick are current and in full compliance with respect to all of their material obligations to their suppliers, vendors and other providers of services.

4.26  Brokers; Certain Expenses.  Except for the Caymus Fee, neither the Sellers, the Company, the Operating Subsidiaries nor the Founders has paid or become obligated to pay any fee or commission to any broker, finder, investment banker or other intermediary in connection with this Agreement or any of the Related Documents.

4.27  Disclosure.  No representation or warranty made by the Sellers, the Company, the Operating Subsidiaries or the Founders in this Agreement, any Schedule hereto, any Related Document, or any document or certificate furnished or to be furnished by or on behalf of the Seller to the Purchaser or its Affiliates, agents and representatives in connection with this Agreement and the Related Documents or the transactions contemplated hereby or thereby contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they are made, not misleading.  There is no fact that has not been disclosed in this Agreement or the Related Documents which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser represents to the Sellers, the Company, the Operating Subsidiaries and the Founders as follows:

5.1    Organization and Existence; Authorization; No Conflicts.

(a)    The Purchaser is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. The Purchaser has all requisite power and authority to execute and deliver this Agreement and the Related Documents to which it is a party, to purchase the Preferred Units hereunder, and to carry out and perform its obligations under the terms of this Agreement and the Related Documents to which it is a party.

(b)    The execution, delivery and performance of this Agreement and the Related Documents by the Purchaser and the consummation of all transactions contemplated hereby or thereby, including but not limited to the purchase of the Preferred Units, have been duly authorized by all required actions of the Purchaser.

(c)    This Agreement and the Related Documents have been duly executed and delivered by the Purchaser. This Agreement and the Related Documents constitute valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with their respective terms, except as enforcement may be limited by principles of public policy, and subject to laws of general application relating to Bankruptcy, insolvency, reorganization, moratorium and the relief of debtors and rules of law and general principles of equity governing specific performance, injunctive relief or other equitable remedies.

5.2    Investment. The Purchaser is acquiring the Preferred Units for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof in violation of Applicable Laws. The Purchaser understands that the Preferred Units to be purchased have not been registered or qualified, as the case may be, under the Securities Act of 1933, as amended (the "Securities Act") or any applicable state securities laws by reason of a specific exemption from the registration or qualification provisions of the Securities Act or any applicable state securities laws.

5.3    Brokers or Finders. The Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken by the Purchaser, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement for which the Sellers, the Company, the Operating Subsidiaries or any Founder will be responsible.

## ARTICLE 6
## CONDITIONS TO THE CLOSING

The obligations of the parties to this Agreement are subject to the following conditions:

6.1    Conditions to the Obligations of the Parties. The obligations of the parties to consummate the transactions contemplated hereby shall be subject to the condition that (a) no injunction or order shall have been issued by any court of competent jurisdiction or any other

Governmental Authority that would restrain or prohibit any of the transactions contemplated by this Agreement or any of the Related Documents or that would impose damages as a result thereof and (b) no Action shall be pending before any court or administrative agency or instrumentality of competent jurisdiction in which any Person seeks such a remedy (if, in the opinion of counsel to any party, there exists a reasonable risk of a materially adverse result in such pending Action).

    6.2    <u>Conditions to the Obligations of the Purchaser</u>.  The obligations of the Purchaser to purchase the Preferred Units at the Closing as contemplated hereby shall be subject to the fulfillment or satisfaction (or waiver in writing by the Purchaser) at or prior to the Closing of each of the following conditions:

    (a)    <u>Representations; Performance by the Seller and the Founders</u>.  Each of the representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement and in each Related Document shall be true and correct as of the Closing with the same force and effect as if made on such date, and the Sellers, the Company, the Operating Subsidiaries shall have performed and satisfied their respective obligations required or contemplated by this Agreement and the Related Documents to be performed and satisfied by them prior to the Closing.

    (b)    <u>No Material Adverse Effect</u>.  Since December 31, 2005, there has been no Material Adverse Effect.

    (c)    <u>Asset and Interest Transfers</u>.  The Sellers shall have consummated the Asset Transfer and the Interest Transfer, free and clear of all Liens, each in a manner satisfactory to the Purchaser.

    (d)    <u>Authorizations</u>.  All authorizations of the Sellers, the Company, the Operating Subsidiaries and the Founders in connection with this Agreement and the Related Documents and the transactions contemplated hereby and thereby shall have been taken and shall be reasonably satisfactory in form and substance to the Purchaser.

    (e)    <u>Delivery of Audited Financial Statements</u>.  The Sellers and Telequick shall have delivered audited balance sheets as of December 31, 2005, and June 30, 2006, and related income and cash flow statements, in form and substance satisfactory to the Purchaser (the "Audited Financial Statements").  The Audited Financial Statements shall have been prepared by Kingery & Crouse, P.A.

    (f)    <u>Caymus Fee</u>.  The Caymus Fee shall have been paid by wire transfer of immediately available funds to the account designated by Caymus Partners LLC at the Closing.

    (g)    <u>Closing Documents</u>.  The Sellers shall have delivered, or caused to be delivered, to the Purchaser on the Closing Date the following documents all in form and substance satisfactory to the Purchaser:

    (i)    original certificates evidencing the Preferred Units;

(ii)    employment agreements with the Company, duly executed by each of Wolf and Eliasson in form and substance satisfactory to the Purchaser (the "Employment Agreements");

(iii)    a Secretary's Certificate of each Seller, the Company and each Operating Subsidiary, as applicable, duly executed by the Secretary of such party, with incumbency, certifying as to the following matters:    (A) the articles or certificates of incorporation or formation, as applicable, of such party, (B) the bylaws or operating agreement, as applicable, of such party, (C) the authorizing resolutions of the board of directors or managers and the shareholders or members of such party, as applicable, approving the transactions contemplated by this Agreement and (D) the good standing certificates set forth in Section 6.2(g)(iv);

(iv)    certificates dated (A) as of a date that is prior to, and in the same month and year as, the Closing Date, with respect to each of the Company and the Operating Subsidiaries, from the Secretary of State of the State of such entity's organization that such entity is legally existing and in good standing in such State, and (B) as of a date that is prior to, and in the same month and year as, the Closing Date, with respect to FTN, Guardian and Bay Pines, from the Secretary of State of the jurisdiction of organization of such entity, that such entity is legally existing and in good standing in such jurisdiction;

(v)    a certificate of the Sellers, executed by the Chief Executive Officers of the Sellers and Wolf and Eliasson, as applicable, dated the Closing Date, and certifying as to the fulfillment of the conditions specified in Sections 6.2(a), 6.2(b), 6.2(c) and 6.2(d) of this Agreement;

(vi)    the Restated LLC Agreement, duly executed by, as applicable, the Seller, the Founders and the Company;

(vii)    evidence, in a form satisfactory to the Purchaser, that the Company and the Operating Subsidiaries, as applicable, have obtained (A) general liability and property insurance in amounts satisfactory to the Purchaser, and (B) director and officer insurance in an amount of no less than Three Million Dollars ($3,000,000);

(viii)    the Services Agreement, duly executed by each of the Sellers, the Company and the Operating Subsidiaries; and

(ix)    the Bay Pines Agreement, duly executed by each of the Sellers, the Company and the Operating Subsidiaries, as applicable.

(h)    Opinion of Counsel.    The Seller shall have caused to be delivered to the Purchaser an opinion of Macfarlane, Ferguson & McMullen, P.A., dated the Closing Date and addressed to the Purchaser in form and substance satisfactory to the Purchaser.

(i)    Licenses; Governmental and Other Third Party Consents.    The Company, the Operating Subsidiaries or the Purchaser, as applicable, shall have received or applied for all necessary Licenses and Consents, including, without limitation, those identified on Schedule

6.2(i), to the consummation of the transactions contemplated by this Agreement and the Related Documents.

(j)    No Distributions.  Except as set forth on Schedule 6.2(j), since December 31, 2005, there shall have been no distributions or dividends of cash or other property or similar transfers from the Sellers to any of the Founders.

(k)    Employment Arrangements.  All employees set forth on Schedule 6.2(k) shall have accepted employment offers with the Company or the Operating Subsidiaries and, and all current and future employees of the Company or the Operating Subsidiaries shall have entered into noncompetition, proprietary information and invention assignment agreements in form and substance satisfactory to the Purchaser. The employee benefit plans listed on Schedule 6.2(k) shall have been assigned to or assumed by the Company or the Operating Subsidiaries.

(l)    Registration Rights Agreement.  The Purchaser and the Company shall have executed a registration rights agreement by and between the Company and the Purchaser, in the form of Exhibit C attached hereto.

(m)    Cash Balance.  Immediately following the Closing and the payment of all fees, expenses and liquidity pursuant to Section 3.4, the Company shall have a minimum of Two Million and Dollars ($2,000,000) in cash (net of (A) any written but uncleared checks of the Company and the Subsidiaries, (B) any accounts payable of the Company and the Subsidiaries that are more than thirty (30) calendar days past due, and (C) any increase in the Indebtedness of the Company and the Operating Subsidiaries immediately following the Closing Date) on its consolidated balance sheet after giving effect to the Sellers Loan provided for in Section 3.4 and the senior debt referenced in Section 3.5.

6.3    Conditions to the Obligations of the Sellers and the Company.  The obligations of the Sellers and the Company to sell the Preferred Units at the Closing as contemplated hereby shall be subject to the fulfillment or satisfaction (or waiver in writing by the Sellers) at or prior to the Closing of each of the following conditions:

(a)    Representations; Performance of the Purchaser.  Each of the representations and warranties made by the Purchaser in this Agreement shall be true and correct as of the Closing and the Purchaser shall have performed and satisfied in all material respects each of its obligations required or contemplated by this Agreement and in each Related Document to be performed as of the Closing.

(b)    Authorizations.  All authorizations of the Purchaser in connection with this Agreement and the Related Documents and the transactions contemplated hereby and thereby shall have been taken and shall be reasonably satisfactory in form and substance to the Seller.

(c)    Restated LLC Agreement.  The Restated LLC Agreement shall have been executed and delivered by the Purchaser.

(d)    Purchase Price.  The Purchase Price shall have been paid, as provided in Section 3.3.

# ARTICLE 7
## COVENANTS AND AGREEMENTS

7.1    <u>Post-Closing Covenants</u>.

(a)    <u>Cooperation; Securities Filings</u>.  Each party shall cooperate with the other parties and use its reasonable best efforts to consummate the transactions contemplated by this Agreement and the Related Documents in accordance with the terms hereof and thereof.  The Sellers and the Company shall make all necessary filings under applicable federal and state securities Laws, including, but not limited to, a Form D and any amendments thereto as required by Rule 503 of Regulation D.

(b)    <u>Publicity</u>.  At any time on or after the Closing Date, no party (nor any of its Affiliates) shall, directly or indirectly, make any press release or other public announcement with respect to the transactions contemplated hereby or under the Related Documents without the prior written consent of the other parties, unless any such party is required by Applicable Law to make such a press release or announcement.

(c)    <u>Operations of Certain Sellers</u>.  The Sellers and the Founders covenant and agree that, at all times after the Closing, (i) the Founders will be the sole record and beneficial owners of FTN, Guardian and Bay Pines, and (ii) FTN and Guardian will engage in no activities or operations other than (A) those incidental to their ownership of interests in the Company, and (B) their obligations under this Agreement and the Services Agreement.  The Sellers and the Founders agree that, for as long as (1) FTN and Guardian are the owners of any Common Units, such entities shall not be dissolved or liquidated without the approval of the Purchaser, and (2) the Bay Pines Agreement remain in effect, Bay Pines shall not be dissolved or liquidated without the approval of the Purchaser.

(d)    <u>Payment of Closing Fee</u>.  Within sixty (60) calendar days after the Closing Date, the Company shall pay the Closing Fee by wire transfer of immediately available funds to the account designated by the Purchaser.

(e)    <u>Assignment of Untransferred Contracts</u>.  Within ninety (90) calendar days after the Closing Date, the Sellers and the Founders shall use their best efforts to take all actions necessary or advisable to, as soon as possible after the Closing, obtain consent to the assignment of, and assign or otherwise transfer the Untransferred Contracts to the Company or one of the Operating Subsidiaries, as applicable.

(f)    <u>Transfer of Bay Pines Assets</u>.  Upon the request of the Purchaser, and, in no event, not later than March 31, 2008:

(i)    the Company shall form, and shall own One Hundred Percent (100%) of the outstanding membership interests of, a limited liability company under the laws of the State of Florida named "Bay Pines, LLC" or such other name as the parties hereto shall agree is appropriate ("<u>Bay Pines, LLC</u>"), and Bay Pines shall sell all of its assets to Bay Pines, LLC for an aggregate purchase price of One Dollar ($1);

(ii)    Bay Pines shall change its name to a name sufficiently dissimilar to Bay Pines, LLC in the Purchaser's reasonable judgment;

(iii)    the parties hereto shall (A) amend this Agreement to (1) revise the definition of "Operating Subsidiaries" to include Bay Pines, LLC and (2) make such other changes to this Agreement as are necessary to make Bay Pines, LLC a party hereto, and (B) take all such other actions necessary to ensure that Bay Pines, LLC is subject to the provisions of this Agreement and the Related Documents; and

(iv)    the Bay Pines Agreement shall be terminated.

Notwithstanding the provisions of this Section 7.1(f), the Company may delay such intended actions if the Board of Managers of the Company determines in good faith that the licenses owned by Bay Pines would be cancelled, or otherwise terminated, as a result of such requested actions; provided, however, that the Company may only delay such transactions long enough to ensure that either (A) Bay Pines, LLC has obtained such licenses as are necessary for Bay Pines, LLC to operate as Bay Pines has historically operated, or (B) Bay Pines has successfully transferred its licenses to Bay Pines, LLC without risk of cancellation; provided, further, that the Company may not delay such intended actions beyond March 31, 2008; provided, further, that the Company may make requests from the Purchaser for six (6)-month extensions beyond March 31, 2008, which requests shall not be unreasonably denied.

(g)    Key-Man Life Insurance.  Within thirty (30) days after the Closing Date, the Company shall deliver evidence, in a form satisfactory to the Purchaser, that the Company has obtained "key man" life and disability insurance on the life of Bryon Wolf in the amount of Twenty-Five Million Dollars ($25,000,000), of which (1) Twenty Million Dollars ($20,000,000) shall be collaterally assigned to Kayne as security for the redemption of the Preferred Units pursuant to the terms of the Restated LLC Agreement, and (2) the remainder shall be assigned to the Company; provided, however, in the event (i) the cost of such insurance exceeds Fifty Thousand Dollars ($50,000) and (ii) a majority of the managers of the Company decide, in good faith, to not pay such amount in excess of Fifty Thousand Dollars ($50,000), the Company shall purchase and maintain such insurance in whatever coverage amount can be acquired for Fifty Thousand Dollars ($50,000); provided, further, that the Company may request for an extension of the foregoing thirty (30)-day period from the Purchaser which request shall not be unreasonably denied.

7.2    Non-solicitation; Covenant Not to Compete; Confidentiality.

(a)    From and after the Closing Date, and for a period of five (5) years thereafter (the "Restricted Period"), the Sellers and the Founders shall not, and they shall cause their respective Affiliates not to, directly or indirectly, (i) hire any employee of the Company or the Operating Subsidiaries within twelve (12) months following the termination of his or her employment with the Company or the Operating Subsidiaries unless the Company or the Operating Subsidiaries has terminated such employee's employment, (ii) encourage, solicit, induce or attempt to encourage, solicit or induce any employee to leave his or her employment with the Company or the Operating Subsidiaries, terminate his or her relationship with the Company or the Operating Subsidiaries or to devote less than his or her full-time efforts to the

Business for any reason, (iii) solicit any present or former customers, clients or other persons from whom Sellers and Telequick derived any revenue in the course of conducting the Business prior to the Closing Date for the purpose of competing with the Business, (iv) solicit any present or future customers, clients or other persons from whom the Company or the Operating Subsidiaries derives any revenue, with respect to the Business as conducted by the Company on or after the Closing Date for the purpose of competing with the Business, or (v) persuade or attempt to persuade any present or future customer, client, vendor, service provider, supplier, contractor or any other Person having business dealings with the Company or the Operating Subsidiaries to cease doing business or otherwise transacting with the Company or the Operating Subsidiaries or to reduce the amount of business or such other transactions it conducts or will conduct with the Company or the Operating Subsidiaries or otherwise disrupt, damage, impair or interfere in any manner with the business of the Company or the Operating Subsidiaries.

(b)     From and after the Closing Date, and for the Restricted Period, the Sellers and the Founders jointly and severally agree that they shall not, and they shall cause their respective Affiliates not to, directly or indirectly, own, manage, operate or control, or engage, join or participate in the ownership, management, operation or control of, or furnish any capital or loans to, be employed by or act as a consultant to or be connected in any manner with, any Person or business that is engaged in, or owns, invests in, operates, manages or controls any venture or enterprise which directly or indirectly engages or proposes to engage in a business which is competitive with the Business or with the business in which the Company or the Operating Subsidiaries is then engaged anywhere in the world (the "Territory"). Notwithstanding the foregoing, nothing herein shall prohibit or otherwise restrict the Sellers or any Founder from holding a passive investment in the equity securities of any Person if such equity securities are registered under the Securities Act; provided that such equity investment does not exceed One Percent (1%) of the outstanding equity securities of such Person.

(c)     The Founders acknowledge that in their capacities as the sole shareholders, directly or indirectly, of the Sellers, they have occupied positions of trust and confidence with respect to the Sellers. The Sellers and each Founder jointly and severally agree that they shall not disclose to others or use, and shall prevent each of their Affiliates from disclosing to others or using, directly or indirectly, any Confidential Information regarding the Sellers, the Company, the Operating Subsidiaries, the Business, the prospective businesses of the Company or the Operating Subsidiaries or any of the Products, except as required in the course of any Founder's employment with the Company or the Operating Subsidiaries, at any time after the Closing. The Sellers and each Founder jointly and severally represent and warrant to the Company and the Operating Subsidiaries that, as of the Closing Date it, he or she has surrendered to the Company or the Operating Subsidiaries, as applicable, all documents, work papers, lists, memoranda, records, computer data and other data (including all copies) in its, his or her possession constituting or pertaining in any way to the Confidential Information. The Sellers and the Founders acknowledge and agree that such Confidential Information is specialized, unique in nature and of great value to the Company, the Operating Subsidiaries and the Business and that such information gives the Company, the Operating Subsidiaries and the Business a competitive advantage.

(d)     The necessity of protection against competition from the Sellers and the Founders and the nature and scope of such protection has been carefully considered by the

parties to this Agreement based upon the consultation with and advice from their respective legal counsel. The Sellers and the Founders acknowledge and agree that they will receive direct and substantial benefits from the transactions contemplated by this Agreement and that the Purchaser would not enter into the transactions contemplated by this Agreement without the agreements of Sellers and the Founders contained in this Section 7.2. The parties agree and acknowledge (i) the Purchaser is investing substantial sums to acquire an interest in the Company and the Business, (ii) that the duration, scope and Territory applicable to the covenants contained in this Section 7.2 are fair, reasonable and necessary, and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the Company's and the Operating Subsidiaries' and the Purchaser's investment therein and the Company's and the Operating Subsidiaries' business goodwill, (iii) that adequate compensation has been received by the Sellers and the Founders for such obligations and (iv) that these obligations do not prevent the Sellers or the Founders from earning a livelihood and/or conducting any other business. If any provision of this Section 7.2 is held to be illegal, invalid or unenforceable under present or future laws, rules or regulations of any governmental entity effective during the period set forth in such sections, the legality, validity and, enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired. If any court determines that any of the covenants contained in this Section 7.2, or any part thereof, are unenforceable because of the duration of such provision or the product, services or area covered thereby or for any other reason, such court shall have the power and the parties intend and desire that such court, and in connection with the purchase and acquisition of the Preferred Units the Purchaser is relying on such court to, exercise such power to reduce the duration or coverage of such provision to the minimum extent necessary to render such provision enforceable, and in its reduced form, such provision shall then be enforceable and shall be enforced. Each party hereto intends to and does hereby confer jurisdiction to enforce the covenants and other provisions contained in this Section 7.2, upon the courts of any jurisdiction within the geographic scope of such covenants or other provisions. If the courts of any one (1) or more of such jurisdictions holds such covenants or other provisions wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of each party that such determination not bar or in any way affect the rights of the Purchaser, the Company or the Operating Subsidiaries to relief in the courts of any other jurisdiction within the geographic scope of such covenants or other provisions, as to breaches of such covenants or other provisions in any such other jurisdiction, such covenants or other provisions as they relate to each jurisdiction and geographic location being, for this purpose, severable into diverse and independent covenants and other provisions.

(e)     The Sellers and each Founder recognize that any actual or threatened breach of this Section 7.2 shall cause irreparable injury to the Company, the Operating Subsidiaries and the Purchaser, inadequately compensable in monetary damages. Accordingly, notwithstanding the provisions of Article 8, in addition to any other legal or equitable remedies that may be available to the Company, the Operating Subsidiaries and the Purchaser, the Sellers and each Founder agree that the Company, the Operating Subsidiaries and the Purchaser shall be able to seek and obtain injunctive relief in the form of a temporary restraining order, preliminary injunction, or permanent injunction. The Company, the Operating Subsidiaries and the Purchaser shall not be required to demonstrate actual injury or damage to obtain injunctive relief from the courts. In addition, in any Action arising out of this Section 7.2, the prevailing party or parties shall be entitled to recover, in addition to any damages caused by a breach of this Section

7.2, all costs and expenses, including but not limited to, reasonable attorneys' fees, expenses, and court costs incurred by such party or parties in connection with such Action.

### 7.3 Tax Matters.

(a)    All transfer, documentary, sales, use, stamp registration and other similar Taxes imposed by any Governmental Authority (including any state, county, local or other taxing authority) as a result of the Transfer or the purchase of the Preferred Units shall be duly and timely paid by the Company. The Company shall duly and timely file all Tax Returns in connection with such Taxes. The Company shall give a copy of each such Tax Return to the Purchaser for its review with sufficient time for the provision of comments prior to filing.

(b)    The Sellers shall prepare or cause to be prepared and file or cause to be filed all Tax Returns with respect to the Business for all periods ending on or before the Closing Date which are filed after the Closing. To the extent permitted by Applicable Law, the Sellers shall include any income, gain, loss, deduction or other Tax items for such periods on their Tax Returns in a manner consistent with the Schedules K-1 furnished by the Company for such periods.

(c)    The Company, the Sellers, the Founders and the Purchaser shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Sellers agree to retain all books and records with respect to Tax matters pertinent to the Sellers and Telequick relating to any Tax period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Company, any extensions thereof) of the respective Tax periods, and to abide by all record retention agreements entered into with any Governmental Authority.

(d)    All Tax sharing agreements or similar agreements with respect to or involving the Sellers, the Company or the Operating Subsidiaries shall be terminated as of the Closing Date and, after the Closing Date, the Sellers, the Company, the Operating Subsidiaries and the Purchaser shall not be bound thereby or have any liability thereunder.

(e)    The Sellers and the Purchaser agree to cause the Company to make an election pursuant to Section 754 of the Code in its initial Tax Return and not to revoke or terminate such election.

(f)    As of the Closing Date, the combined opening Capital Account (as defined in the Restated LLC Agreement) of the Purchaser with respect to the Preferred Units shall be Twenty Million Dollars ($20,000,000). As of the Closing Date, the combined opening Capital Accounts of each Seller with respect to the Common Units shall be Two Million Dollars ($2,000,000).

## ARTICLE 8
## INDEMNIFICATION

8.1     <u>Survival of Representations and Warranties</u>.  The representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement or any Related Document shall survive the Closing and shall continue in effect for a period of eighteen (18) months (the "<u>Survival Period</u>") following the Closing Date, except:

(a)     As to the breach of any such representation or warranty as to which a claim is submitted in writing by a Purchaser Indemnitee within the Survival Period and identified as a claim for indemnification pursuant to this Agreement or any Related Document, in which case such representation and warranty shall survive until the claim is resolved;

(b)     The representations and warranties set forth in <u>Sections 4.8</u> (Absence of Certain Changes or Events), <u>4.11</u> (Litigation; Restriction on Business Activities), <u>4.12</u> (Material Contracts and Other Agreements), <u>4.13</u> (Compliance with Laws; Licenses), <u>4.19</u> (Related Party Transactions), <u>4.21</u> (Products; Product Warranty and Liability), <u>4.22</u> (Liabilities and Indebtedness) and <u>4.27</u> (Disclosure) shall continue in effect for a period of thirty-six (36) months following the Closing Date; and

(c)     The representations and warranties set forth in <u>Sections 4.7</u> (Financial Statements), <u>4.10</u> (Employees; Employee Benefits), <u>4.17</u> (Taxes), <u>4.18</u> (Environmental and Safety Laws) and <u>4.20</u> (Intellectual Property) shall survive the Closing until sixty (60) calendar days following the expiration of all applicable statutes of limitations (and any extension thereof) with respect to such matters; and

(d)     The representations and warranties set forth in <u>Sections 4.1</u> (Organization; Good Standing; Qualification), <u>4.2</u> (Subsidiaries), <u>4.3</u> (Power and Authority; Capitalization; Indebtedness), <u>4.4</u> (Asset and Interest Transfer), <u>4.5</u> (Authorization; Execution and Delivery; No Conflicts), <u>4.14</u> (Title to Properties; Liens and Encumbrances) and shall survive the Closing indefinitely.

Notwithstanding anything to the contrary contained in this Agreement, the obligations of the Sellers, the Company, the Operating Subsidiaries and the Founders to indemnify any Purchaser Indemnitee for Losses arising out of or resulting from any fraud or intentional or willful misrepresentation shall survive indefinitely.  The representations and warranties of the Purchaser shall survive the Closing for a period of eighteen (18) months commencing on the Closing Date.  Notwithstanding the right of the Purchaser to investigate the business, assets and financial condition of the Sellers, the Company and the Operating Subsidiaries, and notwithstanding any knowledge obtained or obtainable by the Purchaser as a result of such investigation, the Purchaser has the right to rely upon, and has relied upon, each of the representations and warranties made by the Sellers, the Company, the Operating Subsidiaries and the Founders in this Agreement or pursuant hereto.

8.2     <u>Indemnification by the Sellers, the Company, the Operating Subsidiaries and the Founders</u>.  Subject to the terms and provisions of <u>Section 8.1</u>, the Sellers, the Company, the Operating Subsidiaries and the Founders (each an "<u>Indemnitor</u>") agree, jointly and severally, to

801393.10

indemnify and hold harmless the Purchaser, and its officers, directors, managers, members, partners, agents, Affiliates (excluding the Company and the Operating Subsidiaries after the Closing) and representatives (each a "Purchaser Indemnitee") from and against, and shall reimburse each Purchaser Indemnitee on demand for, any and all direct or indirect claims, suits, actions, proceedings, liabilities, obligations, judgments, fines, penalties, claims, losses, damages, diminution in value, lost profits, costs and expenses of any kind (including, without limitation, the reasonable fees and disbursements of counsel, accountants and other experts whether incurred in connection with any of the foregoing or in connection with any investigative, administrative or adjudicative proceeding, whether or not such Purchaser Indemnitee shall be designated a party thereto), together with any and all reasonable costs and expenses associated with the investigation of the same and/or the enforcement of the provisions hereof and thereof (collectively, "Losses"), which may be incurred by such Purchaser Indemnitee relating to, based upon, resulting from or arising out of:

(a)  the breach of any representation or warranty made by any of the Sellers, the Company, the Operating Subsidiaries or the Founders in this Agreement or in any Related Document as of the date hereof and as of the Closing Date;

(b)  the breach of any agreement, covenant or obligation of any of the Sellers, the Company, the Operating Subsidiaries or the Founders contained in this Agreement or in any Related Document;

(c)  the Excluded Liabilities;

(d)  any Liability incurred by the Sellers, the Company, the Operating Subsidiaries or the Founders to pay any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement;

(e)  any misrepresentation contained in any certificate or other document furnished by or on behalf of the Sellers, the Company, the Operating Subsidiaries or the Founders pursuant to this Agreement or in any Related Document or in connection with the transactions contemplated hereby or thereby or any other Losses arising out of or resulting from any fraud or intentional or willful misrepresentation;

(f)  the operation of the Business on or prior to the Closing Date, including any suit, action or other proceeding against the Company or the Operating Subsidiaries (not disclosed in the Schedules) brought by or on behalf of (i) any current or former (as of the Closing Date) employee, officer, director, agent, consultant or independent contractor of the Sellers or Telequick with respect to any act or omission by the Sellers or Telequick prior to the Closing or (ii) any Person as a result of a purported breach of contract or tort committed by the Sellers, the Company, the Operating Subsidiaries or the Founders prior to the Closing; or

(g)  the failure of the Sellers, the Company, the Operating Subsidiaries or the Founders to comply with any applicable bulk sales laws.

8.3  Conditions to and Limitations on Indemnification.  No party to this Agreement shall be entitled to indemnification pursuant to this Article 8 for breaches of representations and

warranties made hereunder unless a claim is submitted in writing by a Purchaser Indemnitee within the periods specified in Section 8.1 of this Agreement. Notwithstanding anything herein to the contrary, a Purchaser Indemnitee shall not be entitled to make a claim for indemnification under a "diminution in value" theory pursuant to Sections 8.2(a), (b) or (f) unless the Losses that are the subject of such claim result in (a) an actual loss of any portion of the Original Issue Price (as such term is defined in the Restated LLC Agreement) to the Purchaser, or (b) a material change in the condition (financial or otherwise) or results of operations of the Company, the Operating Subsidiaries or the Business such that the Company, Operating Subsidiaries or Business will not be able to meet its obligations under this Purchase Agreement or the Restated LLC Agreement executed even herewith.

8.4     Indemnity Threshold.  A Purchaser Indemnitee shall not be entitled to make any claims for indemnification payment pursuant to Section 8.2(a), until such time as the total amount of all Losses (including the Losses arising from such breach and all other Losses arising from any other breaches of any representations or warranties made by the Indemnitors in this Agreement) that have been suffered or incurred by any one or more of the Purchaser Indemnitees, or to which any one or more of the Purchaser Indemnitees has or have otherwise become subject, exceeds Four Hundred Thousand Dollars ($400,000).  Subject to the Indemnity Cap, if the total amount of such Losses exceeds Four Hundred Thousand Dollars ($400,000), the Purchaser Indemnitees shall be entitled to be indemnified against and compensated and reimbursed for all such Losses.

8.5     Indemnity Cap.  Notwithstanding anything in this Agreement to the contrary, the aggregate rights of Purchaser Indemnitees to indemnification payments pursuant to Section 8.2 shall be limited to, and shall not exceed the Purchase Price ("Indemnity Cap"); provided however, that the parties agree that the Indemnity Cap in this Section 8.5 shall not apply to any claim for Losses arising out of or relating to (a) any Excluded Liabilities, or (b) any fraud or willful or intentional misrepresentation by the Sellers, the Company, the Operating Subsidiaries or the Founders.

8.6     Claims for Indemnity.  Whenever a claim for Losses shall arise for which a Purchaser Indemnitee shall be entitled to indemnification hereunder, the Purchaser Indemnitee shall notify the Indemnitor in writing describing the claim and the basis therefor; provided however, that the failure to give notice shall not affect the right of the Purchaser Indemnitee to indemnification hereunder except to the extent (and only to the extent) that the Indemnitor is materially prejudiced by such failure.  The right of the Purchaser Indemnitee to indemnification, as set forth in such notice, shall be deemed agreed to by the Indemnitor unless, within thirty (30) calendar days after the mailing of such notice, the Indemnitor shall notify the Purchaser Indemnitee in writing that it disputes the right of the Purchaser Indemnitee to indemnification.  If the Purchaser Indemnitee shall be duly notified of such dispute, the parties shall attempt in good faith, for a period of thirty (30) calendar days, to settle and compromise such dispute.

8.7     Defense of Claims by Third Parties.  If any Purchaser Indemnitee shall receive notice of any third party claim, suit, arbitration or other legal proceeding giving rise to indemnity under this Agreement (a "Third Party Claim"), the Purchaser Indemnitee shall give the Indemnitor prompt written notice of the same; provided, however, that failure to provide such written notice shall not release the Indemnitor from any of its obligations under this Article 8,

except to the extent (and only to the extent) the Indemnitor is materially prejudiced by such failure. If such Third Party Claim seeks only recovery of a sum of money, the Indemnitor may, but shall not be obligated to, upon prompt written notice furnished to the Purchaser Indemnitee, assume the defense of any such claim, suit, arbitration or other proceeding, with counsel reasonably satisfactory to the Purchaser Indemnitee, if the Indemnitor acknowledges to the Purchaser Indemnitee in writing its obligations to indemnify the Purchaser Indemnitee with respect to all elements of such claim. If the Indemnitor furnishes such written acknowledgment, the Indemnitor will be entitled to assume and control the defense of such claim, suit, arbitration or other or proceeding, and the Purchaser Indemnitee shall be entitled to participate in (but not control) the defense of any such action, with its own counsel and at its own expense. The notice to the Indemnitor shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom. Neither the Indemnitor nor the Purchaser Indemnitee shall settle or compromise any claim by a third party without the prior written consent of the other party (which shall not be unreasonably withheld). If the Indemnitor does not assume the defense of any such claim, suit, arbitration or other proceeding as provided above, (a) the Purchaser Indemnitee may defend against the same, in such manner as it may deem appropriate and at the Indemnitor's cost and expense, including, without limitation, settling such matter; provided that such settlement shall be subject to the Indemnitor's prior written consent (which shall not be unreasonably withheld), and (b) the Indemnitor shall be entitled to participate in (but not control) the defense of such action, with its own counsel and at its own expense. Notwithstanding the foregoing, if a Purchaser Indemnitee determines in good faith that there is a reasonable probability that a Third-Party Claim may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the Purchaser Indemnitee may, by notice to the Indemnitor, assume the exclusive right to defend, compromise, or settle such Third-Party Claim, but the Indemnitor will not be bound by any compromise or settlement effected without its consent (which may not be unreasonably withheld).

### ARTICLE 9
### MISCELLANEOUS

9.1    Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; provided that no such succession, assignment or delegation of obligations by either the Sellers, the Company, the Operating Subsidiaries or any Founder, on the one hand, or Purchaser, on the other hand, may occur without the express written approval of the other party; provided further that Purchaser may (a) assign any or all of its rights and interests hereunder to one (1) or more of its Affiliates and (b) designate one (1) or more of its Affiliates to perform its obligations hereunder. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in Article 8 of this Agreement.

9.2    Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware.

9.3    Jurisdiction; Waiver of Jury Trial.

801393.10

. (a)     Any suit, action or proceeding seeking to enforce any provision of, or based on any dispute or matter arising out of or in connection with, this Agreement, the Related Documents or the transactions contemplated hereby or thereby, must be brought in the courts of the State of Delaware, in New Castle County, or the federal courts in the District of Delaware. Each of the parties (a) consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding, (b) irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum, (c) will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (d) will not bring any action relating to this Agreement, the Related Documents or any of the transactions contemplated hereby or thereby in any other court, and (e) to the fullest extent permitted by Law, voluntarily, knowingly, irrevocably and unconditionally waive any right to have a jury participate in the resolution of any such dispute or matter. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party in accordance with the notice provisions of Section 9.5 below will be deemed effective service of process on such party.

(b)     If the jury waiver set forth in this section is not enforceable, then any dispute, controversy or claim arising out of or relating to this Agreement or any of the transactions contemplated therein shall be settled by final and binding arbitration held in the County of New Castle, State of Delaware in accordance with the then applicable Commercial Arbitration Rules of the American Arbitration Association. Judgment upon any award resulting from arbitration may be entered into and enforced by any state or federal court having jurisdiction thereof.

9.4     Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

9.5     Notices. Any notices hereunder shall be deemed sufficiently given by one (1) party to another only if in writing and if and when delivered by personal delivery or as of five (5) Business Days after deposit in the United States mail in a sealed envelope, registered or certified, with postage prepaid, twenty-four (24) hours after deposit with an overnight courier if such day is a Business Day (or the next Business Day if it is not), or five (5) hours after confirmation of delivery by facsimile during business hours on a Business Day, addressed as follows (or at such other address or facsimile number for a party as shall be specified by like notice):

If to the Purchaser:          Kayne Sunstate Investors, LLC
                              1800 Avenue of the Stars, 2nd Floor
                              Los Angeles, California  90067
                              Attn:  Krishnan Ramaswami
                              Facsimile:  (310) 282-2852

801393.10

With a copy to (which shall not
constitute notice):

Downey Brand LLP
555 Capitol Mall, 10th Floor
Sacramento, CA 95814
Attn: Jeffrey M. Koewler, Esq.
Facsimile: (916) 444-2100

If to the Sellers, the Company, the
Founders, or the Operating Subsidiaries,
to the Sellers' Representative:

Mr. Bryon Wolf
8751 Ulmerton Road
Largo, Florida 33771
Attn: Chief Executive Officer
Facsimile: _____

With a copy to (which shall not
constitute notice):

Macfarlane, Ferguson & McMullen, P.A.
201 North Franklin Street, Suite 2000
Tampa, Florida 33602
Attn: Charles A. Moore, Esq.
Facsimile: (813) 273-4256

or to such other address as the party addressed shall have previously designated by written notice
to the serving party, given in accordance with this Section 9.5. Any party may unilaterally
change any one (1) or more of the addresses to which a notice to the party or its representative is
to be delivered or mailed, by ten (10) calendar days written notice to the other parties hereto
given in the manner stated above.

9.6    Sellers' Representative. The Sellers, the Company, the Operating Subsidiaries
and the Founders hereby appoint Wolf as the representative (the "Sellers' Representative") for
purposes of making and receiving notices. The Purchaser may, for all purposes of this
Agreement, assume and treat every notice directed to the Sellers' Representative as if such notice
had been directed to each of the Sellers, the Company, the Operating Subsidiaries and the
Founders.

9.7    Fees and Expenses. The Company shall bear and pay the Purchaser's costs and
expenses, including the costs and expenses of the Purchaser's counsel, accountants and other
advisors, relating to the transactions contemplated hereby and in the Related Documents;
provided, however, that the Purchaser agrees that its total fees and expenses shall not exceed
Two Hundred Fifty Thousand Dollars ($250,000).

9.8    Severability. If one (1) or more provisions of this Agreement is held to be
unenforceable under Applicable Law, such provision shall be excluded from this Agreement and
the balance of this Agreement shall be interpreted as if such provision were so excluded and shall
be enforceable in accordance with its terms.

9.9    Entire Agreement.  This Agreement and the Related Documents and the Exhibits and Schedules hereto and thereto constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and thereof and supersede all prior agreements, term sheets, letters, discussions and understandings of the parties in connection therewith.

9.10    Assurances.  Each party to this Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate this Agreement, whether before, concurrent with or after the consummation of the transactions contemplated hereby.  The Seller and the Founders shall cause the Company and, shall cause the Company to cause the Operating Subsidiaries, to perform all of its obligations hereunder.

9.11    Amendments and Waivers.  This Agreement may be amended only in writing with the prior approval of the Sellers, the Founders and the Purchaser.  Unless otherwise provided herein, any waiver hereunder may be granted only with the prior written approval of the Sellers, the Founders and the Purchaser.

*[The Remainder of this Page is Intentionally Left Blank – Signature Pages Follow]*

801393.10

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**"PURCHASER"**          KAYNE SUNSTATE INVESTORS, LLC,
a Delaware limited liability company

By: KAYNE ANDERSON PRIVATE INVESTORS II,
L.P., a Delaware limited partnership, Manager

By: _____
Name: Krishnan Ramaswami
Title:  Senior Managing Director

Address:    1800 Avenue of the Stars,
Second Floor
Los Angeles, California  90067
Attention:    Krishnan Ramaswami
Telephone:    (310) 282-2802
Facsimile:    (310) 282-2852

**"SELLERS"**          FTN PROMOTIONS, INC., a Florida corporation

By: _____
Name: Bryon Wolf
Title: President/CEO

Address:    8751 Ulmerton Rd.
Largo, FL 33771

Attention:    Donald Booth
Telephone:    (727) 471-0292
Facsimile:    (727) 471-0255

GUARDIAN MARKETING SERVICES, CORP., a
Florida corporation

By: _____
Name: Bryon Wolf
Title: President/CEO

Address:    8751 Ulmerton Rd.
Largo, FL 33771

Attention:    Donald Booth
Telephone:    (727) 471-0292
Facsimile:    (727) 471-0255

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

BAY PINES TRAVEL, INC., a Florida corporation

By: _____

Name: Bryon Wolf

Title: CEO

Address: 8751 Ulmerton Road
Largo, FL 33771

Attention: Donald Booth

Telephone: (727) 471-0292

Facsimile: (727) 471-0255

_____
Bryon Wolf

_____
Roy Eliasson

"COMPANY"

SUNSTATE HOLDINGS, LLC, a Delaware limited liability company

By: _____

Name: Bryon Wolf

Title: CEO

Address: 8751 Ulmerton Rd.
Largo, FL 23771

Attention: Donald Booth

Telephone: (727) 471-0292

Facsimile: (727) 471-0255

_____
Bryon Wolf

_____
Roy Eliasson

"FOUNDERS"

_____
Alfred Wolf

BAY PINES TRAVEL, INC., a Florida corporation

By:_____
    Name:
    Title:

    Address:     _____
               _____
               _____

    Attention:    _____
    Telephone:   _____
    Facsimile:    _____

_____
Bryon Wolf

_____
Roy Eliasson

**"COMPANY"**

SUNSTATE HOLDINGS, LLC, a Delaware limited liability company

By:_____
    Name:
    Title:

    Address:     _____
               _____
               _____

    Attention:    _____
    Telephone:   _____
    Facsimile:    _____

**"FOUNDERS"**

_____
Bryon Wolf

_____
Roy Eliasson

_____
Alfred Wolf

*[Signature Page to Interest Contribution and Preferred Unit Purchase Agreement]*

**"OPERATING SUBSIDIARIES"**

STRATEGIA MARKETING, LLC, a Florida limited liability company

By:_____
    Name: *Bryon Wolf*
    Title: CEO

    Address: 8751 Ulmerton Rd.
    Largo, FL 33771

    Attention: Donald Booth
    Telephone: (727) 471-0292
    Facsimile: (727) 471-0255

CO-COMPLIANCE, LLC, a Florida limited liability company

By:_____
    Name: *Bryon Wolf*
    Title: CEO

    Address: 8751 Ulmerton Rd.
    Largo, FL 33771

    Attention: Donald Booth
    Telephone: (727) 471-0292
    Facsimile: (727) 471-0255

TELEQUICK SYSTEMS, LLC, a Florida limited liability company

By:_____
    Name: *Bryon Wolf*
    Title: CEO

    Address: 8751 Ulmerton Rd.
    Largo, FL 33771

    Attention: Donald Booth
    Telephone: (727) 471-0292
    Facsimile: (727) 471-0255

# EXHIBIT B

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) Civ. No. 8:07-cv-1279-T-30TGW |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FTN PROMOTIONS, INC., a Florida | ) |
| corporation, dba Suntasia Inc., Suntasia | ) |
| Marketing, Inc., and Capital Vacations, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## <u>PRELIMINARY INJUNCTION ORDER</u>

In furtherance of this Court's Order (Dkt. #178) entered on January 15, 2008, the Court hereby enters this Preliminary Injunction Order.

The Court, having granted Plaintiff Federal Trade Commission's *Ex Parte* Motion for a Temporary Restraining Order with Asset Freeze and the Appointment of a Receiver; having entered an Order to Show Cause Why a Preliminary Injunction Should Not Issue; and having considered the submissions of the parties, and now being otherwise advised fully of the premises, hereby finds that:

1.     This Court has jurisdiction over the subject matter of this case and there is good cause to believe it will have jurisdiction over the parties;

2.     There is good cause to believe that FTN Promotions, Inc., dba Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services, Corp., dba

Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance, LLC; JPW Consultants, Inc., dba Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC, dba Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct, and Lucid Long Distance; Agent's Travel Network Inc., dba Florida Passport; Bay Pines Travel, Inc.; Suntasia Properties, Inc.; Bryon W. Wolf; Roy A. Eliasson; and John Louis Smith II (herein collectively referred to as "Defendants") have engaged in, and are likely to engage in the future in, acts and practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as well as various provisions of the Telemarketing Sales Rule, 16 C.F.R. Part 310, and that the Commission is therefore likely to prevail on the merits of this action;

3.     There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for Consumers in the form of monetary restitution will occur from the sale, transfer, or other disposition or concealment by Defendants of their Assets or corporate records unless Defendants are immediately restrained and enjoined by Order of this Court;

4.     Weighing the equities and considering Plaintiff's likelihood of ultimate success, a preliminary injunction order with asset freeze and other equitable relief is in the public interest; and

5.     No security is required of any agency of the United States for issuance of a restraining order. Fed. R. Civ. P. 65(c).

## DEFINITIONS

For purposes of this Preliminary Injunction ("Order"), the following definitions shall apply:

1.     **"Asset" or "Assets"** means any legal or equitable interest in, right to, or claim to, any real or personal property, including, but not limited to, "goods," "instruments," "equipment," "fixtures," "general intangibles," "inventory," "checks," or "notes," (as these terms are defined in the Uniform Commercial Code), lines of credit, chattels, leaseholds, contracts, mail or other deliveries, shares of stock, lists of Consumer names, accounts, credits, premises, receivables, funds, and all cash, wherever located.

2.     **"Assisting others"** means providing any of the following goods or services to any person or entity engaged in telemarketing, including, but not limited to: (a) providing for or arranging for the provision of mail or telephone lists that contain, incorporate, or utilize consumers' account numbers; (b) preparing or providing, or causing to be prepared or provided, telephone sales scripts or other materials for use in connection with the promotion of products or services to consumers; (c) providing, mailing or shipping, or arranging for the provision, mailing, or shipping, of fulfillment products or services; (d) providing or arranging for the provision of telemarketing services; (e) providing or facilitating the means of obtaining payment from consumers, by providing or facilitating access to the credit card or bank account payment and collection system; (f) performing or providing marketing services of any kind; (g) developing, providing, or arranging for the provision of names of potential customers; (h) providing or arranging for the provision of post office boxes or the

3

services of commercial receiving agencies; (I) preparing, printing, or transmitting invoices; (j) recording or verifying sales solicitations; and (k) performing customer service functions, including, but not limited to, receiving or responding to consumer complaints, obtaining or receiving identifying and financial information from consumers, and communicating with consumers on behalf of the seller or telemarketer.

3.    **"Consumer"** means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

4.    **"Defendant" or "Defendants"** means FTN Promotions, Inc., dba Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services, Corp., dba Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance, LLC; JPW Consultants, Inc., dba Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC, dba Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct, and Lucid Long Distance; Agent's Travel Network Inc., dba Florida Passport; Bay Pines Travel, Inc.; Suntasia Properties, Inc.; Bryon W. Wolf; Roy A. Eliasson; and John Louis Smith II, and by whatever other names each may be known, and any subsidiaries, affiliates, and any fictitious business entities or business names created or used by these entities, or any of them.

5.    **"Document" or "Documents"** means any materials listed in Federal Rule of Civil Procedure 34(a) and includes writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations from which information can be obtained and translated, if necessary, into reasonably usable form through detection

4

devices. A draft or nonidentical copy is a separate Document within the meaning of the term.

6. **"Financial Institution"** means any bank, savings and loan institution, credit union, or any financial depository of any kind, including, but not limited to, any brokerage house, trustee, broker-dealer, escrow agent, title company, commodity trading company, or precious metal dealer.

7. **"Material"** means likely to affect a person's choice of, or conduct regarding, goods or services.

8. **"Person"** means a natural person, an organization or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

9. **"Plaintiff"** means the Federal Trade Commission ("Commission" or "FTC").

10. **"Receivership Defendants"** means FTN Promotions, Inc., dba Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services, Corp., dba Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance, LLC; JPW Consultants, Inc., dba Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC, dba Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct, and Lucid Long Distance; Agent's Travel Network Inc., dba Florida Passport; Bay Pines Travel, Inc.; and Suntasia Properties, Inc.

# I.

## PROHIBITED BUSINESS ACTIVITIES

**IT IS THEREFORE ORDERED** that in connection with the advertising, promoting, offering for sale, or sale of any product or service, Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, are hereby restrained and enjoined from:

A.     Misrepresenting, either orally or in writing, expressly or by implication, that:

    1.     Defendants are calling from, on behalf of, or are otherwise affiliated with the Consumer's bank or other third party with whom the Consumer has conducted business;

    2.     Defendants already have the Consumer's bank routing and account numbers;

    3.     Consumers will have a designated period of time in which to review Defendants' program before incurring any charges;

    4.     Defendants' free trial period will not begin to run until Consumers have received Defendants' informational material in the mail;

    5.     Defendants will honor Consumers' requests to cancel their

6

participation in Defendants' programs;

6.      Consumers will be able to easily cancel their participation in Defendants' programs; and

7.      Consumers are entitled to keep and to use the gas coupons, airline savings vouchers, or "two free nights of hotel accommodations" even if they cancel Defendants' program.

B.      Failing to disclose, or disclose adequately, Material terms and conditions of any offer of any good or service, including, but not limited to:

1.      The fact that the Consumer's account will be charged unless the Consumer takes affirmative action to avoid the charge;

2.      That Consumers' checking account information will be used to debit their bank accounts to pay for Defendants' programs;

3.      The cost of Defendants' programs;

4.      The dates the charges to Consumers' checking accounts will be submitted for payment;

5.      The dates that a free trial period begins and ends;

6.      the specific steps Consumers must take in order to cancel Defendants' programs, including that Consumers must cancel each of Defendants' programs by calling a separate telephone number; and

7.      Any limitations and restrictions on the use of free gifts that Defendants offer to Consumers as an inducement to convince them to agree to

7

review one of Defendants' programs.

C.  Debiting a Consumer's bank account, or otherwise assessing charges to a Consumer, without first obtaining express informed consent from the Consumer for the charges;

D.  Assisting others who violate any provision of Paragraphs A, B or C of this Section.

E.  Violating, or assisting others in violating, any provision of the Telemarketing Sales Rule, 16 C.F.R. Part 310, including, but not limited to:

    1.  Section 310.3(a)(2)(vii) of the TSR, 16 C.F.R. § 310.3(a)(2)(vii), by misrepresenting, expressly or by implication, that Defendants are calling from, on behalf of, or are otherwise affiliated with the Consumer's bank or some other third party with whom the Consumer has conducted business;

    2.  Section 310.3(a)(1)(vii) of the TSR, 16 C.F.R. § 310.3(a)(1)(vii), by failing to disclose truthfully, in a clear and conspicuous manner, before a Consumer pays for the goods or services offered, all Material terms and conditions of the negative option feature, including, but not limited to, the following: (1) the fact that the Consumer's account will be charged unless the Consumer takes affirmative action to avoid the charge; (2) the date(s) the charge(s) will be submitted for payment; and (3) the specific steps the Consumer must take to avoid the

charge(s);

3.    Section 310.3(a)(2)(iv) of the TSR, 16 C.F.R. § 310.3(a)(2)(iv), by

misrepresenting, directly or by implication, a Material aspect of the

nature or terms of Defendants' cancellation policy, including that:

    a.    Consumers will have a designated period of time in

which to review and to cancel Defendants' programs

before incurring any charges;

    b.    The free trial period will not begin until Consumers

have received Defendants' informational material in the

mail;

    c.    Defendants will honor Consumers' requests to cancel

their participation in Defendants' programs;

    d.    Consumers will be able to easily cancel their

participation in Defendants' programs; and

    e.    Consumers are entitled to keep and to use the gas

coupons, airline savings vouchers, or "two free nights

of hotel accommodations" even if they cancel

Defendants' program;

4.    Section 310.4(d)(2) and (3) of the TSR, 16 C.F.R. § 310.4(d)(2) and

(3), by failing to disclose promptly, and in a clear and conspicuous

manner, that the purpose of Defendants' call is to sell goods or

9

services and the nature of the goods or services;

5.     Section 310.3(a)(3) of the TSR, 16 C.F.R. § 310.3(a)(3), by causing a Consumer's billing information to be submitted for payment without the Consumer's express verifiable authorization;

6.     Section 310.4(a)(6) of the TSR, 16 C.F.R. § 310.4(a)(6), by causing a Consumer's billing information to be submitted for payment without the Consumer's express informed consent; and

7.     Section 310.4(a)(5) of the TSR, 16 C.F.R. § 310.4(a)(5), by receiving, for consideration, unencrypted Consumer account numbers for use in telemarketing.

## II.

### MAINTAIN RECORDS AND REPORT NEW BUSINESS ACTIVITY

**IT IS FURTHER ORDERED** that Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, are hereby restrained and enjoined from:

A.     Failing to create and maintain books, records, accounts, bank statements, current accountants' reports, general ledgers, general journals, cash receipt ledgers, cash disbursements ledgers and source Documents, Documents indicating title to real or personal

property, and any other data which, in reasonable detail, accurately, fairly, and completely reflect the incomes, disbursements, transactions, dispositions, and uses of the Defendants' Assets;

B.    Destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any Documents, including electronically-stored materials, that relate in any way to the business practices or business or personal finances of Defendants; to the business practices or finances of entities directly or indirectly under the control of Defendants; or to the business practices or finances of entities directly or indirectly under common control with any other Defendant; and

C.    Creating, operating, or exercising any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing Plaintiff with a written statement disclosing: (1) the name of the business entity; (2) the address and telephone number of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

## III.

## ASSET FREEZE

IT IS FURTHER ORDERED that Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active

11

concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, except as provided herein, as stipulated by the parties, or as directed by further order of the Court, are hereby restrained and enjoined until further order of this Court, from:

A.     Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, or other Assets, or any interest therein, wherever located, including any Assets outside the territorial United States, that are: (1) owned, controlled, or held by, or for the benefit of, in whole or in part, any Defendant; or (2) in the actual or constructive possession of any Defendant, including, but not limited to, any Assets held for or by any Defendant in any account at any bank or savings and loan institution, or any credit card processing agent or agent providing electronic funds transfer services or automated clearing house processing, bank debit processing agent, network transaction processor, customer service agent, commercial mail receiving agency, or mail holding or forwarding company, or any credit union, retirement fund custodian, money market or mutual fund, storage company, trustee, or with any broker-dealer, escrow agent, title company, commodity trading company, precious metal dealer, or other Financial Institution or depository of any kind, either within or outside the United States;

B.     Opening, or causing to be opened, any safe deposit boxes, commercial mail

12

boxes, or storage facilities titled in the name of, or for the use or benefit of, any Defendant, or subject to access by any Defendant, or under the control of any Defendant, without providing Plaintiff prior notice and an opportunity to inspect the contents in order to determine that they contain no Assets covered by this Section;

C.     Incurring charges or cash advances on any credit card issued in the name, singly or jointly, of any Defendant; and

D.     Incurring liens or other encumbrances on real property, personal property or other Assets titled in the name, singly or jointly, of any Defendant.

Notwithstanding the Asset freeze provisions of Sections III.A-D above, and subject to prior written agreement with the Commission, Defendants Bryon W. Wolf, Roy A. Eliasson, and John Louis Smith II may, upon compliance with Section VI (Financial Statements and Accounting), *infra*, pay from their individual personal funds reasonable, usual, ordinary, and necessary living expenses.

The Assets affected by this Section shall include both existing Assets and Assets acquired after the effective date of this Order.

## IV.

### PROHIBITION ON DISCLOSING CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants, their agents, servants, and employees, and those Persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any entity, corporation, subsidiary, division, affiliate, or other device, are hereby restrained and

enjoined from:

A.     Selling, renting, leasing, transferring, or otherwise disclosing the name, address, birth date, telephone number, email address, Social Security number, credit card number, bank account number, or other financial or identifying personal information of any Person from whom or about whom any Defendant obtained such information in connection with activities alleged in the FTC's Complaint;

B.     Benefitting from or using the name, address, birth date, telephone number, email address, Social Security number, credit card number, bank account number, or other financial or identifying personal information of any Person from whom or about whom any Defendant obtained such information in connection with activities alleged in the FTC's Complaint.

*Provided, however*, that Defendants may disclose such financial or identifying personal information to a law enforcement agency or as required by any law, regulation, or court order.

## V.

### DUTIES OF THIRD PARTIES

**IT IS FURTHER ORDERED** that each Person, Financial Institution, or other entity maintaining or having custody or control of any Asset of any Defendant, or that at any time since January 1, 2003, has maintained or had custody of any such Asset, and which is provided with a copy of this Order, or otherwise has actual or constructive knowledge of this Order, shall:

14

A.     Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, liquidation or other disposal of any of the Assets or other property held by, under its control, or on behalf of any Defendant in any account maintained in the name of, or for the benefit or use of, any Defendant, in whole or in part, except as directed by further order of this Court, or by written agreement of Plaintiff and the parties claiming an interest in such account or Asset;

B.     Deny Defendants access to any safe deposit boxes, commercial mail boxes or storage facilities that are titled in the name, individually or jointly, of any Defendant, or otherwise subject to access by any Defendant;

C.     Within five (5) business days of the date of notice of this Order, provide to counsel for Plaintiff a certified statement setting forth:

      1.     The identification of each account or Asset titled in the name, individually or jointly, of any Defendant, or to which any Defendant is a signatory, or which is held on behalf of, or for the benefit or use of, any Defendant or subject to any Defendant's control, including all trust accounts on behalf of any Defendant or subject to any Defendant's control;

      2.     The balance of each such account, or a description and appraisal of the value of such Asset, as of the close of business on the day on which notice of this Order is received, and, if the account or other Asset has

15

been closed or removed, or more than $1,000 withdrawn or transferred from it within the last ninety (90) days, the date of the closure or removal of funds, the total funds removed or transferred, and the name and account number of the Person or entity to whom such account, funds, or other Asset was remitted; and

3.    The identification and location of any safe deposit box, commercial mail box, or storage facility that is either titled in the name, individually or jointly, of any Defendant, or is otherwise subject to access or control by any Defendant.

D.    Allow representatives of Plaintiff immediate access to inspect and copy, or upon Plaintiff's request, within five (5) days of said request, provide Plaintiff's representatives with copies of, any records or other Documents pertaining to any such account or Asset, including, but not limited to, originals or copies of account applications, corporate resolutions, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

The Assets affected by this Section shall include both existing Assets and Assets acquired after the effective date of this Order.

16

## VI.

### FINANCIAL STATEMENTS AND ACCOUNTING

**IT IS FURTHER ORDERED** that, if they have not done so already in compliance with the temporary restraining order previously issued in this matter, each Defendant shall serve upon counsel for the Commission, no later than three (3) business days after service of this Order, a completed financial statement accurate as of the date of entry of this Order, in the form provided by Attachments A (for individuals) and B (for businesses) to the *Ex Parte* Temporary Restraining Order With Asset Freeze and the Appointment of Temporary Receiver ("TRO"), signed under penalty of perjury.

The financial statements shall include Assets held outside the territory of the United States, shall be accurate as of the date of the entry of this Order, and shall be verified under oath. Defendants shall attach to these completed financial statements copies of all local, state, provincial, and federal income and property tax returns, with attachments and schedules, as called for by the instructions to the financial statements.

### VII.

### PERMANENT RECEIVER

**A.    APPOINTMENT OF PERMANENT RECEIVER**

**IT IS FURTHER ORDERED** that Robb Evans & Associates LLC is appointed Permanent Equity Receiver ("Receiver") for **FTN Promotions, Inc., dba Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services, Corp., dba Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance, LLC; JPW**

17

**Consultants, Inc., dba Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC, dba Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct, and Lucid Long Distance; Agent's Travel Network Inc., dba Florida Passport; Bay Pines Travel, Inc.; Suntasia Properties, Inc.**, and any of their affiliates, subsidiaries, divisions, or telephone sales operations, wherever located, with the full power of an equity receiver. The Receiver shall be the agent of this Court and solely the agent of this Court in acting as Receiver under this Order. The Receiver shall be accountable directly to this Court. The Receiver shall comply with all Local Rules of this Court governing receivers.

**B.    RECEIVERSHIP DUTIES**

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:

1.    Assume full control of the Receivership Defendants by removing, as the Receiver deems necessary or advisable, any director, officer, employee, independent contractor, or agent of the Receivership Defendants, including any Defendant, from control of, management of, or participation in, the affairs of the Receivership Defendants;

2.    Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, the Receivership Defendants, wherever situated. The Receiver shall have full power to divert mail and to sue for, collect, receive, take in possession, hold, and manage all Assets and Documents of the Receivership Defendants and other Persons or entities whose interests are now held by or under the

18

direction, possession, custody, or control of the Receivership Defendants.    Provided, however, that the Receiver shall not attempt to collect any amount from a Consumer or to allow any Receivership Defendant to continue to debit monthly charges from a Consumer's account, if the Receiver believes the Consumer was a victim of the unfair or deceptive acts or practices alleged in the Complaint in this matter;

       3.     Use any means necessary to take possession of and to secure all areas of the business premises of the Receivership Defendants.    Such steps may include, but are not limited to, the following as the Receiver deems necessary or advisable:    (1) serving this Order; (2) completing a written inventory of all receivership Assets; (3) obtaining pertinent information from all employees and other agents of the Receivership Defendants, including, but not limited to, the name, home address, social security number, job description, method of compensation, and all accrued and unpaid commissions and compensation of each such employee or agent; (4) videotaping all portions of the locations; (5) securing the locations by changing the locks and disconnecting any computer modems or other means of access to the computer or other records maintained at the locations; (6) requiring any persons present on the premises at the time this Order is served to leave the premises, to provide the Receiver with proof of identification, or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises Documents or Assets of the Receivership Defendants; and/or (7) employ the assistance of law enforcement officers as the Receiver deems necessary to implement the provisions of this Order;

       4.     Conserve, hold, and manage all receivership Assets, and perform all acts

necessary or advisable to preserve the value of those Assets, in order to prevent any irreparable loss, damage, or injury to Consumers or to creditors of the Receivership Defendants, including, but not limited to, obtaining an accounting of the Assets and preventing transfer, withdrawal, or misapplication of Assets, and including the authority to liquidate or close out any open securities or commodity futures positions of the Receivership Defendants;

5.    Enter into contracts and purchase insurance as advisable or necessary;

6.    Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of Consumers and creditors who have transacted business with the Receivership Defendants;

7.    Manage and administer the business of the Receivership Defendants until further order of this Court by performing all incidental acts that the Receiver deems to be advisable or necessary, which includes retaining, hiring, or dismissing any employees, independent contractors, or agents;

8.    Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

9.    Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order.  The Receiver shall apply to the Court for prior approval of any payment of

any debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Defendants, such as rental payments;

10.     Determine and implement the manner in which the Receivership Defendants will comply with, and prevent violations of, this Order and all other applicable laws;

11.     Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

12.     Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Receiver in his role as Receiver, or against the Receivership Defendants that the Receiver deems necessary and advisable to preserve the Assets of the Receivership Defendants or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

13.     Continue and conduct the business of the Receivership Defendants in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; provided, however, that the continuation and conduct of the business shall be conditioned upon the Receiver's good faith determination that the business can be lawfully operated at a profit using the Assets of the receivership estate;

21

14.    Issue subpoenas to obtain Documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate;

15.    Open one or more bank accounts in the Middle District of Florida as designated depositories for funds of the Receivership Defendants.  The Receiver shall deposit all funds of the Receivership Defendants in such a designated account and shall make all payments and disbursements from the receivership estate from such an account;

16.    Maintain accurate records of all receipts and expenditures that he or she makes as Receiver;

17.    Cooperate with reasonable requests for information or assistance from any state or federal law enforcement agency; and

18.    File reports with the Court on a timely and reasonable basis.

## C.    COOPERATION WITH THE RECEIVER

**IT IS FURTHER ORDERED** that:

1.    Defendants and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, shall fully cooperate with and assist the Receiver.  This cooperation and assistance shall include, but not be limited to:

a.    Providing any information to the Receiver that the Receiver deems

necessary to exercising the authority and discharging the
responsibilities of the Receiver under this Order;

b.    Providing any password required to access any computer,
electronic file, or telephonic data in any medium; or

c.    Advising all Persons who owe money to the Receivership
Defendants that all debts should be paid directly to the Receiver.

2.    Defendants and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division, or other device, or any of them, are hereby restrained and enjoined from directly or indirectly:

a.    Transacting any of the business of the Receivership Defendants;

b.    Destroying, secreting, defacing, transferring, or otherwise altering
or disposing of any Documents of the Receivership Defendants,
including, but not limited to, books, records, accounts, writings,
drawings, graphs, charts, photographs, audio and video recordings,
computer records, and other data compilations, electronically-
stored records, or any other records of any kind or nature;

c.    Transferring, receiving, altering, selling, encumbering, pledging,
assigning, liquidating, or otherwise disposing of any Assets owned,

23

controlled, or in the possession or custody of, or in which an

interest is held or claimed by, the Receivership Defendants, or the

Receiver;

d.    Excusing debts owed to the Receivership Defendants;

e.    Failing to notify the Receiver of any Asset, including accounts, of

the Receivership Defendants held in any name other than the name

of the Receivership Defendants, or by any Person or entity other

than the Receivership Defendants, or failing to provide any

assistance or information requested by the Receiver in connection

with obtaining possession, custody, or control of such Assets;

f.    Doing any act or refraining from any act whatsoever to interfere

with the Receiver's taking custody, control, possession, or

managing of the Assets or Documents subject to this receivership;

or to harass or interfere with the Receiver in any way; or to

interfere in any manner with the exclusive jurisdiction of this Court

over the Assets or Documents of the Receivership Defendants; or

to refuse to cooperate with the Receiver or the Receiver's duly

authorized agents in the exercise of their duties or authority under

any Order of this Court; or

g.    Filing, or causing to be filed, any petition on behalf of any of the

Receivership Defendants for relief under the United States Bankruptcy

24

Code, 11 U.S.C. § 101 *et seq.*, without prior permission from this Court.

**D.    DELIVERY OF RECEIVERSHIP PROPERTY**

**IT IS FURTHER ORDERED** that:

1.    Immediately upon service of this Order upon them, or within such period as may be permitted by the Receiver, Defendants or any other Person or entity shall transfer or deliver possession, custody, and control of the following to the Receiver:

a.    All Assets of the Receivership Defendants, including Assets subject to repatriation pursuant to Section VIII, *infra*;

b.    All Documents of the Receivership Defendants, including, but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

c.    All Assets belonging to members of the public now held by the Receivership Defendants; and

d.    All keys, codes, and passwords necessary to gain or to secure access to any Assets or Documents of the Receivership Defendants, including, but not limited to, access to their business premises, means of communication, accounts, computer systems, mail boxes, or other property.  This includes providing the necessary means to gain access

25

to at least the following commercial mail boxes:

1.    10500 Ulmerton Road, Suite 726-302
      Largo, FL 33771;

2.    13785 Walsingham Road, Suite 113
      Largo, FL 33774;

3.    10460 Roosevelt Boulevard North, Suite 312
      St. Petersburg, FL 33716;

4.    13799 Park Boulevard, Suite 312
      Seminole, FL 33776;

5.    6822 22nd Avenue North, Suites 432, and PMB 303
      St. Petersburg, FL 33710;

6.    3993 Tyrone Boulevard, Suite 608-182
      St. Petersburg, FL 33709;

7.    11125 Park Boulevard, Suites 104-364, and 331
      Seminole, FL 33772;

8.    2655 Ulmerton Road, Suite 407
      Clearwater, FL 33762;

9.    10500 Ulmerton Road, Suite 726-305
      Largo, FL 33771;

10.   3993 Tyrone Boulevard, Suite 608-149
      St. Petersburg, FL 33709;

11.   200 2nd Avenue South, Suite 413
      St. Petersburg, FL 33701;

12.   6860 Gulfport Boulevard, Suite 148
      South Pasadena, FL 33707; and

13.   4604 49th Street, Suite 64
      St. Petersburg, FL 33709.

2.    In the event any Person or entity fails to deliver or transfer any Asset or

26

otherwise fails to comply with any provision of this Section, the Receiver may file *ex parte*
an Affidavit of Non-Compliance regarding the failure. Upon filing of the affidavit, the Court
may authorize, without additional process or demand, Writs of Possession or Sequestration
or other equitable writs requested by the Receiver. The writs shall authorize and direct the
United States Marshal or any sheriff or deputy sheriff of any county, or any other federal or
state law enforcement officer, to seize the Asset, Document, or other thing and to deliver it to
the Receiver.

E.    **TRANSFER OF FUNDS TO THE RECEIVER**

**IT IS FURTHER ORDERED** that, upon service of a copy of this Order, all banks,
savings and loan associations, credit unions, depository institutions, finance companies,
commercial lending companies, credit card processing agents or agents providing electronic
funds transfer services or automated clearing house processing, brokerage houses, escrow
agents, money market or mutual funds, title companies, commodity futures merchants,
commodity trading companies, precious metal dealers, trustees, or other Financial
Institutions or depositories of any kind, shall cooperate with all reasonable requests of the
Receiver relating to implementation of this Order, including transferring funds at his or her
direction and producing records related to the Assets of the Receivership Defendants.

F.    **STAY OF ACTIONS**

**IT IS FURTHER ORDERED** that:

1.    Except by leave of this Court, during pendency of the receivership ordered
herein, Defendants and all other Persons and entities be and hereby are stayed from taking

any action to establish or enforce any claim, right, or interest for, against, on behalf of, in, or in the name of, the Receivership Defendants, any of their subsidiaries, affiliates, partnerships, Assets, Documents, or the Receiver or the Receiver's duly authorized agents acting in their capacities as such, including, but not limited to, the following actions:

    a.    Commencing, prosecuting, continuing, entering, or enforcing any suit or proceeding, except that such actions may be filed to toll any applicable statute of limitations;

    b.    Accelerating the due date of any obligation or claimed obligation; filing, perfecting or enforcing any lien; taking or attempting to take possession, custody, or control of any Asset; attempting to foreclose, forfeit, alter, or terminate any interest in any Asset, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise, or setoff of any debt owing to the Receivership Defendants that arose before the date of this Order against any claim against the Receivership Defendants;

    c.    Executing, issuing, serving, or causing the execution, issuance or service of, any legal process, including, but not limited to, attachments, garnishments, subpoenas, writs of replevin, writs of execution, or any other form of process whether specified in this Order or not; or

    d.    Doing any act or thing whatsoever to interfere with the Receiver

taking custody, control, possession, or management of the Assets or Documents subject to this receivership, or to harass or interfere with the Receiver in any way, or to interfere in any manner with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Defendants.

2.    This Order does not stay:

    a.    The commencement or continuation of a criminal action or proceeding;

    b.    The commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or

    c.    The enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

3.    Except as otherwise provided in this Order, all Persons and entities in need of documentation from the Receiver shall in all instances first attempt to secure such information by submitting a formal written request to the Receiver, and, if such request has not been responded to within thirty (30) days of receipt by the Receiver, any such Person or entity may thereafter seek an Order of this Court with regard to the relief requested.

G.    **COMPENSATION OF RECEIVER**

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by or in the possession or control of or which may be received by the Receivership Defendants. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

H.    **RECEIVER'S BOND**

**IT IS FURTHER ORDERED** that the Receiver, if it has not already done so, shall file with the Clerk of this Court a bond in the sum of $50,000 with sureties to be approved by the Court, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs.

I.    **ACCESS TO DEFENDANTS' BUSINESS PREMISES**

**IT IS FURTHER ORDERED** that Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, corporations, subsidiaries, affiliates, successors, and assigns, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary,

30

division, or other device, or any of them, and the Receiver, shall allow the Commission's representatives, agents, and assistants, as well as Defendants' representatives, and Defendants themselves, reasonable access to the premises of the Receivership Defendants, or any other premises where the Receivership Defendants conduct business or telephone sales operations. The purpose of this access shall be to inspect and copy any and all books, records, Documents, accounts, and other property owned by or in the possession of the Receivership Defendants or their agents. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access. The Commission may remove materials from the Defendants' business premises to inspect, inventory, and copy such materials. The Commission shall return materials so removed within five (5) business days of completing said inventory and copying.

**VIII.**

**REPATRIATION OF ASSETS AND DOCUMENTS
LOCATED IN FOREIGN COUNTRIES**

**IT IS FURTHER ORDERED** that Defendants shall:

A.      Within three (3) business days following service of this Order, take such steps as are necessary to repatriate to the territory of the United States of America all Documents and Assets that are located outside such territory and are held by or for Defendants or are under Defendants' direct or indirect control, jointly, severally, or individually;

B.      Within three (3) business days following service of this Order, provide Plaintiff with a full accounting of all Documents and Assets that are located outside of the territory of the United States of America or that have been transferred to the territory of the

31

United States pursuant to Subsection A above and are held by or for any Defendant or are under any Defendant's direct or indirect control, jointly, severally, or individually, including the addresses and names of any foreign or domestic Financial Institution or other entity holding the Documents and Assets, along with the account numbers and balances;

C.      Hold and retain all such Documents and Assets and prevent any transfer, disposition, or dissipation whatsoever of any such Documents or Assets; and

D.      Within three (3) business days following service of this Order, provide Plaintiff access to Defendants' records and Documents held by Financial Institutions or other entities outside the territorial United States, by signing and delivering to Plaintiff's counsel the Consent to Release of Financial Records attached to the TRO as Attachment C.

## IX.

### EXPEDITED DISCOVERY

**IT IS FURTHER ORDERED** that pursuant to Federal Rules of Civil Procedure 30(a), 31(a), 34, and 45, and notwithstanding the provisions of Federal Rules of Civil Procedure 26(d) and (f), 30(a)(2)(A)-(C), and 31(a)(2)(A)-(C), Plaintiff is granted leave, at any time after service of this Order to:

A.      Take the deposition of any Person or entity, whether or not a party, for the purpose of discovering the nature, location, status, and extent of the Assets of Defendants, and Defendants' affiliates and subsidiaries; the nature and location of Documents reflecting the business transactions of Defendants, and Defendants' affiliates and subsidiaries; the location of any premises where Defendants, directly or through any third party, conduct

business operations; the Defendants' whereabouts; and/or the applicability of any evidentiary privileges to this action; and

      B.    Demand the production of Documents from any Person or entity, whether or not a party, relating to the nature, status, and extent of the Assets of Defendants, and Defendants' affiliates and subsidiaries; the nature and location of Documents reflecting the business transactions of Defendants, and Defendants' affiliates and subsidiaries; the location of any premises where Defendants, directly or through any third party, conduct business operations; the Defendants' whereabouts; and/or the applicability of any evidentiary privileges to this action.

      Three (3) days notice shall be deemed sufficient for any such deposition, five (5) days notice shall be deemed sufficient for the production of any such Documents, and twenty-four (24) hours notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only as electronic data. The provisions of this Section shall apply both to parties to this case and to non-parties. The limitations and conditions set forth in Federal Rules of Civil Procedure 30(a)(2)(B) and 31(a)(2)(B) regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Section. Any such depositions taken pursuant to this Section shall not be counted toward any limit on the number of depositions under the Federal Rules of Civil Procedure or the Local Rules of Civil Procedure for the United States District Court for the Middle District of Florida, including those set forth in Federal Rules of Civil Procedure 30(a)(2)(A) and 31(a)(2)(A). Service of discovery upon a party, taken pursuant to this Section, shall be sufficient if made

through the means described in Section XI of this Order.

## X.

### DISTRIBUTION OF ORDER BY DEFENDANTS

**IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this Order to each of their corporations, subsidiaries, affiliates, divisions, directors, officers, agents, partners, successors, assigns, employees, attorneys, agents, representatives, sales entities, sales persons, telemarketers, independent contractors, and any other Persons in active concert of participation with them. Within five (5) calendar days following service of this Order by Plaintiff, each Defendant shall file with this Court and serve on Plaintiff, an affidavit identifying the names, titles, addresses, and telephone numbers of the Persons and entities Defendants have served with a copy of this Order in compliance with this provision.

## XI.

### SERVICE OF THIS ORDER

**IT IS FURTHER ORDERED** that copies of this Order may be distributed by U.S. first class mail, overnight delivery, facsimile, electronic mail, or personally, by agents or employees of Plaintiff, by agents or employees of the Receiver, by any law enforcement agency, or by private process server, upon any Person, Financial Institution, or other entity that may have possession or control of any property, property right, Document, or Asset of any Defendant, or that may be subject to any provision of this Order. Service upon any branch or office of any Financial Institution or entity shall effect service upon the entire Financial Institution or entity.

## XII.

### CONSUMER REPORTING AGENCIES

**IT IS FURTHER ORDERED** that, pursuant to Section 604 of the Fair Credit Reporting Act, 15 U.S.C. § 1681b, any consumer reporting agency may furnish a consumer or credit report concerning any Defendant to Plaintiff.

## XIII.

### JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

**DONE** and **ORDERED** in Tampa, Florida on February 11, 2008.

JAMES S. MOODY, JR.
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:
Counsel/Parties of Record

S:\Odd\2007\07-cv-1279.prelim inj order.wpd

35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| KAYNE SUNSTATE INVESTORS, LLC<br>A Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>ROY ELIASSON, BRYON WOLF, and<br>ALFRED WOLF,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 1:08-CV-00141 (SLR)<br>)<br>)<br>)<br>)<br>)<br>) |

## **ORDER**

AND NOW, this _____ day of _____, 2008, upon

consideration of Defendants' Motion to Stay this Action in Favor of the Related Action

Currently Pending in Florida or, Alternatively, to Dismiss ("Defendants' Motion"), and

Plaintiff's opposition thereto,

IT IS HEREBY ORDERED that Defendants' Motion is DENIED.


_____
The Honorable Sue L. Robinson